IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. 25-2249 |
| | ) | |
| Plaintiff-Appellee, | ) | Appeal from the United States |
| | ) | District Court for the |
| v. | ) | Northern District of Illinois, |
| | ) | Eastern Division |
| MICHAEL J. MADIGAN, | ) | |
| | ) | No. 22 CR 115-1 |
| Defendant-Appellant. | ) | Honorable John R. Blakey |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO
DEFENDANT-APPELLANT'S MOTION FOR
RELEASE PENDING APPEAL**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................iii

I.    INTRODUCTION ..................................................................1

II.   FACTS PROVEN AT TRIAL...................................................1

    A.    Background ...................................................................2

    B.    ComEd Conduct.............................................................2

        1.    Subcontractors .......................................................2

        2.    Reyes Kurson .........................................................4

        3.    Other Hires ...........................................................5

    B.    State Board Conduct......................................................6

III.  APPLICABLE LAW...............................................................9

IV.   STANDARD OF REVIEW.......................................................9

V.    ARGUMENT.......................................................................10

    A.    The Court Properly Instructed the Jury...............................10

        1.    Standard of Review................................................10

        2.    Madigan Did Not Preserve His 18 U.S.C. § 666 Timing and
              Specificity Argument, and the Instructions Were Proper. ...........11

        3.    The District Court's Other § 666 Instructions Were Correct.......14

        4.    The Court Properly Instructed the Jury on the Travel Act
              Predicates. ..........................................................17

    B.    The District Court Correctly Responded to a Jury Note. ...................18

        1.    Standard of Review................................................18

        2.    The District Court's Response to a Jury Note Was Correct.........18

i

C.    Madigan's Sufficiency Claims Fail. ...........................................19

    1.    Standard of Review ...................................................19

    2.    Sufficient Evidence Supported the ComEd Convictions ...............19

    3.    Sufficient Evidence Supported the State Board Convictions........20

D.    Madigan Raises No Substantial Questions That Would Require a
      New Trial on All Counts. ...........................................................22

VI.    CONCLUSION ....................................................................23

# TABLE OF AUTHORITIES

## Cases

*McDonnell v. United States*,
   579 U.S. 550 (2016) ............................................................................12, 13

*Perrin v. United States*,
   444 U.S. 37 (1979) ........................................................................................17

*Ryan v. United States*,
   688 F.3d 845 (7th Cir. 2012) ........................................................................13

*Street v. New York*,
   394 U.S. 576 (1969) ......................................................................................18

*United States v. Bayko*,
   774 F.2d 516 (1st Cir. 1985) ........................................................................10

*United States v. Bilanzich*,
   771 F.2d 292 (7th Cir. 1985) ....................................................................9, 22

*United States v. Black*,
   104 F.4th 996 (7th Cir. 2024) ......................................................................10

*United States v. Blagojevich*,
   794 F.3d 729 (7th Cir. 2015) ........................................................20, 21, 23

*United States v. Chilingirian*,
   280 F.3d 704 (6th Cir. 2002) ........................................................................10

*United States v. Collins*,
   966 F.2d 1214 (7th Cir. 1992) ......................................................................11

*United States v. Eaken*,
   995 F.2d 740 (7th Cir. 1993) ....................................................................9, 10

*United States v. Ford*,
   435 F.3d 204 (2d Cir. 2006) ........................................................................16

*United States v. Hawkins*,
   777 F.3d 880 (7th Cir. 2015) ........................................................................16

*United States v. Hewlett*,
   453 F.3d 876 (7th Cir. 2006) ........................................................................18

*United States v. Khattab*,
   536 F.3d 765 (7th Cir. 2008) ........................................................................19

*United States v. Lawson*,
   810 F.3d 1032 (7th Cir. 2016) ................................................................10, 14

*United States v. Mangano*,
   128 F.4th 442 (2d Cir. 2025) ........................................................................11

*United States v. Menendez*,
   No. 23-CR-490, 2025 WL 1212152 (S.D.N.Y. Apr. 25, 2025)....................23

*United States v. Peleti*,
   576 F.3d 377 (7th Cir. 2009) ........................................................................16

*United States v. Ramsey*,
   406 F.3d 426 (7th Cir. 2005) ........................................................................13

*United States v. Reichberg,*
   5 F.4th 233 (2d Cir. 2021) ................................................................ 12

*United States v. Shen Zhen New World I, LLC,*
   115 F.4th 1167 (9th Cir. 2024) .......................................................... 17

*United States v. Shoffner*,
   791 F.2d 586 (7th Cir. 1986) ............................................................... 9

*United States v. Silver*,
   948 F.3d 538 (2d Cir. 2020) ................................................. 12, 15, 16

*United States v. Skelos*,
   988 F.3d 645 (2d Cir. 2021) .............................................................. 13

*United States v. Snyder*,
   603 U.S. 1 (2024) ........................................................................ 15, 16

*United States v. Solomon*,
   892 F.3d 273 (7th Cir. 2018) ............................................................. 13

*Zant v. Stephens*,
   462 U.S. 862 (1983) .......................................................................... 18

## Statutes

18 U.S.C. § 3143(b) .............................................................................. 9, 22

720 ILCS § 5/33-8 .................................................................................... 17

18 U.S.C. § 666 ................................................................................*passim*

## Rules

Federal Rule of Criminal Procedure 29 ........................................... 19

iv

## I.     INTRODUCTION

On February 12, 2024, after a four-month trial, a jury convicted Michael Madigan on ten counts of conspiracy, bribery, wire fraud, and Travel Act offenses. R. 331.[1] The district court sentenced Madigan to 90-months' imprisonment and ordered him to begin serving his sentence on October 13, 2025. R. 453. On August 8, 2025, the district court denied Madigan's motion for release pending appeal. R. 470. The district court found that Madigan failed to demonstrate any substantial issue likely to result in reversal or a new trial. *Id*. The court concluded that, even if Madigan made such a showing for certain convictions, his fraud convictions on Counts 8, 9, and 10, would remain untouched. *Id*.

Madigan moves this Court to reverse the district court's denial of his motion. Dkt. 14. Because there is no substantial question of law or fact likely to succeed on appeal, this Court should deny Madigan's motion.

## II.    FACTS PROVEN AT TRIAL

The district court found the following facts in denying Madigan's post-trial motions. R. 450 at 1-2, 7-24, 28-36.

---

[1] Citations to the district court record are designated by "R." and citations to the appellate record are designated by "Dkt." followed by the docket number.

## A.     Background

Madigan served as Speaker of the Illinois House of Representatives from 1983 to 2021, with a two-year gap in the 1990s. He served for decades as Democratic Committeeman for the Thirteenth Ward, Chairman of the Thirteenth Ward Democratic Organization, and Chairman of the Democratic Party of Illinois. Madigan also had a law firm, Madigan & Getzendanner.

Codefendant Michael McClain was Madigan's friend and agent, who served with Madigan as a legislator before becoming a lobbyist for Commonwealth Edison ("ComEd").

## B.     ComEd Conduct

### 1.     Subcontractors

From 2011 to 2019, Madigan arranged so-called "subcontracts" from ComEd for his political associates in exchange for Madigan's official action on ComEd's legislation. The "subcontractors" did virtually no work and were paid through Madigan-affiliated intermediaries to conceal the payments. Over eight years, ComEd paid approximately $1.3 million to these low- and no-show "subcontractors." The subcontractors were loyal Madigan associates: former 13th Ward Alderman Frank Olivo, political workers Ray Nice and Edward Moody, former 23rd Ward Alderman Michael Zalewski, and former Illinois House member Edward Acevedo. The payments started in 2011, while major ComEd legislation, the Energy Infrastructure and Modernization Act

("EIMA"), was pending in the General Assembly. Within months, on October 26, 2011, EIMA passed in a veto override with Madigan's vote in support. After this, Madigan helped ComEd secure other legislative victories, all while Madigan's associates received monthly payments from ComEd.

Madigan was directly involved in the subcontractor payments from their outset. For example, Moody—one of Madigan's top political workers—testified that Madigan got him the contract with ComEd and warned Moody would "lose the contract" if Moody stopped his political work. Tr. 4325:7-4326:14. In 2018, while Moody was campaigning, Moody told Madigan he was not performing any work for ComEd. Tr. 4425:11-4426:3. Madigan told Moody he had "nothing to worry about," and that what he was "doing right now" was what Madigan wanted and "what ComEd" wanted. Tr. 4426:5-7.

Likewise, in 2018, Madigan directed and took credit for hiring Zalewski as a subcontractor, as captured in multiple recordings. R. 471-3 at 270-81; GX1618. On Madigan's behalf, McClain worked with ComEd CEO Anne Pramaggiore to ensure Zalewski was hired and directed that ComEd pay him $5,000 per month. R. 471-3 at 271-77. McClain and ComEd executive Fidel Marquez discussed the subcontractors' value to Madigan's political operation, without mentioning any work for ComEd. *Id.* at 274-75.

The subcontractor payments and Madigan's control over ComEd's legislative agenda were linked. Pramaggiore made this link when she stated

that the payments should continue until the legislative session ended, to avoid a "disruptive battle where" a person "gets their nose out of joint and we're trying to move somebody off and then we get forced to give 'em a five-year contract because we're in the middle of needing to get something done in Springfield." R. 471-3 at 733. Doherty—the longest serving intermediary—made the same connection, when he advised that ComEd continue to pay the subcontractors because ComEd's money "comes from Springfield." *Id.* at 720.

As the district court found, "Madigan plainly understood the existence and nature of the surreptitious Doherty arrangement." R. 450 at 10.

### 2.    Reyes Kurson

At Madigan's request, ComEd paid $1.8 million to Reyes Kurson, the law firm of a valuable Madigan fundraiser, from 2012 to 2018. GX1520. ComEd's unique contract with Reyes Kurson guaranteed hundreds of hours of work each year.

McClain, on Madigan's behalf, pressured ComEd's general counsel to enter the first contract with Reyes Kurson, which was finalized in 2011, one day before Madigan voted in favor of EIMA's veto override. In 2016, when the contract was up for renewal and ComEd sought to reduce the firm's hours, McClain continued the pressure; McClain emailed Pramaggiore that if Reyes did not get "850 hours for his law firm per year then he will go to our Friend [Madigan]. Our Friend will call me and then I will call you. Is this a drill we

must go through?" R. 472 at 40. McClain added that he did "not understand why we have to spend valuable minutes on items like this when we know it will provoke a reaction from our Friend." *Id.* At the time, ComEd was seeking to pass major legislation. ComEd renewed the firm's contract in 2016 and 2017. The district court correctly found that "a reasonable jury could easily conclude that Madigan was knowingly involved in the conspiracy to solicit a bribe in the form of contracts with Reyes Kurson," citing the "overwhelming evidence." R. 450 at 12.

### 3.    Other Hires

Madigan, through McClain, made numerous other hiring demands of ComEd for "unwanted candidates," including individuals who "'bombed' ComEd interviews, failed ComEd qualification examinations, and/or did not show up for ComEd's employment-related tests." R. 450 at 12. These demands further proved Madigan's use of ComEd for personal and political benefits while ComEd pursued legislation. McClain described this illegal arrangement in a 2014 conversation, when he told Marquez that Madigan had complained about Marquez not being "with us," and Madigan "believes in his mind there should be a hard and quick favorable response" to his demands. R. 471-3 at 926. *See also* R. 450 at 13.

## B.     State Board Conduct

Madigan agreed to use his official position to try to obtain a State board position for former Chicago Alderman Daniel Solis in order to obtain business for his private law firm, which specialized in appealing real estate tax assessments. Madigan used Solis, a powerful Alderman and Chairman of Chicago's Zoning Committee, to acquire real estate developers as clients.

Solis, who was then cooperating, first raised the State board appointment to Madigan on June 20, 2018 (R. 471-3 at 395-96), immediately after a developer pitch meeting at Madigan's firm that Solis arranged and attended (*Id.* at 148-49).

Before this, Solis had expressly linked official action and sending business to Madigan's firm in six conversations with Madigan. The first four concerned Madigan's efforts to use Solis to bring in as a client the developer of a property known as Union West.[2] Solis told Madigan that the developer understood the "*quid pro quo*," meaning the link between the developer meeting Madigan and Solis's zoning approvals. *Id.* at 42. Madigan responded "yeah, okay" (*id.*), and continued to work to get business from Union West, even as Solis continued to emphasize the this-for-that exchange. *Id.* at 58, 97-98, 104. The next two related to a development in Chicago's Chinatown

---

[2] The Union West transaction was the basis of Counts 15, 16, 17, and 18, for which the jury acquitted.

neighborhood. Solis sought Madigan's assistance with legislation to transfer the property from State to city ownership, to facilitate a sale to the developer.[3] *Id.* at 91-93. On March 26, 2018, Solis told Madigan that the developer would work with Madigan "and get you the . . . property taxes." *Id.* at 173. The next day, during a call with Madigan, Solis repeated this linkage between Madigan obtaining legal business and pushing the land transfer legislation. *Id.* at 175.

With this backdrop, when Solis told Madigan he was interested in a State board position on June 20, 2018, Madigan immediately said, "I'll take a note down. I have a file…." R. 471-3 at 396. Solis told Madigan that he would continue to get him legal business. Madigan then asked Solis to help arrange a pitch with Harry Skydell, a developer. *Id.* at 396-97.

This transactional back and forth continued for weeks as Solis and Madigan discussed the State board appointment. On August 2, 2018, Solis and Madigan met and reviewed a list of State boards. R. 471-3 at 452-53. Solis told Madigan that he would continue to help Madigan get business. Madigan immediately shifted to the State board position and said, "Just leave it in my hands." *Id.* at 457. Solis asked if Madigan was interested in anything else. *Id.* Madigan responded, "There's one thing you can do," and asked Solis to contact the head of a Chicago non-profit to help Madigan's son secure insurance

---

[3] The Chinatown transaction was the basis of Counts 19, 20, 21 and 22, for which the jury was unable to reach a verdict.

business. *Id.* at 457-58. Madigan then shifted back to the State board appointment and again said, "just leave this in my hands." *Id.* at 458.

Soon thereafter, Madigan asked Solis about a new Skydell development that "may be an opportunity for me." R. 471-3 at 553. On October 26, 2018, Solis told Madigan that Skydell would give Madigan the development. *Id.* at 576. Madigan then told Solis he would discuss the State board position with Governor-elect JB Pritzker and tell Pritzker, "here it is, this is what we want to do." *Id.* at 577.

On November 23, 2018, Solis told Madigan, "I figure I can still help you a lot" with clients. R. 471-3 at 643. Madigan asked, "Do you want to go forward now on one of those state appointments?" *Id.* at 644. Madigan asked for Solis's resume and later called Solis to confirm Solis's board selections. *Id.* at 644, 654.

Madigan admitted on cross-examination that Solis had, on six occasions, proposed exchanging official action for law firm business and that Madigan knew this was illegal. Tr. 9168:23-9170:25, 9187:25-9189:23. Yet, Madigan took steps to secure a State board position for Solis, while continuing to ask Solis to help secure work for himself and his son.

The recommendation never materialized, because in January 2019, Solis's cooperation became public. R. 472-2 at 179.

## III.   APPLICABLE LAW

18 U.S.C. § 3143(b) establishes a presumption that a defendant who has been sentenced should begin serving his sentence, even if he appeals, unless the Court finds (1) the defendant is not likely to flee and does not pose a danger, and (2) the appeal is not for the purpose of delay and "raises a substantial question of law or fact likely to result in" reversal of defendant's conviction or an order for a new trial.[4] The defendant bears the burden to show the merit of the appeal. *United States v. Bilanzich*, 771 F.2d 292, 298 (7th Cir. 1985). A question is substantial if the appeal presents "a 'close' question or one that very well could be decided the other way." *United States v. Eaken*, 995 F.2d 740, 741 (7th Cir. 1993) (citation omitted). Even if a question is substantial, the defendant must also show that, assuming the question is decided in defendant's favor, "the appellate court is more likely than not to reverse the conviction or order a new trial" as to all counts. *Bilanzich*, 771 F.2d at 298. The Court must consider the appellate standard of review, including the deference due to a trial court's or jury's factual findings. *See id.* at 299.

## IV.   STANDARD OF REVIEW

Although this Court independently reviews orders of detention, the Court affords "some deference to the district court's firsthand judgment of the

---

[4] The government concedes that Madigan is not a flight risk or a danger, and that he did not appeal for the purpose of delay.

situation." *United States v. Shoffner*, 791 F.2d 586, 590 (7th Cir. 1986); *see also United States v. Bayko*, 774 F.2d 516, 520 (1st Cir. 1985) ("[W]e do not suggest that we will conduct our own *de novo* hearing divorced from what has taken place below."); *cf. United States v. Chilingirian*, 280 F.3d 704, 709 (6th Cir. 2002) ("This court reviews a district court's denial of bail under an abuse of discretion standard.").

## V.     ARGUMENT

None of Madigan's arguments presents a substantial question likely to result in reversal or a new trial on all, or any, counts, because they misconstrue the trial record and/or the law. Even if this Court agrees with Madigan's novel legal arguments concerning his bribery and Travel Act convictions, Madigan's factual sufficiency challenge as to his wire fraud convictions fails because the evidence was "overwhelming." R. 470 at 38.

### A.     The Court Properly Instructed the Jury.

#### 1.     Standard of Review

This Court reviews claims of instructional error *de novo* "to decide 'whether, taken as a whole, [the instruction] correctly and completely informed the jury of the applicable law.'" *United States v. Black*, 104 F.4th 996, 1001 (7th Cir. 2024) (citation omitted). Instructional challenges that are not preserved in the district court are reviewed for plain error. *United States v. Lawson*, 810 F.3d 1032, 1040 (7th Cir. 2016).

**2.    Madigan Did Not Preserve His 18 U.S.C. § 666 Timing and Specificity Argument, and the Instructions Were Proper.**

Madigan argues that the jury should have been instructed that, under a stream of benefits bribery theory, as alleged in Counts 2, 4 and 6, the defendant must understand the *specific* question or matter to be influenced at the time he solicits the first bribe. Dkt. 14 at 10-11.

Madigan has waived or forfeited this argument by failing to propose this instruction at trial. *See United States v. Collins*, 966 F.2d 1214, 1223 (7th Cir. 1992); *United States v. Mangano*, 128 F.4th 442, 474 (2d Cir. 2025) (defendant waived or forfeited same instructional challenge Madigan now raises). At trial, Madigan opposed any stream of benefits instruction and argued that "the stream of benefits theory is not valid post-*Snyder*" (R. 317 at 10)—which he now concedes was incorrect. Dkt. 14 at 10. Similarly, Madigan did not object on this basis to the Seventh Circuit's pattern "official action" instruction. *See* R. 261 at 74.

Waiver aside, "the record undermines Madigan's objection." R. 470 at 18. The instructions conveyed the very concept Madigan now contends is required and "completely foreclosed the possibility that the jury would convict a defendant under § 666 based on an 'unidentified future action.'" *Id.* at 20. Specifically, the instructions required that: (i) Madigan knew the solicitation "was a 'this for that' exchange of a 'thing of value' for an 'official action,'" and

11

(ii) the agreement occurred "*before* the official action is to take place." R. 313 at 67, 77-78 (emphasis added). The instructions further defined "official action," consistent with *McDonnell v. United States*, 579 U.S. 550 (2016), to require a "*specific* decision or action" on a "*specific* question or matter," that "involve[s] a formal exercise of governmental power and must be something *specific and focused*, rather than a broad policy objective." R. 313 at 55 (emphasis added). The instructions also stated that "[v]ague expectations of some future benefit are not sufficient, by themselves, to make a payment a bribe." *Id.* at 68, 78.

The instructions thus satisfy the standard Madigan proposes and did not allow conviction based upon an "open-ended promise to perform official actions for the benefit of the payor." *United States v. Silver*, 948 F.3d 538, 559 (2d Cir. 2020) (quotations omitted); *see also United States v. Reichberg*, 5 F.4th 233, 247-48 (2d Cir. 2021) ("By requiring the jury to find that the official 'understood he was expected as a result of the payment to exercise particular kinds of acts or influence,' this instruction successfully required the jury to find that the official action was to be taken on a 'specific and focused question or matter.'"). Contrary to Madigan's claim, the instructions *did*, consistent with *McDonnell*, focus on the initial solicitation and the specificity of the action. Considered together, there is no error in the district court's instruction that a "'thing of

value' may involve a stream of benefits in a 'this for that' exchange for one or more official actions." R. 313 at 68, 78.

Madigan also ignores binding precedent of this Court, which requires evidence of an "ongoing agreement" for stream of benefits bribery. *United States v. Solomon*, 892 F.3d 273, 277-78 (7th Cir. 2018) ("to convict someone of honest-services fraud, the government must prove that there is an agreement to pay a bribe or kickback," which can reach "schemes that involve a stream of benefits over time, not just singly negotiated deals") (citations omitted); *Ryan v. United States*, 688 F.3d 845, 852 (7th Cir. 2012).

Finally, any instructional error was harmless. *See*, *e.g.*, *United States v. Skelos*, 988 F.3d 645, 656 (2d Cir. 2021) (error based on "official action" definition was harmless); *Ryan*, 688 F.3d at 847 (same); *United States v. Ramsey*, 406 F.3d 426, 432 (7th Cir. 2005). Contrary to Madigan's contention, the evidence established that the bribes were connected to specific official action starting in 2011. The first bribes (Olivo and Reyes Kurson) were arranged on the eve of EIMA's passage, which implemented the valuable formula rate, changing the way ComEd charged ratepayers. This legislation was a concrete, identifiable "matter" under *McDonnell*. The bribes continued for eight years, while ComEd extended the formula rate legislation. Indeed, a final extension was pending when the government's investigation went overt

in May 2019. Put simply, Madigan knew ComEd sought official action on its specific legislative agenda starting in 2011. There is no substantial issue.

### 3. The District Court's Other § 666 Instructions Were Correct.

Madigan argues that there is a substantial question as to whether the instruction for "corruptly" should have required consciousness of wrongdoing or unlawfulness. Madigan also claims the instruction given improperly focused on the bribegivers' intent. Dkt. 12 at 14-16. The district court correctly rejected both arguments.

_First_, Madigan proposed two completely different "corruptly" instructions at trial—neither of which tracks his current proposal. R. 261 at 95 (requesting instruction that "[a] person acts corruptly when that person acts with the knowledge that his conduct is unlawful"); Tr. 9027:13-28:10; R. 317 at 9 (requesting instruction that a "defendant acts corruptly when he specifically intends to receive a private financial benefit in violation of his legal duty to faithfully represent his constituents and the citizens of Illinois"). In fact, Madigan argued _against_ defining "corruptly" to require knowledge of wrongfulness. Tr. 8090:15-95:13, 8948:18-19. Madigan has waived his contention that "corruptly" requires wrongfulness. _See Lawson_, 810 F.3d at 1040.

14

Waiver aside, the court correctly instructed the jury that "[a] defendant acts 'corruptly' if he acted with the understanding that a 'thing of value' is to be exchanged for an 'official act' with the intent to influence or reward a State agent in connection with his official duties . . ." R. 313 at 67, 77. The jury thus had to find Madigan understood he solicited a bribe intended as a "this-for-that" exchange. *See also id.* at 67-68, 77-78.

As the district court summarized, "this traditional understanding of § 666 is consistent with the meaning of 'corruptly' as used by Congress in other statutes." R. 470 at 8-9 (collecting cases). Indeed, "American law treats bribes as inherently corrupt and unlawful." *United States v. Snyder*, 603 U.S. 1, 5 (2024).

The district court correctly found any error harmless, because "[a]s a licensed attorney and long-time member of the Illinois General Assembly, Madigan knew that he was not permitted to accept bribes . . . ; thus, he remained fully aware of the 'wrongfulness and illegality of his actions.'" R. 470 at 8. Madigan admitted as much, when he testified that he knew a "*quid pro quo*" was improper. *Id.* at 9.

*Second*, the instructions correctly required the jury to find Madigan understood a thing of value was given as an intended this-for-that exchange. R. 313 at 67, 77. The instructions also made clear that § 666 does not require the public official to change his conduct or take any official action. *See Silver*,

15

948 F.3d at 548-50 ("the official need not follow through or even intend to follow through on his representations. . . ."). As the Supreme Court stated, § 666 criminalizes instances where an official "took a bribe before the official act but asserts as a defense that he would have taken the same act anyway and therefore was not 'influenced' by the payment." *Snyder*, 603 U.S. at 19. The instructions correctly conveyed that concept.

Madigan relies on *United States v. Ford*, 435 F.3d 204 (2d Cir. 2006), to argue that the instruction improperly focused on the bribegiver's intent. As the district court observed, *Ford* is inconsistent with this Court's precedent. R. 470 at 13. For example, the Seventh Circuit held, in a case involving an army official convicted of receiving bribes, that whether the defendant "actually intended to be influenced is irrelevant, so long as [defendant] conveyed to [the bribe payor] that the money would influence him." *United States v. Peleti*, 576 F.3d 377, 383 (7th Cir. 2009). That rationale applies equally to § 666. *See United States v. Hawkins*, 777 F.3d 880, 882 (7th Cir. 2015), which as the district court found was not invalidated by *Snyder*. R. 470 at 13 n.12.

Moreover, "the Second Circuit's decision [in *Ford*] was limited by its unique concern" presented by the facts of that case (R. 470 at 13), and *Ford* was at odds with cases like *Silver*, which stated that the phrase "being influenced" in § 201(b)(2)(A) ""does not describe the [official's] true intent, it

16

describes the intention he *conveys* to the briber in exchange for the bribe.'" 948 F.3d at 552 (quotation omitted).

Finally, any error was harmless, considering the evidence that Madigan took repeated official actions that benefited ComEd. *See*, *e.g.*, R. 408 at 26-27.

## 4.　The Court Properly Instructed the Jury on the Travel Act Predicates.

There is no basis to disturb the Travel Act counts (Counts 5, 12, 13, and 14). The district court correctly ruled that *Perrin v. United States*, 444 U.S. 37, 49 (1979), forecloses Madigan's argument that the Travel Act criminalizes only violations of statutes that meet the "generic definition of bribery" at the time of the Act's enactment and requires a *quid pro quo*. R. 470 at 27-28 (collecting cases).[5] Contrary to Madigan's contention, the Supreme Court has held "that Congress intended 'bribery'" as "used in the Travel Act to encompass" a "violation of state commercial bribery statutes," explicitly rejecting a "narrow common-law definition" of the crime. 444 U.S. at 49-50. In adopting that expansive view, the Court stated that "by the time the Travel Act was enacted in 1961, federal and state statutes had extended the term bribery well beyond its common-law meaning." *Id*. at 43.

---

[5] The Ninth Circuit's decision in *United States v. Shen Zhen New World I, LLC*, is inconsistent with *Perrin*, and the government has not identified any authority in the Seventh Circuit adopting the Ninth Circuit's position. 115 F.4th 1167, 1183 (9th Cir. 2024), *cert. denied*, No. 24-855, 2025 WL 1727387 (U.S. June 23, 2025).

Moreover, any error was harmless, because the instructions *did* incorporate an exchange requirement with regard to the legislative misconduct statute (720 ILCS § 5/33-8). R. 313 at 87-88. In addition, the jury's § 666 and § 1343 convictions premised on the same evidence demonstrate that they found a *quid pro quo.* Accordingly, "there is no uncertainty about the multiple grounds on which a general verdict rests." *Zant v. Stephens*, 462 U.S. 862, 883 (1983); *see also Street v. New York*, 394 U.S. 576, 588 (1969).

## B. The District Court Correctly Responded to a Jury Note.

### 1. Standard of Review

A district court's "decision to answer a question from the jury as well as the language used in the response" is reviewed "for an abuse of discretion." *United States v. Hewlett*, 453 F.3d 876, 880 (7th Cir. 2006) (citation omitted). Such answers must, "as a whole, fairly and adequately" treat the issue, present "a correct statement of the law," and answer "the question specifically." *Id.*

### 2. The District Court's Response to a Jury Note Was Correct.

The district court responded to a jury note by clarifying that "bona fide" salary or wages paid "in the usual course" are not a "thing of value," but that compensation "obtained by means of bribery is not 'in the usual course of business,' and thus can be considered a 'thing of value.'" R. 404 at 11073-74.

This instruction did not read § 666(c) out of the statute but tracked the statutory language and the instruction given before deliberations. As the

18

district court emphasized, "[u]nder well-settled precedent, courts have long held that a salary or other compensation is not 'bona fide' simply because it is paid for legitimate work." R. 470 at 22 (cleaned up).

The court's response did not introduce confusion into the § 1343 instructions. The response correctly stated that a "thing of value" can include wages in an honest services fraud scheme. If anything, the court's response benefitted Madigan by suggesting that § 666(c) applies equally to § 1343, and thus "the jury could have excluded certain relevant payments from its consideration if it found those payments were bona fide." R. 470 at 25.

Finally, any error was harmless because the evidence of Madigan's guilt as to the fraud counts was "overwhelming." *Id.*

## C.    Madigan's Sufficiency Claims Fail.

### 1.    Standard of Review

In reviewing a sufficiency challenge, this Court draws reasonable inferences in the government's favor and "uphold[s] the verdict if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Khattab*, 536 F.3d 765, 769 (7th Cir. 2008).

### 2.    Sufficient Evidence Supported the ComEd Convictions

Madigan ignores the vast evidence that supported his convictions, and the standard under Federal Rule of Criminal Procedure 29.

Madigan's control over the ComEd hires, the conspirators' clear understanding of the link between Madigan's power over legislation and the "subcontractors," the duration and amount of the payments, the conspirators' efforts at concealment, and the fact that the subcontractors were essentially ghost workers, demonstrated that the subcontractor payments and other hires were part of a "this-for-that" exchange. McClain specifically referenced "that ComEd agreement" in a conversation with Madigan, in which the men discussed ceasing payments to Moody. R. 471-3 at 663. This alone was powerful evidence of Madigan's participation in the conspiracy, but as this Court has noted, an express agreement is not necessary. *See United States v. Blagojevich*, 794 F.3d 729, 738 (7th Cir. 2015) ("Few politicians say, on or off the record, 'I will exchange official act X for payment Y.'").

The evidence proved that Madigan was involved in the subcontractor arrangement from the start; and that, recognizing its illicit nature, Madigan initially thought the arrangement was "crazy" but then thought it was "great." R. 471-3 at 708-09, 207. In short, the evidence overwhelmingly established Madigan's guilt as to the ComEd counts.

### 3. Sufficient Evidence Supported the State Board Convictions

As the district court found, "overwhelming evidence" (R. 470 at 38) demonstrated that Madigan agreed to use his position as Speaker to get Solis

appointed to a paid State board, in exchange for Solis steering business to Madigan's law firm.

Contrary to Madigan's mischaracterization, "[t]he Government presented numerous recordings, in person and over the phone, proving that Madigan and Solis discussed a *quid pro quo* arrangement before their State board discussions and that, once raised, they simultaneously discussed both Solis obtaining legal business for Madigan's private law firm, and Madigan obtaining a state board appointment for Solis." R. 470 at 39. *See Blagojevich*, 794 F.3d at 738.

In fact, the recording in which Madigan made the statement he claims exonerates him ("Don't worry about it" (R. 471-3 at 457)) proves a this-for-that exchange, as discussed above.

Contrary to Madigan's contention, Madigan's scheme involved false statements. Madigan planned to falsely represent to Pritzker, through his recommendation, that Solis had the appropriate credentials when, in fact, his recommendation was part of a bribe. Had he known the truth, Pritzker "would never" have appointed Solis, as his transition team director testified. Tr. 6313:7-14.

Madigan, for the first time, claims the government did not prove an official action. This is waived or foreclosed, but in any event, the government presented ample evidence that Madigan planned to advise Pritzker to appoint

Solis. Madigan said he would tell Pritzker, "here it is, this is what we want to do." R. 471-3 at 577. And Madigan made clear he had the power to secure the appointment, when he told Solis, "I got him appointed," referring to another individual. *Id.* at 453-54. The jury had abundant evidence to find Madigan guilty of Counts 8, 9, and 10.

### D. Madigan Raises No Substantial Questions That Would Require a New Trial on All Counts.

The district court correctly concluded that there is no possible basis to invalidate the Count 8, 9, and 10 convictions:

> [T]he fate of Madigan's entire motion rides on routine, and meritless, sufficiency of the evidence objections to his wire fraud convictions . . . As such, he clings to false hope. As noted by the Seventh Circuit, 'successful challenges' of this variety 'are relatively rare,' given a defendant's burden constitutes 'a nearly insurmountable hurdle.'

R. 470 at 4 (citations omitted). Madigan cannot overcome this high hurdle, particularly with the State board counts, and thus cannot meet his burden to show a substantial question as to *all* counts of conviction. *Bilanzich*, 771 F.2d at 298.

In addition, Madigan ignores the district court's findings that it would impose the same sentence even if the ComEd counts were reversed. Dkt. 14 at 24.

Madigan also ignores § 3143(b)(1)(B), which permits bond if a favorable appellate ruling will likely result in "(iii) a sentence that does not include a

term of imprisonment, or (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process." Neither is true here, given the district court's findings, the length of Madigan's below-Guidelines sentence (90 months), and the Guidelines range if only Counts 8, 9, and 10 were affirmed (121 to 151 months). R. 470 at 5.[6]

## VI.    CONCLUSION

Madigan's motion for release pending appeal should be denied.

Respectfully submitted.

ANDREW S. BOUTROS
United States Attorney

By:      /s/ Sarah Streicker

SARAH STREICKER
Assistant United States Attorney
219 S. Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-5300

---

[6] Madigan is wrong that courts "routinely" grant relief pending appeal in "complex fraud and corruption cases." Dkt. 14 at 4. *E.g., United States v. Menendez*, No. 23-CR-490, 2025 WL 1212152, at *7 (S.D.N.Y. Apr. 25, 2025); *United States v. Cui*, 19 CR 322, ECF No. 545 (N.D. Ill. Dec. 30, 2024), *aff'd* No. 24-2495, ECF No. 17 (7th Cir. Jan. 27, 2025); *cf. Blagojevich*, 794 F.3d at 743.

## CERTIFICATE OF SERVICE

I hereby certify that on September 19, 2025, I electronically filed the foregoing Government's Response In Opposition to Defendant-Appellant's Motion For Release Pending Appeal with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

By:    */s/ Sarah Streicker*
SARAH STREICKER
Assistant United States Attorney
219 S. Dearborn Street
Chicago, Illinois 60604
(312) 353-5300