# In the United States Court of Appeals for the Seventh Circuit

---

No. 25-2249

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*

*v.*

MICHAEL J. MADIGAN,
*Defendant-Appellant*

---

*On Appeal from the United States District Court for the Northern District of Illinois*
*No. 1:22-cr-00115 (Hon. Robert J. Blakey)*

---

## BRIEF OF DEFENDANT-APPELLANT MICHAEL J. MADIGAN

---

DANIEL J. COLLINS
KATTEN MUCHIN ROSENMAN LLP
  525 West Monroe Street
  Chicago, Illinois 60661
  (312) 902-5434
  Daniel.Collins@Katten.com

LISA S. BLATT
DAVID M. ZINN
AMY MASON SAHARIA
  Counsel of Record
PATRICK J. LOOBY
ALLISON S. EISEN
KAITLIN D. WETZ
WILLIAMS & CONNOLLY LLP
  680 Maine Avenue, S.W.
  Washington, DC 20024
  (202) 434-5000
  asaharia@wc.com

Save As    Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-2249

Short Caption: United States of America v. Michael J. Madigan

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]  **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Michael J. Madigan

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Katten Muchin Rosenman LLP; Breen & Pugh; Williams & Connolly LLP

(3)  If the party, amicus or intervenor is a corporation:

i)  Identify all its parent corporations, if any; and

ii)  list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)  Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)  Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: /s/ Amy Mason Saharia    Date: 11/3/2025

Attorney's Printed Name: Amy Mason Saharia

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  Yes [✓]  No [ ]

Address: 680 Maine Ave. SW,

Washington, D.C. 20024

Phone Number: 202-434-5847    Fax Number: 202-434-5029

E-Mail Address: asaharia@wc.com

rev. 12/19 AK

# TABLE OF CONTENTS

INTRODUCTION ................................................................1

STATEMENT OF JURISDICTION ................................5

STATEMENT OF THE ISSUES .....................................5

STATEMENT OF THE CASE ..........................................6

    A.    Factual Background ....................................................6

        1.    ComEd counts (2, 4-6) ........................................7

        2.    State board counts (Counts 8-10, 12-14) .............14

    B.    Procedural History ..................................................18

SUMMARY OF ARGUMENT ........................................22

STANDARD OF REVIEW ..............................................25

ARGUMENT ....................................................................26

I.     MADIGAN IS ENTITLED TO ACQUITTAL OR A NEW TRIAL ON THE COMED COUNTS (COUNTS 2, 4-6). ......................26

    A.    The Government Did Not Prove the ComEd Counts Beyond a Reasonable Doubt. ........................26

        1.    The government failed to prove bribery or conspiracy to commit bribery. .....................27

        2.    The government failed to prove conspiracy to falsify documents or avoid internal controls. ...............................35

    B.    At a Minimum, Madigan Is Entitled to a New Trial Due to Instructional Errors. ......................36

        1.    The stream-of-benefits instruction was erroneous. ...........37

        2.    The "corruptly" instruction was erroneous. .......................41

        3.    The Travel Act instruction was erroneous. .........................52

II.    MADIGAN IS ENTITLED TO ACQUITTAL OR A NEW TRIAL ON THE STATE BOARD COUNTS (COUNTS 8-10, 12-14). ......................57

    A.    The Government Did Not Prove the State Board Counts Beyond a Reasonable Doubt. ........................57

        1.    The government failed to prove a quid pro quo. .................58

        2.    The government failed to prove a scheme to defraud. ........62

        3.    The government failed to prove an "official act." ..............65

    B.    Madigan Is Entitled to a New Trial on Counts 12-14 Because the Travel Act Instruction Was Erroneous. ...................67

CONCLUSION .................................................................68

# TABLE OF AUTHORITIES

Page

## CASES

*Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005) ..........................42

*Chapman v. California*, 386 U.S. 18 (1967) ................................................37

*Commonwealth v. Albert*, 29 NE.2d 817 (Mass. 1940) ............................54

*Corley v. United States*, 556 U.S. 303 (2009) ............................................44

*Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*,
    831 F.3d 815 (7th Cir. 2016).......................................................................60

*Fry v. UAL Corp.*, 84 F.3d 936 (7th Cir. 1996)............................................63

*Jackson v. Virginia*, 443 U.S. 307 (1979) ....................................................26

*Kousisis v. United States*, 145 S. Ct. 1382 (2025) ..............................62, 64

*Marinello v. United States*, 584 U.S. 1 (2018)............................................43

*McDonnell v. United States*, 579 U.S. 550 (2016) ...................................*passim*

*Neder v. United States*, 527 U.S. 1 (1999) ..................................................37

*Ocasio v. United States*, 578 U.S. 282 (2016) ............................................35

*Osborn v. State*, 28 S.W.2d 47 (Tenn. 1930) ..............................................54

*People v. Kohut*, 282 N.E.2d 312 (N.Y. 1972) ...........................................54

*Perrin v. United States*, 444 U.S. 37 (1979)..........................................53, 55

*Republic of Hawaii v. Young Hee*, 10 Haw. 114 (1895)..............................54

*Selvidge v. State*, 126 Tex. Crim. 489 (1934) .............................................53

*Skilling v. United States*, 561 U.S. 358 (2010)........................................1, 58

*Snyder v. United States*, 603 U.S. 1 (2024).................................................*passim*

*State v. Davis*, 45 A. 394 (Del. 1899) ...........................................................53

*State v. Durham*, 73 Minn. 150 (1898).........................................................54

*State v. Ferraro*, 67 Ariz. 397 (1948)...........................................................53

*State v. Hart*, 136 Wash. 278 (1925)............................................................54

*Taylor v. United States*, 495 U.S. 575 (1990) .............................................53

*Thompson v. United States*, 604 U.S. 408 (2025) .......................................36

*United States v. Allinson*, 27 F.4th 913 (3d Cir. 2022)...............................27

*United States v. Arroyo*, 581 F.2d 649 (7th Cir. 1978) ...............................46

*United States v. Aslan*, 644 F.3d 526 (7th Cir. 2011)............................64, 65

*United States v. Autori*, 212 F.3d 105 (2d Cir. 2000)..................................63

*United States v. Barnes*, 230 F.3d 311 (7th Cir. 2000) ..............................64

*United States v. Blagojevich*, 794 F.3d 729 (7th Cir. 2015) ................44, 45, 49

*United States v. Bonito*, 57 F.3d 167 (2d Cir. 1995) ..................................48

*United States v. Burnette*, 65 F.4th 591 (11th Cir. 2023).....................28, 32, 40

*United States v. Coffman*, 94 F.3d 330 (7th Cir. 1996)..........................62, 64

Page

Cases—continued:

*United States v. Edwards*, 869 F.3d 490 (7th Cir. 2017) ....................................37
*United States v. Elwell*, 515 F. App'x 155 (3d Cir. 2013) ...........................46
*United States v. Fattah*, 914 F.3d 112 (3d Cir. 2019) ..........................66
*United States v. Fernandez*, 282 F.3d 500 (7th Cir. 2002)...................62
*United States v. Fischer*, 64 F.4th 329 (D.C. Cir. 2023)......................42
*United States v. Ford*, 435 F.3d 204 (2d Cir. 2006)....................................*passim*
*United States v. Garrido*, 713 F.3d 985 (9th Cir. 2013)....................................46
*United States v. Ghilarducci*, 480 F.3d 542 (7th Cir. 2007)..........................62
*United States v. Grady*, 746 F.3d 846 (7th Cir. 2014).................................25
*United States v. Hawkins*, 777 F.3d 880 (7th Cir. 2015)....................................49
*United States v. Hills*, 27 F.4th 1155 (6th Cir. 2022)...................................28
*United States v. Jackson*, 560 F.2d 112 (2d Cir. 1977) ..........................64
*United States v. Jackson*, 688 F. App'x 685 (11th Cir. 2017)........................46
*United States v. Jefferson*, 289 F. Supp. 3d 717 (E.D. Va. 2017) ....................66
*United States v. Johnson*, 114 F.4th 913 (7th Cir. 2024).................................36
*United States v. Jones*, 713 F.3d 336 (7th Cir. 2013)..........................25, 26, 63
*United States v. L.E. Myers Co.*, 562 F.3d 845 (7th Cir. 2009) ........................40
*United States v. Lindberg*, 39 F.4th 151 (4th Cir. 2022)..........................29
*United States v. Maggio*, 862 F.3d 642 (8th Cir. 2017).............................46
*United States v. Martinez*, 994 F.3d 1 (1st Cir. 2021)...............................46
*United States v. Medley*, 913 F.2d 1248 (7th Cir. 1990)......................45
*United States v. Moeller*, 80 F.3d 1053 (5th Cir. 1996) ............................46
*United States v. Moore*, 572 F.3d 334 (7th Cir. 2009)....................................26
*United States v. Morgan*, 635 F. App'x 423 (10th Cir. 2015)..........................46
*United States v. Mullins*, 800 F.3d 866 (7th Cir. 2015).................................49
*United States v. Muratovic*, 719 F.3d 809 (7th Cir. 2013) ...............................64
*United States v. Myers*, 692 F.2d 823 (2d Cir. 1982) ............................46
*United States v. Nardello*, 393 U.S. 286 (1989) ....................................53
*United States v. Ng Lap Seng*, 934 F.3d 110 (2d Cir. 2019) .....................41, 42
*United States v. Peleti*, 576 F.3d 377 (7th Cir. 2009)..................................49
*United States v. Quintero*, 618 F.3d 746 (7th Cir. 2010)..........................25
*United States v. Reichberg*, 5 F.4th 233 (2d Cir. 2021) ....................................28
*United States v. Roberson*, 998 F.3d 1237 (11th Cir. 2011) ...............................28

Page

Cases—continued:

*United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003) (en banc)......................63
*United States v. Sawyer*, 85 F.3d 713 (1st Cir. 1996) .................................62
*United States v. Seidling*, 737 F.3d 1155 (7th Cir. 2013) ..................................65
*United States v. Shen Zhen New World I, LLC*,
    115 F.4th 1167 (9th Cir. 2024) ........................................24, 52, 53, 56
*United States v. Silver*, 948 F.3d 538 (2d Cir. 2020)................................*passim*
*United States v. Sittenfeld*, 128 F.4th 752 (6th Cir. 2025),
    *pet. for cert. filed*, No. 25-49 (U.S. July 11, 2025)..........................46
*United States v. Snyder*, 2024 WL 4834037 (7th Cir. Nov. 20, 2024) .............42
*United States v. Solakyan*, 119 F.4th 575 (9th Cir. 2024)................................63
*United States v. Solomon*, 892 F.3d 273 (7th Cir. 2018) .................................28
*United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398 (1999) ...........29
*United States v. Vaughn*, 815 F. App'x 721 (4th Cir. 2020) ............................46
*United States v. Wade*, 962 F.3d 1004 (7th Cir. 2020) ...................................37
*United States v. Weimert*, 819 F.3d 351 (7th Cir. 2016)...................................62
*Yates v. Evatt*, 500 U.S. 391 (1991) ................................................50, 56

## STATUTES AND RULE

15 U.S.C.
    § 78m ..................................................................................7, 35
    § 78ff...................................................................................7, 35
18 U.S.C.
    § 201..................................................................27, 45, 48, 49
    § 371.......................................................................................18
    § 666................................................................................*passim*
    § 1343...........................................................2, 18, 57, 62
    § 1346...........................................................2, 18, 57, 62
    § 1512.......................................................................................42
    § 1952................................................................................*passim*
    § 1962.......................................................................................18
    § 3231..........................................................................................5
21 U.S.C. § 7212 ..........................................................................42
28 U.S.C. § 1291 ............................................................................5
Fed. R. Crim. P. 29 .....................................................................26

Page

Statutes and Rule—continued:

720 ILCS

    § 5/33-1 ...............................................................................55

    § 5/33-3 ...............................................................................55

    § 5/33-8 ...............................................................................56

## OTHER AUTHORITIES

Model Penal Code § 240.1 (Am. L. Inst., Proposed Official Draft 1962)..........54

R. Perkins Criminal Law (1957)..........................................................................54

3 Wharton's Criminal Law and Procedure (Anderson 1957).............................54

## INTRODUCTION

Over the past two decades, the Supreme Court has erected critical guardrails around the scope of bribery and honest-services fraud laws, carefully distinguishing criminal corruption from the everyday functioning of democratic government.  In *Skilling v. United States*, 561 U.S. 358 (2010), the Court rejected open-ended theories of honest-services fraud and confined the statute to traditional bribery and kickback schemes.  In *McDonnell v. United States*, 579 U.S. 550 (2016), the Court explained that routine political courtesies are not bribery, holding that an official must agree to take official action on a *specific* question or matter in exchange for something of value.  And just last year, the Court reiterated these principles in *Snyder v. United States*, 603 U.S. 1 (2024), holding that only unlawful quid pro quo agreements—not mere gratuities—constitute federal-program bribery.  Collectively, these decisions recognize that the law punishes only quid pro quo bribery, not commonplace attempts to curry favor.

The prosecution of Michael J. Madigan, the long-time Speaker of the Illinois House of Representatives, flouts these principles.  The indictment shoehorned nearly a decade of conduct into several alleged corruption schemes, throwing years' worth of legislative action and political relationships

1

at the jury in the hopes of making something stick.  On each of the two alleged schemes that produced convictions, the government's theories stretched the statutes—federal-program bribery, 18 U.S.C. § 666; the Travel Act, 18 U.S.C. § 1952(a)(3); and wire fraud, 18 U.S.C. §§ 1343, 1346—past their breaking points.

As to the first scheme, the government built its case on the allegation that Madigan helped Democratic party members secure jobs (and a law firm secure legal work) from a utility company, ComEd.  (The government also claimed, implausibly, that Madigan conspired to falsify ComEd documents, and circumvent ComEd's internal controls, that he knew nothing about.)  But the government could not tie those jobs to Madigan's agreement to support *any* specific legislation.  When the government first indicted the case, this Circuit's case law did not require it to prove a quid pro quo.  But, while the case was pending, the Supreme Court decided *Snyder*, rejecting this Circuit's position and limiting § 666 to quid pro quo bribery.

The government then scrambled to repackage its charges at trial under a nebulous "stream-of-benefits" theory.  But it never proved an unlawful quid pro quo.  The district court facilitated this improper result by erroneously instructing the jury it could convict based on Madigan's receipt of a "stream of

2

benefits," without requiring proof that, at the time of the alleged bribe, Madigan agreed to be influenced on a *specific* question or matter—a critical limitation required by *McDonnell*.

The district court also erred in incorrectly defining "corruptly" under § 666. The court's instruction read "corruptly" out of the statute, by collapsing it into the distinct element of intent to influence or reward. The court also defined "corruptly" by reference to the bribe-*giver*'s intent, even though Madigan was the alleged bribe-*recipient*. The instructions created the incorrect impression that Madigan did not have to intend to be influenced or rewarded as long as the bribe-*giver* intended to influence him.

The district court also erred in instructing the jury on the Travel Act. By including as predicates state offenses that do not require a quid pro quo—in conflict with recent Ninth Circuit authority—the instructions facilitated convictions while bypassing *McDonnell* and *Snyder*.

As to the second scheme, the government built its bribery case on the fact that Madigan volunteered to recommend an alderman for a position on a state board controlled by the governor, allegedly in return for referrals to Madigan's law firm (where Madigan worked part-time, as is normal for state

legislators).  The government charged the scheme under the wire-fraud stat-
utes and the Travel Act.  Although the alderman was a cooperating
government witnesses who recorded many hours of conversations with Madi-
gan, the government never offered proof that Madigan conditioned his
recommendation on any exchange.  Madigan never made or attempted to make
the recommendation.  And his firm received no business.  As a result, the evi-
dence fell well short of the wire-fraud statute's misrepresentation element (no
representation was made) and *McDonnell*'s official act requirement (no act
occurred).

As to both schemes, the prosecution improperly criminalizes the rough-
and-tumble business of state politics in direct contravention of recent Supreme
Court rulings.  To be sure, the evidence showed that ComEd and the alderman
sought to curry favor with Madigan.  Constituents do this every day, whether
through hiring politically connected individuals or offering other support to
legislators.

These interactions may strike federal prosecutors as unbecoming.  But
they do not constitute bribery.  Were it otherwise, "any official who accepts a
thing of value and then later acts to the benefit of the donor, in any manner,

could be vulnerable to criminal prosecution," casting a pall over "the most pro-saic interactions." *United States v. Silver*, 948 F.3d 538, 558 (2d Cir. 2020). The Court should reverse with instructions to enter judgment of acquittal and/or vacate the convictions.

## STATEMENT OF JURISDICTION

The district court (Blakey, J.) had jurisdiction under 18 U.S.C. § 3231. Judgment was entered on July 15, 2025. SA.102. Madigan timely appealed on July 23, 2025. R.456. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

I. Whether Madigan is entitled to judgment of acquittal or a new trial on Counts 2, 4-6 (the ComEd counts) because:

A. The government did not prove a quid pro quo or conspiracy to engage in a quid pro quo, or a conspiracy to falsify ComEd documents or to circumvent ComEd's internal controls.

B. The court erred in instructing the jury on the stream-of-benefits theory of bribery without conveying that the government needed to prove Madigan agreed to act on a specific question or matter.

C. The court erred in instructing the jury that an official acts "corruptly" under the federal-program bribery statute by accepting a

thing of value (a) without consciousness of unlawfulness or wrong-

doing and (b) without intending to be influenced or rewarded.

D. The court erred in permitting the jury to base a Travel Act convic-
tion on predicate Illinois offenses lacking a quid pro quo element.

II. Whether Madigan is entitled to judgment of acquittal or a new trial on
Counts 8-10 and 12-14 (the state board counts) because:

A. The government failed to prove a quid pro quo, a scheme to de-
fraud, or an official act.

B. Again, the court erred in permitting the jury to base Travel Act
convictions on predicate Illinois offenses lacking a quid pro quo
element.

## STATEMENT OF THE CASE

### A.    Factual Background

Michael Madigan served as Speaker of the Illinois House nearly contin-

uously from 1983 through 2019.  SA.1.  Because state legislators work part-

time, Madigan also maintained a law practice.  A.93-94.  Madigan viewed his

responsibilities as a public servant to include helping constituents and col-

leagues where he could.  A.379-80.  He often recommended students, friends,

and former officials for work in the Chicago area.  A.379-80.  The government

charged two bribery schemes arising out of this routine assistance.

### 1.  ComEd counts (2, 4-6)

The first purported "scheme" involved the public utility company, ComEd, which has regular business before the Illinois State Legislature.  In Count 2, the government alleged that, between 2011 and 2019, Madigan conspired with ComEd to:  (i) receive a "stream of benefits" in connection with legislation of interest to the company, in violation of the federal-program bribery statute, 18 U.S.C. § 666(a)(1)(b) and (a)(2); and (ii) falsify ComEd's books and records and circumvent ComEd's internal accounting controls in violation of 15 U.S.C. §§ 78m(b)(5) and 78ff(a).  Counts 4 and 6 charged substantive counts of federal-program bribery, and Count 5 charged a Travel Act violation based on the same allegations.

The government premised its case on these counts on ComEd's hiring (at Madigan's alleged recommendation) various former officials, interns, and a law firm between 2011 and 2019, when legislation of interest to the company was pending at various times.  But no evidence proved that Madigan made (or was asked to make) any connection between ComEd's hiring decisions and specific pending legislation.  The government instead urged an implicit connection based on the facts that (i) the individuals ComEd hired did little to no

7

work, the law firm ComEd was retained on allegedly favorable terms, and un-
qualified interns were hired, on the one hand, and (ii) legislation favorable to
ComEd passed during the same nine-year period, on the other hand.

### a.    The alleged quos:  legislation.

Legislation affecting ComEd's interests periodically came before the
state legislature.  Before the events in question here, in 2007, after adverse
decisions from the Illinois Commerce Commission ("ICC"), the company faced
significant financial pressures.  A.14-16.  In 2007 and 2009, the Illinois legisla-
ture passed two bills providing ComEd financial assistance.  A.12-14, 77-79.
ComEd lobbied for passage of this (and later) legislation, as occurs all the time
in state capitals.  A.5-6.

In subsequent years, the legislature debated several additional bills af-
fecting ComEd.  The government's case focused on four:

***2011: Energy Infrastructure Modernization Act (EIMA)***.  In Decem-
ber 2010, ComEd lobbied for a bill creating "formula rates" to provide
regularity in its revenue.  R.471-3 p.817; A.7-9.  That month, Madigan told
ComEd to "put the formula rate proposal in bill format" and that "he would
take it up in January [2011]" because he knew "the ICC's rate making process

8

[wa]s antiquated and need[ed] a face lift." R.471-3 p.817. As the bill pro-gressed, Madigan supported ComEd's proposal but subject to significant modifications, including limiting the rate of return that ComEd could receive. A.10-11, 17-37, 63, 113-14. In May 2011, after months of negotiations, EIMA (as modified) passed both houses. A.39-40. In October 2011, after the Gover-nor vetoed the legislation a month prior, both houses passed a veto override. A.41-42.

*2012-2013: Senate Bill 9 (SB9)*. In May 2012, an adverse ICC decision led to postponement of certain EIMA initiatives. A.48-49. In response, in March 2013, the legislature overwhelmingly and with bipartisan support passed SB9 to ensure sufficient funding for EIMA's implementation. A.43. In May 2013, both houses overrode another gubernatorial veto. A.44.

*2016: Future Energy Jobs Act (FEJA)*. In 2016, the legislature took up a bill to, among other things, extend EIMA's formula rates. A.4. ComEd lobbied for various terms, including so-called "demand-based rates," R.475-2 p.70; A.37, 348-50, 355, and authority to install "microgrids," R.475-2 p.71; A.38, 66-67, 351. ComEd's parent company pushed for a three-fifth's vote in the Illinois House, R.475-4 p.62, to ensure the bill would survive a veto and take immediate effect, A.424.

As with EIMA, Madigan pushed for modifications to the legislation. A.351-57. While FEJA passed with bipartisan support, Madigan did not vote for it, A.3, 50-51, it failed to pass with a three-fifth's majority, R.475-2 pp.49-68, and the bill did not include ComEd's preferred demand-based rates or microgrids, A.66-71, 356, 395-97.

***2018:  House Bill 5626 (HB 5626)***.  In 2018, ComEd opposed HB 5626, a bill to create a "more manageable and transparent repayment plan" for customers with overdue bills.  A.76.  Madigan, in contrast, supported the legislation, going so far as to help remove a procedural hurdle that would have stymied a timely vote.  A.376-78.

### b.    The alleged quids:  ComEd contracts.

Madigan never directly received even a penny from ComEd.  The government claimed that the "benefits" Madigan received came in the form of ComEd jobs for Democratic party members and students from his community, as well as contracts for a law firm affiliated with the Democratic Party.[1]  Madigan often recommended people to work for ComEd without any guarantee

---

[1] The government also alleged that Madigan arranged for Juan Ochoa to be appointed to ComEd's Board of Directors.  The jury acquitted Madigan of the substantive counts related to Ochoa, and the government no longer relies on those allegations to support the Count 2 conviction.  R.408 p.8 n.1.

that ComEd would take his recommendation; ComEd acted on some recommendations, but not others. *See, e.g.*, R.471-3 pp.851-55, 869-72, 883-84, 891-95, 916-17; R.472-1 p.116.

***Subcontractors***.   ComEd hired five individuals for putative lobbying and similar government-facing positions (the "subcontractors") between 2011 and 2018.  The first three were Frank Olivo, a former Chicago alderman (August 2011), A.83; Ed Moody, a former precinct captain (April 2012), A.86-87; and Ray Nice, a registered lobbyist for Cook County (June 2012), A.80.  The first hirings occurred *after* the legislature had already passed EIMA in May 2011.  *See supra* pp.8-9. Over four years later, in January 2017, ComEd hired former Representative Eddie Acevedo.  A.111.  In May 2018, ComEd hired former alderman Michael Zalewski.  A.84.

ComEd hired these individuals through subcontracts issued by ComEd contractor Jay Doherty (a ComEd external lobbyist) or other ComEd consultants.   *See, e.g.*, A.73-75, 82.   There was substantial evidence that the subcontractors did little to no work for ComEd.  But Madigan's knowledge about the nature of the jobs was disputed.  *See, e.g.*, A.423.

***Interns***.  Madigan often received requests from families seeking "summer job opportunities" for their children, and in turn recommended these students to employers in the community, including ComEd.  A.382-83.

***Reyes Kurson Law Firm***.  In October 2011, ComEd hired Reyes Kurson to perform no less than 850 hours of legal services per year over the next three years including corporate transaction due diligence, advising on municipal laws, and litigation.  R.474-1 p.21.  Reyes Kurson was a small, minority-owned law firm—which was important to ComEd—founded by Victor Reyes, the former head of a political organization that fundraised for Democratic state politicians, who was close with Madigan.  A.54.  Reyes Kurson performed significant work for ComEd, including economically efficient work on administrative hearings.  R.472 pp.6-9; A.55.  Following months of negotiations, ComEd renewed its contract with Reyes Kurson in July 2016 to extend through the end of the year.  A.53, 56-60.  In December 2016, after FEJA passed, the firm's contract was renewed again.  A.413.

\*        \*        \*

Because there was no explicit connection between the "quid" contracts and the "quo" legislation, the government's case on the ComEd counts relied on a "stream of benefits" theory.  The government urged the jury to infer a

12

bribery agreement from the fact that the Illinois legislature passed laws benefitting ComEd during the near decade when ComEd hired the subcontractors, interns, and Reyes Kurson. The government's closing demonstrative summarized it this way (with legislative actions at the top and the ComEd contracts at the bottom):



R.408 p.19; *see also* A.414 ("So those are the bribes, a stream of benefits designed to impact Madigan's official action.").[2]

The government largely focused its case on evidence that Madigan's co-defendant Michael McClain invoked Madigan in discussions with ComEd (for

---

[2] The "Skinny Bill" noted in the above graphic refers to Senate Bill 2080, which did not pass in the Senate and did not receive a vote in the House. A.358.

example, when discussing the Reyes Kurson contract with ComEd, *see* R.472 p.40), or that ComEd-affiliated individuals stated their intent to curry goodwill with Madigan, *see* R.471-3 pp.732-34 (statement by ComEd CEO Pramaggiore). Madigan was not a party to the communications between McClain and ComEd. The government emphasized that it was not required to prove Madigan's *agreement* to act on a specific question or matter in exchange for the contracts, urging in closing argument: "What does matter is whether Madigan knew these benefits were being showered on him in exchange for his official action on *future* legislation." A.400 (emphasis added).

### 2. State board counts (Counts 8-10, 12-14)

Sixteen of the indictment's twenty-three counts centered on Madigan's interactions with Danny Solis, a long-time Chicago alderman. Madigan had known Solis for decades, and they regularly supported each other. A.384-85. For example, when Solis's daughter needed work, Madigan hired her as a campaign assistant. A.385. And Solis sometimes introduced Madigan to potential clients for Madigan's firm. A.88, 384. None of this was alleged to be improper.

### a. The ruse.

Unbeknownst to Madigan, in 2016, the government caught Solis attempting to unlawfully solicit campaign contributions for himself. A.89-91. In exchange for a deferred prosecution agreement that led to dismissal of a felony

charge and no jail time, Solis agreed to become an informant. A.89-91. From 2016 to 2018, Solis was "undercover, [and] was basically lying all the time." A.96. The government told Solis when and with whom to meet and instructed Solis what to say. A.96.

In 2018, the government gave Solis a new "assignment": target Madigan. A.95. Agents directed Solis to tell "Madigan that if [Madigan] could get [Solis] appointed to a state board position, [Solis] would continue to" do what Solis had already been doing for Madigan for years: "mak[ing] introductions to developers for [Madigan] with the expectation [Madigan's] [law] firm would receive tax business." A.88.[3]

### b.     The recordings.

After the ruse began, every relevant interaction between Solis and Madigan was recorded. The transcripts of those recordings demonstrate that the ruse did not go as planned. In June 2018, Solis introduced Madigan to developer John Abell. A.386. At roughly the same time, Solis told Madigan he was looking to exit his alderman role and wanted Madigan's help securing

---

[3] The power to appoint board members belonged to the governor. A.97. At the inception of the government's ruse, Bruce Rauner, a Republican, was governor. Madigan had an "antagonistic political position with then-Governor Rauner." A.72.

a state board position.  A.387-88; R.471-3 pp.395-96.  Without hesitation, Madigan responded that he would "take a note down."  R.471-3 p.396.  Because the discussion had just followed a pitch, the conversation turned back to various developers, and Madigan noted that he was interested in meeting with Harry Skydell, a developer with a new project in Chicago.  R.471-3 p.396.  Madigan made no connection between an introduction to a developer—which Solis routinely and unconditionally gave Madigan—and Solis's interest in a state board seat.  A.393.

In August 2018, Solis and Madigan met again.  R.471-3 p.450.  Solis asked, "[W]hat would happen if you recommended me?"  Madigan responded that, if he recommended Solis, "[Madigan] would go to Pritzker," then the Democratic candidate for governor.  R.471-3 p.456.  As the conversation progressed, Solis saw his opening:  he made his first—and only—offer to "help" Madigan and referenced various developers that he knew.  R.471-3 p.456-57.  But Madigan immediately and emphatically rejected Solis:  "Don't.  Don't worry about it."  R.471-3 at 457.  After confirming Solis's interest in board seats, Madigan told Solis, without condition, "Just leave it in my hands."  R.471-3 p.457.

Later in the same conversation, Madigan and Solis discussed Madigan's son, Andrew, who worked at an insurance company, Alliant.  R.471-3 pp.457-58.  Andrew had previously pitched a developer, Raul Raymundo, for insurance business.  Madigan knew that Raymundo and Solis were friends, and asked if Solis would ask Raymundo to give Andrew "a chance to show what he, what he can do."  R.471-3 p.458.  Neither Madigan nor Solis made any connection to the state board recommendation.

Madigan and Solis had two remaining conversations, *see* R.471-3 pp.640-45; R.471-3 p.654, during which Solis identified the state board seats he was (supposedly) interested in.  Governor Pritzker won the election, but Madigan never recommended Solis.  Even if he had, there was no evidence the governor would have responded favorably.  Pritzker's office did not "think that it was necessary to act on a particular recommendation" from Madigan.  A.109-10.  The office "did [its] own due diligence," "had a process around any recommendation," and ultimately "made the decision that [the office] thought … was right for the position."  A.110; *see also* A.108.  The governor selected fewer than half of Madigan's recommendations for other positions.  A.98.

Meanwhile, Solis did introduce Madigan to Skydell, R.471-3 p.535, but Skydell never hired Madigan's firm, R.401 p.26.  As for Madigan's son, Solis

17

asked Raymundo to return Andrew's call, A.99-100, and Raymundo gave Andrew's name to another individual at his organization, A.106. The company did not hire Alliant at that time. A.100.[4]

## B.    Procedural History

1.  In March 2022 a grand jury indicted Madigan on twenty-two counts, including RICO conspiracy in violation of 18 U.S.C. § 1962(d); conspiracy to commit federal-program bribery and to falsify ComEd's books and records and circumvent ComEd's internal controls in violation of 18 U.S.C. § 371; five counts of federal-program bribery in violation of 18 U.S.C. § 666; Travel Act violations under 18 U.S.C. § 1952(a)(3); and wire fraud and honest-services fraud in violation of 18 U.S.C. §§ 1343 and 1346. R.1. The government superseded the indictment in October 2022. R.37.

The indictment charged as a co-defendant Michael McClain, an associate of Madigan's, on some of the counts. R.1, R.37. McClain was not convicted on any counts.

---

[4] Two years later, in 2020, that organization, unrelated to Andrew, hired Alliant, a decision that "was in the best interest of" the company, and "only because of service, quality, and cost." A.100.

While the case was pending, the Supreme Court issued *Snyder v. United States*, 603 U.S. 1 (2024), holding that § 666 proscribes only quid pro quo bribery and not gratuities. The district court offered the government the opportunity to supersede again, in light of *Snyder*. R.121. The government declined. R.123.[5]

2. The trial lasted four months. The parties vigorously litigated the jury instructions. As relevant here, the district court gave its own instruction—over Madigan's objection—on the "stream of benefits" theory (affecting Counts 2, 4, and 6). The instruction read: a "'thing of value' may involve a stream of benefits in a 'this for that' exchange for one or more official actions." A.505-06, 516, 518.

With respect to the federal-program-bribery-related counts (Counts 2, 4, and 6), the court crafted its own instructions on the "corruptly" means rea element, modeled off this Court's Pattern Instructions:

---

[5] In a separate case, the government prosecuted four individuals—Pramaggiore, Hooker, McClain, and Doherty (the ComEd defendants)—alleging they conspired to bribe Madigan. *United States v. McClain* (N.D. Ill.) (No. 1:20-CR-812). After the trial in that case, the district court vacated over half of the counts of conviction, concluding that the jury instructions erroneously permitted conviction on a gratuity theory that *Snyder* invalidated. *See* No. 1:20-CR-182, Dkt. 398.

(a) a "defendant acts 'corruptly' if he acted with the understanding that a 'thing of value' is to be exchanged for an 'official act' with the intent to influence or reward a State agent in connection with his official duties" or, (b) "[i]n other words," "the defendant understood the conspiracy involved a 'this for that' exchange of a thing of value' for an official action."

A.505; *see also* A.515-16.  In doing so, the court rejected both parties' proposals to define "corruptly" as embracing consciousness of unlawfulness or wrongdoing.  *See* R.176 pp.71, 137-39.  Madigan also objected that the instruction erroneously focused on the intent of the bribe-giver, not the recipient.  R.314 pp.3-4.

Finally, with respect to the Travel Act (Counts 5, 12-14), the court included as predicates Illinois state offenses lacking a quid pro quo element, A.525-26, and refused Madigan's request to include a quid pro quo element in the instruction, R.314 p.2.

In closing and rebuttal, the government seized on these instructions.  For example, the government reiterated that the "bribes [were] a stream of benefits" in exchange for "ComEd's legislative tides."  A.414-15.  The government repeatedly argued that it did not need to prove that Madigan intended to be influenced or to modify his behavior in any way.  A.402, 417; *see also* A.400 ("And it doesn't [m]atter that these, payments, these bribes, they didn't need to affect Madigan's vote").  And it leaned on the fact that, under the

20

Travel Act, it needed to prove only that Madigan "receiv[ed] or agree[d] to accept property, knowing that it was tendered with the intent to cause the person to be influenced." A.417.

4. Madigan moved for judgment of acquittal at the close of the government's case, and the court reserved. A.112. After the defense case, in which Madigan testified, Madigan renewed the motion. A.398. The court denied the motion. A.399.

After lengthy deliberations, the jury returned a mixed verdict, declining to convict on more than half of the counts.[6] The jury acquitted Madigan of seven counts and failed to reach a verdict on six others. SA.102; R.331.

After the verdict, Madigan renewed his acquittal motion and moved for a new trial. R.401. As discussed in more detail below, the court denied Madigan's motions. SA.1-101.

5. At sentencing, the court calculated the guidelines sentence as an astonishing 1260 months' (105 years') imprisonment, driven primarily by the purported (and disputed) value of the at-issue legislation. A.433-34. The court ultimately imposed a sentence of 90 months' imprisonment on both sets of

---

[6] For a chart of the counts and corresponding verdicts, *see* SA.2-3.

counts, to run concurrently. SA.103. The court fined Madigan $2.5 million. SA.109. The court acknowledged that the record reflected numerous instances in which Madigan "went out of his way to help people, and did so without any gain to himself." A.435.[7]

## SUMMARY OF ARGUMENT

The government pursued legally flawed bribery theories that yielded significant instructional errors and related failures of proof. Both plague the ComEd and state board convictions.

I. A. On the ComEd counts (Counts 2, 4-6), the government pursued the legally flawed theory that Madigan was bribed through a decade-long stream of benefits where the parties did not contemporaneously identify the specific question or matter on which Madigan was supposed to act. Instead, the government argued that an agreement to help ComEd with "future legislation" sufficed. A.400. As other circuits have concluded since *McDonnell*, *McDonnell* forecloses such a theory. Under *McDonnell*, the government must prove, and the jury must be instructed, that when an official accepts a "bribe,"

---

[7] The sentences for the ComEd defendants were a fraction of Madigan's: 24 months for McClain and Pramaggiore, 18 months for Hooker, and 12 months for Doherty. *See United States v. McClain*, ECF 479, 467, 499 (N.D. Ill. No. 1:20-CR-812).

he understands the "particular question or matter to be influenced." *United States v. Silver*, 948 F.3d 538, 568 (2d Cir. 2020); *see McDonnell v. United States*, 579 U.S. 550, 579 (2016). The government never proved a quid pro quo on a concrete question or matter.

Nor did the government prove the other objects of the alleged conspiracy: falsifying ComEd's internal records and circumventing ComEd's internal controls. The government never proved that Madigan even knew about ComEd's internal records or controls; it merely speculated that he must have known about them because he is a lawyer. The government likewise did not prove the existence of any false documents.

B. 1. Relatedly, the "stream of benefits" instruction on the federal-program bribery counts failed to convey the legal limits of that theory of bribery. The government prosecuted the ComEd § 666 counts (Counts 2, 4, and 6) on the theory that Madigan received a "stream of benefits" from ComEd over nearly a decade, and, in return, acted favorably on legislation as opportunities arose. The jury instructions did not require the jury to find a quid pro quo on a specific question or matter, permitting the government to urge conviction on the flawed basis that Madigan agreed to act favorably on "legislation."

23

2.  The district court also misunderstood the "corruptly" element of federal-program bribery.  Although the government in *Snyder* conceded that "corruptly" requires consciousness of wrongdoing, the court refused to give any similar instruction, instead collapsing "corruptly" into the separate element of "intending to be influenced or rewarded."  The court further erred by defining "corruptly" as turning on the intent of the alleged bribe-giver and not the bribe-taker, an error that the Second Circuit has acknowledged.  *See United States v. Ford*, 435 F.3d 204, 212-13 & n.4 (2d Cir. 2006).

3.  On the Travel Act count (Count 5), the instructions permitted conviction based on predicate Illinois offenses that did not require a quid pro quo.  But, as the Ninth Circuit has held, the Travel Act proscribes only "generic bribery" as it existed in 1961, which required a quid pro quo.  *United States v. Shen Zhen New World I, LLC*, 115 F.4th 1167, 1184 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 2814 (2025).

II.  A.  Madigan was entitled to acquittal on the state board counts (Counts 8-10, 12-14) because the government failed to prove the alleged scheme beyond a reasonable doubt.  The alleged scheme (which the government manufactured through its cooperator) never progressed far enough to amount to a crime.  The recorded calls did not show a quid pro quo agreement.

Because Madigan never recommended Solis to Governor Pritzker, no evidence proved that Madigan made any misrepresentation.  And the jury was left to speculate whether Madigan's recommendation, which never occurred, would have satisfied *McDonnell*'s "official act" standard.

B.  At a minimum, vacatur of the convictions on the Travel Act counts (Counts 12-14) is required because of the same instructional error requiring vacatur of the Count 5 conviction.

## STANDARD OF REVIEW

This Court reviews jury instructions de novo to "determine whether they fairly and accurately summarize the law."  *United States v. Grady*, 746 F.3d 846, 848 (7th Cir. 2014).  The Court will vacate a conviction when the instructions "so misguided the jury that they led to appellant's prejudice."  *Id.* (quoting *United States v. Quintero*, 618 F.3d 746, 753 (7th Cir. 2010)).

This Court likewise reviews de novo denial of a motion for judgment of acquittal.  *United States v. Jones*, 713 F.3d 336, 339 (7th Cir. 2013).

## ARGUMENT

**I. MADIGAN IS ENTITLED TO ACQUITTAL OR A NEW TRIAL ON THE COMED COUNTS (COUNTS 2, 4-6).**

### A. The Government Did Not Prove the ComEd Counts Beyond a Reasonable Doubt.

Federal bribery law is not a code of "good government for local and state officials." *McDonnell*, 579 U.S. at 577 (internal quotation marks omitted). Its reach is limited to specific conduct: an exchange of something of value for an official act, a quid pro quo. The government failed to prove an unlawful quid pro quo. Nor did it prove that Madigan conspired to falsify ComEd documents or circumvent ComEd's internal controls that he knew nothing about.

In reviewing the sufficiency of the evidence, this Court asks "'whether, after viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Jones*, 714 F. 3d at 340 (emphasis omitted) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Inferences drawn from evidence must be reasonable, and convictions based on speculation cannot stand. *Jones*, 714 F. 3d at 340. Rather, "each link in the chain of inferences" must be "sufficiently strong to avoid a lapse into speculation." *United States v. Moore*, 572 F.3d 334, 337 (7th Cir. 2009) (quotation omitted). Because the district court reserved decision on Madigan's motion at the close of the government's

case, A.112, the sufficiency of the evidence is reviewed "on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b).

### 1. *The government failed to prove bribery or conspiracy to commit bribery.*

a. *McDonnell* clarified the scope of bribery in cases that, as here, incorporate the definitions of 18 U.S.C. § 201.[8] *McDonnell* held that an act is "official" only if it is a "decision or action" on a "specific and focused" "question or matter" that "involves a formal exercise of governmental power." *Id.* at 571-72. It further held that a "question or matter" must be "relatively circumscribed—the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete." *Id.* at 570.

Numerous circuits have considered *McDonnell*'s impact on the "stream of benefits" theory of bribery, under which a public official agrees to perform official acts on an ongoing basis "as opportunities arise." The circuits have unanimously agreed that while *McDonnell* did not abrogate the theory altogether, its holding compels an important limitation. To comport with

---

[8] The government urged the district court to use § 201's definition of a quid pro quo for the § 666 counts. *See, e.g.*, R.269 pp.8-9; *see also* SA.17 n.18. When the government affirmatively agrees to application of a legal standard to a given claim, as here, that standard governs. *See, e.g.*, *McDonnell*, 579 U.S. at 562, 580; *United States v. Allinson*, 27 F.4th 913, 920 (3d Cir. 2022).

*McDonnell*, the parties to an alleged stream-of-benefits bribery agreement must identify at the time of the agreement the "specific and "focused" "question or matter" to be influenced, even if the official acts to be taken on that question or matter are not yet identified. *See United States v. Burnette*, 65 F.4th 591, 603 (11th Cir. 2023); *United States v. Roberson*, 998 F.3d 1237, 1251 (11th Cir. 2011); *United States v. Hills*, 27 F.4th 1155, 1179 (6th Cir. 2022); *United States v. Reichberg*, 5 F.4th 233, 247-48 (2d Cir. 2021).[9]

As the Second Circuit explained in *Silver*, 948 F.3d 538, after *McDonnell* the government cannot base a conviction on an open-ended promise to take official action "for the benefit of the payor." *Id.* at 565. If no specific and focused question or matter is identified when an official accepts a thing of value, "an official could accept a payment—lawful or otherwise—and later incur criminal liability by voting on *any* legislation or performing *any* official act on *any* topic that benefits the payor." *Id.* at 568-69; *see also Burnette*, 65 F.4th at 614 (Jordan, Rosenbaum, and Newsom, JJ., concurring) (under *McDonnell*, an official's promise to "vote for his benefactor on some unspecified, future

---

[9] This Court has considered the stream-of-benefits theory once since *McDonnell*, but was not asked to decide how *McDonnell* impacted the theory. *See United States v. Solomon*, 892 F.3d 273, 275 (7th Cir. 2018) (recognizing general validity of "stream of benefits" theory in sentencing appeal).

project that might someday come before him" is too "hazy a promise" to "form the basis of a bribery conviction"). Criminalizing insufficiently specific agreements would improperly eliminate the distinction between lobbying (lawful attempts to "buy favor"), *see United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 405-06 (1999)), and bribery (unlawful attempts to buy action on specific questions or matters). *See Silver*, 948 F.3d at 567.

Failure to identify the specific question or matter to be influenced also would blow up the distinction between bribes (provided with an intent to influence) and gratuities (provided as tokens of appreciation). After *Snyder*, the government must show a quid pro quo to prove federal-program bribery; gratuities do not suffice. 603 U.S. 1, 10-11; *see also United States v. Lindberg*, 39 F.4th 151, 172 (4th Cir. 2022) (§ 666 requires "intent to engage in a fairly specific quid pro quo" (quotation and emphasis omitted)). If no specific and focused question or matter is identified when a payment is accepted, it becomes impossible to distinguish among a lawful "quid" for unidentified future action, a lawful gratuity for past action, and an illegal bribe.

b. The government here pursued the legally flawed theory that ComEd bribed Madigan through a decade-long stream of benefits where the parties

did not contemporaneously identify the question or matter on which Madigan was supposed to act. As just discussed, the law requires more.

The government never proved a conspiracy to exchange things of value for action on specific questions or matters. To the contrary, in closing, the government repeatedly, and unlawfully, urged the jury to convict so long as Madigan agreed to take *unidentified*, future legislative action for ComEd's benefit.

- "What does matter is whether Madigan knew these benefits were being showered on him in exchange for his official action on *future* legislation." A.400 (emphasis added).

- "[T]hese benefits, these subcontractor payments, were made as a favor to Madigan to make sure he was positively disposed to ComEd's legislative agenda." A.410.

- "[J]ust know that this stream of benefits, including the no-show subcontractor payments, was corresponding to ComEd's constant need for legislation." A.411.

- "The payments were intended to make sure Madigan would not block ComEd bills, would help move ComEd bills out of committee, would call bills for votes and, in some instances, would vote on bills." A.408.

The government advanced the same invalid theory in opposing Madigan's post-trial motions:

- "[T]he 'quo' was action on legislation."  R.408 p.28.

- "[T]he massive benefits conferred on Madigan were intended to secure ComEd's good fortune in Springfield."  R.408 p.35.

- "Madigan knew that when he made a demand of ComEd – a regulated entity that was beholden to him for its legislation – it would be acted upon so that Madigan would act favorably on legislation."  R.408 p.40.

- "Furthermore, the evidence proved that Madigan did, in fact, take official action on a particular matter or question—legislation affecting ComEd—as the opportunity to influence such legislation arose."  R.408 p.94.

"Legislation" writ large is not a specific question or matter.  As *McDonnell* put it, a question or matter must be "relatively circumscribed—the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete."  579 U.S. at 570; *see also id.* at 570-71 (identifying sufficiently specific examples).  "Legislation" of interest to a company is not such a thing.  If it were otherwise, criminal liability could impermissibly attach anytime an official accepts a payment "lawful or otherwise" and "later … vot[es] on *any*

legislation or perform[s] *any* official act on *any* topic that benefits the payor."
*Silver*, 948 F.3d at 568-69; *see also Burnette*, 65 F.4th at 614 (Jordan, Rosenbaum, and Newsom, JJ., concurring).  The government secured a conviction on this improper basis.

To the extent the government even tried to link particular ComEd hirings to specific legislation, it primarily pointed to the fact that the first hirings began in 2011, when EIMA was pending.  *See, e.g.*, R.460 p.10.  But there was no evidence of a quid pro quo in 2011.  When ComEd hired the first subcontractor in August 2011, A.83, *the legislature had already passed EIMA with Madigan's support.  See supra* pp.8-9.  The governor did not veto the bill until September 2011.  A.64.  And while the Reyes Kurson contract began in October 2011, R.474-1 p.21, the day before the legislature overrode the veto, A.65, the parties had been negotiating the contract since June 2011, A.52 (also before the governor's veto).  The government did not prove the contract was part of an exchange for Madigan to take official action to overcome the veto.

Nor was the renewal of the Reyes Kurson contract tied to the FEJA vote in 2016; the contract was in negotiations for over six months, and was initially renewed in July 2016, well before the legislature voted in December.

*See supra* p.12.  ComEd renewed the Reyes Kurson contract again in December 2016, after FEJA passed, to continue its relationship with the firm into 2017.  *See, e.g.* A.61-62.

Nor did the district court conclude after trial that the government proved a legally valid quid pro quo.  Although the court alluded to "specific pending legislation," *e.g.*, SA.7, the court characterized the alleged quid pro quo in vague terms suggesting that ComEd was paying the subcontractors and the Reyes Kurson law firm to curry favor with Madigan on any and all legislation that might affect it:

- "[T]hese payments constituted an overt act whereby ComEd coconspirators, through intermediaries, paid Madigan's allies to unlawfully obtain his favor."  SA.6.

- "[P]ayments ComEd made to Madigan's associates were all part of the same unified strategy: to procure Madigan's favor and prevent him from single-handedly blocking their legislation."  SA.17.

For the reasons just discussed, these are not valid quid pro quos.  Conferring benefits on officials to "procure [their] favor" on future legislation is what lobbyists do every day.  Even if these interactions do not "typify normal

33

political interactions between public officials and their constituents," *McDonnell*, 579 U.S. at 576, they are not bribery.

c.   Counts 4 and 6 (federal-program bribery) are likewise defective. Count 4 alleged that Madigan committed bribery by soliciting payments for Zalewski in April-June 2018.  R.37 p.65.  Count 6 alleged that Madigan committed bribery by soliciting payments for three subcontractors in January-March 2019.  R.37 p.67.  But no evidence showed that Madigan understood any link between those payments and specific legislation—let alone that he acted with a corrupt mind or intended to be influenced or rewarded as to specific legislation.  Indeed, the *only* relevant bill during this time period—HB 5626—went against ComEd's interest, and Madigan nonetheless supported it.

d.  Count 5 (Travel Act) likewise fails.  As discussed below, the government needed to prove quid pro quo bribery to satisfy the Travel Act.  *See infra* Part I.B.3.  Count 5 related to ComEd's hiring of Zalewski in June 2018.  R.37 p.66.  Again, no evidence proved that Madigan understood, much less corruptly agreed to, any link between that hiring and specific legislation.

34

### 2. The government failed to prove conspiracy to falsify documents or avoid internal controls.

The government likewise failed to prove Madigan's participation in a conspiracy to falsify ComEd's internal documents or avoid its internal controls. 15 U.S.C. §§ 78m(b)(5) & 78ff(a). As to both "objects," the government had to show that Madigan joined the conspiracy with the specific intent to commit these crimes. *See Ocasio v. United States*, 578 U.S. 282, 288 (2016). It came nowhere close. If the evidence here suffices, then anytime an official accepts a bribe from a corporate entity, he will automatically be guilty of "conspiring" to circumvent the company's internal controls, and falsifying company documents, designed to prevent bribery. That cannot be right.

a. The government based its claim that Madigan conspired to falsify documents on ComEd's purported failure to describe the purpose for hiring the subcontractors on ComEd's "single source justification" forms. A.85. In closing, the government urged the jury to speculate that because Madigan was a lawyer, he would understand that employees were not permitted to falsify documents. A.412; *see also* SA.35. But the government presented no evidence that Madigan knew anything about these forms or ComEd's processes for documenting contracts. Without that knowledge, he could not possibly have conspired to falsify ComEd's internal documents.

35

In any event, the purportedly "false" documents were not even false. When, as here, a statute criminalizing "false" statements does not include the word "misleading," the government must prove the statements or documents were false, not simply misleading. *Thompson v. United States*, 604 U.S. 408, 413 (2025). The government's theory that the forms *should have disclosed* the payment's true purpose is an invalid misleading-by-omission theory.

b. The government likewise presented *no evidence* that Madigan was even aware of ComEd's internal controls. It beggars belief that Madigan conspired to circumvent internal controls that he knew nothing about. Again, the district court's contrary holding rested on the mere fact that Madigan is a lawyer. SA.35.

## B. At a Minimum, Madigan Is Entitled to a New Trial Due to Instructional Errors.

Overlooking or dismissing relevant authority from this Court and other circuits, the district court misinstructed the jury on critical elements of the federal-program bribery and Travel Act counts. Even if the evidence suffices, vacatur is required.

A conviction must be vacated if the jury instruction misstated the law and the error was not harmless. *United States v. Johnson*, 114 F.4th 913, 917 (7th Cir. 2024). When a district court fails to accurately instruct on an element

36

of an offense, the burden rests on the government to prove that the error was harmless beyond a reasonable doubt. *See Neder v. United States*, 527 U.S. 1, 15 (1999); *United States v. Wade*, 962 F.3d 1004, 1008 (7th Cir. 2020); *United States v. Edwards*, 869 F.3d 490, 501 (7th Cir. 2017). Under this standard, vacatur is required if there is even a "reasonable possibility that" the error "contributed to the conviction." *Chapman v. California*, 386 U.S. 18, 24 (1967). The government cannot carry this heavy burden here.

### 1. The stream-of-benefits instruction was erroneous.

The district court's "stream of benefits" instruction improperly permitted the jury to convict Madigan without evidence of an unlawful quid pro quo. *See supra* Part I.A.

a. Neither party requested a stream-of-benefits instruction. *See* R.176 pp.71-76; R.178 pp.70-75. After the charge conference, the district court *sua sponte* added its own "stream of benefits" instruction into the final instructions. The court stated:

> A "thing of value" means a private benefit either to the public official or to any person, with the intent to influence or reward an agent of State government in exchange for an official action or actions related to some business, transaction, or series of transactions of the government (as defined in these instructions). The term "thing of value" may involve a stream of benefits in a "this for that" exchange for one or more official actions."

A.505-06.  Madigan objected, noting that the instruction "lessen[ed] the government's burden" and referred the court to his pre-trial arguments on the stream-of-benefits theory.  R.314 p.4; R.317 p.10; *see* R.55 p.55; R.79 p.10.

The final sentence of this passage, which does not come from this Court's pattern instructions, invited conviction on a nebulous "stream of benefits" theory without the limitations required by *McDonnell*.  The jury did not have to find any connection between the benefits received and an agreement by Madigan to take official action on some concrete "question or matter."

The instruction resembled the invalid instruction in *Silver*, which permitted the jury to convict if Silver "understood that, as a result of the bribe, he was expected to exercise official influence or take official action *for the benefit of the payor* and, at the time the bribe was accepted, intended to do so as specific opportunities arose."  *Silver*, 948 F.3d at 559.  The Second Circuit held that "the jury should have been instructed that, … the Government must prove that, *at the time the bribe was accepted*, Silver promised to take official action on *a specific and focused question or matter* as the opportunities to take such action arose."  *Id.* at 568 (emphasis added).

38

In denying Madigan's post-trial motion, R.401 p.53, the district court held that its instruction "clearly and forcefully articulate[d] that an official action must be 'specific' and make use of the official's office in a specific and focused manner." SA.62. But what qualifies as an official act is a different question than whether the parties identified the question or matter on which an official would act at the time of the agreement. The instructions did not convey that latter requirement.

The court also reasoned, in denying release pending appeal, that other aspects of the instructions cured the error. None did. The court pointed to the instruction that the government "must prove that an agreement existed … *before* the official action is to take place." SA.19 (emphasis in original). But the timing of the purported agreement is irrelevant to whether the agreement, when reached, related to a specific question or matter. The court also asserted that its definition of "official action" purportedly covered the concept. SA.20. But that instruction likewise failed to inform the jury that the specific question or matter must be identified at the time of the agreement. A.493. It instructed only that an "official action" is, itself, a "specific decision or action," but provided no guidance for determining the question or matter to be acted upon. A.493.

b. The government cannot show beyond a reasonable doubt that the jury would have convicted without the erroneous instruction. *See United States v. L.E. Myers Co.*, 562 F.3d 845, 855 (7th Cir. 2009). As already discussed, the government built its entire case on the flawed premise that Madigan's so-called "stream of benefits, including the no-show subcontractor payments, was corresponding to ComEd's constant need for legislation." A.411. The government disclaimed the need to identify the legislation—*i.e.*, the specific question or matter—subject to the agreement. *See supra* pp.30-31. On the government's theory, an agreement to help ComEd with future unidentified legislation would be federal-program bribery. As already discussed, *McDonnell* forecloses that theory. *See Burnette*, 65 F.4th at 614 (Jordan, Rosenbaum, and Newsom, JJ., concurring); *Silver*, 948 F.3d at 568.

For good reason: eliminating this guardrail would turn legal lobbying efforts into corruption merely by virtue of the fact that a company with general business before a state legislature attempts to curry favor with representatives. Were that the standard, lobbying would cease to exist. At a minimum, a new trial is required.

## 2. The "corruptly" instruction was erroneous.

Section 666(a)(1)(B) makes it a crime to "corruptly solicit[] or demand[] … , or accept[] or agree[] to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions" of a covered entity valued over $5,000. As the Supreme Court recognized in *Snyder*, the statute contains two distinct intent elements: the official must act (1) "corruptly" and (2) "intending to be influenced or rewarded." 603 U.S. at 11.

Over Madigan's objection, the district court misstated, and collapsed, these intent elements. First, by defining "corruptly" as acting with knowledge of an intended exchange, the court failed to convey that "corruptly" requires knowledge of an unlawful or wrongful exchange. This effectively wrote "corruptly" out of the statute. Second, the court further erred in defining "corruptly" as turning on the intent of the alleged bribe-giver and not the bribe-recipient. The Second Circuit has vacated a conviction for this latter error. *See United States v. Ford*, 435 F.3d 204, 212-13 & n.4 (2d Cir. 2006). Both errors require vacatur of Counts 2, 4, and 6.

a. A defendant acts "corruptly" when he knows his actions are unlawful or wrongful. In *United States v. Ng Lap Seng*, 934 F.3d 110 (2d Cir. 2019), the

41

Second Circuit defined "corruptly" under § 666 as "the bad purpose of accomplishing either an unlawful end or result, or a lawful end or result by some unlawful method or means." *Id.* at 142 (quotation omitted).  As support, the Second Circuit cited *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005), which held that an instruction on "corruptly" in 18 U.S.C. § 1512(b) "failed to convey the requisite consciousness of wrongdoing." *Id.* at 706; *see also, e.g.*, *United States v. Fischer*, 64 F.4th 329, 357 (D.C. Cir. 2023) (Walker, J., concurring in part) ("corruptly" requires that defendant "knew he was obtaining an unlawful benefit [and] that his objective or 'purpose' was to obtain that unlawful benefit" (internal quotation marks omitted)), *vacated on other grounds*, 144 S. Ct. 2176 (2024) (mem.).

The Solicitor General embraced this definition in *Snyder*, telling the Supreme Court that "corruptly" means "consciousness of wrongdoing."  U.S. Br. 38-39, *Snyder v. United States*, No. 23-108 (S. Ct. filed Mar. 11, 2024).  This Court embraced that definition on remand, observing that the statute required proof that "Snyder was conscious of wrongdoing and had a corrupt state of mind." *United States v. Snyder*, 2024 WL 4834037, at *2 (7th Cir. Nov. 20, 2024).  The Solicitor General's position in *Snyder* was consistent with its interpretation of "corruptly" in 21 U.S.C. § 7212(a) as requiring the "specific intent

42

to obtain an unlawful advantage." *Marinello v. United States*, 584 U.S. 1, 10 (2018) (quoting oral argument); *see also id.* at 21 (Thomas, & Alito JJ., dissenting) ("corruptly" functions like "willfully" but also requires proof that the "unlawful benefit" was the defendant's "objective or purpose").

Here, the government conceded at the charge conference that it "would be remiss not to have some concept of consciousness of wrongdoing" in the definition of "corruptly." A.278-79. The court recognized the evolving law on this issue, A.347, and acknowledged it "could be totally wrong," A.310. But the court, over Madigan's objection, R.314 p.3, refused to equate "corruptly" with consciousness of unlawfulness or wrongdoing.

Instead, the court instructed the jury as follows:

> [A] defendant acts "corruptly" if he acted with the understanding that a "thing of value" is to be exchanged for an "official act" with the intent to influence or reward a State agent in connection with his official duties. The government need not prove, however, that the defendant knew that the law prohibited his conduct.

A.505 (conspiracy count); *see also* A.515 (materially identical instruction on substantive federal-program bribery counts). The court based the first sentence of this instruction on this Court's Pattern Instruction on § 666; it crafted the second sentence by itself.

43

The instruction misstated the law in two respects.  First, it improperly rendered "corruptly" superfluous by equating "corruptly" with the separate intent element of "intending to influence or reward."  *See Corley v. United States*, 556 U.S. 303, 314 (2009) (applying canon against superfluity).  The government recognized this problem at the charge conference.  *See* A.279 ("[N]ot only do we have to prove the actual, the wrongful intent to influence, but some other potential mental, maybe some other potential mental state … we acknowledge that 'corruptly' does have a separate meaning.").

Second, the concept of consciousness of unlawfulness or wrongfulness was missing from the instructions entirely.  Worse, the court told the jury the opposite:  "The government need not prove, however, that the defendant knew that the law prohibited his conduct."  A.505.  This instruction, too, rendered "corruptly" meaningless.

In denying a new trial, the court defended its instruction by citing the maxim in *Snyder* that "American law generally treats bribes as inherently corrupt and unlawful."  SA.44 (citing 603 U.S. 1, 5).  That argument puts the cart before the horse:  a quid pro quo constitutes a "bribe" only if every element of § 666 is satisfied, including the "corruptly" requirement.  Not all exchanges are inherently corrupt.  *See, e.g.*, *United States v. Blagojevich*, 794 F.3d 729,

44

736 (7th Cir. 2015).  By requiring consciousness of unlawfulness or wrongdoing, the "corruptly" element ensures that only quid pro quos the defendant understands as unlawful are punished.

b.  The district court's definition of "corruptly" was wrong for the additional reason that it focused on the bribe-giver's, not the bribe-taker's, intent. Section 666 criminalizes as separate offenses both the offer and the receipt of bribes.  The bribe-taker must "corruptly" solicit, demand, or accept "anything of value from any person, intending to be influenced or rewarded."  18 U.S.C § 666(a)(1)(B); *see supra* p.41.  "[T]he recipient must have accepted the thing of value while 'intending to be influenced.'"  *Ford*, 435 F.3d at 213; *see also United States v. Medley*, 913 F.2d 1248, 1260 (7th Cir. 1990).  When the crime concerns a bribe offer, in contrast, liability turns on *the offeror's* corrupt "intent to influence or reward" the bribe-recipient.  18 U.S.C. § 666(a)(2).

The intending-to-be-influenced-or-rewarded element differentiates § 666(a)(1)(B) from other bribery statutes like § 201.  "Section 201 lacks an explicit intent requirement as to recipients of alleged bribes while Section 666 contains one."  *Ford*, 435 F.3d at 210 n.2; *see* 18 U.S.C. § 201(b) (criminalizing the acceptance or demand of something of value "in return for" "being influenced").  This Court and others have interpreted § 201's distinct "in return

45

for" language as criminalizing bribe solicitation without respect to an official's subjective intent. *See United States v. Arroyo*, 581 F.2d 649, 655 (7th Cir. 1978); *see also, e.g.*, *United States v. Myers*, 692 F.2d 823, 841 (2d Cir. 1982).

As the Second Circuit held in *Ford*, it is error to apply those holdings to § 666. *See* 435 F.3d at 213 n.5 & 6. Because "[t]he plain language of [§ 666(a)(1)(B)]" requires the recipient to "take the proffered thing of value 'intending to be influenced,'" it follows "that a recipient's knowledge of a donor's intent to influence is insufficient to support conviction." *Id.* at 213 n.5. Other courts agree that, under § 666(a)(1)(B), a bribe-recipient's liability turns on his intent to be influenced or rewarded.[10]

The instructions fatally undermined the intending-to-be-influenced-or-rewarded element. First, with respect to the Count Two conspiracy—which

---

[10] *See United States v. Martinez*, 994 F.3d 1, 8 (1st Cir. 2021); *United States v. Elwell*, 515 F. App'x 155, 163 (3d Cir. 2013); *United States v. Vaughn*, 815 F. App'x 721, 729 (4th Cir. 2020); *United States v. Moeller*, 80 F.3d 1053, 1057 (5th Cir. 1996); *United States v. Maggio*, 862 F.3d 642, 647 (8th Cir. 2017); *United States v. Garrido*, 713 F.3d 985, 999-1000 (9th Cir. 2013); *United States v. Morgan*, 635 F. App'x 423, 433 (10th Cir. 2015); *United States v. Jackson*, 688 F. App'x 685, 692 (11th Cir. 2017). *But see United States v. Sittenfeld*, 128 F.4th 752, 770 (6th Cir. 2025), *pet. for cert. filed*, No. 25-49 (U.S. July 11, 2025) (suggesting it is "bribery to knowingly accept a bribe even if the official does not intend to be influenced by the bribe"); *id.* at 805 (Bush, J., dissenting) (evidence insufficient where there was "no proof that Sittenfeld himself viewed the campaign contribution" as bribe).

charged Madigan with conspiring both to solicit a bribe under § 666(a)(1)(B) and to offer a bribe under § 666(a)(2)—the court gave one definition of "corruptly" covering both offenses, over Madigan's objection.  R.314 pp.3-4.  That definition instructed that Madigan acted "corruptly" with respect to either object if he "acted with the *understanding* that a 'thing of value' is to be exchanged for an 'official act' with the intent to influence or reward a State agent in connection with his official duties."  A.505 (emphasis added); *see also* A.515-16.  In other words, Madigan's knowledge of *ComEd's intent* to influence him would satisfy the element.

Second, when defining "intent to influence," the court instructed that it was "sufficient if the public official knew that the thing of value was offered with the intent to exchange the thing of value for the performance of the official act."  A.509.  This reinforced the instruction's focus on the bribe-giver's intent.

The court based its definition of "corruptly" on this Court's Pattern Instructions, which define the term as turning on the bribe-giver's intent (and the bribe-taker's understanding of that intent) rather than the bribe-recipient's intent to be influenced or rewarded.  SA.41-43.  The Second Circuit in *Ford* vacated a § 666(a)(1)(B) conviction based on virtually identical errors

47

drawn from the same Pattern Instructions. 435 F.3d at 213. The district court in *Ford* took its instruction "from the Seventh Circuit's Pattern Jury Instructions, which in turn rely on *United States v. Bonito*, 57 F.3d 167, 171 (2d Cir. 1995)." *Id.* at 212 n.4.

The Second Circuit held that this Court's "Pattern Instructions misread *Bonito*," because *Bonito* was a § 666(a)(2) case against the bribe-giver. *Id.* The court noted that the error may have resulted from reliance on language in cases arising from Hobbs Act prosecutions premised on § 201, without appreciating that § 666(a)(1)(B) is a "different statute" with different elements. *Id.* at 213 n.5.

The Second Circuit held that the flawed instructions "may have confused the jury as to the specific intent required by … Section 666," requiring vacatur. *Id.* at 211. As the court explained, a jury in a § 666(a)(1)(B) case "should be clearly instructed that it is the recipient's intent to make good on the bargain, not simply her awareness of the donor's intent that is essential to establishing guilt." *Id.* at 213. This error was significant, the court explained, because "[t]he act underlying the conviction[]—accepting volunteer services and related goods in an election campaign—[was], *by itself,* not only innocuous but also rather commonplace." *Id.* at 212. The result should follow here. As in

48

*Ford*, the alleged quid—job placements for constituents and politically connected individuals—is commonplace in politics.

The district court here dismissed *Ford* on two grounds, both of which lack merit.

First, the court insisted that this Court had already decided the issue in *United States v. Hawkins*, 777 F.3d 880 (7th Cir. 2020), and *United States v. Peleti*, 576 F.3d 377 (7th Cir. 2009). SA.45, 55 n.47. But *Snyder* abrogated the reasoning of *Hawkins*, which upheld the pattern instruction because it "leaves work for" the "statute's prohibition of taking money as a 'reward,'" 777 F.3d at 882, which covered the now-rejected gratuity theory. *See* 603 U.S. at 19.[11] *Peleti* is irrelevant because it involved § 201(b)(2), not § 666. *See* 576 F.3d at 382.

Second, the court defended its instruction on the ground that the Count 2 conspiracy charged as objects both soliciting a bribe under § 666(a)(1)(B) and offering a bribe under § 666(a)(2). SA.53. This is irrelevant because the general verdict does not indicate which object the jury found. *See Yates v. Evatt*,

---

[11] This Court has restated *Hawkins*' holding in two other pre-*Snyder* cases without further analysis. *See United States v. Mullins*, 800 F.3d 866, 870 (7th Cir. 2015); *Blagojevich*, 794 F.3d at 736.

500 U.S. 391, 403-05 (1991).  And the flawed instructions applied to the substantive counts arising out of the same conduct, which were charged only under § 666(a)(1)(B).

c.  The government cannot prove harmlessness beyond a reasonable doubt.  As the district court recognized in its release order, the definition of "corruptly" was "significant to the case."  SA.9.  The government, too, told the jury that the corruptly element was "where the rubber meets the road" and "the key part here."  A.401-02.

It was critical for the jury to understand that Madigan needed to intend to be influenced or rewarded—not merely that he knew *ComEd had the requisite intent*.  The government repeatedly leveraged this error to Madigan's detriment.  Throughout closing and rebuttal, the government argued it did not need to prove that Madigan ever intended to be influenced or to modify his behavior.  *See, e.g.*, A.400 ("And it doesn't [m]atter that these, payments, these bribes, they didn't need to affect Madigan's vote.  What does matter is whether Madigan knew these benefits were being showered on him in exchange for this official action on future legislation."); A.415 ("What the government needs to show is that Madigan knew ComEd was giving all these benefits, intending them to be an exchange[.]"); A.415 ("Madigan knew why ComEd was bending

50

over backwards to pay all of his people."); A.428 (quoting from the instruction and arguing "[w]hat it talks about is this knowledge and understanding that the public official has of an intent to give a benefit in exchange for an official act. That's what's key.").

It was also critical to instruct the jury that Madigan needed to understand the unlawful nature of his actions to act "corruptly." The alleged quids and quos were not obviously improper. Again, Madigan received no payment from ComEd. Legislators regularly make job recommendations for constituents. Even if, as the court observed after trial (SA.9), Madigan understood it was unlawful to receive "a personal benefit for the purposes of influencing official action," it is not apparent that jobs for others are such a personal benefit. And the government never argued that Madigan's actions on legislation were contrary to the public good. *See, e.g.*, A.400 (closing: "It doesn't matter if the legislation was good for the people of Illinois or bad."); A.427 (rebuttal: "[S]o it's not a response to say, hey you know what, this EIMA, Smart Grid, FEJA, it was good legislation").

As discussed above, the government's case on Madigan's side of the alleged quid pro quo was exceptionally weak. Madigan had long supported the

only piece of legislation under contemplation when the alleged conspiracy began. *See supra* pp.8-9. Some of his actions on legislation in the subsequent years benefitted ComEd, but others did not. *See supra* p.10. A jury would rightfully doubt whether this ambiguous evidence showed that Madigan ever intended to be influenced or rewarded by ComEd's hirings or that he knew his actions were unlawful or wrongful.

### 3. The Travel Act instruction was erroneous.

Count 5 was premised on a purported violation of the Travel Act. At the government's urging, the district court instructed the jury that Illinois state offenses lacking a quid pro quo element could serve as Travel Act predicates. That was error. The generic definition of bribery requires a quid pro quo, and thus only state offenses requiring a quid pro quo can be Travel Act predicates. *United States v. Shen Zhen New World I, LLC*, 115 F.4th 1167, 1183 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 2814 (2025). If the Court does not order judgment of acquittal, it should vacate the conviction on Count 5.

a. The Travel Act, 18 U.S.C. § 1952(a), prohibits using "any facility in interstate … commerce" to carry on "unlawful activity," which the statute defines to include "bribery" in violation of state law, *id.* § 1952(b). The Travel Act does not define "bribery." The Supreme Court has held that Congress

52

intended the Travel Act to proscribe a uniform type of conduct qualifying as predicate acts, rather than deferring to "the manner in which States classify their criminal prohibitions[.]"  *United States v. Nardello*, 393 U.S. 286, 295 (1989) (involving predicate act of extortion).

Therefore, the Act applies to state offenses that correlate to the "generic definition of bribery" when the Travel Act was enacted in 1961.  *Perrin v. United States*, 444 U.S. 37, 44 (1979); *see also Shen Zhen*, 115 F.4th at 1182. To discern the generic definition of a term, courts ordinarily survey multiple sources—including state statutes, the Model Penal Code, and criminal law treatises from the relevant period.  *See Taylor v. United States*, 495 U.S. 575, 598 (1990); *Shen Zhen*, 115 F.4th at 1183.

This Court has not yet addressed the generic definition of bribery under the Travel Act.  However, as the Ninth Circuit has concluded, by 1961, state laws overwhelmingly defined bribery to require a quid pro quo.  *Id.* at 1183-84.  Texas, for example, held that bribery required an official "for a valuable consideration or reward" to "agree to refrain from performing an official act." *Selvidge v. State*, 126 Tex. Crim. 489, 490 (1934).  Other jurisdictions followed the same approach.  *See, e.g.*, *State v. Ferraro*, 67 Ariz. 397, 401 (1948); *State v. Davis*, 45 A. 394, 395 (Del. 1899); *Republic of Hawaii v. Young Hee*, 10 Haw.

114, 116 (1895); *Commonwealth v. Albert*, 29 NE.2d 817, 819 (Mass. 1940); *State v. Durnam*, 73 Minn. 150, 159 (1898); *People v. Kohut*, 282 N.E.2d 312, 319 (N.Y. 1972); *Osborn v. State*, 28 S.W.2d 47, 48 (Tenn. 1930); *State v. Hart*, 136 Wash. 278, 281-82 (1925).

The version of the Model Penal Code drafted closest in time to 1961 confirms that understanding. The American Law Institute's 1962 proposed Model Penal Code defined bribery as offering, giving, soliciting, or accepting a private benefit as "consideration" for an official act. Model Penal Code § 240.1(1) (Am. L. Inst., Proposed Official Draft 1962). The drafters explained that their definition of bribery—involving a quid pro quo and official act—reflected the era's "more conventional formula in bribery legislation." *Id.*

Leading criminal treatises agreed, with one treatise describing bribery in quid pro quo terms as "the offense of giving or receiving money or anything of value in return for which a public officer agrees to do or to refrain from doing an act, contrary to his legal duty." 3 Wharton's Criminal Law and Procedure 771 (Anderson 1957) (emphasis added). Another treatise noted that "[b]ribery [wa]s the corrupt tender or receipt of a private price for official action." R. Perkins Criminal Law 397 (1957) (emphasis added).

This authority reflects a settled understanding: generic bribery in 1961 required an exchange. The Travel Act incorporated this established meaning.

The district court concluded that the Supreme Court's decision in *Perrin* foreclosed this conclusion. SA.28 n.27 (citing 444 U.S. at 49-50). Not so. *Perrin* involved the question of whether commercial bribery may constitute a Travel Act predicate. The Court held that Travel Act "bribery" must accord with its "ordinary meaning … at the time Congress enacted the statute," as opposed to a narrower common-law meaning excluding commercial bribery. 443 U.S. at 43. Madigan's interpretation is fully consistent with that approach.

b. The government predicated the Travel Act charges on, among other Illinois statutes, 720 ILCS § 5/33-1(d)–(e) ("Bribery") and 720 ILCS § 5/33-3(a)(4) ("Official misconduct"). As the court acknowledged, neither statute requires "proof of an exchange." SA.25. Madigan requested that the court impute a quid pro quo requirement into the Illinois statutes. A.342-44. The court refused, A.483-84, 525-26, creating a mismatch between generic bribery and the predicate Illinois statutes.

The court thus permitted conviction for conduct that is not "bribery" under the Travel Act's generic definition. That was error. In a recent decision,

the Ninth Circuit agreed. *See Shen Zhen*, 115 F.4th at 1182. There, the government charged Travel Act violations premised on California's state bribery law. *Id.* The Ninth Circuit held that the generic definition of bribery in 1961 applies, and that bribery at that time required a quid pro quo. *Id.* at 1183. The California statutes the government charged as predicates did not require a quid pro quo. *Id.* at 1184. However, the district court imputed a quid pro quo into the jury instructions by requiring the jury to find that the defendant agreed to pay a benefit in exchange for an official act, rendering the error harmless. *Id.* at 1185. The court here refused to do the same.

c. The error requires vacatur of Count 5. Although one of the Illinois offenses charged as a predicate required a quid pro quo, 720 ILCS § 5/33-8, because the jury rendered a general verdict, it is impossible to know which predicate(s) the jury relied on. *Yates*, 500 U.S. at 403-05. The government emphasized that an exchange was not required. A.416.

The government cannot prove harmlessness beyond a reasonable doubt based on the convictions on other counts with a quid pro quo requirement. The government failed to prove a legally valid quid pro quo on those counts, *supra* pp.25-34, and the instructions on those counts were erroneous in several respects, *supra* pp.36-52.

## II.    MADIGAN IS ENTITLED TO ACQUITTAL OR A NEW TRIAL ON THE STATE BOARD COUNTS (COUNTS 8-10, 12-14).

The government charged the state board scheme as violations of the wire-fraud statutes and the Travel Act.  But the government came nowhere close to proving a quid pro quo.  Additionally, because the entire scheme was a ruse and no recommendation even occurred, the government did not prove that Madigan's future recommendation would involve a misrepresentation or an official act.  At a minimum, the instructional error on the Travel Act counts just discussed requires vacatur of the convictions on Counts 12-14.

### A.    The Government Did Not Prove the State Board Counts Beyond a Reasonable Doubt.

The government advanced both a Travel Act and two wire-fraud theories on the state board counts.  For the wire-fraud theories, the government posited that Madigan participated in a scheme to defraud (1) "the State of Illinois of money or property" (traditional wire fraud) and (2) "the people of Illinois of Madigan's honest services as speaker" (honest-services wire fraud). SA.28.  *See* 18 U.S.C. §§ 1343, 1346.  Both the Travel Act and wire-fraud theories rested on the same allegation that Madigan agreed to accept a bribe in exchange for recommending Solis for a state board seat.  *See* A.419-21.

For three reasons, the government failed to prove these counts beyond a reasonable doubt. First, the government did not prove a quid pro quo; Madigan rejected the only reference—circumstantial or otherwise—to a quid pro quo, which the government's own cooperator injected into their conversation. Second, Madigan never made the recommendation, and thus never made—or even attempted to make—any false statement or misrepresentation. Third, the government did not prove that Madigan's hypothetical recommendation would have involved an "official act."

### *1. The government failed to prove a quid pro quo.*

Each of the state board counts required proof of a bribe: As the court recognized, "merely asking for introductions or recommendations to obtain private benefits remains a common, and without more, lawful business practice." SA.27. And a mere failure to disclose a conflict of interest, without more, is not wire fraud. *Skilling v. United States*, 561 U.S. 358, 413-15 (2010). Accordingly, to convict Madigan under either wire-fraud theory, the government needed to prove a quid pro quo: an "exchange" of a "thing of value" for official action. *McDonnell*, 579 U.S. at 574; *see also* A.420-21. Additionally, as discussed in more detail above, the government needed to prove a quid pro quo to establish a violation of the Travel Act. *See supra* Part I.B.3.

Through its undercover cooperator, the government had nearly unfettered access to Madigan for two years and recordings from every relevant interaction. Yet no conversation between Madigan and Solis demonstrated that the requested recommendation of Solis was in exchange for anything of value.

The first recorded meeting did not establish a quid pro quo. *See* R.471-3 pp.395-405. Solis (at the government's direction) brought up a state board position and asked Madigan for help. R.471-3 p.396. Before Solis could even offer something of value, Madigan said he would "take a note down," while observing that he hadn't made recommendations to Governor Rauner.[12] R.471-3 p.396. Madigan did not condition his agreement to make a note on anything. Nor would he have any reason to—Solis already was sometimes introducing developers to Madigan.

The government urged the jury to infer a quid pro quo from the fact that the conversation contained discussion of both topics (the state board and developers). A.418. But mere "[j]uxtaposi[tion]" of "the discussion of the two

---

[12] The gubernatorial election had not yet occurred, and it was unclear whether Pritzker would be elected; as noted above, Madigan had a contentious relationship with the Republican incumbent (Rauner). A.72; *see supra* n.3.

topics," without more, does not prove agreement to an "exchange." *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 825 (7th Cir. 2016). Otherwise, routine, lawful conversations between officials and constituents could be prosecuted as quid pro quos. Here, given that the government itself programmed Solis to include both topics in the discussion, the requirement that there be evidence of an actual exchange is even more important.

The second recorded meeting also did not establish a quid pro quo. Quite the opposite: At the direction of law enforcement, A.95, Solis made his most explicit reference to a potential quid pro quo, but Madigan *rejected* it:

> *Solis*: I, I, I, I've helped you in the past. I'm gonna continue to help you. I've got ah, Curt Bailey, uh, Colin Kincaid, Lendlease, Related, the Post Office. Um, there's a lot of good stuff happening.
>
> *Madigan*: Oh yeah.
>
> *Solis*: --in my ward—
>
> *Madigan*: Mhmm.
>
> *Solis*: --and you've been very good to me.
>
> *Madigan*: Yeah.
>
> *Solis*: And, and I'm gonna help you.
>
> *Madigan*: **<u>Don't. Don't worry about it</u>**.
>
> *Solis*: Okay.

60

***Madigan***:  These are the two things you're interested in.

***Solis***:  Yes.

***Madigan****:*  Okay.  Fine.

***Solis***:  Yes.  Ah—

***Madigan***:  **<u>Just leave it in my hands.</u>**

R.471-3 p.457.  Madigan's plain rejection of a quid pro quo is exculpatory and forecloses any inference that Madigan agreed to accept a thing of value in exchange for an official act.

None of the remaining recorded conversations permitted such an inference either.  *See* R.471-3 pp.640-45; R.471-3 p.654; *see also infra* pp.16-17.  In response to Madigan's acquittal motion, the government argued the jury could infer Madigan's agreement to a bribe from the fact that Solis brought up "quid pro quos" in other conversations.  R.408 pp.64-67.  Those other conversations, however, did not relate to the state board counts and instead involved counts on which the jury acquitted Madigan or hung.  What is more, Solis's reference to a quid pro quo concerned Solis's efforts to tie his zoning approvals as alderman (*i.e.*, his own official acts) to his ability to set up meetings with developers.  R.471-3 pp.41-43.  They had nothing to do with Madigan.  And in response, Madigan admonished Solis that he "shouldn't be talking like that."  R.471-3

p.62.  In any event, Solis's supposed transactions *with others* says nothing about whether Madigan agreed to a quid pro quo with Solis.

## *2.  The government failed to prove a scheme to defraud.*

Under either wire-fraud theory, the government had to prove that Madigan participated in a "scheme to defraud."  18 U.S.C. §§ 1343, 1346.  A defendant participates in a scheme to defraud only if "he … engage[s] in deception."[13] *Kousisis v. United States*, 145 S. Ct. 1382, 1390 (2025).  To establish this element, the government must prove "the defendant made a material false statement, misrepresentation, or promise, or concealed a material fact," *United States v. Weimert*, 819 F.3d 351, 355 (7th Cir. 2016), in "furtherance of the scheme," *United States v. Coffman*, 94 F.3d 330, 336-37 (7th Cir. 1996).  That requirement applies equally to traditional wire fraud, *see e.g.*, *United States v. Ghilarducci*, 480 F.3d 542, 546 (7th Cir. 2007), and honest-services fraud, *see, e.g.*, *United States v. Fernandez*, 282 F.3d 500, 509 (7th Cir. 2002);

---

[13] In an honest-services case premised on bribery, "the evidence presented must permit a finding that" the official *both* accepted a bribe and "intended to deceive the public about that conduct."  *United States v. Sawyer*, 85 F.3d 713, 733 (1st Cir. 1996) (emphasis added).  Proof of a bribe alone does not suffice because "bribery of a public official" does not "necessarily incorporate[] a finding that the offender intended to 'trick' or 'deceive' the public into thinking that the official was acting independently when, in fact, the official was actually motivated by the bribe."  *Id.*

*see also United States v. Solakyan*, 119 F.4th 575, 588 (9th Cir. 2024); *United States v. Rybicki*, 354 F.3d 124, 151-52 (2d Cir. 2003) (en banc).

Proof of this essential element is absent here. It was undisputed that Madigan never recommended Solis to Pritzker and therefore did not actually make a false statement or misrepresentation. Without a deceptive statement, the government's case rested on speculation about what Madigan *might have* said to Pritzker. *See, e.g.*, A.422. But speculation is not evidence, *see United States v. Autori*, 212 F.3d 105, 120 (2d Cir. 2000) (vacating wire-fraud conviction where the government failed to present proof of what defendant said, or did not say, at meeting), and cannot support conviction, *Jones*, 714 F.3d at 340; *see also Fry v. UAL Corp.*, 84 F.3d 936, 943 (7th Cir. 1996) ("[A] case of fraud cannot be founded entirely on conjecture."). Moreover, the evidence showed that when Madigan made recommendations, the process was typically limited to sending a list of names and resumes, but nothing more. *E.g.*, R.475-4 pp.32-35. There was no proof that, had Madigan recommended Solis, it would have involved a false statement or misrepresentation at all.

To sidestep this problem, the government invoked the principle that a fraud scheme need not succeed to be criminal. R.408 p.77; SA.31. But that proposition does not mean the government need not prove deception at all.

"[T]he wire-fraud statute" is "[m]odeled … after a common-law attempt offense[.]" *Kousisis*, 145 S. Ct. at 1407 n.2 (Gorsuch, J. concurring in part and concurring in judgment).  Even a common-law attempt offense requires that the defendant take a "substantial step" towards completion, *United States v. Muratovic*, 719 F.3d 809, 815 (7th Cir. 2013), a requirement that avoids "harsh penalties [] for relatively remote preparatory acts," *United States v. Jackson*, 560 F.2d 112 (2d Cir. 1977).  Thus, while the government need not prove that a scheme to defraud succeeded—*i.e.*, that the defendant actually "collect[ed] any money or property from the victim of the scheme," *United States v. Aslan*, 644 F.3d 526, 545 (7th Cir. 2011)—it must prove that the defendant did "something more than mere preparation," *United States v. Barnes*, 230 F.3d 311, 315 (7th Cir. 2000).

The government fell far short of that standard.  This is not a case where Madigan made (or even previewed) a misrepresentation but did not succeed at getting Solis appointed.  Rather, the alleged scheme was so inchoate that it did not even involve an attempt.  The absence of any deceptive act in furtherance of the alleged scheme distinguishes this case from every case the government and court relied on below.  *See, e.g.*, *Coffman*, 94 F.3d at 337 (defendants called

attempted victim and lied about investment plans); *Aslan*, 644 F.3d at 545 (defendants supplied false names to co-schemers, which co-schemers used to lure victims); *United States v. Seidling*, 737 F.3d 1155, 1161 (7th Cir. 2013) (defendants sent mailings containing misrepresentations to court, clerks, and process servicers).

### 3.  *The government failed to prove an "official act."*

Because both theories of wire fraud required a bribe, the government also was required to prove that Madigan planned to take an "official act" in exchange for the referrals.  *McDonnell*, 579 U.S. at 567.  As Madigan argued below, however, he "did not control who was appointed to state boards" and "was in no position to offer a state board position[.]"  R.401 p.33 n.6.

To be sure, *McDonnell* makes clear that an official need not personally possess power to take the at-issue "official act."  579 U.S. at 567.  This requirement can be satisfied if the official uses his position to "exert pressure" on another official or provides "advice … knowing or intending that such advice will form the basis for an 'official act' by another official."  *Id.*  But merely "expressing support," without more, is not an official act.  *Id.*  It was the government's burden to show that Madigan's conduct crossed—or would have

crossed—the line from permissible support to impermissible pressure or advice. *Id.*

This line is context specific. For example, in *Silver*, the Second Circuit rejected the argument that recommending an individual on official assembly letterhead would automatically qualify as an official act. *Silver*, 864 F.3d at 120. Instead, the court concluded a jury could have found that Silver's letter offering general assistance was merely "expressing support" and not "exert[ing] pressure" on a pending matter—and therefore was not an official act under *McDonnell*. *Id.* Likewise, in *United States v. Jefferson*, 289 F. Supp. 3d 717 (E.D. Va. 2017), the court held that "a letter on congressional letterhead in support of [a] visa application" and phone calls to decision-makers would not be an official act because this conduct amounted only to expressions of support. *Id.* at 739; *see also United States v. Fattah*, 914 F.3d 112, 156 (3d Cir. 2019) (distinguishing support from pressure or advice).

Because Madigan never recommended—or attempted to recommend—Solis to Governor Pritzker, the jury was left to speculate whether Madigan's endorsement of Solis would have been a "permissible attempt[] to 'express[] support,' or impermissible attempt[] 'to pressure or advise [Pritzker].'" *Fattah*, 914 F.3d at 156. This was a fundamental failure of proof.

If anything, the evidence refuted a finding that Madigan's recommendation would have crossed the line. Because Pritzker was newly elected, Madigan could not know how Pritzker or his aides would receive his recommendations. Only one witness, Governor Pritzker's senior advisor, testified to the effect of a potential recommendation from Madigan. When asked whether the office would "think that it was necessary to act on a particular recommendation," she answered, "No." A.109-10. She affirmed the office "did [their] own due diligence," "had a process around any recommendation," and "made the decision … that the team thought was right for the position." A.110; *see also* A.108. Less than half of Madigan's recommendations for the new administration were even accepted. A.98.

Perhaps recognizing the weakness of this evidence, in rebuttal the government said that mere "influence" "is sufficient." A.429. That was incorrect, for the reasons stated above. On this record, no reasonable jury could conclude beyond a reasonable doubt that Madigan's actions would have constituted an official act.

## B. Madigan Is Entitled to a New Trial on Counts 12-14 Because the Travel Act Instruction Was Erroneous.

For the reasons discussed, the court erred in permitting the jury to base Travel Act convictions on Illinois offenses lacking a quid pro quo requirement.

67

*See supra* Part I.B.3. Accordingly, if the Court does not enter judgment of acquittal, the Court should vacate the convictions on Counts 12-14.

## CONCLUSION

For the foregoing reasons, the Court should reverse the conviction with instructions to grant judgment of acquittal or, alternatively, vacate the conviction and remand for a new trial.

Respectfully submitted,

NOVEMBER 3, 2025

LISA S. BLATT
DAVID M. ZINN
AMY MASON SAHARIA
   *Counsel of Record*
PATRICK J. LOOBY
ALLISON S. EISEN
KAITLIN D. WETZ
WILLIAMS & CONNOLLY LLP
   *680 Maine Avenue, S.W.*
   *Washington, DC 20024*
   *(202) 434-5000*
   *asaharia@wc.com*

DANIEL J. COLLINS
KATTEN MUCHIN ROSENMAN
LLP
   *525 West Monroe Street*
   *Chicago, Illinois 60661*
   *(312) 902-5434*
   *Daniel.Collins@Katten.com*

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT AND TYPEFACE AND TYPE-STYLE REQUIREMENTS</u>

I, Amy Mason Saharia, counsel for Defendant-Appellant and a member of the Bar of this Court, certify that:

1. This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B) and 7th Cir. R. 32(c), because it contains 13,946 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f); and

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) and 7th Cir. R. 32(b) because it was prepared in a proportionally spaced typeface using Microsoft Word in Century Expanded BT, size 14.

3. I further certify, pursuant to Circuit Rule 28(A)(h)(2), that this document and the attached appendices have been scanned for viruses and are virus-free.

*Amy Mason Saharia*
*Attorney for Defendant-Appellant*

NOVEMBER 3, 2025

## <u>CERTIFICATE OF COMPLIANCE WITH APPENDIX REQUIRE-</u><br><u>MENT</u>

I, Amy Mason Saharia, counsel for Defendant-Appellant and a member of the Bar of this Court, certify that:

1.      This brief complies with Circuit Rule 30(d); and

2.      All of the material required by Circuit Rule 30(a) and (b) are included herein.

*Amy Mason Saharia*
*Attorney for Defendant-Appellant*

NOVEMBER 3, 2025

## <u>CERTIFICATE OF SERVICE</u>

I, Amy Mason Saharia, counsel for Defendant-Appellant and a member of the Bar of this Court, certify that on November 3, 2025, a true and correct copy of the foregoing Brief for Defendant-Appellant Michael J. Madigan was filed with the Clerk through the Court's electronic filing system.  I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*Amy Mason Saharia*
*Attorney for Defendant-Appellant*

NOVEMBER 3, 2025

# In the United States Court of Appeals for the Seventh Circuit

---

No. 25-2249

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*

*v.*

MICHAEL J. MADIGAN,
*Defendant-Appellant*

---

*On Appeal from the United States District Court for the Northern District of Illinois*
*No. 1:22-cr-00115 (Hon. Robert J. Blakey)*

---

## SHORT APPENDIX OF DEFENDANT-APPELLANT MICHAEL J. MADIGAN

---

DANIEL J. COLLINS
KATTEN MUCHIN ROSENMAN LLP
  525 West Monroe Street
  Chicago, Illinois 60661
  (312) 902-5434
  Daniel.Collins@Katten.com

LISA S. BLATT
DAVID M. ZINN
AMY MASON SAHARIA
  *Counsel of Record*
PATRICK J. LOOBY
ALLISON S. EISEN
KAITLIN D. WETZ
WILLIAMS & CONNOLLY LLP
  680 Maine Avenue, S.W.
  Washington, DC 20024
  (202) 434-5000
  asaharia@wc.com

## TABLE OF CONTENTS

Memorandum Opinion and Order (July 3, 2025) (R.450)...................................... SA.1

Judgment in a Criminal Case (July 15, 2025) (R.453)................................. SA.102-09

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

UNITED STATES OF AMERICA,

Case No. 22 CR 115

v.

Judge John Robert Blakey

MICHAEL MADIGAN and
MICHAEL McCLAIN

---

**MEMORANDUM OPINION AND ORDER**

### I.    Introduction

The Court now addresses in writing Defendant Michael Madigan's motion for judgments of acquittal pursuant to Federal Rule of Criminal Procedure 29(c) and, in the alternative, for a new trial pursuant to Federal Rule of Criminal Procedure 33. For the reasons explained below, the Court properly denied Madigan's motions ([396]) from the bench on June 9, 2025, and as promised, sets forth its written findings below.

### II.    Background

In this case, the Government brought charges against Defendants Michael J. Madigan and Michael F. McClain for activities related to Madigan's role as Speaker of the Illinois House of Representatives. Defendant Madigan served as the Speaker of the House from approximately 1983 through 2019 (except two years, 1995–1997). *See* Stip. 50. He also served as Democratic Committeeman for the Thirteenth Ward from 1969 through 2019, Chairman of the Thirteenth Ward Democratic Organization from 1969 through 2019, and Chairman of the Democratic Party of Illinois from 1998 through 2019. *See* Stip. 6. Madigan also worked as a lawyer and a named partner at his private law firm, Madigan & Getzendanner. *See* Stip. 7.

Defendant McClain served as a legislator in the Illinois House of Representatives from 1973 through 1983, after which he became a contract lobbyist. *See* Stip. 8. McClain worked as a contract lobbyist or consultant for Commonwealth Edison ("ComEd") from approximately 1985 through 2019. He retired from lobbying at the end of 2016 and did not register as a lobbyist with the State of Illinois from 2017 onwards. McClain was also a lawyer and remained registered to practice law in Illinois from 1977 through 2016. *Id.*

### a. Indictment

The superseding indictment ([37]) charged Defendants Madigan and McClain with numerous crimes spanning the years 2011 through 2019. Count One charged Defendants with participating in a racketeering conspiracy. Counts Two through Seven charged Madigan with criminal activities related to ComEd. Counts Eight through Fourteen charged Madigan with unlawful efforts to obtain business for his private law firm in exchange for recommending then-alderperson Daniel Solis for a state board position. Counts Fifteen through Eighteen charged Madigan with criminal activities involving the attempted extortion of the developer Union West. Counts Nineteen through Twenty-Two charged both Defendants with crimes related to legislative land-transfer efforts of a parking lot in Chinatown. Finally, Count Twenty-Three charged Defendants with a conspiracy involving criminal activities related to AT&T. These charges are summarized in the table below:

| Count | Defendants | Violations | Description |
|---|---|---|---|
| 1 | Madigan & McClain | 18 U.S.C. § 1962(d) | Racketeering conspiracy |
| 2 | Madigan | 18 U.S.C. §§ 371, 2 | Conspiracy to commit an offense against the United States <br>• Object 1: Violation of 18 U.S.C. § 666(a)(1)(B) <br>• Object 2: Violation of 18 U.S.C. § 666(a)(2) <br>• Objects 3 and 4: Violations of 15 U.S.C. §§ 78m(b)(5) and 78ff(a) |
| 3 | Madigan | 18 U.S.C. §§ 666(a)(1)(B), 2 | Bribery |
| 4 | Madigan | 18 U.S.C. §§ 666(a)(1)(B), 2 | Bribery |
| 5 | Madigan | 18 U.S.C. §§ 1952(a)(3), 2 | Use of an interstate facility to promote unlawful activity |
| 6 | Madigan | 18 U.S.C. §§ 666(a)(1)(B), 2 | Bribery |
| 7 | Madigan | 18 U.S.C. §§ 1952(a)(3), 2 | Use of an interstate facility to promote unlawful activity |
| 8 | Madigan | 18 U.S.C. §§ 1343, 1346 | Wire fraud |
| 9 | Madigan | 18 U.S.C. §§ 1343, 1346 | Wire fraud |
| 10 | Madigan | 18 U.S.C. §§ 1343, 1346 | Wire fraud |

| 11 | Madigan | 18 U.S.C. § 666(a)(1)(B) | Bribery |
|---|---|---|---|
| 12 | Madigan | 18 U.S.C. §§ 1952(a)(3), 2 | Use of an interstate facility to promote unlawful activity |
| 13 | Madigan | 18 U.S.C. §§ 1952(a)(3), 2 | Use of an interstate facility to promote unlawful activity |
| 14 | Madigan | 18 U.S.C. §§ 1952(a)(3), 2 | Use of an interstate facility to promote unlawful activity |
| 15 | Madigan | 18 U.S.C. §§ 1951(a), 2 | Attempted extortion |
| 16 | Madigan | 18 U.S.C. §§ 1952(a)(3), 2 | Use of an interstate facility to promote unlawful activity |
| 17 | Madigan | 18 U.S.C. §§ 1952(a)(3), 2 | Use of an interstate facility to promote unlawful activity |
| 18 | Madigan | 18 U.S.C. §§ 1952(a)(3), 2 | Use of an interstate facility to promote unlawful activity |
| 19 | Madigan and McClain | 18 U.S.C. §§ 1343, 1346 | Wire fraud |
| 20 | Madigan and McClain | 18 U.S.C. §§ 1343, 1346 | Wire fraud |
| 21 | Madigan and McClain | 18 U.S.C. §§ 666(a)(1)(B), 2 | Bribery |
| 22 | Madigan and McClain | 18 U.S.C. §§ 1952(a)(3), 2 | Use of an interstate facility to promote unlawful activity |
| 23 | Madigan and McClain | 18 U.S.C. §§ 371, 2 | Conspiracy to commit an offense against the United States<br>• Object 1: Violation of 18 U.S.C. § 666(a)(1)(B)<br>• Object 2: Violation of 18 U.S.C. § 666(a)(2) |

### b. Trial

At trial, the Government's case spanned four months, with over twelve weeks of testimony and legal proceedings,[1] and presented voluminous evidence, including: numerous recorded phone calls; video recorded meetings; emails and business records; photographs of relevant locations; and the testimony of dozens of witnesses, including a series of FBI agents and cooperating witnesses. The evidence showed an extensive history of Madigan and McClain working together to obtain job contracts for Madigan's political associates. Among other things, the evidence proved that from

---

[1] This excludes the week of December 23, 2024, because the jury did not sit that week due to the holidays. The Court does, however, count the week of December 30 since charge conferences were held during that time, although the jury did not hear evidence that week.

2011–2019 ComEd unlawfully paid, through several different intermediaries, over $1.3 million dollars to five different Madigan associates—Frank Olivo, Raymond Nice, Edward Moody, Edward Acevedo, and Michael Zalewski. *See* GX 1520. The evidence also showed that these individuals did little or no work for ComEd. *See* Tr. 2533:6–2534:13 (testimony of Fidel Marquez); Tr. 3630:4–13; GX 270. From 2012–2019, ComEd also unlawfully paid over $1.8 million dollars to Reyes Kurson, a law firm with connections to Madigan. *See* GX 1520. Motivating this corruption scheme during that same period, ComEd had a significant and ongoing interest in pending legislation before the Illinois General Assembly, such as the Energy Infrastructure and Modernization Act ("EIMA"), passed in 2011, and the Future Energy Jobs Act ("FEJA"), passed in 2016.

The evidence also proved unlawful efforts by Madigan to obtain business for his private law firm through the use of his role as a public official. For example, the Government presented numerous recordings and other evidence showing incriminating contacts between Madigan and former alderperson (and cooperating witness) Danny Solis, including conversations in which Solis offered to facilitate introductions with Madigan and his law partner to developers in the Chicago area while simultaneously requesting Madigan's assistance in obtaining a state board position. *See* GX 125; GX 146; GX 151; GX 146; GX 166; GX 185; GX 197; GX 236; GX 853; GX 1574.

On January 16, 2025, after the Government rested its case, both Defendants Madigan and McClain renewed their respective Rule 29 motions for a judgment of acquittal as to all elements and counts charged. Tr. 9815:4–20. The Court orally denied both motions. Tr. 9816:6–7.

The defense case consisted of numerous witnesses, documents, and additional testimony, including from Madigan himself.

On February 12, 2025, the jury returned a partial verdict, finding Madigan guilty on Counts 2s, 4s, 5s, 6s, 8s, 9s, 10s, 12s, 13s, and 14s. The jury found Madigan not guilty on Counts 3s, 7s, 11s, 15s, 16s, 17s, and 18s. The jury reached no verdict on Counts 1s, 19s, 20s, 21s, 22s, and 23s—all the counts which charged both Defendants Madigan and McClain.

On March 28, 2025, Madigan filed the present post-trial motions, renewing his motion seeking judgments of acquittal and, in the alternative, a new trial on other grounds of claimed error. [396] [401].

On June 9, 2025, the Court denied Madigan's motions in their entirety [435] and noted that it would issue today's findings by separate written order.

On June 13, 2025, the Government moved to dismiss the unresolved Counts as to Defendant Madigan only, and the Court granted the motion without objection. [443] Tr. 122:10–20.

## III.     Motion for Judgment of Acquittal

Under Rule 29, the "trial judge, upon a defendant's motion or on the judge's own initiative, 'must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction,' either after the government has closed its evidence or after a jury has rendered a verdict or been discharged." *United States v. Garcia*, 919 F.3d 489, 496 (7th Cir. 2019) (quoting Fed. R. Crim. P. 29(a), (c)). The Court must examine the evidence "in the light most favorable to the government" and "will uphold the jury's verdict so long as any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Howard*, 619 F.3d 723, 726 (7th Cir. 2010) (quotation omitted). In conducting this review, the Court does "not weigh the evidence or assess the credibility of witnesses." *United States v. Orozco–Vasquez*, 469 F.3d 1101, 1106 (7th Cir. 2006). *See also United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999) ("In considering a motion for judgment of acquittal, a court must view all evidence in the light most favorable to the prosecution."); *United States v. Smallwood*, 188 F.3d 905, 912 (7th Cir. 1999) (In evaluating a motion under Rule 29, courts "consider the evidence in the light most favorable to the Government, defer to the credibility determination of the jury, and overturn a verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt") (quotation omitted).

As the Seventh Circuit has "often said," defendants "seeking a judgment of acquittal" face "a 'nearly insurmountable hurdle'" (*Garcia,* 919 F.3d at 496 (quoting *United States v. Johnson,* 874 F.3d 990, 998 (7th Cir. 2017)), although "the height of the hurdle depends directly on the strength of the government's evidence." *United States v. Jones*, 713 F.3d 336, 339 (7th Cir. 2013). Thus, "successful challenges are relatively rare." *Garcia*, 919 F.3d at 497 (quoting *Jackson v. Virginia*, 443 U.S. 307, 317 (1979)).

### a.  Counts 2s, 4s, 5s, and 6s[2]

Counts Two, Four, Five, and Six of the superseding indictment charged Madigan with conspiracy to commit an offense against the United States, federal program bribery, and a violation of the Travel Act related to certain Madigan associates receiving contracts from ComEd in exchange for Madigan's favorable

---

[2] The Government claims Madigan waived or forfeited several arguments he advances in his Rule 29(c) motion because he did not raise them later in the proceedings. *See* [408] at 54, 78 n.27. Because each of Madigan's Rule 29 arguments fail on the merits, the Court need not address each specific claim of waiver/forfeiture urged by the Government. The record in this regard speaks for itself.

actions on legislation affecting ComEd's business interests. Count Two charged a conspiracy to commit an offense against the United States under 18 U.S.C. § 371, while Counts Four and Six charged substantive violations of 18 U.S.C. § 666(a)(1)(B). Count Five charged Madigan under 18 U.S.C. § 1952 with causing use of a facility in interstate commerce, specifically an email, with intent to promote unlawful activity. The Court discusses these Counts individually below.

### i. Count 2s[3]

To sustain a conviction of conspiracy under 18 U.S.C. § 371, the Government must prove three elements beyond a reasonable doubt: (1) the conspiracy charged existed; (2) the defendant knowingly became a member of the conspiracy with an intent to advance the conspiracy; and (3) one of the co-conspirators committed an overt act in an effort to advance a goal of the conspiracy within five years of the indictment. [313] at 63. *See also United States v. Foy*, 50 F.4th 616, 624 (7th Cir. 2022).

Addressing the third element first, the Government presented evidence at trial of unlawful payments made by ComEd to intermediaries, arrangements between the intermediaries and various Madigan associates, and the political importance and value of these associates to Madigan. As discussed below, many of these payments occurred within five years of the indictment. *See, e.g., infra* Part III.a.i.1.A (evidence showing payments made to the "no-show" subcontractors in 2018 and 2019). Without doubt, a reasonable jury possessed a more than sufficient basis to find these payments constituted an overt act whereby ComEd coconspirators, through intermediaries, paid Madigan's allies to unlawfully obtain his favor. *See* GX 1520.

The first and second elements of this conspiracy charge require more analysis. Count Two alleged that Madigan participated in a conspiracy with four objects: (1) to corruptly solicit, demand, accept, and agree to accept things of value in exchange for official actions, namely actions on legislation affecting ComEd and its business, in violation of 18 U.S.C. § 666(a)(1)(B); (2) to corruptly give, offer, and agree to give things of value in exchange for official actions, namely, actions on legislation affecting ComEd and its business, in violation of 18 U.S.C. § 666(a)(2); (3) to knowingly and willfully falsify books, records, and accounts of ComEd and Exelon in violation of 15 U.S.C. §§ 78m(b)(5) and 78ff(a); and (4) to knowingly and willfully circumvent a system of internal accounting controls in violation of 15 U.S.C. §§ 78m(b)(5) and 78ff(a).

---

[3] The conspiracy charged in Count Two also incorporated conduct relating to the appointment of Juan Ochoa to ComEd's board of directors. The jury, however, acquitted Madigan on the substantive § 666 charge concerning the board appointment (Count Three). The Government accordingly did not rely upon that alleged scheme in its Response, and the Court similarly does not include those failed allegations in its analysis here.

In this case, the jury returned a general verdict form stating whether each Defendant was guilty or not guilty of each count in the indictment.[4] *United States v. Smith*, 938 F.2d 69, 70 (7th Cir. 1991) (noting "special interrogatories or verdicts are generally not favored in criminal cases"). As to the conspiracy charged in Count Two, the record supports the jury's verdict and contains more than sufficient evidence for a "reasonable jury" to convict on the conspiracy count with respect to all four alleged objects of the conspiracy. The Court addresses each object in turn.

## 1. The Government presented sufficient evidence to find a conspiracy to exchange official actions for jobs at ComEd

The first and second objects of the conspiracy alleged violations of § 666 through soliciting and giving bribes. For both bribery objects, the Government needed to prove that Madigan "acted with the understanding that a 'thing of value' is to be exchanged for an 'official act,'" meaning that he "understood the conspiracy involved a 'this for that' exchange of a 'thing of value' for an 'official action.'" [313] at 67. Specifically, these objects of Count Two alleged Madigan participated in a conspiracy spanning from 2011 to 2019 to obtain a stream of benefits in the form of contracts and jobs at ComEd for his associates, in return for Madigan's favorable action on specific pending legislation ComEd sought to pass during that time period. Based on the evidence the Court discusses below, the Government presented more than sufficient evidence from which a reasonable jury could find that Madigan participated in such a conspiracy.

## A. Evidence showing Madigan arranged for private benefits from ComEd for his political associates

### i. Subcontractors

From 2011 through 2019, ComEd unlawfully paid a total of $1,302,750 to certain political associates of Madigan's. GX 1520. These individuals, termed "the subcontractors," included former 13th Ward alderperson Frank Olivo, 13th Ward precinct captain Ray Nice, 13th Ward precinct captain and political worker Edward Moody, former 23rd Ward alderperson Michael Zalewski, and former Illinois House of Representatives member Edward Acevedo. ComEd paid these individuals through intermediary firms owned by other Madigan associates—such as McClain's private

---

[4] This was true of the verdict forms for all Counts except for Count One, where the jury was asked to identify specific predicate acts each Defendant committed in furtherance of the alleged RICO conspiracy. *See United States v. Schiro*, 679 F.3d 521, 533–34 (7th Cir. 2012) ("A number of cases say that in a RICO conspiracy case the jury should be instructed that it must agree unanimously on the 'types of racketeering activity' that the conspirators agreed to commit.") (citations omitted).

law firm, and Jay D. Doherty & Associates ("JDDA") owned by Madigan's co-conspirator Jay Doherty. *See id.*

The Government presented ample evidence showing that Madigan was involved in the hiring of the subcontractors. For example, Ed Moody testified that he first learned about his contract with ComEd when Madigan informed him that he would be working for McClain. Tr. 4325:7–8. Moody testified that during this conversation, Madigan told him that if he stopped doing his political work for Madigan, he would "lose the contract." Tr. 4325:25–4326:7. Thereafter, from 2012 through 2019, Moody received approximately $354,000 from ComEd through various intermediaries. GX 1520. Moody stated that he initially performed some canvassing for ComEd while being paid through McClain, but after his contract was transferred to JDDA in 2014, he no longer performed any work. Tr. 4378:20–4379:1; Tr. 4391:2–13. Moody did not speak with Doherty about providing any services for ComEd; instead, he understood Doherty was paying him to "stay politically vital" and keep performing the political work for Madigan that he had done for the past twenty years. Tr. 4391:8–10. Moody testified that a 2018 conversation he had with Madigan bolstered this understanding. While doing campaign work near Madigan's house, Moody testified that he ran into Madigan and shared concerns that he was not performing any work for ComEd. Tr. 4425:11–12. Madigan told him he had "nothing to worry about," and that what he was "doing right now" is what Madigan wanted, what the intermediary wanted,[5] and "what ComEd" wanted. Tr. 4426:5–7. Moody testified that he understood Madigan was referring to the political work he continued to do for Madigan. Tr. 4426:10–17. Moreover, Moody stopped receiving payments after December 2018 when Madigan informed McClain that Moody's contract should be terminated since Moody recently got a new job. GX 248.

The Government also presented ample evidence regarding ComEd's unlawful payments to Mike Zalewski. In a May 16, 2018, recorded call between Madigan and McClain, Madigan asked McClain to speak with Anne Pramaggiore[6] concerning Mike Zalewski. Less than an hour later, McClain followed through on Madigan's direction and called Pramaggiore about hiring Zalewski. GX 74. Pramaggiore assured McClain she told then-senior vice president of government and legislative affairs Fidel Marquez to "get it done." *Id.* McClain then spoke to Marquez later that same afternoon, instructing Marquez to pay Zalewski $5,000 per month. GX 75. McClain added that "we still have Ray Nice," and explained to Marquez that Nice was "one of the top three precinct captains," and that he trained other political operatives "how to go door to door," so that Marquez could get "an idea" of "how important the guy is."

---

[5] Moody was paid by ComEd through four intermediaries from 2012 through 2019: McClain's law firm from 2012 to 2014; JDDA from 2014 to 2016; Shaw Decremer Consulting LCC from 2016 to 2018; and The John E. Bradley Law Firm from March through December 2018. GX 1520.

[6] Anne Pramaggiore was CEO of ComEd from March 2012 through May 2018. She subsequently became a senior executive at ComEd's parent company, Exelon. *See* Stipulation 12.

*Id.* Marquez and McClain then listed the other subcontractors still paid by ComEd, naming Olivo, Moody, and Acevedo, before Marquez agreed to add Zalewski. *Id.* McClain subsequently called Madigan to confirm that Madigan could tell Zalewski that Jay Doherty would contact him about a contract. GX 76. The Government introduced phone records showing that Madigan placed a call to Zalewski four minutes after this call. GX 1618.

The evidence presented at trial, taken in the light most favorable to the Government, also confirmed that the subcontractors performed little to no work for ComEd while receiving these payments. *See e.g.*, GX 74; GX 230; GX 270; Tr. 4425:11–4426:7 (Moody); Tr. 2497:12–14 (Marquez testimony that Moody did no work for ComEd); Tr. 2505:25–2506:6 (Marquez testimony that Olivo and Nice did no work for ComEd); Tr. 2535:10–18 (Marquez testimony that Zalewski did no work for ComEd); Tr. 2554:12–15 (Marquez testimony that Acevedo did no work for ComEd). *See also* Tr. 3605:18–21, 3630:4–13, 3686:25–3687:24 (testimony from FBI agents that no evidence of work product was recovered during any searches conducted). The jury also heard a February 13, 2019 recorded meeting between Doherty and Marquez[7] where Doherty explained that former ComEd executive and Madigan co-conspirator John Hooker and McClain first arranged the subcontractor payments years prior, and that the subcontractors did not do "much" and Doherty rarely had conversations with them. GX 270. The co-conspirators also took pains to conceal the no-show nature of the arrangement; as discussed below, JDDA submitted numerous invoices containing false statements about the subcontractors' services to conceal the reason for the increased payments to his firm. *See infra* Part III.a.i.1.A.

While subcontractors performed little to no legitimate work, the evidence did show they were indeed paid for a reason, that is, to benefit Madigan's political machine, and numerous exhibits showed that executives at ComEd and Madigan's co-conspirators understood these payments to the contractors were benefits to Madigan. For example, Marquez testified that he asked McClain's permission before terminating Acevedo's contract because he knew "the original request came through from Michael Madigan. So I felt I had to get the green light before I could move on such a" decision. Tr. 2555:21–24. Former ComEd CEO Anne Pramaggiore made similar incriminating statements, counseling Marquez in one recorded call not to discontinue the payments to the subcontractors "until after the" legislative "session's over." GX 274. Pramaggiore specified that ComEd did "not want to get caught up in" a "disruptive battle where" a person "gets their nose out of joint and we're trying to move somebody off and then we get forced to give 'em a five-year contract because we're in the middle of needing to get something done in Springfield." *Id.* Pramaggiore was not the only co-conspirator to directly tie the subcontractor payments to legislative actions in Springfield. In the same recorded meeting between Doherty and Marquez, when Marquez asked about renewing the subcontractors' contracts, Doherty answered that "ComEd money" for the most part "comes from Springfield,"

---

[7] Fidel Marquez began cooperating with the Government in January 2019. Tr. 2315:9–10.

adding that his "advice would be 'if it ain't broke, don't fix it' with those guys." GX 270. Doherty also stated that he knew Hooker and McClain had conversations with Madigan about the subcontractors. GX 270.

The evidence also confirmed Madigan plainly understood the existence and nature of the surreptitious Doherty arrangement. In one recording, Madigan proposes using Doherty (though "not necessarily with ComEd") as an intermediary for paying representative Jaime Andrade's wife, and she would, in turn, do general "monthly reports" to just keep "on file." GX 135.[8] Madigan himself testified that he suggested using Doherty's firm to prevent his hiring of Andrade's wife from being "publicly disclosed." Tr. 8721:19. Other evidence further showed that Madigan personally controlled when the payments started and stopped, and he would give directives to McClain to carry out those decisions. *See* GX 248.

In short, there was plenty of evidence on which a reasonable jury could conclude that the subcontractor payments constituted a *quid* in an ongoing *quid pro quo* bribery arrangement between Madigan and ComEd. The jury heard evidence (both live testimony and recorded statements) from Madigan's own coconspirators describing the nature of the subcontractors' arrangement and their connection with ComEd's legislative success in Springfield. Clearly, the evidence supported the jury's conclusion that the subcontractors' true benefit to ComEd was the benefit they provided to Madigan, and the Government presented numerous exhibits showing Madigan's direct knowledge and involvement in the unlawful contracts. Accordingly, a reasonable jury could easily conclude that Madigan knowingly involved himself in this scheme.

### ii. Reyes Kurson contract

The evidence of benefits exchanged pursuant to the conspiracy went beyond the subcontractors. The Government also produced ample evidence from which a reasonable jury could find Madigan and his co-conspirators solicited a bribe in the form of a contract between ComEd and the law firm Reyes Kurson.

Reyes Kurson first obtained a contract with ComEd on October 25, 2011, one day before Madigan voted in favor of the veto override for ComEd's EIMA legislation. GX 1071; GX 1204. Former ComEd general counsel Tom O'Neill testified that he first met with Victor Reyes of the Reyes Kurson law firm at the request of then-ComEd CEO Frank Clark in the summer of 2011. Tr. 1177:16–1178:5. Victor Reyes was a top fundraiser for Madigan. *See e.g.,* GX 196; GX 609. O'Neill did not immediately hire the law firm because it would take "some time" to find work for the firm to do. Tr. 1180:12–15. O'Neill testified that McClain pressed him repeatedly about hiring the law firm through the summer. Tr. 1181:4–16. A few days before the veto override

---

[8] The Court addresses Madigan's arguments concerning the admission of this exhibit below. *See infra* Part IV.b.iii.

vote, O'Neill testified that then-ComEd executive and Madigan co-conspirator John Hooker met with him in his office. Hooker informed him that "it was important" to finalize the contract and "we needed to get it done and we needed to get it done now." Tr. 1183:20–21. O'Neill testified that, after he received that directive, he received a draft contract from Reyes Kurson and they finalized the agreement. Tr. 1184:12–15.

In 2016, the Reyes Kurson contract was up for renewal at ComEd. O'Neill testified that ComEd sought to reduce the number of hours in Reyes Kurson's contract because there was insufficient work available for the firm. Tr. 1193:19–25. After ComEd communicated this to the firm, McClain sent emails to O'Neill and ComEd CEO Anne Pramaggiore claiming that if Victor Reyes did not get the preset "850 hours for his law firm per year then he will go to our Friend. Our Friend will call me and then I will call you. Is this a drill we must go through?"[9] GX 522. McClain added that failing to renew the contract would produce an adverse reaction from Madigan, stating that he did "not understand why we have to spend valuable minutes on items like this when we know it will provoke a reaction from our Friend." *Id. See also* GX 518 (series of emails where McClain tells ComEd executives that he "anticipates that a mutual friend of ours will be solicited to help Reyes" if ComEd did not guarantee "at least" 850 billable hours per year); GX 533 (McClain email to O'Neill where he states that he "talked with our Friend and he asked if" ComEd would give Reyes Kurson a preset number of hours). In response, ComEd renewed the Reyes Kurson contract in 2016 and again in 2017, and McClain continued to correspond with ComEd executives about the number of hours directed to the Reyes Kurson law firm. *See, e.g.,* GX 540; GX 730; GX 803; GX 816. In total, ComEd paid Reyes Kurson a total of $1,837,938.13 from 2012 to 2019. GX 1520.

The Government also presented evidence corroborating McClain's attributions to Madigan and Madigan's desire for the contract.[10] For example, on March 5, 2016, shortly after a calendared meeting with Madigan, McClain emailed O'Neill and Marquez stating that he "talked with our Friend" and Madigan made specific requests regarding the billable hours provision in Reyes Kurson's contract. *See* GX 1118; GX 533. Similarly, in an April 5, 2016 email, McClain notes that Madigan brings up the Reyes Kurson "item" "every Monday as he did last night at our weekly meetings"—a meeting that again Madigan's own calendar confirmed. *See* GX 535; GX 1118. *See also* GX 539 (May 2, 2016 email from McClain to ComEd executives

---

[9] The evidence at trial overwhelmingly confirmed that McClain referred to Madigan as "our Friend" or similar nicknames in the relevant conversations and recordings. *See, e.g.,* Tr. 843:18–844:6.

[10] Continuing to protest his innocence, Madigan disputes the jury's view of this evidence and claims he had no involvement in the Reyes Kurson contract, pointing to the lack of recorded calls between him and McClain going over the contract, and the testimony from Tom O'Neill where he said he found it difficult at times "to discern which client" McClain "might be acting on behalf of" when pushing for the contract. Tr. 1395:13–16; *see also* GX 44 (McClain makes a passing comment to a lobbyist that he's gotten Victor Reyes "a lot of business over the years"). The trial record, however, provides no basis for this Court to revisit the jury's reasonable findings of fact.

that he "JUST met" with Madigan and "told him" the contract "was not done yet but
that I thought it would be accomplished this week"); GX 1118 (Madigan's calendar
listing a meeting with McClain earlier that same day).  Further, the evidence also
showed a December 29, 2016 email from Victor Reyes to McClain where he notes that
the "agreement" with ComEd was "the one we requested of you," and adds that he
and his law partner "are grateful to you and our leader."  GX 803.

Taking this evidence in the light most favorable to the Government, a
reasonable jury could easily conclude that Madigan was knowingly involved in the
conspiracy to solicit a bribe in the form of contracts with Reyes Kurson.  Over the
course of the trial, the jury heard overwhelming evidence showing McClain acted as
Madigan's agent and conduit to convey directions to ComEd executives regarding the
Reyes Kurson contracts (including the evidence discussed above related to the no-
show subcontractors).  Madigan consistently relayed demands to McClain concerning
the Reyes Kurson contract, who in turn relayed those to ComEd.  This arrangement
continued for several years, as McClain, at Madigan's direction, continually
monitored the workflow to the law firm and remained heavily involved in the
contract's adjustments over time.  This evidence was more than sufficient for the jury
to conclude that Madigan knowingly involved himself in this solicitation scheme.[11]

### iii.  Other hires

The evidence also proved that Madigan, through McClain, repeatedly made
other hiring demands of ComEd for unwanted candidates. These demands persisted,
even where the individuals "bombed" ComEd interviews, failed ComEd qualification
examinations, and/or did not show up for ComEd's employment-related tests.  *See* GX
424; GX 470; GX 480; GX 495; GX 552; Tr. 2840:17–2844:21; Tr. 2847:4–2848:18.
Madigan, through McClain, also consistently pressured ComEd to hire certain
Madigan-connected candidates for their internship programs, even when the
candidates were unqualified or made untimely applications.  GX 480 (email from a
ComEd employee asking Fidel Marquez if there was "pressure to hire" a certain
candidate or if they could "just fairly consider" the applicant).  McClain characterized

---

[11] In his motion, Madigan also argues that the "allegations regarding the recommendation and hiring
of the Reyes Kurson law firm are similar to the allegations related to the recommendation of Juan
Ochoa" and thus, because the jury acquitted Madigan on the substantive counts related to Ochoa,
there remains "no reason to believe that the jury bought the government's argument on Reyes Kurson."
[401] at 24. Madigan, however, cites no legal authority supporting such an inferential leap, based
solely on the purported similarity of two different schemes in an indictment, resulting in two different
verdicts by the jury.  Moreover, the counts related to Juan Ochoa were substantive counts while the
conduct related to Reyes Kurson only applied to Count Two, which charged a conspiracy under 18
U.S.C. § 371.  Accordingly, the record presents separate factual allegations, applied to separate
offenses with separate elements and separate legal instructions. This is not a basis to undo the jury's
findings.  Indeed, a "jury's somewhat split verdicts are a strong indication that the jurors followed this
Court's instructions," including the need to consider each count separately; and the Court finds no
reason to conclude the jury did not do the same here. *United States v. Delatorre*, 581 F. Supp. 2d 968,
991–92 (N.D. Ill. 2008).

this practice as "our Friend's pathway." GX 648. *See also* GX 409; GX 425; GX 442; GX 460; GX 475; GX 476; GX 477; GX 478; GX 480; GX 531; GX 541; GX 632; GX 648; GX 649; GX 650; GX 651; GX 676; GX 758; GX 761; GX 791; GX 793; GX 797; GX 798; GX 804; GX 854; GX 891.

At trial, the evidence further showed that the hiring pressure came from Madigan, and McClain ensured that ComEd understood that fact, emailing Marquez that Madigan criticized Marquez's opposition to the hires during their regular dinners. McClain reported that Madigan complained that "there are two Fidels" and that "sometimes Fidel is totally responsive and engaging" but "sometimes he is not with us." GX 466. McClain also emphasized via email that Madigan "believes in his mind there should be a hard and quick favorable response" to his demands, pointing out that Marquez failed to respond to an email McClain sent that morning about a hiring request. *Id.* McClain's statements did not stand in isolation; in one recorded call, Madigan sarcastically quipped that Marquez did not move quickly enough when completing tasks. *See* GX 108 ("This is Fidel."). *See also* GX 62 (call between Hooker and McClain discussing Marquez, where Hooker commented "it didn't go unnoticed when we mentioned his name in front of the Speaker he said talking to him is like dealing with a, putting something in a dark hole").[12]

## B. Evidence showing Madigan knew ComEd provided bribes in exchange for official actions

While Madigan received the described stream of benefits from 2011 through 2019, ComEd simultaneously pursued the passage of multiple pieces of legislation profoundly affecting its business interests. The evidence presented at trial showed Madigan received these benefits for a reason: his favorable action on specific bills that would determine ComEd's financial viability.

The jury heard undisputed evidence that ComEd faced significant financial difficulties in the years prior to 2011. ComEd Vice President Scott Vogt testified that from 1998 to 2006, the company could not raise their energy rates due to a rate freeze

---

[12] Again, continuing to proclaim his innocence, Madigan claims he was not involved in the intern program and argues that because ComEd did not hire many of his recommendations, none of these jobs were bribes. But these claims ignore large swaths of the evidence presented at trial. The jury received many exhibits showing how particular candidates with direct connections to the 13th Ward, many of whom were unqualified, were pushed through ComEd's hiring protocols at Madigan's behest. McClain repeatedly and explicitly informed ComEd that Madigan expected these hiring requests to be completed without delay or pushback—sentiments reflected by Madigan's own words in other recordings. *See United States v. Loscalzo*, 18 F.3d 374, 383 (7th Cir. 1994) ("evidence of [a] defendant's acts or statements may be provided by the statements of co-conspirators"); GX 108; GX 62. Although some of Madigan's candidates did not receive jobs, evaluating the evidence in the light most favorable to the Government, the jury could reasonably conclude that many of the actual hires were, in fact, bribes paid to Madigan.

enacted by the state legislature. Tr. 558:22–25. This inability to increase revenue caused the company to fall into calamitous financial conditions; by the end of 2006, Vogt testified that he was personally involved in preparing bankruptcy affidavits for the company. Tr. 561:13–14. In 2007, the Illinois legislature ended the rate freeze, requiring ComEd to file multiple requests with the Illinois Commerce Commission ("ICC") in the hopes of increasing their rates to recover their losses. Tr. 562:7–11. ComEd, however, faced systemic difficulty working with the ICC; Vogt testified that ComEd lost approximately $100 million to $120 million per year from 2002 to 2010 due to costs the ICC would not permit the company to recoup. Tr. 570:5–9.

Against this backdrop, ComEd began to pursue the passage of EIMA, or Smart Grid. The legislation would establish a new "formula rate" which would solve ComEd's current crisis and provide a more predictable way to set the energy rates ComEd could charge consumers. Tr. 571:10–572:24. The proposed bill also contained other significant benefits to ComEd, including providing for "$2.6 billion of investment for infrastructure investments over a 10-year period" which would allow ComEd to significantly upgrade ComEd's technology and "eliminate a lot of costs." Tr. 597:11–25; Tr. 600:12–15.

As mentioned above, Madigan served as Speaker of the Illinois House of Representatives House from approximately 1983 through 2019 (except two years, 1995–1997). *See* Stip. 50. The jury heard extensive evidence regarding the powers and authority Madigan possessed in that Office. Multiple Government witnesses testified that Madigan had a "very high" degree of control over the House of Representatives and that he was the most powerful member of that body. Tr. 201:25–202:21. Madigan also exercised significant influence over the flow of legislation. Multiple witnesses testified that as Speaker, Madigan had the authority to decide what bills would be permitted to be called for a vote and the ability to prevent a bill from even reaching the House floor. Tr. 201:25–202:21 (former Rep. Carol Sente); Tr. 768:2–4 (former Rep. Lou Lang); Tr. 1603:24–1605:14 (former Speaker's Office Issues Director Will Cousineau); Tr. 1756:2–8 (Cousineau testimony defining a "brick," meaning a "hold" on legislation); Tr. 7872:15–17 (former Speaker's Office chief counsel David Ellis).

ComEd knew that Madigan wielded this authority; Tom O'Neill testified that during the legislative campaign for EIMA, he "understood that the Speaker of the House controls the legislative agenda in the House and that includes determining which bills would be called to votes and which wouldn't." Tr. 1065:2–5. O'Neill also testified that in fall of 2010, prior to the beginning of the EIMA legislative campaign, he attended a meeting with Hooker and McClain where he was told that "the Speaker will run the bill" and ComEd began its legislative campaign "in earnest" in January of 2011. Tr. 1063:12–17; Tr. 1066:1. As former Speaker's Office general counsel David Ellis testified, the Speaker's Office had the leverage over ComEd when it came to finalizing the bill. Tr. 7871:16–22. With the power to move or kill the bill, Madigan's

team could, and did, make demands on the company during the negotiations. *Id.* Simultaneous with the legislative campaign, ComEd also attended to Madigan, communicating via McClain, about paying for Madigan's hires. Prior to the bill passing, ComEd began paying Frank Olivo for a no-show job (GX 1520) and finalized the preset contract with Reyes Kurson. GX 1071 (finalizing the contract on October 25, 2011). On October 26, 2011, EIMA passed with Madigan voting in favor of the bill. GX 1204. Thereafter, ComEd also began paying two additional Madigan associates for no-show jobs—Ed Moody and Ray Nice. GX 1520.

ComEd approached the legislature again in 2013. That bill, termed "Senate Bill 9," limited the ICC's authority with respect to the new ratemaking procedure, and increased ComEd's "certainty" that the rates they submitted to the ICC would "be approved by the Commission." Tr. 612:22–25. That bill passed in the legislature, and passed again through a veto override, with Madigan moving the bill and voting in favor both times. *See* GX1205; GX1206.

At the same time, ComEd also began work on extending the formula rate past its scheduled expiration date of 2017. Tr. 616:13–16. ComEd hoped to extend the rate from 2018 through 2022 and Vogt testified that the company's financial forecasting estimated the extension would add approximately $400 million to shareholder value. Tr. 614:12–18. ComEd actively worked for the extension, and the legislature passed a bill extending the formula rate to 2019. Tr. 617:5–12. Although Madigan was absent on the day of the final vote (GX 1207), coconspirator Anne Pramaggiore recognized Madigan's determinant role in moving the bill and sent him a thank you letter, telling Madigan that by passing the bill, "you created more certainty for us around the regulatory platform, which will insure we complete the Smart Grid programs we began in 2012 and deliver more benefits to consumers." GX 1304.

In 2016, ComEd pursued another significant piece of legislation—FEJA. That bill extended the lucrative formula rate to 2022 and contained numerous other beneficial provisions for ComEd's parent company, Exelon, including price support for two underperforming nuclear plants owned by the organization. Tr. 623:1–625:25. The Speaker's Office remained extensively involved throughout the FEJA legislative campaign and participated in extensive meetings with ComEd. At his direction, Madigan's staff also made efforts to secure votes for FEJA's passage. *See* Tr. 1638:14–18 (Cousineau testimony that Madigan instructed him to "work the bill and try to get that bill passed"); GX 577 (email from McClain to Pramaggiore noting that Cousineau "was extremely helpful in us acquiring the necessary votes in the Illinois House"); GX 70 (call between McClain and Hooker where McClain commented "that last day, um, we had to go to Madigan. Madigan put 47 votes on . . . ."). FEJA passed on December 1, 2016. Madigan himself voted "NV" or "no vote" on the bill. GX 1209.

SA15

Contemporaneous with the efforts surrounding FEJA, ComEd also attended to Madigan's demands related to the Reyes Kurson contract renewals in 2016 and 2017 and demands related to the other hires, as described above. These demands increased in 2017, with Eddie Acevedo being added to ComEd's payroll on top of the other subcontractors. GX 1520.

The jury also heard evidence related to two other important bills: the 2018 ARES bill (which ComEd opposed), and the 2019 "Skinny Bill" (which would have again extended the formula rate). McClain repeatedly informed ComEd that Madigan gave "the code" to "go ahead and kill" the ARES bill (GX 794; GX 82),[13] and during the floor vote held on May 31, 2018, the bill failed to pass and got postponed until a later date. Tr. 8515:3–5. A modified version of the bill later passed in the 2019 legislative session, after the Government's investigation went public. Tr. 8546:24–25; Tr. 8298:24–8299:2. As to the Skinny Bill, ComEd advanced a similar effort to extend the formula rate during the 2019 legislative session. In February 2019, Marquez (now cooperating with law enforcement) recorded a meeting with Hooker and McClain where they discussed the possibility of the subcontractors' contracts not getting renewed by ComEd. Marquez asked how "our friend will react" if that happened, and Hooker described Madigan's attitude as "You're not going to do something for me, I don't have to do anything for you," and adding that Madigan "won't say it." GX 286. Pramaggiore expressed similar concerns when Marquez brought up the same subject in another recorded call, advising Marquez not to cease any payments "until after the" legislative "session's over." GX 274. Pramaggiore added that ComEd did "not want to get caught up in" a "disruptive battle where" someone "gets their nose out of joint and we're trying to move somebody off and then we get forced to give 'em a five-year contract because we're in the middle of needing to get something done in Springfield." *Id.* The Skinny Bill failed to pass in the 2019 legislative session. Tr. 719:21–720:4. In May 2019, before the end of the 2019 legislative session, the Government's investigation in this case went public. Tr. 8298:24–8299:2.

The trial record confirmed that the above legislative agenda remained critical to ComEd's ongoing business operations. The formula rate dramatically improved ComEd's finances and its initial implementation through EIMA was met with "a lot of jubilation" inside the company." Tr. 606:11–12. FEJA, too, was viewed as a tremendous success for ComEd with the company hosting multiple celebrations marking its passage, including one where the company invited the entire Democratic

---

[13] Madigan contends that McClain statements were incorrect, pointing to Rep. Greg Harris' testimony that he did not himself specifically recall Madigan opposing the bill, nor Madigan's staff working against the bill. Tr. 8515:24–8516:4. The jury, however, remained free to weigh the significance of this evidence, and the credibility/accuracy of this testimony, against the other contradictory evidence presented at trial. *United States v. Orozco–Vasquez*, 469 F.3d 1101, 1106 (7th Cir. 2006). Thus, the record does not support an overturning of the verdict under Rule 29, and this Court see no basis to supplant the jury's reasonable evaluation of the evidence. *Id.*

Caucus and all of the legislative leaders in the General Assembly. *See* Tr. 9630:19–9631:2; 9652:7–18.

The evidence also showed that ComEd executives understood Madigan possessed a singular power to block their legislation and thus made extensive efforts (both lawful and unlawful) to secure his favorable actions on their behalf. At trial, the jury received evidence establishing that ComEd tied the private benefits discussed above to the legislative agenda, and that the negotiations ComEd had with the Speaker's Office staff, and payments ComEd made to Madigan's associates were all part of the same unified strategy: to procure Madigan's favor and prevent him from single-handedly blocking their legislation. *See* GX 522 (McClain email to ComEd executives noting that failure to renew the Reyes Kurson contract "will provoke a reaction from our Friend"); GX 270 (recorded meeting where Doherty noted that "ComEd money" predominately "comes from Springfield," adding that his "advice would be 'if it ain't broke, don't fix it' with" the subcontractors); GX 274 (Pramaggiore stating that ComEd could "get forced to give" someone "a five-year contract because we're in the middle of needing to get something done in Springfield").[14]

Likewise, the trial record showed that Madigan knew ComEd offered him such private benefits in exchange for his official actions; specifically, enabling their legislation to pass the General Assembly. As part of the evidence, McClain expressly acknowledged the "*quid pro quo*" nature of subcontractor arrangement and added that "if you want to pass this bill, this is what it requires. So, either you're gonna play in the tier-one game here or you're gonna keep playing in your tier-two game here . . . this is like serious business, it's millions of dollars." GX 279. *See Loscalzo*, 18 F.3d at 383 ("evidence of [a] defendant's acts or statements may be provided by the statements of co-conspirators"). The evidence further showed that Madigan maintained personal oversight of contracts, including controlling when the payments stopped and started. *See* GX 248; GX 522; GX 533. The record also showed that Madigan regularly employed McClain as his agent and communicated messages and demands through McClain after their regular meetings, and McClain would then ensure Madigan's demands were met by explicitly warning ComEd that failure to respond could provoke an adverse reaction from Madigan. *See* GX 522. *See also* Tr. 2555:21–24 (Marquez testimony that he obtained McClain's permission before terminating a subcontractor payment because "the original request came through from Michael Madigan. So I felt I had to get the green light before I could move on such a" decision).

---

[14] Ultimately, of course, the Government did not "have to prove the bribery offense caused an official action to take place, that is, a violation of Count Two may occur even if an official action or actions would have occurred in the absence of the bribery offense." [313] at 68. A public official faces criminal liability for bribery if he accepts a benefit knowing the briber payer gave the "the money for the purposes of influencing" his "official actions." *United States v. Peleti*, 576 F.3d 377, 382 (7th Cir. 2009). Whether he performs the official act does not change the analysis. *See id.* (the term "'being influenced' does not describe the recipient's true intent") (quotation omitted) (cleaned up).

In short, the evidence of Madigan's participation in the conspiracy was overwhelming and did not require the jury to rely on speculation. *United States v. Blagojevich*, 794 F.3d 729, 738 (7th Cir. 2015) ("Few politicians say, on or off the record, 'I will exchange official act X for payment Y.'"). Accordingly, the Court finds the jury had more than sufficient evidence to reasonably conclude that Madigan participated in a conspiracy to solicit and agree to give bribes.

Despite the evidence discussed above, Madigan seeks to undo the jury's verdict, asserting that he never made an express threat to kill a piece of legislation, nor did he have unilateral control to do so. [401] at 23–24. This defense effort, however, is undermined by both the law and the trial record. Under well-settled law, "the term 'official action' does not require that the official possess the power or ability to act unilaterally on" a "specific question or matter," nor that he enters into an *explicit* agreement to do so. [313] at 55. *See United States v. Arroyo*, 581 F.2d 649, 654 n.10 (7th Cir. 1974) (noting "whether the official act could be influenced is irrelevant in prosecution of a bribe payer"); *United States v. Peleti*, 576 F.3d 377, 382 (7th Cir. 2009) ("An officer can act corruptly without intending to be influenced; the officer need only 'solicit or receive the money on the representation that the money is for the purpose of influencing his performance of some official act.'") (quoting *Arroyo*, 581 F.2d at 652); *McDonnell v. U.S.*, 579 U.S. 550, 572 (2016) (in proving a *quid pro quo* bribery agreement, the "agreement need not be explicit, and the public official need not specify the means that he will use to perform his end of the bargain"). Despite these requirements, the evidence produced at trial showed that Madigan's co-conspirators *did* repeatedly threaten ComEd executives that Madigan would react adversely if they did not comply with Madigan's requests. *See e.g.,* GX 274; GX 522; Tr. 2555:21–24. Multiple witnesses also testified regarding Madigan's power to stop bills from moving through the House of Representatives. *See e.g.,* Tr. 202:3–13; 307:14–18 (former Rep. Sente testimony that Madigan had "the most power of the members of the House" and controlled the gateway to further progress of any particular bill); Tr. 716:22–25 (Vogt testimony that Madigan had "a lot of ability" "to determine what's going to move through different committees" and "ultimately make it to the floor"); Tr. 851:2–4 (former Rep. Lou Lang testimony that "sometimes you could have a bill that the Speaker doesn't like that passes anyway. But if the Speaker wants to kill your bill, your bill is dead. That's it.").

Madigan's unlawful agreement to accept the bribes was enough for criminal liability to attach. Whether Madigan's official action actually took place (or, much less, the bill succeeded) remains inconsequential, nor would the analysis change if Madigan had an intent to advance FEJA or any of the other bills all along.[15] Quite

---

[15] Again, under the law, the Government need not prove that Madigan intended to follow through on the unlawful agreement. *See Peleti*, 576 F.3d at 383 (noting that the term "'being influenced' does not describe the recipient's true intent"). If a public official accepts money from a bribe payer knowing that the payer expects him to take an official action in exchange, then he violates § 666 regardless of

simply, the evidence presented at trial was more than sufficient for the jury to find that Madigan participated in an ongoing agreement to exchange official actions for private benefits.

Attempting to revisit the verdict, Madigan next claims that he never acted officially on ComEd's behalf, pointing to the fact that the finalized version of FEJA did not contain every item ComEd wanted after multiple, intense rounds of negotiations with his office. But the record clearly shows that Madigan moved the legislation, that the legislation was, in fact, extremely favorable to ComEd, and that ComEd viewed it as such. The jury heard multiple ComEd executives testify regarding the enormous positive financial impact the bill had on the company and heard about the company's extensive celebrations following ComEd's passage. This evidence provided a more than sufficient basis for the jury to conclude that the legislation passed presented a substantial victory for the company.

Finally, Madigan raises separate arguments alleging that certain defense witnesses and other testimony undermined the testimony of certain Government witnesses, particularly that of his former Issues Director, Will Cousineau. But under Rule 29, the Court must evaluate the evidence "in the light most favorable to the government" and must uphold the jury's verdict so long as any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Howard*, 619 F.3d 723, 726 (7th Cir. 2010) (quotation omitted). Here, for the reasons explained above, the jury was confronted with overwhelming evidence that Madigan used his office to direct private benefits to his political associates in exchange for his action on legislation. The jury remained free to weigh the evidence and make credibility determinations regarding both the government and defense witnesses in this case. The Court cannot, and will not, vacate those reasonable determinations where the jury was faced with more than sufficient evidence to reasonably conclude Madigan participated in a conspiracy to solicit and agree to give bribes. Accordingly, Madigan's motion must be denied with respect to the first and second objects of the conspiracy charged in Count Two.

---

whether he ever intended to follow through on the agreement. *See United States v. Hawkins*, 777 F.3d 880, 882 (7th Cir. 2015). Here, however, the evidence showed that Madigan *did* take official actions to advance ComEd's legislation as he permitted the bills to be called for a vote and in other instances actively employed his staff to advance certain ComEd bills. *See e.g.*, GX 1204 (EIMA); GX 1206 (SB 9); GX 1209 (FEJA). Accordingly, Madigan's arguments fails because: (1) the evidence supported the jury's reasonable conclusion that he did knowingly participate in a conspiracy to accept bribes; and (2) a public official can violate § 666 without actually following through on his end of the bribery agreement. In other words, if Madigan had accepted bribes from ComEd, knowing ComEd tendered the payments with an intent to exchange the payment for his official action(s), but later "killed" ComEd's legislation, his conduct would still meet the requirements of § 666.

## 2. The Government presented sufficient evidence to find a conspiracy to falsify documents

Madigan next argues that the Government failed to produce sufficient evidence that he joined a conspiracy to falsify documents in violation of 15 U.S.C. §§ 78m(b)(5) and 78ff. Section 78m(b)(5) of the FCPA makes it a crime to "knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account . . . ." 15 U.S.C. § 78m(b)(5). Section 78ff(a) sets forth the penalties for violating the statute. *See id.* § 78ff(a). The Court instructed the jury that a person commits the crime of falsifying documents when: (1) a company is an issuer; (2) a person falsifies, or causes the falsification of, the books, records, or accounts of the company; (3) the books, records, or accounts were of the type that were required to accurately and fairly reflect in reasonable detail the transactions and dispositions of the assets of ComEd or Exelon; and (4) the person acts knowingly and willfully. *See* [313] at 65–66.[16]

At trial, Exelon director of corporate accounting, Elizabeth Lynch, testified to Exelon's system of internal controls and processes for ensuring proper payments to third party vendors. Lynch testified that payments made to third parties would be reflected in ComEd's general ledger and the company used specialized software to record, categorize, and process invoices received from consultants and other entities contracting with the company. Tr. 3550:3–3551:20. Within the system, an employee would then be "responsible for" reviewing the invoice and "making sure the services that are described on the invoice were provided" when approving the transaction. Tr. 3552:18–21. Per ComEd and Exelon policy, this internal user reviewing and approving the payment would not be the same person who created the invoice, in order "to mitigate risk and also to prevent potential fraud or errors" from occurring. Tr. 3552:3–12.

ComEd and Exelon also used forms called "single source justification" forms ("SSJs") for certain vendor contracts that were not subject to a competitive bidding process. Tr. 4103:5–13. Exelon principal category manager Carrie Bourque testified that the person requesting a specific vendor's services would have to sign off on the form if the contract amount exceeded $250,000. Tr. 4103:14–18. The requesting individual was also responsible for providing accurate information in the form, which included a "Reason for Justification" section containing information about what the requested service entailed. Tr. 4105:6–23; 4106:12–13; 9396:2–9397:2.

The jury heard more than sufficient evidence from which they could reasonably conclude that the co-conspirators in this case submitted false documents in furtherance of the conspiracy charged in Count Two. For example, the scope of services description in the 2018 amendment to Doherty's contract claimed that

---

[16] In his post-trial motions, Madigan does not claim any error with respect to the jury instructions setting forth the elements of the §§ 78m(b)(5) and 77ff(a) violations.

SA20

Doherty had an "expanded role" with certain Cook County officials. GX 809. As Fidel Marquez testified, this description was false; Doherty did not have an expanded role but instead the increase was intended to account for the addition of Mike Zalewski to Doherty's contract. Tr. 2551:13–2553:11. The jury also heard a recorded conversation between Doherty and Marquez where Doherty stated that the subcontractors did not do "anything" for him "on a day to day basis" and the reason they were paid was "to keep Mike Madigan happy." GX 270.

Additionally, Carrie Borque testified to the importance of the scope of services section of a contract, stating that it required accurate information so invoice approvers could verify the company was receiving the services it contracted for. Tr. 4101:15–4102:2. Former ComEd manager for governmental affairs and defense witness Eric Duray echoed this testimony, stating that it was important to have accurate information in the scope of services portion of a contract even where a contract permitted the hiring of subcontractors. Tr. 9392:6–8. Duray added that an undisclosed plan to pay subcontractors who did not do work for the company would render a scope of services description inaccurate. Tr. 9392:9–11.

The jury also heard evidence concerning the SSJs related to the renewal of Doherty's contract. The Government introduced forms approved by co-conspirator Anne Pramaggiore stating that the "Consultant has specific knowledge that cannot be sourced from another consultant/supplier" (GX 759) and the "consultant provides unique insight and perspective to promote ComEd" and its interests. GX 1108. The Government further presented evidence, per Lynch's testimony, that invoices were reflected in ComEd and Exelon's general ledgers. After Zalewski was added as a subcontractor, Doherty submitted an invoice to ComEd for his usual compensation, plus $5,000 more "due to additional scope of services" not covered in the previous pay period. GX 1095 at 192. The same occurred when Doherty added Nice and Moody as subcontractors. *See id.* at 27, 87 (adding extra payment lines for "services rendered" when Nice and Moody were added as subcontractors in 2012 and 2014, respectively).

Based upon the entire record, the jury reasonably concluded a conspiracy existed to falsify documents, and the relevant forms failed to disclose the true intent of the payments; specifically, that the payments were not for professional services rendered (little to no work was performed), but instead the payments made were intended to unlawfully influence Madigan. The invoices also falsely indicated that Doherty provided additional services to ComEd when, in fact, there were none. As Marquez testified, the subcontractors were not paid to work but instead were paid as a "favor to Michael Madigan" so he would "be more positively disposed towards ComEd's legislative agenda." Tr. 2453:9–13. Faced with the above examples in

addition to other evidence of falsified documents, the jury had more than sufficient evidence to find this object of the conspiracy.[17]

Nevertheless, Madigan claims that ComEd maintained no policy requiring the disclosure of subcontractors on consultant contracts or SSJs, and therefore, those documents were not false. [401] at 27. But this argument completely ignores the false statements contained within the SSJs themselves. As stated above, the SSJs contained false and inaccurate statements regarding the amount and nature of the services performed and the true purpose of the payments made, that is, to compensate Madigan's political associates who provided little to no work for ComEd. *See* "Falsify," BLACK'S LAW DICTIONARY (12th ed. 2024) ("to make deceptive; to counterfeit, forge or misrepresent;"). Madigan's arguments regarding the subcontractors' public registrations as lobbyists for ComEd remain unavailing for the same reason; whether the subcontractors held themselves out in certain public registration forms as lobbyists for ComEd (despite doing little to no work for the company) does not change the fact that the SSJs contained false statements regarding their true services.[18]

### 3. The Government presented sufficient evidence to find a conspiracy to circumvent internal controls

Madigan asserts there was insufficient evidence of a conspiracy to circumvent internal controls because the Government failed to show an adequate "internal accounting control" for purposes of 15 U.S.C §§ 78m(b)(5) and 78ff(a). Madigan claims the Government only submitted Exelon's Corporate Code of Business Conduct ("Code of Conduct") as the "internal accounting control." This argument simply misstates the record.

---

[17] Stipulation 10 stated that both ComEd and Exelon were subject to Section 12 of the Securities and Exchange Act of 1934, were both "issuers," and thus were required to file reports under the Foreign Corrupt Practices Act.

[18] Separately, this Court notes that the recent Supreme Court decision in *United States v. Thompson* does not alter the result here. In that case, the Supreme Court reversed Seventh Circuit precedent that held 18 U.S.C. § 1014 criminalized both false and misleading statements. The Court held that because the statute only refers to "'knowingly mak[ing] any false statement or report,'" it does not criminalize merely misleading statements because "a statement that is misleading but true is by definition not a 'false statement'" and the statutory text only includes the term "false." 145 S.Ct. 821, 826 (2025) (quoting 18 U.S.C § 1014) (alterations in original). The *Thompson* case does not apply here, however, for the obvious reason that it concerned a statutory interpretation question analyzing an entirely separate statute from 15 U.S.C. §§ 78m(b)(5) and 78ff(a). Likewise, the SSJs at issue here *did* contain false statements for the reasons explained above. The Court also instructed the jury that the offense of "falsifying books, records, or accounts," is committed when a "person falsifies, or causes the falsification of, the books records or accounts of the company." [313] at 65–66. This instruction mirrors the statutory language, unlike *Thompson* where the lower courts permitted a departure from the term used in the statute itself. Accordingly, the facts in this case would satisfy the requirements set forth by *Thompson*, even if that case applied.

The Seventh Circuit has stated that "internal accounting controls include manual or automated review of records to check for completeness, accuracy and authenticity; a method to record transactions completely and accurately; and reconciliation of accounting entries to detect errors." *McConville v. United States SEC*, 465 F.3d 780, 789 (7th Cir. 2006). *See also United States v. Sealed Appellant (In re Grand Jury subpoenas Dated Sept. 13, 2023)*, 128 F.4th 127, 142 (2d Cir. 2025) ("'Internal accounting controls' refers to the mechanism by which companies monitor their accounting system for errors and irregularities in order to safeguard company assets and ensure that records are sufficiently reliable.") (quotation omitted) (cleaned up). This standard was met at trial.

In this case, the Code of Conduct constituted only one of many internal accounting controls presented to the jury. As the Court noted above, Elizabeth Lynch testified concerning the internal controls and processes ComEd maintained to ensure invoices appearing on the general ledger were accurate and reflected actual services received. Tr. 3552:18–21. Company policy also prohibited the person who created the invoice transaction from approving it, requiring two different users to process the transaction in order "to mitigate risk and also to prevent potential fraud or errors" from occurring. Tr. 3552:3–12. Further, the SSJs presented yet another internal control. As Carrie Borque testified, the SSJ forms required the requester to provide accurate information about the services in the "Reason for Justification" section of the form and sign off on the form themselves. Tr. 4103:14–18; 4105:6–23; 4106:12–13. It was important for this section of the form to contain accurate information so invoice approvers could verify the company was receiving the services it contracted for. Tr. 4101:15–4102:2. Significantly, Bourque stated that the purpose of the SSJs was to ensure that the company spent its money "in a cost effect manner" and "in the best interest" of its "customers" and "shareholders." Tr. 4103:22–24. Bourque also testified regarding the contract approval processes at ComEd, noting that invoice accuracy in the scope of services descriptions was important so that invoice approvers could verify the company was receiving the services it contracted for. Tr. 4101:15–4102:2. Defense witness Eric Duray echoed this testimony, stating that political consultant contracts were subject to multiple layers of approval, and the company maintained "checks and balances" to finalize political consultant contracts, in addition to the scope of services requirement. Tr. 9392:16–25.

Finally, the Government presented evidence of internal controls beyond the Code of Conduct itself. At trial, the Government called Exelon's former chief compliance and ethics officer, Kristopher Keys, who testified that Exelon maintained three different types of internal controls to mitigate risk: (1) operational controls; (2) compliance and ethics controls; and (3) internal accounting controls. Tr. 4036:11–17. Keys testified that the Code of Conduct was one of these three different types of internal controls employed by the company. Tr. 4038:23–25. Keys also testified that the Code directly concerns the company's internal financial practices, and that it directs employees to accurately report all financial information, prohibits falsifying

financial data, mandated employees to conduct due diligence on all potential agents, consultants, and other contractors, and prevented employees from using third parties to make improper payments or offers. Tr. 4044:9–20. *See also* Stipulation 34.

Here, the evidence was more than sufficient to find a conspiracy to circumvent these internal controls. As the Court recounted above (*see supra* Part III.a.i.2), the evidence showed that the conspirators concealed the true nature of the JDDA contract through creating false invoices, falsely describing JDDA's scope of services, and falsely describing JDDA's scope of services in the organization's contract with the company. These actions circumvented the internal controls, which were designed to ensure the accuracy and reliability of the company's business transactions.

Despite this evidence, Madigan claims the Government failed to prove any "internal accounting control" under the FCPA. But the Code of Conduct's language directly refutes Madigan's assertion. The Code's provisions regarding financial transactions certainly qualified as "a method to record transactions completely and accurately" since employees were instructed to "accurately, completely, and in a timely fashion" record all transactions and the Code specified employees' responsibility to ensure the accuracy and authenticity of financial data. Stipulation 34. This language, and the supporting testimony, shows the Code easily qualified as an "internal accounting control" under the FCPA. *See Sealed Appellant*, 128 F.4th at 142 (finding a company's process of the legal department reviewing "all significant contracts" qualifies as an internal control for purposes of 15 U.S.C. §§ 78m(b)(5) and 78ff(a)).

Similarly, this Court rejects Madigan's argument that the Government merely tried to "bootstrap a violation of the Code of Conduct" into a violation of federal criminal law. [401] at 29. Here, the jury instructions explicitly prevented this imagined scenario. First, the jury received a limiting instruction at trial explicitly directing that any violation of a code of conduct, without more, is not a violation of criminal law. *See* Limiting Instruction 8.[19] Additionally, the jury instructions for Count Two provided, in part, that the offense of "circumventing a system of internal accounting controls" is committed by a person who acts "knowingly and willfully." [313] at 66. The instructions further specified that a person acts "willfully" only when "he or she acts knowingly and with the intent to do something that he or she knows is against the law." *Id.* at 68. During cross examination, Madigan testified that he had represented numerous corporate entities in his capacity as a lawyer and knew that corporate employees cannot falsify or mischaracterize books and records. Tr. 9278:2–24. Furthermore, as discussed above, Madigan had knowledge and awareness

---

[19] Limiting Instruction 8 provided as follows: "Ladies and gentlemen, you have heard or will hear evidence regarding the internal Exelon Code of Business Conduct. A violation of the internal code of conduct without more is not a violation of any criminal law. This evidence may only be considered by you to show the internal controls in place at Exelon during the relevant period for the purposes of Count 2."

of the unlawful conspiracy to conceal the subcontractor payments. This evidence did not "bootstrap" a violation of the Code of Conduct; rather, the evidence allowed the jury to reasonably infer that Madigan willfully acted in furtherance of a conspiracy to conceal the unlawful payments, and circumvented ComEd's internal accounting controls in the process, all in violation of the statute.

### ii. Counts 4s and 6s

Madigan also moves for acquittal on Counts Four and Six—the substantive 18 U.S.C. § 666 charges pertaining to the contracts and payments provided to Nice, Olivo, and Zalewski. For the reasons the Court explained above (*see supra* Part III.a.i.1), the Government presented more than sufficient evidence at trial to prove beyond a reasonable doubt the requisite elements of Counts Four and Six, and proved among other things that Madigan demanded a stream of benefits from ComEd, including payments to the subcontractors in 2018 and 2019, in return for his favorable action on ComEd's legislation. As such, Madigan's motion is denied.

### iii. Count 5s

Madigan separately challenges his Travel Act conviction in Count Five by arguing that the underlying Illinois state law and bribery statutes required the Government to prove a *quid pro quo*. This argument largely reiterates the arguments Madigan makes in his Rule 33 motion concerning the Court's instructions regarding those state statutes. For the reasons the Court explains in addressing Madigan's Rule 33 motion below (*see infra* Part IV.a.iv), Madigan's arguments fail as a matter of law because the Illinois state bribery statutes do not require proof of an exchange.[20] Because the jury was correctly instructed and the Government did not need to prove that Madigan actually committed the underlying state law offenses to obtain a conviction under Count Five, Madigan's arguments must fail. *See United States v. Campione,* 942 F.2d 429, 434 (7th Cir. 1991) (". . . the federal crime to be proved in § 1952 is use of the interstate facilities in furtherance of the unlawful activity, not the violation of state law; therefore § 1952 does not require that the state crime ever be completed.") (citations omitted).

But even if the Illinois bribery statutes required proof of a *quid pro quo*, Madigan's motion would still fail. As the Court recounted extensively above (*see supra* Part III.a.i), the Government presented overwhelming evidence of an ongoing agreement between Madigan and ComEd to exchange private benefits for official actions; and the evidence showed that the contract obtained for Michael Zalewski was one such exchange. *See e.g.,* GX 75; GX 270; Tr. 2533:6–23; Tr. 2534:2–13; 2538:6–

---

[20] As the Court notes in response to Madigan's Rule 33 motion on this subject, the Court did find that the Illinois legislative misconduct statute (720 ILCS 5/33-8) does require proof of an exchange and instructed the jury accordingly. *See* [313] at 87–88. Thus, consistent with the Court's findings concerning Madigan's Rule 33 motion, Madigan's arguments are moot with respect to that statute.

SA25

16. Accordingly, any error would be harmless, and the Court finds no basis to disturb the jury's conviction as to Count Five.

### b. Counts 8s, 9s, 10s, 12s, 13s, and 14s

Counts Eight, Nine, Ten, Twelve, Thirteen, and Fourteen charged Madigan with wire fraud and violations of the Travel Act stemming from his efforts to recommend former alderperson Daniel Solis for a state board position in exchange for Solis' assistance in obtaining business for Madigan's private law firm. Counts Eight, Nine, and Ten charged Madigan with wire fraud under 18 U.S.C. §§ 1343 and 1346, identifying three emails sent in furtherance of the scheme. [37] at 69–77. Counts Twelve, Thirteen, and Fourteen charged Madigan under 18 U.S.C. § 1952 with causing use of a facility in interstate commerce with intent to promote unlawful activity, identifying three phone calls made in furtherance of the scheme alleged in Count Eight. *Id.* at 79–81.

Under 18 U.S.C. § 1343, a defendant commits wire fraud by devising "or intending to devise any scheme or artifice to defraud," or by "obtaining money or property by means of false or fraudulent pretenses, representations, or promises" and "transmits or causes to be transmitted by means of wire" or other "communication in interstate or foreign commerce" for the purposes "of executing such scheme or artifice." A "scheme or artifice to defraud" under the wire fraud statute includes bribery or kickback schemes—in other words schemes "to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. *See also Skilling v. U.S.*, 561 U.S. 358, 408–09 (2010). Such schemes do not need to succeed for criminal liability to attach; the "wire fraud statutes criminalize the fraudulent acts undertaken to secure illicit gains, not their ultimate successes." *United States v. Lupton*, 620 F.3d 790, 805 (7th Cir. 2010). In this case, the Government pursued both a money/property fraud theory and an honest services theory with respect to Counts Eight, Nine, and Ten. *See* [37] at 69–77; [313] at 91.

18 U.S.C. § 1952 criminalizes, in relevant part, use of "the mail or any facility in interstate or foreign commerce, with intent to . . . otherwise promote, manage, establish, carry on, or facilitate . . . any unlawful activity." 18 U.S.C. § 1952(a)(3). The government does not need to prove the defendant violated a "specified state law, only that the federal crime uses interstate facilities to further the unlawful activity." *United States v. Burke*, No. 19 CR 322, 2024 WL 3090277, at *16 (N.D. Ill. Jun. 21. 2024) (citing *United States v. Baker*, 227 F.3d 955, 961 (7th Cir. 2000)). *See also United States v. Campione*, 942 F.2d 429, 434 (7th Cir. 1991) ("Since § 1952 does not incorporate state law as part of the federal offense, violation of the Act does not require proof of a violation of state law.") (citation omitted).

Madigan raises several challenges to these convictions. Madigan first asserts that the Government failed to prove that Madigan participated in a *quid pro quo* to

exchange his recommendation for a board seat for receiving introductions to potential clients for legal business. Madigan separately argues that the Government failed to show that he made any material misrepresentation in furtherance of the scheme. Finally, Madigan asserts the Court must vacate his Travel Act convictions for two reasons: (1) the underlying Illinois bribery laws required evidence of a *quid pro quo* which the Government failed to prove; and (2) the phone calls identified in Counts Twelve and Fourteen were not transmitted outside the state of Illinois.

To start, merely asking for introductions or recommendations to obtain private benefits remains a common and, without more, lawful business practice. But conditioning those introductions or recommendations on a public servant's use of his office for personal gain falls far afield of that innocent conduct. Here, the Government charged Madigan with devising a scheme to exchange use of his position as Speaker of the Illinois House of Representatives for personal business introductions facilitated by then-alderperson Daniel Solis to certain real estate developers with projects in the 25th Ward. The jury agreed with the Government's allegations in part, and found Madigan guilty on some, but not all, of the Counts related to this theory.

Viewing the evidence in the light most favorable to the Government and deferring to the jury's credibility determinations and reasonable inferences, this Court finds no basis to disturb the jury's findings of guilt. In fact, the evidence of guilt on those verdicts was, again, overwhelming.

### i. The Government presented sufficient evidence of a scheme to defraud (Counts 8s, 9s, and 10s)

To sustain a conviction for wire fraud under § 1343, the Government must prove that "the defendant (1) participated in a scheme to defraud, (2) intended to defraud, and (3) used interstate wires in furtherance of the fraud." *United States v. Buncich*, 926 F.3d 361, 366 (7th Cir. 2019) (citing *United States v. Sheneman*, 682 F.3d 623, 628 (7th Cir. 2012)). To establish a defendant's intent to defraud, the government must show a "willful act by the defendant with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another." *United States v. Sloan*, 492 F.3d 884, 891 (7th Cir. 2007) (quoting *United States v. Leahy*, 464 F.3d 773, 786 (7th Cir. 2006)). The government, however, does not need to prove "that the defendant personally benefitted from the fraud." *United States v. Filer*, 56 F.4th 421, 434 (7th Cir. 2022) (citing *United States v. Ross*, 77 F.3d 1525, 1543 (7th Cir. 1996)). Because "direct evidence of an intent to defraud is rare," (*Sloan*, 492 F.3d at 891) the "specific intent to defraud is typically shown by 'circumstantial evidence and inferences drawn from the scheme itself' showing that the scheme was 'reasonably calculated to deceive individuals of ordinary prudence and comprehension.'" *Filer*, 56 F.4th at 435 (quoting *Sloan*, 492 F.3d at 891).

SA27

When the government pursues an honest services fraud theory at trial, the evidence must contain "proof of a *quid pro quo*." *United States v. Johnson*, 874 F.3d 990, 999 (7th Cir. 2017). But, as stated above, any "*plan* to take" such financial gain "in exchange for an official act" constitutes a "scheme to defraud, whether or not the plan succeeds." *United States v. Hawkins*, 777 F.3d 880, 883–84 (7th Cir. 2015) (citing *United States v. McDonough*, 727 F.3d 143, 159-60 (1st Cir. 2013); *United States v. Rosen*, 716 F.3d 691, 700–02 (2d Cir. 2013); and *United States v. Bryant*, 655 F.3d 232, 244–45 (3d Cir. 2011)) (emphasis in original). *See also Lupton*, 620 F.3d at 805.

Here, the jury reasonably found that Madigan knowingly devised or participated in a scheme to: (1) deprive the State of Illinois of money or property; or (2) deprive the people of Illinois of Madigan's honest services as Speaker. The evidence showed that Madigan was a named partner at the law firm Madigan & Getzendanner while he served in the Illinois House of Representatives. Tr. 9410:4–7. The firm's primary practice was in real estate tax work. Tr. 9408:21–25. From 1996 through 2019, Solis was the alderperson of the 25th Ward. Tr. 4755:20–4756:13. Solis also served as chairman of City of Chicago's Committee on Zoning, Landmarks and Building Standards from 2009 to 2019. Tr. 4765:9–11. Former alderperson Michele Smith testified that, when voting on matters associated with a development project, the City Council member would, under custom and practice, typically defer to the alderperson in whose ward the project was located. Tr. 4622:15–24. Smith also testified that the chair of the Zoning Committee retained the power to arrange the Committee's agenda, and thus personally controlled what projects were called before the Committee for approval. Tr. 4633:19–21.

Against this backdrop, the jury heard ample evidence supporting the wire fraud counts. For example, the trial exhibits included a recording of a meeting that took place on June 20, 2018 at Madigan's law office. *See* GX 125. Solis facilitated this introductory meeting between the developers, Madigan, and Madigan's law partner at Madigan's request (*see* GX 28), and the firm pitched its services to the group. *Id.* After the pitch, Solis and Madigan met separately. Solis was cooperating with the FBI at the time.[21] As part of his cooperation, Solis told Madigan he planned to run for re-election but would retire before the completion of the term. *Id.* Solis wanted to secure a state board position for when he left office. *Id.* Madigan responded that he had "a file" and he "monitor[ed] all of this stuff," adding that he'll "put a note in there." *Id.* Solis replied "And, and, and I'll continue to get you legal business." *Id.* After Solis stated he wanted to wait on the board appointment until after the election, Madigan asked Solis about Harry Skydell, the developer of a large project located in Solis' ward. *Id.* Solis agreed to facilitate an introduction. *Id.* On July 27, 2018, Solis informed Madigan over the phone that Skydell was willing to meet with his law firm. GX 146. Solis then told Madigan he received a list board seats from him and asked if Madigan could meet with him the following week to "talk them over." *Id.*

---

[21] As noted previously, Solis began cooperating with the FBI in June 2016. Tr. 4908:23–24.

On August 2, 2018, Solis and Madigan met in person and discussed the state board appointments. *See* GX 151. Solis asked Madigan "what would happen if you recommended me?" *Id.* Madigan responded: "See, I would go to Pritzker. That's what I would do." *Id.* Solis told Madigan that "there's a lot of good stuff happening—in my ward" and he would continue to help get Madigan legal business. *Id.* Madigan responded, "Don't worry about it" and confirmed which two appointments Solis was most interested in. *Id.* Solis indicated which positions were his top choices and Madigan replied "Okay. Fine," before adding, "Just leave it in my hands." *Id.* Solis then told Madigan that Skydell would be in Chicago in a few weeks and if there was anything else Madigan was interested in to "just let me know." *Id.* Madigan responded, "There's one thing you can do." *Id.* Madigan then asked Solis to reach out to Raul Raymundo, CEO of the non-profit organization Resurrection Project, so that Madigan's son could obtain insurance business from the organization. *Id.* Madigan also told Solis: "Just ask him, 'Give Andrew something,'" and "'Give him a chance to show what he, what he can do.'" *Id.* Solis agreed to contact Raymundo for him, and Madigan handed Solis his son's business card. *Id.*; GX 1401; GX 1703. Madigan then brought up the state board appointments again, saying, "And I'll. Just leave this in my hands." *Id.* In the conversation, Solis repeated to Madigan that he would do "whatever you need," adding that "this would be fantastic for me." *Id.* Madigan replied, "I got it," and then reminded Solis about reaching out to Raymundo.

After this meeting, Madigan and Solis spoke on the phone regarding Solis' conversation with Raymundo (GX 154) and Solis' efforts to arrange a meeting between Madigan and Skydell. GX 166.[22] That meeting occurred on September 4, 2018, which Solis attended. *See* GX 178; GX 179. Madigan called Solis approximately three weeks after the meeting to ask Solis to contact Skydell again, in an effort to obtain the legal business for Madigan's firm. GX 185. On October 26, 2018, Madigan and Solis met in person again and further discussed Skydell. GX 197. As part of his cooperation, Solis told Madigan that Skydell agreed to give his firm the tax work on one of his projects. *Id.* Solis then informed Madigan that he still planned to run for re-election but would only sit for two years. Solis brought up the state board appointment again, and Madigan assured Solis that Madigan had "it in my notes" and told Solis: "When I sit down with Pritzker, that's, I'll tell him here it is, this is what we want to do." *Id.* Madigan and Solis continued to have additional conversations about the plan through December 2018. *See* GX 236; GX 244.

Madigan asserts no reasonable jury could infer a "this for that" agreement based on the trial evidence. But this argument amounts to nothing more than a dispute with the jury's credibility determinations. Although Madigan posits in his motion, and claimed during his testimony, that he never mentally connected the state board appointment with a business introduction, the jury remained free to reject Madigan's explanation of the evidence. Further, "alternative explanations alone,

---

[22] This phone call forms the interstate communication underlying Count Twelve. *See* [37] at 79; GX 166.

even if plausible, do not ordinarily overcome the defendant's burden in challenging the sufficiency of the evidence." *United States v. Romero*, 57 F.3d 565, 570 (7th Cir. 1995) (citing *United States v. Maholias*, 985 F.2d 869, 874 (7th Cir. 1993)). The jury rejected Madigan's gloss on his business involvement with Solis, and the evidence supported that determination. *See United States v. Powell*, 576 F.3d 482, 492 (7th Cir. 2009).

Here, considering the evidence in the light most favorable to the Government, the evidence showed Madigan and Solis engaged in multiple discussions that did, in fact, link Madigan's agreement to recommend Solis for a state board position with Solis' efforts to both connect Madigan with Skydell and connect Madigan's son with the Resurrection Project. Since "direct evidence of a defendant's fraudulent intent is typically not available, specific intent to defraud may be established by circumstantial evidence and by inferences drawn from examining the scheme itself." *United States v. Pust*, 798 F.3d 597, 600–01 (7th Cir. 2015) (quotation omitted). While Madigan did not use the term "*quid pro quo*" or "exchange" in the recordings noted above, the jury reasonably concluded that Madigan's repeated conversations with Solis connecting the board appointment recommendations to benefits for himself and his son constituted "a scheme to defraud" within the meaning of the statute. *See Hawkins*, 777 F.3d at 883–84.

Consistent with his unsuccessful theory at trial, Madigan repeatedly argues in his motion that he never actually intended to recommend Solis for a state board position. In his testimony, Madigan claimed that he only considered recommending Solis for a state board position because he "never heard anything bad" about Solis and "had worked with him over several, several years," but never made the decision to recommend Solis. Tr. 8804:9–13. But, as the Court already stated, the jury remained free to reject Madigan's own interpretation of the evidence. Here, in addition to Madigan's testimony and the above recounted conversations, the jury also heard extensive evidence regarding Madigan and Solis' prior dealings. This included recorded instances where Solis explicitly used the term "*quid pro quo*" when discussing obtaining legal business for Madigan and Solis approving a developer's project in his capacity as chair of the zoning committee. *See* GX 7. *See also* GX 9 (call where Solis told Madigan he got a confirmation for a meeting between a developer and Madigan and he believed the developer understood about "me giving him the zoning change and everything he needs"); GX 11 (meeting where Madigan told Solis he "shouldn't be talking like that" in reference to his earlier *quid pro quo* comment); GX 12 (call where Solis told Madigan he "was gonna be deciding" on the developer's project" but "wanted to know if, if you had, uh, done anything with them yet"); GX 16 (call where Solis asked if the developer had contacted Madigan's firm and Madigan responded that Solis "should go ahead and process that"); GX 32 (call where Solis told Madigan that if he could "take care of that matter" concerning land transfer legislation, he was confident a different developer would "appreciate it and sign up, sign you up after May"); Tr. 9179:21–25 (Madigan acknowledging on cross

examination that Solis brought up a connection between Solis taking an official action and a developer giving Madigan legal business). Even though these exhibits involved schemes charged in other Counts that the jury did not ultimately convict on,[23] the recorded evidence still provided proper context for the relationship between Madigan and Solis, and remained a legitimate evidentiary basis for making certain reasonable inferences about Counts Eight, Nine, and Ten.[24] In sum, the jury heard more than sufficient evidence on the wire fraud counts of conviction to infer Madigan's intent to engage in a *quid pro quo* from the evidence, and thus the jury's determination was not unreasonable.

Madigan also claims that these wire fraud convictions lacked sufficient evidence because: (1) Solis did not offer anything of value pursuant to any alleged scheme; (2) Madigan never obtained business from Skydell and the Resurrection Project did not hire Andrew Madigan's insurance brokerage firm until much later; and (3) Madigan never actually made the recommendation to the Governor-elect. These arguments fail as well.

First, the efforts to help obtain business offered by Solis certainly constituted "something of value," i.e., "property, money, fees, or contractual rights." [313] at 96 (Court's Instruction 76). As part of his cooperation, Solis told Madigan that Skydell would give his law firm business (*see* GX 197) and, further, Madigan admitted on cross examination that prior referrals from Solis resulted in his firm obtaining business. Tr. 9240:11–9241:19. Thus, the evidence clearly supported the jury's reasonable determination that Madigan intended to accept "something of value," as Madigan himself admitted (and the evidence confirmed) that such business introductions led to highly-profitable retainer contracts with paying clients.

Second, a scheme to defraud does not need to succeed for criminal liability to attach. *See Hawkins*, 777 F.3d at 883–884. Whether Madigan actually took the official action he intended to exchange,[25] or actually received the benefit he sought,

---

[23] The jury acquitted Madigan on the counts related to the alleged Union West Development Scheme (Counts Fifteen, Sixteen, Seventeen, and Eighteen); and the jury was unable to reach a verdict regarding the counts related to the Chinatown Parking Lot Scheme (Counts Nineteen, Twenty, Twenty-One, and Twenty-Two). *See* [331].

[24] For example, as to one of the acquitted counts involving a different scheme, Madigan's own trial theory asserted that Madigan was only avoiding impropriety when he warned Solis not to "be talking" about *quid pro quo*, yet even this version of events (that Solis was the one in the wrong) remains highly relevant to their relationship and any later legitimacy of Madigan's purported good-faith intended recommendation of Solis to an important state board position. *See* GX 11.

[25] A public official takes an official action "by using his official position to exert pressure on *another* official to perform an 'official act,'" or if he "uses his official position to provide advice to another official, knowing or intending that such advice will form the basis for an 'official act' by another official." *McDonnell v. U.S.*, 579 U.S. 550, 572 (2016) (emphasis in original). *See also* [313] at 55 (jury instruction on this same principle). Here, the official action involved Madigan using his position as

does not affect the validity of his wire fraud convictions. Although the jury heard evidence and testimony that Andrew Madigan and his insurance brokerage firm did, in fact, receive the business from the Resurrection Project, neither Madigan nor his son needed to receive any benefits pursuant to the scheme for the jury to convict. *See* GX 1601-A; GX 1601-B; Tr. 5971:2–4; 5984:2–4; 5986:4–7. Indeed, "the wire fraud statute punishes the scheme, not its success." *United States v. Aslan*, 644 F.3d 526, 545 (7th Cir. 2011) (citing *Pasquantino v. United States*, 544 U.S. 349, 371 (2005)). Accordingly, the Seventh Circuit has described wire fraud as a "crime of attempting rather than attaining." *United States v. Coffman*, 94 F.3d 330, 337 (7th Cir. 1996). In other words, the "fraud is therefore complete once a defendant with the requisite intent has used the wires in furtherance of a scheme to defraud, whether or not the defendant actually collects any money or property from the victim of the scheme." *Aslan*, 644 F.3d at 545 (citations omitted). Here, once Madigan participated in the scheme, bore the requisite intent to defraud, and caused use of the wires in furtherance of that scheme, the crime was complete; the subsequent results of the scheme do not change that result. Madigan's arguments to the contrary are unavailing.

Madigan also posits that the jury's not guilty verdicts on Counts Fifteen through Eighteen[26] establish that he had no intent to exchange with respect to Counts Eight, Nine, and Ten. But Counts Fifteen through Eighteen presented distinct charges with distinct elements from Counts Eight, Nine, and Ten. Jurors are presumed to follow the trial court's legal instructions and apply those instructions to their consideration of the evidence accordingly. *United States v. Marchan*, 935 F.3d

---

Speaker to provide advice to then-Governor-elect Pritzker regarding who he should appoint to certain state board positions. Again, whether Madigan completed the plan is of no consequence; Madigan committed wire fraud once he participated in the plan, maintained an intent to defraud pursuant to the plan, and caused use of the wires in furtherance of the plan. *See Aslan*, 644 F.3d at 545.

[26] In his Reply Brief, Madigan suggests that the Government wrongfully conflates "other episodes" from those charges where "the jury acquitted Madigan or stalemated at 11-1 in favor of acquittal." [410] at 33. First, while each count must be (and was) considered separately by the jury, the evidence admitted at trial may, of course, properly relate to more than one charge, so neither the Government nor the jury has conflated anything. Second, without objection, the Court did not poll the jury with respect to any of the hung counts in this case. Madigan instead appears to reference (without citing) inadmissible media reports about interviews with jurors after the verdict was reached. *See e.g.*, Jason Meisner et al, *'Wow we were part of something really big': Madigan jurors on how they reached their verdict*, CHI. TRIB. (Feb. 13, 2025), https://www.chicagotribune.com/2025/02/12/wow-we-were-part-of-something-really-big-madigan-jurors-on-how-they-reached-their-verdict/; Emmanual Camarillo et al, *Inside the Madigan jury room: 'Pronouncing someone guilty didn't make me feel good'*, CHI. SUN TIMES (Feb. 13, 2025), https://chicago.suntimes.com/madigan-trial-news/2025/02/12/jurors-michael-madigan-deliberations-foreman. Obviously, this type of extraneous information appears nowhere in the record and carries no legal significance at all. *See United States v. Torres-Chavez*, 744 F.3d 988, 997 (7th Cir. 2014) (affirming denial of a defendant's Rule 33 motion based on post-trial juror statements, noting juror statements that "concern only intrajury influences on the verdict during the deliberative process . . . fall squarely within the Rule 606(b)(1) prohibition" and thus "are not admissible") (quotation omitted).

540, 546–47 (7th Cir. 2019).  The jury's verdict on separate counts involving separate schemes, therefore, bears no weight on the reasonableness of the jury's guilty verdicts with respect other counts in this case.[27]

In sum, the Government presented more than sufficient evidence to establish that Madigan participated in a scheme to defraud.  Although Madigan presents multiple alternative explanations of this evidence, the Court must "consider the evidence in the light most favorable to the Government, defer to the credibility determination of the jury, and overturn a verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt."  *Smallwood*, 188 F.3d at 912 (quotation omitted).  For the reasons explained above, the Court presented more than sufficient evidence to prove Madigan's violations of § 1343 beyond a reasonable doubt, and thus Madigan's motion is denied.

### ii.  The Government presented sufficient evidence of material misrepresentation (Counts 8s, 9s, and 10s)

Madigan next argues that his convictions must be vacated because the Government failed to prove he made any false statements or material misrepresentations.  [401] at 39–42.  In a typical case, a wire fraud charge "requires a material misrepresentation or omission."  *Neder v. United States*, 527 U.S. 1, 25 (1999).  Generally, "a false statement is material if it has a natural tendency to influence," or is "capable of influencing, the decision of the decision-making body to which it was addressed."  *Id.* at 16.  The concept of a "'false representation' encompasses a range of conduct."  *United States v. Chanu*, 40 F.4th 528, 541 (7th Cir. 2022).  Besides "affirmative misrepresentations a defendant knows to be false," a "material omission can amount to fraud."  *Id.* (citing *Neder v. United States*, 527 U.S. 1, 24–25 (1999)).  Further, a "half-truth, or what is usually the same thing as a misleading omission, is actionable as fraud" if the defendant "intended to induce a false belief and resulting action" that would "advantage" the "misleader" and "disadvantage" the "misled."  *United States v. Stephens*, 421 F.3d 503, 507 (7th Cir. 2005) (quoting *Emery v. American General Finance, Inc.*, 71 F.3d 1343, 1348 (7th Cir. 1995)).  Put simply, "an implied misrepresentation is simply an omission by another name."  *Chanu*, 40 F.4th at 541.  Although a "mere failure to disclose information will not always constitute fraud," an "omission accompanied by acts of concealment or affirmative misrepresentations can constitute fraud."  *Stephens*, 421 F.3d at 507.

---

[27] And, even to extent a verdict might appear inconsistent to the defense, a "jury's somewhat split verdicts are a strong indication that the jurors followed this Court's instructions."  *Delatorre*, 581 F. Supp. 2d at 989.  *See also United States v. Powell*, 469 U.S. 57, 66 (1984) (rejecting "a rule that would allow criminal defendants to challenge inconsistent verdicts on the ground that in their case the verdict was not the product of lenity, but of some error that worked against them," noting that "Courts have always resisted inquiring into a jury's thought processes") (citations omitted).

The evidence produced at trial established that Madigan participated in a scheme to defraud that involved false or fraudulent representations. As detailed above, Madigan participated in a plan where he would recommend Solis to the Governor-elect under the false pretense—that he was recommending Solis based on his credentials—rather than the truth—that he was doing so pursuant to a bribery scheme. This false pretense did not merely constitute an undisclosed conflict of interest, as Madigan claims, but rather functions as an "actionable" "misleading omission" that would have been "intended to induce a false belief and resulting action to the advantage of the misleader and the disadvantage of the misled." *Stephens*, 421 F.3d at 507 (quoting *Emery* 71 F.3d at 1348). Here, Madigan intended to induce a false belief that he recommended Solis based on his credentials, rather than bribery.

*United States v. Hausmann* provides an instructive example. 345 F.3d 952 (7th Cir. 2003). There, the jury convicted a personal injury attorney of conspiracy to commit mail and wire fraud under 18 U.S.C. § 371 for devising a scheme where he would refer his clients to his co-defendant, a chiropractor, for services paid from insurance settlement funds. *Id.* at 954. In return, the co-defendant funneled twenty percent of the fees he collected from those services to third-party recipients at the defendant attorney's direction. *Id.* On appeal, the Seventh Circuit affirmed both defendants' convictions, noting that the defendant attorney "deprived his clients of their right to know the truth about his compensation" and thus "misrepresented" the "compensation" he received, even if the "clients received the same net benefit as they would have absent the kickback scheme." *Id.* at 957. Thus, "the *scheme itself* converted" the defendant's "representations to his clients into misrepresentations," because he "illegally profited at the expense of his clients, who were entitled to his honest services." *Id.* (emphasis added).

In this case, as in *Hausmann*, Madigan's recommendation of Solis to the Governor-elect would have relied upon false representations and deprived others of the "right to know the truth" about Madigan's unlawful use of his office to make recommendations to state board positions. Thus, "the *scheme itself* converted" Madigan's representations about Solis, because he stood to illegally profit "at the expense" of the Governor-elect and the people of Illinois, who were "entitled to his honest services." *Id.* Whether Madigan successfully executed this plan does not change the outcome because the crime was completed once Madigan met the requisite elements under the statute, not upon receiving or providing any planned benefits. *See Aslan*, 644 F.3d at 545. As the Court explained above, the Government produced more than sufficient evidence for the jury to find that Madigan participated in a scheme to defraud and possessed the requisite intent to defraud when he agreed to

recommend Solis for a board position.[28] Accordingly, because the scheme itself involved false representations, Madigan's challenge fails.[29]

Finally, Madigan's arguments under the Supreme Court's decision in *Thompson v. United States* fail to alter the result here. As the Court noted above (*see supra* Part III.a.i.2), the Supreme Court held in *Thompson* that 18 U.S.C. § 1014, which "criminalizes 'knowingly mak[ing] any false statement or report,'" does not criminalize misleading statements because "a statement that is misleading but true is not by definition a 'false statement'" and the statutory text only prohibits "false" statements. 145 S. Ct. 821, 826 (2025) (quoting 18 U.S.C § 1014) (alterations in original). Importantly, that case concerned a different statute with statutory language distinct from 18 U.S.C. § 1343. The wire fraud statute criminalizes both "false or fraudulent pretenses, representations, or promises"—clearly a more expansive standard than the solitary "false" used in 18 U.S.C. § 1014, which the Court found dispositive in *Thompson*. *See* 145 S. Ct. at 826 ("Given that some misleading statements are also true, it is significant that the statute uses only the word 'false.'").

Further, *Thompson* does not apply to this case for an additional reason. There, the Supreme Court overturned Seventh Circuit precedent holding that § 1014 criminalized misleading statements despite the limited statutory language described above. *See* 145 S. Ct. at 825. No similar linguistic limitations exist in this case. Here, conforming with the Seventh Circuit Pattern Criminal Jury Instructions, the Court instructed the jury in accordance with the broad statutory language: that a scheme to defraud must involve "a materially false or fraudulent pretense, representation, or promise." [313] at 90. *See also* [313] at 92 (defining a "scheme to defraud" as "a scheme that is intended to obtain money or property . . . by means of materially false or fraudulent pretenses, representations, or promises"). Therefore, this Court's instructions plainly satisfied any new directives from *Thompson*, because the instructions did not depart from or misstate the statutory language in § 1343.[30]

---

[28] Madigan does not raise any issues with the "use or caused use of interstate wire communications" element of his § 1343 convictions, so the Court does not address that element.

[29] Madigan does not raise any arguments that the false representations were not material, nor could he consistent with the evidence. Here, the false representations certainly qualified as material to the Governor-elect's impending decision regarding state board appointments, as Rep. Budzinski (former senior advisor on Governor Pritzker's campaign team) testified that the Pritzker administration "would never" appoint someone to a board position who participated in a bribery scheme. Tr. 6313:7–14. Instead, his arguments focus upon the notion that statements were never actually made. *See* [401] at 40 ("There was no evidence of a statement by Madigan, let alone a misrepresentation, that could form the basis of a wire fraud charge."). As the Court explains above, success of the scheme to defraud is not required under § 1343, and thus this Court rejects Madigan's theory.

[30] The Court notes separately that, between the parties' filing deadlines and the issuance of this opinion, the Supreme Court decided *Kousisis et al. v. United States*, 145 S. Ct. 1382 (2025). In that case, the Court upheld the defendants' convictions, finding that "fraudulent-inducement," which has "long been considered a species of actionable fraud," (*id.* at 1398) "is devoid of an economic-loss

SA35

Accordingly, the jury instructions remained proper, and evidence presented at trial sufficiently established all the essential elements of § 1343 beyond a reasonable doubt. *United States v. Howard*, 619 F.3d 723, 726 (7th Cir. 2010). The Court therefore must uphold the jury's reasonable verdict.

### iii. The Government presented sufficient evidence of violations of the Travel Act (Counts 12s, 13s, and 14s)

Counts Twelve, Thirteen, and Fourteen are predicated on the use of a facility in interstate commerce (here, phone calls) to carry out the wire fraud scheme detailed above. As stated above with respect to Count 5, to meet its burden on a § 1952 charge the Government must prove beyond a reasonable doubt that a defendant "used or caused to be used a facility in interstate or foreign commerce." 18 U.S.C. § 1952.

For Counts 12s, 13s, and 14s, Madigan reiterates the same arguments raised in Count 5s and in his Rule 33 motion asserting that the Illinois state law bribery and official misconduct statutes underlying the § 1952 charges required the Government to prove a *quid pro quo*. For the reasons the Court explains below (*see infra* Part IV.a.iv), Madigan's arguments fail as a matter of law because the Illinois state bribery statutes do not require proof of a *quid pro quo* to obtain a conviction.[31]

But, even if the state law bribery statutes required proof of such an exchange, Madigan's arguments would still fail because the Government presented more than sufficient evidence of a *quid pro quo*, as shown in the Court's discussion of the evidence related to the wire fraud charges applied to the state board conduct. *See supra* Part III.b. Each call underlying the charges in these counts furthered that scheme and the jury reasonably inferred that Madigan had the requisite unlawful intent. *See* GX 166 (Count Twelve); GX 176 (Count Thirteen); GX 244 (Count Fourteen). Accordingly, the Court finds no basis to overturn the convictions on Counts 12s, 13s, and 14s.

### iv. The Government presented sufficient evidence of use of a facility in interstate commerce (Counts 12s and 14s)

Finally, Madigan claims that the Government failed to produce sufficient evidence to convict him on Counts Twelve and Fourteen because the phone calls

---

requirement." *Id.* at 1391. Rather, "a defendant violates §1343 by scheming to 'obtain' the victim's 'money or property,' regardless of whether he seeks to leave the victim economically worse off." *Id.* at 1392. The Court's analysis of Madigan's convictions under § 1343 thus also comports with *Kousisis* because that decision reaffirms prior precedent interpreting the wire fraud statute.

[31] Though again, as the Court already noted with respect to Count 5s, the Court did find that the Illinois legislative misconduct statute (720 ILCS 5/33-8) requires proof of such a planned exchange. *See* [313] at 87–88. Thus, Madigan's arguments remain moot as to that statute.

underlying those charges (GX 166 and GX 244, respectively) did not travel outside the state of Illinois. Government witness Jack Randall[32] testified that AT&T maintained an international wireless network capable of transmitting calls across state lines. Tr. 5720:13–18. Randall also testified regarding the technical process the AT&T network utilizes to route calls from one person's device to another. Randall testified that the company uses processing centers to route calls, and that the calls "are evenly distributed as much as possible" within these processing centers across the network to optimize efficiency and usage rates. Tr. 5722:1–5723:12. As a result, calls made between callers in the same state often, but not always, travel outside of the state if they are routed through an out-of-state processing center. Tr. 5722:18–21. Randall testified that he reviewed, among other calls, the calls underlying Counts Twelve and Fourteen in this case. For both Counts, the calls occurred between callers located within the state of Illinois and were routed through a processing center in Chicago, Illinois. *See* Tr. 5727:7–10; Tr. 5729:2–6. *See also* GX 1646. In other words, neither call traveled outside Illinois during transmission.

The Seventh Circuit has not explicitly addressed the question of whether an intrastate call may violate the Travel Act. But the Seventh Circuit has held that a similar provision (§ 1958, the murder-for-hire statute),[33] only requires "that the facility, and not its use, be in interstate or foreign commerce," adding that "there is only one way to read the plain language" of that statute. *United States v. Richeson*, 338 F.3d 653, 660 (7th Cir. 2003). The court added that the "plain language, context in the realm of commerce clause jurisprudence, and legislative history all lead to the conclusion that that it is sufficient under § 1958 that the defendant used an interstate commerce facility in an *intra* state fashion." *Id.* (quotation omitted) (emphasis in original).

Other circuits have also compared § 1958 to § 1952 when determining the jurisdictional bounds of § 1952 and reached the same conclusion as the Seventh Circuit in *Richeson*. *See United States v. Nader*, 542 F.3d 713, 720 (9th Cir. 2008) (holding (1) "intrastate telephone calls involve the use of a facility 'in' interstate commerce" and thus may violate the Travel Act and (2) a 2004 amendment changing

---

[32] As of his testimony on December 3, 2024, Jack Randall was an associate director of technology at AT&T. Tr. 5719:8–9.

[33] Important to this analysis, § 1952 and § 1958 contain almost identical language in the clauses providing the interstate "jurisdictional hook." *Compare* 18 U.S.C. § 1952(a) ("Whoever travels in interstate or foreign commerce or *uses the mail or any facility in interstate or foreign commerce*, with intent to . . . .) (emphasis added) *with* 18 U.S.C. § 1958(a) ("Whoever travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) *to use the mail or any facility of interstate or foreign commerce,* with intent . . . .") (emphasis added).

§ 1958 to say "of interstate" rather than "in interstate" did not constitute a substantive change, noting three other circuits have concluded "that Congress intended the two phrases to be interchangeable.") (citing, among other cases, *Richeson*); *United States v. Halloran*, 821 F.3d 321, 342 (2d Cir. 2016) ("intrastate use of an interstate facility is sufficient to violate the Travel Act").

Additionally, another court in this District addressed this exact question in *Burke*. There, the court held that "the plain language of 18 U.S.C. § 1952(a)" indicates "that the use of interstate commerce is enough to fulfill the jurisdictional element of the statute. The phrase 'in interstate . . . commerce' modifies the word 'facility,' not the word 'uses.'" No. 19 CR 322, 2022 WL 1970189, at *25 (N.D. Ill. June 6, 2022) (Dow, J.) (quoting 18 U.S.C. § 1952(a)). The court, citing to both *Richeson* and *Nader*, also noted that the "overwhelming weight of authority holds or at least suggests that § 1952 reaches intrastate telephone calls, and Congress appears to have promulgated the Travel Act under its authority to regulate the instrumentalities of commerce." *Id.* at *27 (N.D. Ill. Jun. 6, 2022).

As stated in *Burke*, the Eighth, Second, and Fifth Circuits have all held that purely intrastate uses of interstate facilities trigger criminal liability under the Travel Act. *See id.* at *26. *See also United States v. Baker,* 82 F.3d 273, 275–76 (8th Cir. 1996) (holding that a violation of the Travel Act was "established by proof" that the defendant "carried out extortion by" using "an interstate network of ATMs which comprise, in the words of the statute, a 'facility in interstate or foreign commerce'"); *United States v. Riccardelli*, 794 F.2d 829, 834 (2d Cir. 2005) ("Congress intended the Travel Act's federal jurisdictional nexus to be satisfied by *any* use of the mails") (emphasis in original); *United States v. Heacock*, 31 F.3d 249, 255 (5th Cir. 1994) ("any use of the United States mails in this case is sufficient to invoke jurisdiction under 18 U.S.C. § 1952, notwithstanding the intrastate destination of the mailings"). *But see United States v. Barry,* 888 F.2d 1092, 1092–93, 1097 (6th Cir. 1989) (court found that purely intrastate use of the mails does not violate the Travel Act).

Madigan cites to *United States v. Isaacs* for the proposition that some interstate travel must occur to trigger criminal liability under § 1952. In that case, the Seventh Circuit reversed the defendant's Travel Act conviction on the grounds that the interstate facility[34] was "so minimal, incidental, and fortuitous, and so peripheral to the activities" of the defendants "and the other participants in this bribery scheme" that it was "error to submit" those counts to the jury. 493 F.2d 1124, 1146 (7th Cir. 1974), *abrogated on other grounds by McNally v. United States*, 483 U.S. 350, 359 (1987). Separately, the court added in a footnote that the requirement

---

[34] In the case, the "use of an interstate facility" was a check that was cleared through a Federal Reserve bank in a different state. *See* 493 F.2d 1124 (7th Cir. 1974).

of "some interstate travel" is "indicated by § 1952's use of the term 'facility in interstate or foreign commerce' rather than 'facility of interstate or foreign commerce.'" *Id.* at 1149 n.1. Madigan argues that this case indicates that the Court should have sided with the Sixth Circuit in *Barry* and instructed the jury that an interstate call was required to trigger liability under § 1952.

But the court in *Burke* distinguished *Isaacs* by noting that "whether a wholly intrastate call or email triggers § 1952" was not a question before the court in *Isaacs*. *Burke*, 2022 WL 1970189 at *27. Further, "the statute's plain language, the Supreme Court's expansive view of congressional power," "the Seventh Circuit's treatment of a nearly identical statute in *Richeson*, and the weight of circuit court of appeals authority all point in the opposite direction." *Burke*, 2022 WL 1970189 at *27 (citing to *United States v. Lopez*, 514 U.S. 49, 558–59 (1995)). This Court found *Burke*'s reasoning persuasive in drafting the jury instructions in this case. Should the Seventh Circuit ever address this issue specifically, it appears unlikely (for the reasons articulated in *Burke*) that the court would depart from the majority of precedent and give an expanded reading to *Isaacs*. *See also United States v. Bursten*, 560 F.2d 779, 784 (7th Cir. 1977) ("Moreover, the Travel Act plainly requires merely the use of a facility in interstate commerce for purposes of furthering an illegal scheme. It is inessential that the scheme itself be interstate in character.") (citation omitted).

As a result, the Court correctly instructed the jury that "the government is not required to prove that an interstate facility was actually used to transmit a communication in interstate commerce"; use of the interstate facility itself was sufficient to violate the Travel Act. [313] at 86. Here, the Government presented sufficient evidence (and indeed, Madigan does not dispute) that the AT&T network itself constituted an "interstate facility," that is, "a facility capable of transmitting communications in interstate commerce." *Id.* In light of the accurate jury instructions and evidence presented at trial, no basis exists to disturb the jury's determination with respect to Counts 12s and 14s.

***

Ultimately, the Court cannot overturn the jury's guilty verdict with respect to any count. For the reasons discussed extensively above, the jury had sufficient and substantial evidence for each count of conviction, and Madigan's arguments essentially dispute the how the jury weighed that evidence. Weight and credibility determinations are within the province of the jury and the Court accordingly cannot interfere with the jury's sound judgment. Thus, Madigan's motion under Rule 29 was properly denied.

SA39

The Court now addresses Madigan's motion under Rule 33.

## IV.    Motion for New Trial

Under Rule 33(a), the trial court "may vacate any judgment and grant a new trial if the interest of justice so requires." The moving defendant may receive "a new trial if there is a reasonable possibility that a trial error had a prejudicial effect upon the jury's verdict." *United States v. Van Eyl*, 468 F.3d 428, 436 (7th Cir. 2006) (citing *United States v. Berry*, 92 F.3d 597, 600 (7th Cir. 1996)). District courts maintain wide discretion in making this determination, because "the district court judge is always in a better position than appellate judges to assess the probable reactions of jurors in a case over which that district judge has presided." *Id.* (citing *Berry*, 92 F.3d at 600).

Unlike Rule 29, when evaluating a motion pursuant to Rule 33, "a court may properly consider the credibility of the witnesses," and it "may grant a new trial if the verdict is so contrary to the weight of the evidence that a new trial is required in the interest of justice." *United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999) (citations omitted). That said, "the exercise of power conferred by Rule 33 is reserved for only the most 'extreme cases.'" *United States v. Linwood*, 142 F.3d 418, 422 (7th Cir. 1998) (quoting *United States v. Morales*, 902 F.2d 604, 605 (7th Cir. 1990)). Indeed, the court "may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable;" instead, "the evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *United States v. Reed*, 875 F.2d 107, 113 (7th Cir. 1989) (quotation omitted).

In his motion for a new trial, Madigan raises several arguments concerning the jury instructions and certain evidentiary rulings the Court made before and during trial. The Court addresses these arguments in turn.

### a. Jury Instructions

A "district court enjoys 'substantial discretion' in formulating its instructions." *United States v. Siepman*, 107 F.4th 762, 765 (7th Cir. 2024), (citing *United States v. Dickerson*, 705 F.3d 683, 688 (7th Cir. 2013)), *cert. denied,* No. 24-6185, 2025 WL 299564 (Jan. 27, 2025) (mem.). To prevail on a motion for a new trial due to instructional error, a defendant must show that "that the instructions *both* misled the jury and prejudiced the defendant." *Id.* (citing *United States v. White*, 95 F.4th 1073, 1079 (7th Cir. 2024); *Dickerson*, 705 F.3d at 688) (emphasis added). Thus, "to constitute reversible error, the plain error must have affected the defendant's substantial rights such that there is a reasonable probability that but for the error the outcome of the trial would have been different." *United States v. Cardena*, 842 F.3d 959, 998 (7th Cir. 2016) (citing *Molina-Martinez v. United States,* 578 U.S. 189,

SA40

194 (2016). *See also United States v. McGuire*, 835 F.3d 756, 760 (7th Cir. 2016)). Harmless errors do not merit a new trial. *United States v. Gan*, 54 F.4th 467, 475 (7th Cir. 2022). *See also Neder v. United States,* 527 U.S. 1, 7 (1999).

### i. Definition of "Corruptly"

Madigan raises multiple arguments concerning the instructions' definition of "corruptly" as applied to charges brought under 18 U.S.C. § 666. The jury instructions defined "corruptly" in those Counts as follows:

> . . . a defendant acts "corruptly" if he acted with the understanding that a "thing of value" is to be exchanged for an "official act" with the intent to influence or reward a State agent in connection with his official duties. The government need not prove, however, that the defendant knew that the law prohibited his conduct. In other words, the government must prove that:
>
> > (1) When the defendant conspired to solicit, demand, accept, or agree to accept, a 'thing of value' with the intent to be influenced or rewarded in connection with his official duties; or
> >
> > (2) When the defendant conspired to give, offer, or agree to give, a 'thing of value' with the intent to influence or reward an agent of a State government or agency thereof in connection with some business, transaction, or series of transactions of the State government;
> >
> > the defendant understood the conspiracy involved a 'this for that' exchange of a 'thing of value' for an 'official action' (as defined in this instruction and Court's Instruction 47,[35] respectively).

[35] Court's Instruction 47 provided the following definition for the term "Official Action":

> An "official action" is a specific decision or action on, or an agreement to make a decision or take action on, a specific question or matter, which is pending or at any time may be pending, or may by law be brought before a public official, in his official capacity. Under the law, the term "official action" does not require that the official possess the power or ability to act unilaterally on the specific question or matter.
>
> A "question" or "matter" must involve a formal exercise of governmental power and must be something specific and focused, rather than a broad policy objective.
>
> A public official makes a specific decision or takes action on a question or matter when he uses his official position to exert pressure on another official to perform an official act, or to advise another official, knowing or intending that the advice will form the basis for an official act by another official.
>
> A public official does not make a specific decision or take action on a question or matter if he does no more than set up a meeting, host an event, or call another public official.

SA41

This exchange involves the unlawful influence of a bribe to be paid before the performance of an official action or actions, or an unlawful reward of a bribe to be paid after the performance of an official action or actions. To prove the conspiracy as charged in Count Two, however, the government must prove that the conspiracy existed to take an official action in exchange for a thing of value before the official action is to take place. Therefore, if the bribe is to be paid after an official action occurs, then the government must prove that the bribery agreement existed before the official action was to take place.

[313] at 67 (Court's Instruction 56).[36]

The jury instructions then defined a "thing of value":

A 'thing of value' means a private benefit either to the public official or to any person, with the intent to influence or reward an agent of State government in exchange for an official action or actions related to some business, transaction, or series of transactions of the government (as defined in these instructions). The term "thing of value" may involve a stream of benefits in a 'this for that' exchange for one or more official actions.

[313] at 67–68.[37]

Madigan contends that the jury instructions defining "corruptly" with respect to Counts Two, Four, and Six misled the jury regarding the required *mens rea* of 18 U.S.C. § 666. Specifically, Madigan argues that the instructions "effectively eliminated the requirement that a defendant possess the requisite *mens rea*, a corrupt intent," because, according to Madigan, the Court's definition of "corruptly" wrongly "permitted conviction based on the defendant's knowledge of an exchange alone." [401] at 50.

In an effort to support these claims, Madigan points to certain cases discussing "corruptly," including *Snyder v. United States*. *Snyder*'s effect on the precise definition of "corruptly" became a central issue in the jury instruction phase of this case. The parties disputed whether *Snyder* altered the meaning of "corruptly" within § 666 and more broadly disputed the correct definition of "corruptly" as used in

[313] at 55.

[36] This definition also appeared in Court's Instructions 63 and 64, though with modifications since those instructions applied to substantive § 666 charges. Court's Instruction 56 applied to the Count 2s conspiracy charged under 18 U.S.C. § 371 where two of the alleged objects were violations of § 666. *See* [313] at 67–69, 77–81.

[37] The Court addresses Defendant Madigan's objections to the Court's definition of "stream of benefits" below. *See infra* Part IV.a.ii.

criminal statutes. At different times, the parties submitted proposed jury instructions equating (to varying degrees) the definition of "corruptly" with the definition of "willfully," relying upon *Snyder* in part for these positions (even though the Government later retreated from these heightened *mens rea* additions). *See* [178] at 64; [183] at 99–100; [188] at 49; [201] at 2; [261] at 101–04. Essentially, the proposals incorporated language opening the door to a mistake of law defense, such as imposing a requirement that a defendant knew not just the factual nature of his conduct but also knew that such conduct was "wrongful or unlawful" under the law. [178] at 64.[38] *See also* [213] at 101.

Both the term "unlawful" and the concept of knowledge of the law contained within the parties' proposals do not appear in the Pattern Instructions for § 666, as the Court noted at the January 2, 2025 Charge Conference. Tr. 8104:15–21. Because of this discrepancy, the Court informed the parties that it conducted an extensive statutory analysis of § 666 and controlling case law to elucidate the correct definition of "corruptly" as used in the statute. *Id.* The Court now recounts that analysis in summary, which informed the drafting of the relevant instructions in this case.[39]

### 1. *Snyder* does not change the meaning of "corruptly"

In *Snyder*, the Supreme Court held that, as a matter of statutory construction, "§ 666 tracks § 201(b), the bribery provision for federal officials," and therefore proscribes bribes alone, not gratuities. 603 U.S. 1, 19 (2024). Though "a gratuity offered and accepted after the official act may be unethical or illegal under other federal, state, or local laws, the gratuity does not violate § 666." *Id.* In reaching this result, the Court relied on "inferences from the word 'corruptly,'" along with an

---

[38] Despite these proposals, the parties on both sides repeatedly represented to the Court that none of the charges in this case supported any mistake of law defense. To point to just one example, on November 12, 2024, the Court directly asked both Defendants if "everyone is in agreement that there's no charge in the indictment that has a mistake of law defense." Counsel for Madigan and McClain each answered "Yes." *See* Tr. 3000:15–21. That same day, the Government also took a position on the record regarding this issue—four pages earlier in the transcript, one of the prosecutors stated unequivocally that "a mistake of law defense, which doesn't exist for 666 according to the Seventh Circuit." Tr. 2996:16–17. As the Court stated to the parties during the January 2, 2025 Charge Conference, "the requested instructions . . . appear incongruent with the parties' prior statements," which the Court noted was "fine," but the "use of the term 'unlawful'" and "the concept of knowledge of the law" contained within the parties proposals "are not in the Pattern Instructions for § 666." Tr. 8104:15–21. Therefore, "given the inconsistencies that the Court has identified, and the parties request to deviate from the Pattern Instruction" (Tr. 8105:3–5), although the Pattern Instructions "are not dispositive and trial courts have to still consult the controlling authority when drafting instructions" (Tr. 8104:24–8105:1), the Court conducted an extensive statutory interpretation analysis of § 666 and thorough review of "the controlling case law in the Seventh Circuit" to determine the correct definition of "corruptly." Tr. 8105:5–6. The Court provides this analysis and reasoning below but notes that its analysis did not return any cases or legislative history supporting a mistake of law defense for charges brought under § 666.

[39] This Court, of course, also incorporates by reference its extensive and detailed analysis at trial.

analysis of "the statute's history and structure, and associate punishments," and "concerns of fair notice and federalism." *Id.* at 20 (Gorsuch, J., concurring). The Court found that "the dividing line between § 201(b)'s bribery provision and § 201(c)'s gratuities provision is that bribery requires that the official have a corrupt state of mind and accept (or agree to accept) the payment intending to be influenced in the official act," and the "statutory text therefore strongly suggests that § 666—like § 201(b)—is a bribery statute, not a gratuities statute." *Id.* at 11–12.

While certainly Congress' use of the term "corruptly" played a crucial role in the majority's analysis, the opinion provides no new or discrete interpretation of "corruptly" besides observing that it imports an additional, distinct *mens rea* requirement. *See id.* ("Congress modeled the text of § 666(a)(1)(B) for state and local officials on § 201(b), the bribery provision for federal officials. Section 201(b) similarly makes it a crime for federal officials to 'corruptly' accept a payment 'in return for' being influenced' in an official act. By contrast, § 666 bears little resemblance to § 201(c), the gratuities provision for federal officials, which contains no express *mens rea* requirements and simply makes it a crime for federal officials to accept a payment 'for or because of any official act.'"). *See also id.* at 36 (Jackson, J., dissenting) (The "precise meaning of the term 'corruptly' is not the question before us today.").[40]

Therefore, under a plain reading of *Snyder*, Seventh Circuit precedent defining the meaning of "corruptly," specifically as used in § 666, remains undisturbed by *Snyder*. In short, the Seventh Circuit's interpretation of the term remains binding on this Court.

## 2. Seventh Circuit precedent defining "corruptly" in § 666

Seventh Circuit case law provides definitive guidance on the meaning of "corruptly." In defining "corruptly" with respect to § 666, the Seventh Circuit Pattern Instructions mainly rely on two cases: *Hawkins* and *Mullins*. More recent Seventh Circuit cases interpreting "corruptly" either cite to the Pattern Instructions or one of those two cases. *See e.g., United States v. Blagojevich*, 794 F.3d 729, 736 (7th Cir. 2015) ("'Corruptly' refers to the recipient's state of mind and indicates that he understands the payment as a bribe or gratuity.") (citing *United States v. Hawkins*, 777 F.3d 880, 882 (7th Cir. 2015)).[41]

---

[40] Significantly, the majority commented that bribery schemes qualify as "inherently corrupt" as the term is traditionally understood. *See Snyder*, 603 U.S. at 5 ("American law generally treats bribes as inherently corrupt and unlawful.").

[41] It bears mention that older Seventh Circuit cases also align with the definition the Court explains below. *See e.g., United States v. Curescu*, 674 F.3d 735, 742 (7th Cir. 2012) ("To be guilty of soliciting or accepting a bribe in violation of section 666(a)(1)(B) requires knowing that the money or other thing of value received was indeed a bribe, which is to say an inducement to do a corrupt act.") (citing *Salinas*

*Mullins* provides a concise definition of "corruptly," finding that "an agent acts corruptly when he understands that the payment given is a bribe, reward, or gratuity." 800 F.3d 866, 870 (7th Cir. 2015) (citing *United States v. Hawkins*, 777 F.3d 880, 882 (7th Cir. 2015)). A plain reading of this definition (accounting for the fact that *Snyder* clarified § 666 does not criminalize gratuities) shows that a defendant acts "corruptly" when he understands the factual existence and nature of the exchange associated with the payment—in other words, he understands there is a *quid pro quo*. The definition, however, does not require a defendant to understand both the factual nature of the "this-for-that" exchange *and* the legal proposition that such an exchange is also prohibited by law.

Turning to *Hawkins*, the Seventh Circuit upheld an instruction where the trial court "told the jury that a covered agent acts 'corruptly' if he takes money 'with the understanding that something of value is to be offered or given to reward or influence him in connection with his official duties.'" 777 F.3d 880, 882 (7th Cir. 2015). The court added that "in other words, the 'corruption' entails the payee's knowledge that the payor expects to achieve a forbidden influence or deliver a forbidden reward," noting that the definition came "from the Seventh Circuit's Pattern Criminal Jury Instructions (2012 ed.) for § 666." *Id.* Again, a plain reading of this definition shows that the term "corruptly" delineates the defendant's knowledge of the exchange; a payee acts corruptly when he knows the payor's expectations to participate in a *quid pro quo* but accepts the payment anyway. The opinion contains no language requiring the payee to maintain an understanding of both the payor's intent *and* the fact that such intent is forbidden by statute. Instead, the existence and nature of the exchange, and the defendant's factual understanding of its terms, forms the required *mens rea* of § 666 under *Hawkins*.

*Hawkins* provides a second articulation of "corruptly" later in the case that further underscores the propriety of this Court's instructions. The court observed that the following "sensible definition of 'corruptly'" also sufficed: "agents of a covered jurisdiction act corruptly if they *know* that the payor is trying to get them to do the acts forbidden by the statute, and they take the money anyway." *Id.* (emphasis in original). Once again, the focus of the *mens rea* requirement articulated by use of "corruptly" remains centered on the payee's *factual* understanding that "the payor is trying to get them to do the acts" but "they take the money anyway." Of course, the "acts" must also be ones "forbidden by the statute" but the defendant's knowledge of the facts is what counts, not his knowledge of the law. In other words, bribery defendants cannot escape liability for knowingly participating in a "this-for-that"

*v. United States*, 522 U.S. 52, 57 (1997); *United States v. Robinson*, 663 F.3d 265, 271 (7th Cir. 2011); *United States v. Ford*, 435 F.3d 204, 212–14 (2d Cir. 2006)).

SA45

exchange, simply because the Government cannot disprove a defendant's claim that he was subjectively ignorant of what a statute forbids. Clearly, in *Hawkins*, the term "corruptly" requires no other extraneous knowledge of the law or other facts besides the nature and purpose of the corrupt "this-for-that" exchange. *See id.*

Both definitions in *Hawkins*, taken together with *Mullins*, demonstrate that § 666 does not require that the defendant have knowledge of what the law prohibits. Rather, binding Seventh Circuit precedent centers the use of the term "corruptly" on criminalizing a defendant's acceptance of a thing of value with the knowledge that his briber expects that he will provide use of his official position in return. In other words, the *mens rea* term in § 666 serves to impose a statutory requirement that the government prove the defendant *knew the facts* which made his conduct unlawful, rather than prove the defendant *knew the law* which made his conduct unlawful. This interpretation more than adequately assures that only unlawful conduct remains within the statute's scope, because defendants must both engage in the *actus reus* of the exchange and possess the *mens rea* of knowing the purpose of those actions.

Further, this understanding remains consistent with the concerns articulated by the Supreme Court in *Snyder* (and other cases interpreting § 666) positing that Congress' use of "corruptly" must serve to differentiate between lawful and unlawful payments to public officials. Certainly, there are no scenarios where a public official could lawfully engage in a "this for that" exchange, trading a payment for official actions. Under § 666, such exchanges are, by definition, inherently unlawful and thus any official acting with the intent to enter into such an exchange, with a factual understanding of its purpose, does so "corruptly" and properly falls within the scope of the statute.[42]

Seventh Circuit precedent interpreting § 666 and campaign contributions illustrates this point, and further supports this Court's instructions. Courts have long held that, in contrast to lawful, First Amendment-protected campaign contributions, campaign contributions where "the payment is made in exchange for an explicit promise to perform or not perform an official act" constitute unlawful bribes. *United States v. Allen*, 10 F.3d 405, 411–412 (7th Cir. 1993) (declining to extend *McCormick v. United States,* 500 U.S. 257 (1991) to a state bribery statute in a RICO case). *See also United States v. Menendez*, 291 F. Supp. 3d 606, 624 (D.N.J. 2018) ("While the *quid pro quo must* be explicit, it need not be express; political contributions may be the subject of an illegal bribe even if the terms are not

---

[42] The Court notes again that the Supreme Court in *Snyder* stated that bribery schemes, by their nature, are "inherently corrupt." *See Snyder*, 603 U.S. at 5 ("American law generally treats bribes as inherently corrupt and unlawful.").

formalized in writing or spoken out loud."); *United States v. Siegelman*, 640 F.3d 1159, 1171 (11th Cir. 2011) (affirming that a campaign contribution may constitute a payment in a Hobbs Act prosecution).  Factual proof of a *quid pro quo* renders an otherwise ordinary, and even Constitutionally protected, payment criminal if a public official agrees to accept it in exchange for the services of his office.  Put differently, where there is a "this for that" exchange of a private benefit for an official action, the agreement is intrinsically unlawful.  By contrast, payments, contributions, donations, and other benefits, which are not made pursuant to a "this for that" scheme do not fall within the scope of the definition.[43]

In sum, the controlling Seventh Circuit precedent defining "corruptly" confirms that the term remains centered on the defendant's factual awareness of the exchange.  Accordingly, in a prosecution under § 666 the government must prove beyond a reasonable doubt that the defendant maintained a factual understanding of the purpose and nature of the exchange but then participated in the scheme anyway.  A mistake of law ("I didn't know bribes were illegal") is simply not provided for in the statute.

---

[43] The Court reiterates the hypothetical examples it provided to the parties on this point at the January 2, 2025 hearing on this point.  *See* Tr. 8114:5–21.  A scenario may arise where public official receives both a campaign contribution and a request from the contributor to recommend an individual for a real (i.e., not "no-show") job.  If the public official believes that the payment was an entirely ordinary campaign contribution *and* believes he is only making a real job recommendation, then he lacks the requisite factual awareness that the transaction constitutes an unlawful "this-for-that" exchange and thus does not have a corrupt state of mind under § 666.  Conversely, however, if the public official knows that the campaign contribution is, in fact, conditioned, or otherwise provided in exchange for, the public official acting in his official capacity to make the job recommendation, then he acts "corruptly."

A contrasting example further proves the point.  Suppose a defendant public official admitted to exchanging an official act for a payment but claimed that he genuinely and subjectively did not know this type of bribery conduct violated the law.  No reasonable interpretation of § 666 would recognize such a defense, but an interpretation of "corruptly" that divorces its meaning from the core factual understanding, as the Court describes above, necessarily introduces this absurd result.  In this example, if "corruptly" incorporates an official's subjective awareness of the legality or illegality of his conduct (beyond the required factual understanding of the nature of the exchange), then the defendant would have a viable mistake of law defense that he could not have violated § 666 since he honestly believed he could lawfully perform official acts in exchange for the payments (or, more specifically, the government could not disprove such a claim beyond a reasonable doubt).  As always, a court must avoid absurd results in construing statutory language, and this bizarre scenario certainly does not reflect Congress' intent in § 666; nor is it consistent with binding precedent from both the Supreme Court and the Seventh Circuit.

### 3. Statutory interpretation of § 666

### A. Traditional meaning of "corruptly"

The Seventh Circuit's statutory construction enjoys strong support from the text, context, and legislative history of 18 U.S.C. § 666. First, the Court begins with the plain language of the statute (as the Court must, *see United States v. Xiang Hui Ye*, 588 F.3d 411, 414 (7th Cir. 2009) ("Statutory interpretation begins with the plain language of the statute.") (internal quotation omitted)). Courts assume "that the purpose of the statute is communicated by the ordinary meaning of the words Congress used; therefore, absent any clear indication of a contrary purpose, the plain language is conclusive." *Xiang Hui Ye*, 588 F.3d at 414–15 (citation omitted).

18 U.S.C. § 666 assigns criminal liability to an agent of a governmental organization who "corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more," (18 U.S.C. § 666(a)(1)(B)), and to whoever "corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent" of a governmental organization "in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more." 18 U.S.C. § 666(a)(2).

Use of "the term 'corruptly'" in criminal law has "a longstanding and well-accepted meaning." *United States v. Aguilar*, 515 U.S. 593, 616 (1995) (Scalia, J., concurring in part). The term "denotes 'an act done with an intent to give some advantage inconsistent with official duty and the rights of others.'" *Id.* (quoting *United States v. Ogle*, 613 F.2d 233, 238 (10th Cir. 1979) (internal quotation marks omitted), *cert. denied*, 449 U.S. 825, 66 L. Ed. 2d 28, 101 S. Ct. 87 (1980)). "Corruptly" certainly covers "'bribery but is more comprehensive; because an act may be corruptly done though the advantage to be derived from it be not offered by another.'" *Id.* (quoting *Ogle*, 613 F.2d at 238). *See also Corruption*, BLACK'S LAW DICTIONARY (12th ed. 2024), *available at* Westlaw ("Depravity, perversion, or taint; an impairment of integrity, virtue, or moral principle; esp., the impairment of a public official's duties by bribery . . . A fiduciary's or official's use of a station or office to procure some benefit either personally or for someone else, contrary to the rights of others; an act carried out with the intent of giving some advantage inconsistent with official duty or the rights of others . . . quid pro quo corruption . . . The direct exchange of an official act for something of value, esp. money."); BOUVIER'S LAW DICTIONARY 688 (8th ed. 1914) ("An act done with an intent to give some advantage inconsistent with official

duty and the rights of others.  It includes bribery, but is more comprehensive; because an act may be done corruptly through the advantage to be derived from it be not offered by another . . . . Something against law: as, a contract by which the borrower agreed to pay the lender usurious interest.  It is said, in such case, that it was corruptly agreed, etc.").

This "well-accepted meaning" applies in other federal criminal statutes, such as 18 U.S.C. § 1503.  That statute imposes criminal liability on whomever:

> " . . . corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States . . . in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice . . . ."

18 U.S.C. § 1503.

In a concurring opinion, Justice Scalia observed that the traditional definition applies to the use of the term "corruptly" in § 1503, finding that Congress' choice of the word provided sufficient notice to defendants on what conduct the statute proscribes because "statutory language need not be colloquial" and "the term 'corruptly' in criminal laws has a longstanding and well-accepted meaning." *Aguilar*, 515 U.S. at 616.  Under this natural reading, the concurrence held that, "in the context of" the statute, "any claim of ignorance is incredible.  Acts specifically intended to 'influence, obstruct, or impede, the due administration of justice' are obviously wrongful, just as they are necessarily 'corrupt.'" *Id.* (quoting 18 U.S.C. § 1503) (citing *Ogle*, 613 F.2d at 238; *United States v. North*, 910 F.2d 843, 941 (D.C. Cir. 1990) (Silberman, J., concurring  in part and dissenting in part), *modified*, 920 F.2d 940 (D.C. Cir. 1990); *United States v. Reeves*, 752 F.2d 995, 999 (5th Cir. 1985), *cert. denied*, 474 U.S. 834 (1985)).  Lower courts articulate similar views of § 1503 and its traditional use of the "corruptly" term.  *See Ogle*, 613 F.2d at 239 ("Thus, the view this court has taken and which most of the other courts have taken is that the term 'corruptly' does not superimpose a special and additional element on the offense . . . . Rather, it is directed to the effort to bring about a particular result.").[44]

---

[44] For another example of a statute employing this historical meaning, *see United States v. Reeves*, 752 F.2d 995, 1000–01 (5th Cir. 1985) (comparing use of the term "corruptly" in 26 U.S.C. § 7212 to 18 U.S.C. § 1503 and then: (1) finding that the "legislative history supports an interpretation of Section 7212(a) as forbidding endeavors intended to give 'some advantage inconsistent with the rights and duties of others' under the tax laws"; and (2) rejecting a "definition of 'corruptly' as meaning 'with

A review of the legislative history of § 666 confirms that Congress intended for this same historical meaning to control in the statute.

In 1986, Congress enacted the Criminal Law and Procedure Technical Amendments Act. *See* Pub. L. No. 99-646, 100 Stat. 3592 (1986). This Act made certain technical amendments and other changes to provisions enacted by the Comprehensive Crime Control Act, passed two years earlier. The 1984 Act amended the language of § 666, among other criminal statutes. *See* Pub. L. No. 98-473, 98 Stat. 2143 (1984). The legislative history of the 1986 Act notes that "18 U.S.C. 666 prohibits bribery of certain public officials, but does not seek to constrain lawful commercial business transactions. Thus, 18 U.S.C. 666 prohibits corruptly giving or receiving anything of value for the purpose of influencing or being influenced in connection with any business, transaction, or series of transactions." H.R. Rep. No. 99-797, at 34 (1986).

This same report goes on to note that the bribery provision in § 666 "parallels the bank bribery provision (18 U.S.C. 215)," citing in part to 131 Cong. Rec. H–9275 (daily ed. Oct. 29, 1985) (remarks of Rep. Conyers). *Id.* The cited portion of the Congressional Record further reflects a floor debate regarding House Resolution 3511, which corrected "a problem" within 18 U.S.C. § 215 which was then "so broadly drafted" that it penalized "conduct that is not culpable or wrongful." 131 Cong. Rec. H–9275 (daily ed. Oct. 29, 1985) (remarks of Rep. Conyers). The "Committee on the Judiciary, therefore, concluded that section 215 should be narrowed." *Id.* H.R. 3511 proposed amendments to § 215 requiring "that the giving or receiving of something of value be done corruptly, which means that the giver or recipient must act with the specific intent to accomplish an unlawful end or to bring about a lawful end by unlawful means." *Id.* Rep. Conyers quoted this definition from the Committee's report, which defined "corruptly" the same way. *See* H.R. Rep. No. 99-335, at n.24 (1985) ("Subsection (a)(1) requires proof that the person . . . had a corrupt purpose. The term 'corruptly' means that the act is done 'voluntarily [*sic*] and intentionally, and with the bad purpose of accomplishing either an unlawful end or result, or a lawful end or result by some unlawful method or means. The motive to act occuptly [*sic*] is ordinarily a hope or expectation of either financial gain or other benefit to one's self, or some aid or profit or benefit to another.' 2 E. Devitt & C. Blackmar, Federal Jury Practice And Instructions § 34.08 (3d ed. 1977)."). Rep. Conyers commented that these amendments constrained the statute to only punishing "conduct that breaches a fiduciary duty or that dishonestly undermines a transaction." 131 Cong. Rec. H–9275 (daily ed. Oct. 29, 1985) (remarks of Rep. Conyers). Other

improper motive or bad or evil purpose'" because it "could potentially raise a question about the overbreadth of section 7212(a) as well as the question of vagueness . . . .").

representatives echoed Rep. Conyer's analysis, adding that the amendment "clarifies what this body intended last year" when it "adopted the section of the comprehensive crime control bill" and therefore it appeared "only appropriate that the statute should explicitly require a corrupt purpose before bribery can be found." 131 Cong. Rec. H–9275 (daily ed. Oct. 29, 1985) (remarks of Rep. Lungren). One representative also explicitly observed that "this is the approach we find in the Criminal Code with respect to public officials. If this is the standard of proof; if this is the *mens rea* that is necessary for conviction of public official in such a situation, it seems to me that we ought not to ask anything less when" discussing "bank officials." *Id.*

This legislative history provides background on the traditional use of the term "corruptly" by Congress and sheds light (consistent with this Court's plain reading of § 666) as to the purpose of adding/using the word in criminal statutes (including in § 215 and § 666). Clearly, Congress added the term to narrow the statutes to apply only to defendants with a factual understanding of the corrupt purposes of their conduct. Neither this history, nor the text of either 18 U.S.C. § 666 (or 18 U.S.C. § 215), make any reference to knowledge of the law, but rather use "corruptly" to denote the defendant's factual state of mind: that is, the purpose of "accomplishing either an unlawful end or result, or a lawful end or result by some unlawful method or means." H.R. Rep. No. 99-335, at n.24 (1985) (internal quotation omitted). *See also* 131 Cong. Rec. H–9275 (daily ed. Oct. 29, 1985) (remarks of Rep. Lungren) ("I would hope that all Members would support this bill, because in fact it does what we had intended to do all along.").

This usage mirrors the traditional definition of "corruptly" discussed above in the case law; and the verbiage used in the legislative history of "accomplishing either an unlawful end or result or a lawful end of result by some unlawful method or means" (*id.*) aligns conceptually with acts "done with an intent to give some advantage inconsistent with official duty and the rights of others." *United States v. Aguilar*, 515 U.S. 593, 616 (1995) (Scalia, J., concurring). Both describe a defendant's purpose to accomplish a prohibited result; that intent itself forms the *mens rea* required for the offense. Thus, the defendant's factual understanding of the purpose of the exchange (which also happens to be an inherently unlawful purpose) meets the requirements of the "corrupt" state of mind familiar in both common law parlance and modern criminal law. *See Ogle*, 613 F.2d at 239 (use of the term "corruptly" "is directed to the effort to bring about a particular result").[45] As such, this Court properly instructed Madigan's jury.

[45] It is worth noting, however, that courts have also "acknowledged that 'corruptly'" may be "subject to other meanings" in different contexts when the Congress modifies the statutory language used. *See id*. One such context arose in *Arthur Andersen LLP v. United States*, an example cited by Madigan. *See* [401] at 48. There, the Supreme Court addressed the term "corruptly" as used in § 1512, and

### B. "Corruptly" does not equate to "willfully"

For the reasons discussed above, the traditional meaning of "corruptly" applies to § 666, and that historical definition remains entirely distinct from the definition of "willfully" when employed by Congress in other statutes.  In this case, however, the parties missed this important distinction when they proposed definitions of "corruptly" which substantially equated that term with "willfully" and required a defendant to know his conduct violated the law.  This equivalence is false.

When a statute uses the term "willfully," "more is required" than when other *mens rea* terms are used, such as "knowingly."  *Bryan v. United States*, 524 U.S. 184, 193 (1998).  The term "willfully" requires juries to "find that the defendant acted with an evil-meaning mind, which is to say, that he acted with knowledge that his conduct was unlawful."  *Id*.  Federal statutes in which the "defendant's knowledge that he or she is violating the statute is an element of the violation are rare;" rarer still are statutes requiring a defendant to know his conduct violated a specific law.  *See Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt International B.V. v. Schreiber*, 327 F.3d 173, 181 (2d Cir. 2003).

Thus, use of "willfully" imports a distinct, higher mental state requirement.  *See Bryan*, 524 U.S. at 195–96.  Because Congress employs the term "willfully" to denote specific, heightened *mens rea* requirements only on rare occasions, the courts

specifically "focused on what it means to 'knowingly . . . corruptly persuade' another person 'with intent to . . . cause' that person to 'withhold' documents from, or 'alter' documents for use in, an 'official proceeding.'"  544 U.S. 696, 703 (2005).  The Court noted that "Section 1512(b) punishes not just 'corruptly persuading' another, but '*knowingly* . . . corruptly persuading' another."  *Id*. at 704–05 (emphasis added) (cleaned up).  The Court noted the presence of both terms in the text and found that "joining these meanings together" made "sense both linguistically and in the statutory scheme."  *Id.* at 705–06.  Thus, when reading the two terms "together," only "persons conscious of wrongdoing can be said to 'knowingly . . . corruptly persuade,'" adding that this interpretation "sensibly allows § 1512(b) to reach only those with" a sufficient "level of 'culpability.'"  *Id*. at 706 (quotation omitted).  The unique "two-term" statutory text presented by § 1512(b) in *Arthur Andersen* clearly does not exist within § 666.  The latter does not combine "corruptly" with any other *mens rea* term, and therefore the plain language does not suggest any modification or departure from the term's historical meaning.  Further, as shown by the Court's examination of the legislative history, Congress did not intend to modify the traditional meaning of "corruptly" when it chose the term in § 666; in fact, as explained above, Congress specifically intended to keep and apply that historical meaning.  *See* 131 Cong. Rec. H–9275 (daily ed. Oct. 29, 1985) (remarks of Rep. Conyers).  Other courts have held that the Supreme Court's interpretation of "corruptly" in *Arthur Andersen* has "marginal relevance" to the term's use in 18 U.S.C. § 666.  *See Ford*, 435 F.3d at 212 n.3 ("The direct holding of *Andersen* is, although fully consistent with our decision, of marginal relevance.  As the Court emphasized, the statute at issue in Andersen used 'corruptly' to modify 'knowingly,' and analogies to statutes using the former but not the latter word are 'inexact,' . . . [§ 666] does not use the word 'knowingly' and the requisite state of mind is set out in the 'intending to be influenced or rewarded' phrase, which appears not to be modified by 'corruptly.'").

should not (and here, the Court did not) graft the requirements of "willfulness" onto § 666 without express textual support.  In other words, where Congress desires to make knowledge of the law an element, it does so explicitly with the term "willfully."  But the legislature chose not to invoke this term in § 666, and accordingly, there remains no textual basis to superimpose that requirement onto the statute.

Further, as explained above, there are no cases recognizing a mistake of law defense in § 666.  *See supra* note 38.  As such, the *mens rea* concept of "willfully" does not apply in § 666 cases.  Instead, the "well-established" meaning of "corruptly" in criminal law applies when interpreting the *mens rea* requirement of 18 U.S.C. § 666; the government must prove that the defendant maintained a factual understanding that his conduct involves a "this for that" or *quid pro quo* exchange.  This interpretation ensures that the statute only reaches unlawful conduct, because it requires the government to prove that the defendants both engaged in the *actus reus* related to the exchange and possessed the "corrupt" state of mind—knowing the terms and purpose of the exchange.  This conforms to the statutory scope Congress intended to enact, as shown through the text and legislative history, which all comport with the historical use and traditional understanding of "corruptly" in criminal law more broadly.

### 4. The jury instructions provided the correct definition of "corruptly"

In Madigan's case, the jury instructions contained a formulation of "corruptly" consistent with the historical definition recounted above and the Seventh Circuit's controlling definition of the term as used in § 666.  *See* [313] at 67, at 67–69, 77–81.  Madigan's arguments, therefore, asserting that the term "corruptly" entails requirements separate and above a factual understanding of the nature and purpose of the exchange must fail.  *See infra* Part IV.a.i.(1)–(3).

Beyond that main theory, Madigan also objects to the Court's formulation on a few additional grounds.  None prevail.

First, Madigan argues that the jury should have been instructed that a defendant must receive a *personal* private benefit to violate § 666.  18 U.S.C. § 666(a)(1)(B) criminalizes "corruptly" soliciting or demanding, "for the benefit of any person," or accepting "anything of value from *any* person."  (emphasis added).  Likewise, § 666(a)(2) also criminalizes "corruptly" giving or offering "anything of value to *any* person."  (emphasis added).  By its plain text, the statute permits criminal liability even where a payment may be received by a third party, provided the defendant maintains the requisite intent.  This Court, therefore, properly instructed the jury accordingly, defining a "thing of value" as "a private benefit either to the public official or to any person, with the intent to influence or reward an agent of State government in exchange for an official action or actions related to some

business, transaction, or series of transactions of the government (as defined in these instructions)." [313] at 67. Madigan cites no cases eliminating this clear statutory language. Because there remains no legal basis to depart from the clear statutory directive that *any* person can receive the exchanged "thing of value," the Court did not error in its definition of "thing of value."[46]

Second, Madigan next claims that the instructions failed to "require that the jury find Madigan specifically intended to receive a private financial benefit in violation of his legal duty to faithfully represent his constituents and the citizens of Illinois." [401] at 52. As the Court has already explained, Madigan's view that "corruptly" entails some other knowledge beyond maintaining a factual understanding of the nature and purpose of the "this for that" exchange remains disproven by the statute's text and history and controlling case law. *See United States v. Curescu*, 674 F.3d 735, 742 (7th Cir. 2012) ("To be guilty of soliciting or accepting a bribe in violation of section 666(a)(1)(B) requires knowing that the money or other thing of value received was indeed a bribe, which is to say an inducement to do a corrupt act.") (citing *Salinas v. United States*, 522 U.S. 52, 57 (1997)). Madigan correctly states that "an exchange is not enough to prove a corrupt intent in this case" ([401] at 51)—precisely why the jury instructions accurately defined the *mens rea* term of "corruptly" to require that a defendant maintain "the understanding that a 'thing of value' is to be exchanged for an 'official act' with the intent to influence or reward" a public official "in connection with his official duties." *See* [313] at 77 (Court's Instruction 63). *See also* [313] at 67 and 80 (Court's Instructions 56 and 64) (same). This definition required the jury to find, beyond a reasonable doubt, that the defendant maintained that requisite understanding, in addition to an exchange—directly refuting Madigan's claim.

Further, Madigan's claim that the instructions did not require the jury to find Madigan violated a legal duty to faithfully represent his constituents remains unsupported by the record. Madigan cites multiple Second Circuit cases for the proposition that "corruptly" entails a breach of some official duty. But all those cases addressed the concept of a "legal duty" because none of the defendants were public officials; all were private citizens at the time of the alleged conduct. *See United States*

---

[46] In a footnote, Madigan seems to imply the Government recognized it needed to prove a private gain to Madigan, noting that "there has been no conviction in the Seventh Circuit under Section 666 that did not include *some* personal financial benefit to the public official." [401] at 51 n.8. (emphasis in original). But convictions under § 666 do exist where a defendant claims no personal gain from criminal conduct. *See e.g., Fan v. United States*, Nos. 12-cr-00068 (DLI), 15-cv-04169 (DLI), 2022 WL 198467, at *4 (E.D.N.Y. Jan. 21, 2022) (upholding a defendant's guilty plea to § 666 charges even where she claimed she "had not broken any law and received no personal gain" from use of the funds) (quotation omitted). The fact that the jury convicted Madigan for bribery schemes in which no-show salaries were ultimately paid to third persons (i.e., political operatives working on Madigan behalf) does not change the express applicability of § 666 to his conduct. Likewise, such arguments ignore the private benefits Madigan personally obtained by unlawfully putting his own political machine on ComEd's payroll, rather than paying millions of dollars to his associates himself.

*v. Ford*, 435 F.3d 204, 206 (2d Cir. 2006) (defendant "was the elected Secretary/Treasurer of the Public Employees Federation ('PEF'), a union");[47] *United States v. Rooney*, 37 F.3d 847, 849 (2d Cir. 1994) (defendant was "an attorney who undertook to develop a modest federally-funded housing project for the elderly in Columbia County, New York"); *United States v. McElroy*, 910 F.2d 1016, 1019 (2d Cir. 1990) (defendants were two bank officials); *United States v. Ng Lap Seng*, 934 F.3d 110, 116 (2d Cir. 2019) (defendant was a foreign national real estate investor). Simply put, the issues in those cases do not apply here. It remains beyond dispute that a public official (and certainly a State representative like Madigan was at the time of the charged conduct) breaches a duty to the public when they engage in a bribery scheme.

Lastly, the Court addresses Madigan's argument that the Court's definition of "corruptly" somehow confused the jury with respect to the § 1343 charges in Counts Eight, Nine, and Ten. Madigan states the jury instructions defining "bribery" (Court's Instruction 76) and "honest services" (Court's Instruction 75) for the § 1343 charges "did not include any additional discussion of bribery requiring a 'this for that' exchange of a thing of value for an official act" yet "emphasized" those details "in the

---

[47] Madigan also cites to *Ford* for the proposition that "a recipient who knows of the donor's intent to arrange a quid-pro-quo or to seek special consideration may, in certain circumstances, be said to be acting 'corruptly'" but "such knowledge is insufficient, by itself, to prove the section 666 violation charged in this case." 435 F.3d 204, 212 (2d Cir. 2006). But this Second Circuit case does not change this Court's analysis on the meaning of "corruptly" meaning for two reasons.

First, *Ford* holds that "a jury should be clearly instructed that it is the recipient's intent to make good on the bargain, not simply her awareness of the donor's intent that is essential to establishing guilt under Section 666." *Id.* This reading by the Second Circuit, however, runs afoul of Seventh Circuit precedent established in *United States v. Peleti*, which clearly holds that a defendant acts "corruptly" when they accept the bribe, regardless of whether he "actually intended to be influenced," so long as the payee conveys "that the money would influence him." *See* 576 F.3d 377, 383 (7th Cir. 2009). *See also Hawkins*, 777 F.3d at 882 (declining to overrule *Peleti*). To the extent that Second Circuit precedent wrongly imposes different requirements on a defendant's intent in § 666 prosecutions, this Court rejects that view and follows, as it must, the Seventh Circuit's approach on this issue.

Second, the Court notes that *Ford* concerned an "underlying conviction" related to "accepting volunteer services and related goods in an election campaign." *Ford*, 435 F.3d at 212. The Second Circuit noted that this conduct was "*by itself*, not only innocuous but also rather commonplace" and although a "volunteer or donor may have arranged a *quid-pro-quo*, or be seeking special consideration as to future work if the campaign is successful," they may also "be acting on ideological grounds or may desire only to display his or her talents in the hope of getting work later on the merits." *Id.* (emphasis in original). In finding that the district court's formulation of "intending to be influenced" failed to sufficiently articulate the *quid pro quo* requirement, the court noted the need for restraint "where the act underlying the conviction" remains "*by itself* innocuous." *Id.* at 212–13 (quotation omitted). Such factual issues distinguish *Ford*. Here, Madigan's underlying § 666 convictions concern "no- show" jobs where his political associates of his received millions of dollars of payments for little to no work. That is not comparable "innocuous" conduct which concerned the Second Circuit in *Ford*. Further, Madigan does not dispute that the jury instructions in his case did, in fact, articulate the *quid pro quo* requirement of § 666. The *Ford* case is thus unavailing.

Section 666 related instructions." [401] at 59. Therefore, Madigan claims, the instructions confused the jury, according to Madigan, since "the same exchange was required for the government to meet its burden under Section 1343." *Id.*

First, Madigan did not object to the Government's proposed instructions for either the definition of "honest services fraud" nor "bribery" for the wire fraud counts. *See* [261] at 162–63 (Madigan's redline to the Government's proposed instructions, noting that the "honest services" and "bribery" definitions were "Agreed."); [313] at 95–96 (providing those agreed definitions to the jury).[48] Because "failure to object qualifies as a forfeiture," Madigan forfeited arguments stemming from these instructions. *See United States v. Griffin*, 84 F.3d 912, 925 (7th Cir. 1996) (citing *Yakus v. United States,* 321 U.S. 414, 444 (1944)). *See also Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) ("It is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court.").

Second, even if Madigan did not waive this issue, his speculative argument would still fail on the merits. Here, the jury received separate instructions for the § 666 and § 1343 Counts in this case detailing those charges' distinct elements. The jury instructions also explicitly told the jury to "consider each charge separately" and that the "decision on one charge, whether it is guilty or innocent, should not influence" any "decision on any other charge." [313] at 23 (Court's Instruction 21). Juries are presumed to "follow the instructions given by the court." *United States v. Marchan*, 935 F.3d 540, 548 (7th Cir. 2019) (citing *United States v. Flournoy*, 842 F.3d 524, 528 (7th Cir. 2016)). Madigan fails to show, and the record does not reflect, any reason to suggest that the jury failed to follow the Court's instructions regarding separate consideration. Indeed, the statutory term "corruptly" (and its definition) appears in § 666 only, not § 1343. Therefore, no cause exists to believe there were "spillover" effects between the instructions given in this case—especially where, as here, the jury carefully returned a mixed verdict convicting on some counts, acquitting on others, and failing to reach unanimous agreement on still others.

Simply put, the jury received proper legal instructions, and importantly, Madigan failed to object to the formulation of the elements, including the *mens rea* terms, in the § 1343 instructions. *See* [261] at 152–53 (only Defendant McClain objecting to non-element language in the Government's proposed instruction); [313] at 90 (Court's Instruction 70, providing the proposed elements instructions).

---

[48] The Court notes that it did change the parties' proposed definition of "something of value" for the § 1343 Counts, adding "contractual rights" to the list of items "something of value" includes. *Compare* [261] at 163 *with* [313] at 96. The Court included this change because (1) it remains a correct statement of law (*see United States v. Sullivan*, 118 F.4th 170, 209 (2d Cir. 2024)) ("Courts interpreting the mail and wire fraud statutes have repeatedly concluded that enforceable rights to payment are 'property' that, when wrongfully thwarted by a defendant, may underlie a criminal prosecution."), and (2) the inclusion of contractual rights was triggered by the evidence presented at trial.

Moreover, § 1343 does not use the term "corruptly" nor "thing of value" in its text, and accordingly there was no legal basis to instruct the jury on those concepts for the wire fraud counts in this case—nor did any party ask for such an instruction.[49]  *See* [261].  There is no legal basis for Madigan to claim error based upon a failure to instruct the jury on terms that do not appear, or apply to, § 1343.[50]  Additionally, the

---

[49] Madigan broadly suggests that the "government capitalized" on the jury's alleged confusion by arguing that Madigan's conduct "was a deprivation to the people of Illinois of the honest services of Michael Madigan," arguing that "Section 1346 only criminalizes bribes and kickbacks." [401] at 60 (quotation omitted).  Madigan appears to claim the Government's statement constituted an error, but does not develop any arguments in his motion regarding why it was improper (especially considering the Government proceeded on an honest services fraud theory from the indictment stage of the case, [38], and Madigan did not dispute the Government's proposed honest services fraud instruction, [261] at 162), nor how the statements denied him the right to a fair trial.  *See United States v. Giannini*, 104 F.4th 667, 673 (7th Cir. 2019) (The Seventh Circuit evaluates a "claim of prosecutorial misconduct through improper statements at closing arguments in two steps.  First, [the court] determine[s] if the comments were improper standing alone," then, "if they were improper," the court inquires "whether the remarks in the context of the whole record denied the defendants the right to a fair trial.") (quotations omitted).  Madigan also did not object to these statements at trial.  *See* Tr. 10275:5–25.  Accordingly, Madigan's prior failure to object timely on the record, and his current failure to develop this argument in his brief, renders the issue waived.  But even if Madigan did not waive the issue, the Court finds no improper conduct occurred because the jury instructions correctly defined honest services fraud as a matter of law, and the Government's closing arguments properly stated that it proceeded on both a property fraud theory and an honest service fraud theory as set forth in the indictment.  *See* Tr. 10275:7–24.  Therefore, for all of these reasons, Madigan fails to meet his burden to show a new trial is required.

[50] Madigan appears to separately suggest that the "jury's decision to acquit Madigan on the Section 666 charge for the same conduct" underlying the wire fraud charges with respect to the state board counts shows a sufficiently inconsistent verdict to constitute grounds for a new trial.  *But see United States v. Delatorre*, 581 F. Supp. 2d 968, 991–92 (N.D. Ill. 2008) (A "jury's somewhat split verdicts are a strong indication that the jurors followed this Court's instruction.").  Madigan admits, however, that the Seventh Circuit has clearly held that "the mere fact that verdicts are inconsistent with each other is of no legal significance unless a party can demonstrate that such verdicts cannot coexist by operation of law."  *United States v. Willbourn*, 799 F.3d 900, 911 (7th Cir. 2015).  *See also* [401] at 60 n.9 (citing *Willbourn*).  Madigan also admits that the "Seventh Circuit has not elaborated on what it means for two verdicts to be inconsistent by operation of law."  [401] at 60 n.9.  But this does not diminish the general rule that, "as the cases recognize, such an inconsistent verdict could be chalked up to jury mistake, compromise, or lenity," and therefore "typically, the guilty verdict will stand (so long as the evidence is sufficient to support it) notwithstanding an inconsistent verdict on a related offense, even if conviction on the latter offense is a predicate to conviction on the former."  *United States v. Moore*, 763 F.3d 900, 910 (7th Cir. 2014) (citing *United States v. Powell*, 469 U.S. 57, 65 (1984); *Dunn v. United States*, 284 U.S. 390, 393–94 (1932); *United States v. Askew*, 403 F.3d 496, 501 (7th Cir. 2005)).

Additionally, bribery, traditionally a common law crime, often has distinct elements between statutes—the state statutes at issue in this case presenting a prime example.  *See infra* Part IV.a.iv.  Here, 18 U.S.C. § 666 and 18 U.S.C. §§ 1343 and 1346, all criminalize bribery schemes but maintain separate elements.  Madigan fails to show that any of the jury instructions provided in this case contained incorrect statements of the law as to any of those elements.  Further, as the Court explained above, more than sufficient evidence supported the jury's guilty verdicts as to Counts Eight, Nine, and Ten in this case.  Accordingly, Madigan presents, and the record demonstrates, no reason to depart

Government pursued *two* theories of wire fraud in the § 1343 charges in this case: money/property fraud and honest services fraud. Money/property fraud does not require evidence of a *quid pro quo* to establish a violation. *See United States v. Weimert*, 819 F.3d 351, 355 (7th Cir. 2016). On this particular issue, Madigan's challenge borders on the frivolous.

In sum, the Court provided the jury with a correct definition of "corruptly" as applied to the 18 U.S.C. § 666 charges in this case. Because this definition was correct as a matter of law, no error exists regarding these instructions and therefore the Court properly denies Madigan's motion. Likewise, even if the instruction was error, the jury instructions read as a whole accurately communicated the elements of a § 666 violation, including the requisite *mens rea*, and did not permit a conviction based on innocent conduct. Thus, any error in the definition of "corruptly" remained harmless. *See Neder*, 527 U.S. at 17.

### ii. Stream of Benefits

In his next challenge, Madigan argues that the jury erroneously received a "stream of benefits" instruction with respect to Counts Two, Four, and Six. *See* [401] at 53. Madigan contends *Snyder* "made clear" that § 666 requires "a *quid pro quo* or link" to prove a violation. *Id.* Therefore, previous cases interpreting § 666 "come from a time when the government believed a looser interpretation of § 666 was allowed" and subsequently cannot be relied upon in the wake of *Snyder*'s narrowing of the statute. *Id.* Even if *Snyder* still permits a stream of benefits theory, according to Madigan, the Court's instructions still "failed to instruct the jury that the government still must prove that Madigan promised to take official action on a particular question or matter as the opportunity to influence that same question or matter arises." *Id.* at 46 (citations omitted).

First, Madigan's arguments regarding the validity of the stream of benefits theory in § 666 prosecutions remain unpersuasive. As Madigan admits, "the *Snyder* decision did not directly address this theory," and thus it does not overrule prior precedent on this issue. *Id.* Instead, per the Court's earlier explanation, the main holding in *Snyder* established the government must show a *quid pro quo* in prosecutions brought under § 666, eliminating the previously accepted gratuities theory. *See* 603 U.S. at 19. Proof of a *quid pro quo* in bribery prosecutions remains a familiar concept; in fact, a *quid pro quo* is an element of proof in numerous other criminal statutes, besides federal program bribery.

In those contexts, the "stream of benefits" theory remains widely and conclusively accepted, certainly in the Seventh Circuit. *See United States v. Solomon*,

from the general rule that apparently inconsistent verdicts do not constitute grounds for a new trial. *See Moore*, 763 F.3d at 910.

892 F.3d 273, 277–78 (7th Cir. 2018) (finding that, "to convict someone of honest-services fraud, the government must prove that there is an agreement to pay a bribe or kickback," which can reach "schemes that involve a stream of benefits over time, not just singly negotiated deals" and therefore "the district court did not have to find an explicit agreement to exchange payment for awarding the second contract" because "it was enough to find sufficient evidence of an ongoing agreement" and that the "agreement was still active at the time" of the alleged conduct) (citations omitted); *Ryan v. United States*, 688 F.3d 845, 852 (7th Cir. 2012) (finding "the Government presented a valid 'stream of benefits,' 'retainer,' or 'course of conduct bribery theory when it explained that" the "corruption" in the case "was more like a meal plan in which you don't pay for each item on the menu. Rather, there is a cost that you pay, an ongoing cost, and you get your meals.") (quotation omitted).

The other circuits also recognize the theory in several criminal statutes, including § 666. *See United States v. Ganim*, 510 F.3d 134, 147 (2d Cir. 2007) (regarding jury instructions in a Hobbs Act case, "requiring a jury to find a *quid pro quo*" ensures that "a particular payment" must be offered "in exchange for a *commitment* to perform official acts to benefit the payor in the future." But "once the *quid pro quo* has been established, however, the specific transactions comprising the illegal scheme need not match up this for that. While it frequently will be true that particular bribes or extorted payments are linked at the time of the corrupt agreement to particular official acts, that will not always be the case—for example, because the opportunity to undertake the requested act has not arisen, or because the payment is one of a series to ensure an ongoing commitment to perform acts to further the payor's interests.") (emphasis in original); *United States v. Rosen*, 716 F.3d 691, 700 (2d Cir. 2013) (establishing "the 'corrupt' intent necessary to a bribery conviction" requires the government to "prove the defendant had a specific intent to give something of value in exchange for an official act" and both "the federal bribery and honest services fraud statutes" prohibit "schemes involving payments at regular intervals in exchange for specific official acts as the opportunities to commit those acts arise even if the opportunity to undertake the requested act has not arisen." Further, "even if the payment is not exchanged for a particular act but given with the expectation that the official will exercise particular kinds of influence," it is sufficient that "once the *quid pro quo* has been established," then "the specific transactions comprising the illegal scheme need not match up this for that.") (quotations and citations omitted); *United States v. Lopez-Cotto*, 884 F.3d 1, 7–8 (1st Cir. 2018) (An "official violates § 666(a)(1)(B) if he exchanges or agrees to exchange $5,000 of government business for a single benefit," and "if he exchanges or agrees to exchange $5,000 of government business for a series of benefits." Therefore, "when a defendant is indicted on the stream of benefits approach, the prosecution must prove an agreement for the ongoing stream of benefits rather than an agreement for stand-

alone bribes.  The prosecution need not, however, link the value of the government business conferred to any particular benefit received by the official."); *United States v. McDonough*, 727 F.3d 143, 154 (1st Cir. 2013) ("Bribery can be accomplished through an ongoing course of conduct, so long as the evidence shows that the favors and gifts flowing to a public official are in exchange for a pattern of official actions favorable to the donor.") (quoting *Ganim*, 510 F.3d at 149) (internal quotations and alterations omitted); *United States v. Wright*, 665 F.3d 560, 568 (3d Cir. 2012) ("The bribery theory does not require that each quid, or item of value, be linked to a specific quo, or official act."); *United States v. Jennings*, 160 F.3d 1006, 1014 (4th Cir. 1998) ("The intended exchange in bribery can be 'this for these' or 'these for these,' not just 'this for that.'").

Madigan offers no authority refuting the validity of the "stream of benefits" theory in these other *quid pro quo* bribery contexts.  He also produces no cases showing that any circuit, much less the Seventh Circuit, has overturned its prior precedent affirming the stream of benefits theory in any bribery context, § 666 or otherwise.  Because Madigan fails to successfully argue that the well-established stream of benefits theory has been overturned by *Snyder*, and he does not argue that the Court's instructions inaccurately articulated the theory, no instructional error exists for this issue.

Further, Madigan's contention that the instructions failed to instruct the jury "that Madigan promised to take official action on a particular question or matter as the opportunity to influence that same question or matter arises" remains similarly unsupported.  Madigan points to two appellate decisions and one district court decision out of the Second Circuit emphasizing that the "as-opportunities-arise theory" of bribery still requires a specific identification of an official act the public official exchanged.  [401] at 54.[51]  All of these decisions, citing *McDonnell v. United*

---

[51] The Court notes separately that Madigan's brief mischaracterizes *United States v. Silver*.  Although Madigan cites *Silver* to claim that the Government must prove a "'this for these' or 'these for these'" exchange under § 666, reading the cited portion of *Silver* in context actually undermines that position. [401] at 54 (citing *United States v. Silver*, 948 F.3d 538, 544 (2d Cir. 2020)).  *Silver* analyzes a prior Second Circuit case, *United States v. Ganim*, which affirmed the validity of the "stream of benefits" theory in bribery prosecutions.  *See Ganim*, 510 F.3d at 147 ("Once the *quid pro quo* has been established, however, the specific transactions comprising the illegal scheme need not match up this for that.").  The *Silver* court noted that in *Ganim*, the Second Circuit held that "the extortion and bribery *quid pro quo* does not require a 'link between each specific benefit and a *single* official act.'" *Silver*, 948 F.3d at 554 (quoting *Ganim*, 510 F.3d at 147) (alterations omitted).  *Ganim* did, however, provide that such *quid pro quos* "may, alternatively, be proven through evidence of a 'scheme involving payments at regular intervals in exchange for specific official acts as the opportunities to commit those acts arise'—*i.e.* 'this for these or these for these, not just this for that.'" *Id.* (quoting *Ganim*, 510 F.3d at 147–48).  *Silver* then concludes the analysis of *Ganim* by stating that "we held [bribery] can also 'be accomplished through an ongoing course of conduct' . . . we were clear that in such cases the public official must still understand the exchange to be one of payment for '*specific* official acts as the

*States*, emphasize the need for clarity in a stream of benefits theory bribery prosecution that the official must "exchange . . . payment for *specific* official acts as the opportunities to commit *those* acts arise." *Silver*, 948 F.3d at 554 (quotation omitted) (emphases in original). *See also United States v. Mangano*, 128 F.4th 442, 473 (2d Cir. 2025) (holding that *Silver* "clarified that convicting a public official under the as-opportunities-arise theory of honest services fraud (also known as the 'stream-of-benefits' theory) requires showing that the official 'promised to take official action *on a particular question or matter* as the opportunity to influence that same question or matter arises.'") (quoting *Silver*, 948 F.3d at 553); *United States v. Bongiovanni*, No. 19-CR-227, 2024 WL 3487914, *3 (W.D.N.Y. Jul. 19, 2024) (noting that the stream of benefits theory requires that a defendant "understood that [he] was expected as a result of the payment to exercise particular kinds of influence . . . as specific opportunities arose.") (quotation omitted). Second Circuit precedent does not bind this Court, especially considering the Seventh Circuit has not made similar cautionary comments in cases affirming the "stream of benefits" theory. *See Solomon*, 892 F.3d at 277–78; *Ryan v. United States*, 688 F.3d 845, 851–852 (7th Cir. 2012) (affirming bribery convictions under 18 U.S.C. §§ 1341 and 1346 based on a stream of benefits theory). But even if the Second Circuit's guidance applied, no error occurred in the instructions given in this case.

Here, the jury instructions explicitly and repeatedly emphasized the required specificity and concrete nature of the official actions in the § 666 charges, even under a stream of benefits theory. Court's Instructions 56, 63, and 64 all incorporated Court's Instruction 47 by reference, which defined "Official Action" as follows:

> An "official action" is a specific decision or action on, or an agreement to make a decision or take action on, a specific question or matter, which is pending or at any time may be pending, or may by law be brought before a public official, in his official capacity. Under the law, the term "official action" does not

---

opportunities to commit *those* acts arise'" in compliance with the requirements of *McDonnell v. United States*. *Id.* (quoting *Ganim*, 510 F.3d at 149) (emphasis in original). Thus, *Silver* did not create any new "this for these" requirements for the government in bribery cases. Instead, the court simply quoted *Ganim* which held a "this for these" exchange could present an alternative method of proving the required *quid pro quo* in a bribery prosecution under the Hobbs Act. Further, the court's final summation emphasized that, if the government pursues a stream of benefits theory, the government must also show sufficient evidence of a "*specific*" official act that the public official exchanged. *Id.* at 147–48 (emphasis in original). Although *Silver* does not bind this Court, it remains significant that the jury instructions provided in this case comply with the "stream of benefits" theory requirements articulated by the Second Circuit. As the Court explains below, the instructions in this case explicitly and repeatedly emphasized that the official act in a bribery charge must be specific and concrete. *See* [313] at 55 (Court's Instruction 47). The instructions also explicitly told the jury that the agreement to exchange must exist prior to the undertaking of the official action. [313] at 67. Accordingly, *Silver* affirms this instructions' articulation of the "stream of benefits" theory.

require that the official possess the power or ability to act unilaterally on the specific question or matter.

A "question" or "matter" must involve a formal exercise of governmental power and must be something specific and focused, rather than a broad policy objective.

A public official makes a specific decision or takes action on a question or matter when he uses his official position to exert pressure on another official to perform an official act, or to advise another official, knowing or intending that the advice will form the basis for an official act by another official.

A public official does not make a specific decision or take action on a question or matter if he does no more than set up a meeting, host an event, or call another public official.

[313] at 55.

This instruction clearly and forcefully articulates that an official action must be "specific" and make use of the official's office in a specific and focused manner, rather than a nebulous or abstract use of the official's position.[52]  Madigan notably raises no arguments concerning language of Court's Instruction 47 in his motion, but rather he contends that the instructions somehow failed to instruct the jury that Madigan promised to take an official action "as the opportunity to influence that same question or matter arises."  [401] at 54.

Not so.  The jury received numerous instructions regarding the nature and timing of the required exchange with respect to the § 666 counts.  Specifically, in Court's Instructions 56, 63, and 64, the jury was informed that "the government must prove that when a defendant solicited, demanded, accepted, or agreed to accept, a 'thing of value' with the intent to be influenced or rewarded in connection with his official duties, the defendant did so knowing it was a 'this for that' exchange of a 'thing of value' for an 'official action' (as defined in this instruction and Court's Instruction 47, respectively)."  [313] at 77.  The instructions continued to inform the jury that the "exchange involves the unlawful influence of a bribe to be paid before the performance of an official action or actions, or an unlawful reward of a bribe to be paid after the performance of an official action or actions" and "the government must prove that an agreement existed to take an official action in exchange for a thing of value before the official action is to take  place.  Therefore, if the bribe is to be paid after an official

---

[52] Notably, the Court modified this instruction at the January 2, 2025 Charge Conference, over the Government's objection, to incorporate Defendant Madigan's own request to add language ensuring the definition excluded "broad policy objectives."  Tr. 8039:8–21.

action occurs, then the government must prove that the bribery agreement existed before the official action was to take place." *Id.* at 77–78.

The instructions explicitly stated that the agreement "to take an official action in exchange for a thing of value" must exist "before the official action is to take place." [313] at 67.  Though the agreement may involve multiple official actions or things of value, the instructions clearly articulated that the agreement to exchange must predate any of the official action.  Further, the instructions defined the official action itself as "a specific decision or action." [313] at 55.  The jury was not misled as to the Government's burden.  The instructions explicitly informed the jury that the Government must prove Madigan entered into an agreement to exchange before any official actions occurred, and that those official actions must be a particular, or "specific," decision or action.[53]  Accordingly, the record does not support Madigan's claim of confusion, because the instructions correctly and repeatedly articulated the need for specificity.

Because the Seventh Circuit recognizes the "stream of benefits theory" in bribery cases, no error exists with respect to the Court's instructions regarding the "stream of benefits" theory pursued in Counts 2s, 4s, or 6s.  *See Solomon*, 892 F.3d at 277–78 (for "schemes that involve a stream of benefits over time," it remains "enough to find sufficient evidence of an ongoing agreement" and that the "agreement was still active at the time" of the alleged conduct).  The instructions correctly informed the jury that an agreement to exchange must exist before an official action occurs, even if the agreement "may involve a stream of benefits in a 'this for that' exchange for one or more official actions," and contained an accurate definition of what constitutes an official action under the law. [313] at 67–68.  Thus, the Court denies Madigan's motion for a new trial with respect to this issue, because the instructions "correctly and completely informed the jury of the applicable law." *Huff v. Sheahan*, 493 F.3d 893, 899 (7th Cir. 2007) (citation omitted).

### iii.  Bona Fide Compensation Instruction

Madigan next argues that the Court erred in its instruction to the jury regarding the "safe harbor" provision contained within 18 U.S.C. § 666(c), also known as the "bona fide compensation" exception.  18 U.S.C. § 666(c) states that the statute "does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business."  Whether "wages are bona fide and earned in the usual course of business is a question of fact for the jury

---

[53] The Court notes here that the instructions incorporated Madigan's proposed defense instructions regarding "vague expectations" into its definition of "bona fide compensation." *See* [313] at 68.  This addition also reinforced the concreteness requirements of the benefit to be exchanged.

to decide." *United States v. Lupton*, 620 F.3d 790, 802 (7th Cir. 2010) (quotation omitted).

The Court provided the following instruction to the jury regarding "bona fide compensation," modeled after the Seventh Circuit's Pattern Instruction (*see* SEVENTH CIRCUIT PATTERN CRIMINAL JURY INSTRUCTIONS 308 (2023 ed.)):

> ". . . bona fide salary, wages, fees, or other compensation paid in the usual curse of business do not qualify as a thing of value. Vague expectations of some future benefit are not sufficient, by themselves, to make a payment a bribe."

[313] at 78.[54]

Madigan's arguments here largely reiterate the arguments made in Defendants' Joint Request for Additional Jury Instruction, filed on February 10, 2025, [325], and in their proposed jury instructions regarding § 666(c)'s safe harbor provision. [261] at 102. Specifically, Madigan claims that the Court erred by failing to instruct the jury "that the government must prove beyond a reasonable doubt that the jobs at issue were not bona fide." [401] at 54.

In the Seventh Circuit, § 666(c) is a statutory "safe harbor" provision and presents an "affirmative defense to be raised at trial." *United States v. Cui*, No. 19 CR 322-3, 2024 WL 3848513, *5 (N.D. Ill. Aug. 16, 2024) (citing *United States v. Lupton*, 620 F.3d 790 (7th Cir. 2010)). This remains true in other circuits. *See United States v. Williams,* 507 F.3d 905, 909 n.2 (5th Cir. 2007) (noting that "the indictment did not require the jury to find explicitly" that the funds were "not" the defendant's "bona fide salary" and thus the defendant's conviction showed "that the jury implicitly determined that the money was not [his] bona fide salary or earned in the usual course of" business); *United States v. Schmitz*, No. 08-P-14-NE, 2008 U.S. Dist. LEXIS 145942, at *5 (N.D. Ala. May 20, 2008) ("An affirmative abrogation of the 18 U.S.C. § 666(c) exception is not an element of the offense and need not be expressly negated in the indictment itself.") *vacated in part on other grounds*, 634 F.3d 1247 (11th Cir. 2011). Here, the Court followed the accepted understanding within the Seventh Circuit and other circuits of § 666(c) as an affirmative defense and thus instructed the jury accordingly. *See* [313] at 78.

Madigan cites no legal authority contradicting that established precedent.[55] Instead, as in previous filings, he still only relies upon *Ruan v. United States* for the

---

[54] *See also* [313] at 68, 80. The Court incorporated Madigan's proposed defense instruction regarding "vague expectations" into this definition. *Compare* [313] at 68, 78, 80 *with* [261] at 106.

[55] Defendants also failed to cite any relevant legal authority for this issue in their Joint Request, which the Court pointed out in the Order denying that request. *See* [328] at 2 ("Defendants provide no legal authority supporting their contention that § 666(c) requires that 'the Government must prove beyond

proposition that certain statutory exceptions are "critical" for correctly defining the *mens rea* in certain criminal statutes. 597 U.S. 450, 461 (2022). In that case, the Supreme Court addressed the applicability of the scienter provision in 21 U.S.C. § 841 to a preceding statutory clause: "except as authorized." *Id.* at 464. The Court held that the "knowingly or intentionally" *mens rea* term in the statute applied to the preceding "except as authorized" clause, and then noted the "crucial role" authorization (or lack thereof) plays in "distinguishing morally blameworthy conduct from socially necessary" conduct. *Id.* While it differed "from an element in some respects," the clause was "sufficiently like an element" to merit "similar legal treatment" in the context before the Court. *Id.*

The *Ruan* case, however, provides no guidance for the issues in Madigan's case. First, and most obviously, the Supreme Court considered an entirely different statute in *Ruan*, 21 U.S.C. § 841. That statute utilizes different *mens rea* terms than § 666 and proscribes entirely different conduct.[56] The statutes have no relevant textual overlap and thus the interpretive issues presented in *Ruan* and those presented within § 666(c) remain distinct.

Unlike the statute the Supreme Court faced in *Ruan*, the statutory text here is safe harbor provision. Generally, the law construes statutory safe-harbor provisions as "an affirmative defense that must be proven by the defendant." *United States v. George,* 171 F. Supp. 3d 810, 818 (N.D. Ill. 2016) (citing *United States v. Vernon*, 723 F.3d 1234, 1271 (11th Cir. 2013)).[57] As the Court already detailed, other courts have held that § 666(c) is a "safe harbor" provision and thus consistently conclude that it presents an affirmative defense for a defendant to raise at trial. *See Cui*, 2024 WL 3848513 at *5 (citing *Lupton*, 620 F.3d at 790); *United States v. McClain*, No. 20 CR 812, 2024 WL 50868, at *5 (N.D. Ill. Jan. 4, 2024); *Williams,* 507 F.3d at 909 n.2; *United States v. Walsh*, 156 F. Supp. 3d 374, 381 (E.D.N.Y. 2016). Congress' use of a safe harbor provision in § 666 implies specific congressional intent to advance an affirmative defense—entirely distinct from the statutory language at issue in *Ruan*.

---

a reasonable doubt that the defendant knew the salary at issue was not bona fide wages paid in the usual course of business.") (quoting [325] at 2).

[56] 21 U.S.C. § 841(a) provides that "Except as authorized . . . it shall be unlawful for any person knowingly or intentionally—(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; or (2) to create, distribute, or dispense, or possess with intent to distribute or dispense, a counterfeit substance."

[57] Numerous other statutes contain "safe harbor" provisions that courts also construe as affirmative defenses. *See, e.g., George*, 171 F. Supp. 3d at 818 (noting that the "Anti-Kickback Statute," 42 U.S.C. § 1320a-7b(b)(1)(A), contained "two 'safe harbor' provisions," and thus "the burden shifts to the defendant to establish that his conduct was protected by a safe harbor" because "safe-harbor provisions are an affirmative defense that must be proven by the Defendant"); *United States v. Novak*, Case No. 13 CR 312, 2014 WL 2937062, at *2 (N.D. Ill. Jun. 30, 2014) (same).

Furthermore, under well-settled law, affirmative defenses that do "not controvert an essential element of an offense" need not "be disproved beyond a reasonable doubt." *United States v. Jumah*, 493 F.3d 868, 873 (7th Cir. 2007) (citing *Dixon v. United States*, 548 U.S. 1, 7 (2006)). Absent "evidence of contrary congressional intent in the structure or history of the statute, federal courts should presume that Congress intended that they follow established common law rules related to affirmative defenses when applying new criminal statutes." *Id.* (citing *Dixon*, 548 U.S. at 12–14). Here, besides the inapplicable citation to *Ruan*, Madigan makes no other arguments showing that Congress intended for § 666(c)'s safe harbor provision to depart from those common law rules. Because all "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived," the Court may stop here. *Crespo v. Colvin* 824 F.3d 667, 674 (7th Cir. 2016).

But even if Madigan did not waive any argument beyond citing *Ruan*, his challenge would still fail since the legislative history of § 666(c) confirms the plain text construction that Congress intended for this safe harbor provision to exempt certain conduct, not add an element to the offenses in § 666(a). Returning to the legislative history of § 666 the Court discussed earlier (*see supra* Part IV.a.i.3), Congress amended the statute in 1986, along with the bank bribery statute (18 U.S.C. § 215) and other codes. For § 215, not only did Congress add an intent requirement of "corruptly" to the statute, but Congress also "amended the exemption in Section 215 to provide, 'This section shall not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business.'" *Walsh,* 156 F. Supp. 3d at 388 (quoting PL 99–370 (HR 3511), PL 99–370, August 4, 1986, 100 Stat 779). The House Report accompanying these changes states that the amendments "broadened" the previous "exemption provision" of § 215, because "the present exemption applies only to salaries paid to officials of a financial institution by the financial institution itself" and failed to exclude certain "normal business practices" that "ought not be criminal." H.R. Rep. 99–335, 2.

Congress' 1986 amendments to § 666 "parallel[ed] the bank bribery provision (18 U.S.C. § 215)." H.R. Rep. 99–797, 34. In addition to similarly adding the term "corruptly" to § 666 (*see supra* Part IV.a.i.3), Congress "also added a safe-harbor provision identical to the amended exemption in Section 215—namely, '[t]his section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business.'" *Walsh,* 156 F. Supp. 3d at 389 (quoting PL 99–370 (HR 3511), PL 99–370, August 4, 1986, 100 Stat 779; PL 99–646 (S 1236), PL 99–646, November 10, 1986, 100 Stat 35921)). Again, as with § 215, the legislative history notes that Congress added this amendment to § 666 "to avoid its possible application to acceptable commercial and business practices." H.R. REP. 99–797, 30. As such, this provision in § 215, as with § 666, presents a "separate safe harbor defense" to be raised at trial. *See United States v. Kaufman*, No. 21-2589, 2023 WL 1871669, at *4 (2d Cir. Feb. 10, 2023)

SA66

(noting that the "elements of section 215(a)(2)" were distinct from "the separate safe-harbor defense").

Consistent with the plain text of the statute, this brief review of Congress' intent confirms that the legislature meant for § 666(c) to exclude certain conduct from criminal liability. No evidence (textual or otherwise) exists to show that Congress intended to modify the elements of the statute's prohibitions, when it included the safe harbor exemption in § 666(c).[58] Accordingly, the Court's instruction to the jury regarding "Bona Fide Compensation" remains a correct statement of the law and accurately instructed the jury regarding the bona fide compensation affirmative defense.

Madigan next raises a separate but related argument concerning the Court's response to Juror Note 29. This challenge fails as well.

District courts maintain discretion in the "decision to answer a question from the jury as well as the language used in the response." *United States v. Hewlett*, 453 F.3d 876, 880 (7th Cir. 2006) (citing *United States v. Young*, 316 F.3d 649 (7th Cir. 2002)). Such answers must, "as a whole, fairly and adequately treat the issue," present "a correct statement of the law," and answer "the question specifically." *Id.* (citing *Young*, 316 F.3d at 649).

On February 7, 2025, the jury sent the following note to the Court, reproduced in relevant part below:

> 2. On page 78 of Instructions, "thing of value" does not include "bona fide salary, wages, fees, or other compensation paid . . . ."

> On page 96 of instructions is bona fide salary considered "something of value" and on page 88 is bona fide salary considered "a valuable thing"?

[336] at 39.

---

[58] As a lone contrasting example, one safe harbor provision (specifically 18 U.S.C. § 1515(c)) has been viewed by the Eleventh Circuit as a complete defense, which "once raised," becomes "the government's burden to prove beyond a reasonable doubt that" the safe harbor did *not* cover the defendant's conduct. *United States v. Gerace*, 731 F. Supp. 3d 497, 508 (W.D.N.Y. 2024). So far, the only circuit court to read a safe harbor in this manner is the Eleventh Circuit. *United States v. Kloess*, 251 F.3d 941, 949 (11th Cir. 2001). No courts have interpreted § 666(c) similarly. Ultimately, however, *Kloess* fails to help Madigan for several reasons: (1) Defendant Madigan waived this argument; (2) § 1515 remains a distinct statute from § 666 in terms of text, context, and history; (3) the Seventh Circuit has not endorsed *Kloess* or otherwise as applied it to § 666; (4) no other court has held that, once a defendant raises a defense under § 666(c) the government must prove beyond a reasonable doubt that the payment at issue was *not* bona fide; and (5) any error on this issue would be harmless as to the subcontractor salaries given the overwhelming evidence at trial that these jobs were, in fact, no-show jobs.

Over the objection of the parties, the Court provided the following answer to Juror Note 29:

On page 78, "bona fide" salary, wages, fees or other compensation paid "in the usual course of business" do not qualify as a "thing of value." But salary, wages, fees, or other compensation paid for a job obtained by means of bribery is not a payment "in the usual course of business," and thus it can be considered a "thing of value."

For the references to "valuable thing" on page 88 and "something of value" on page 96, a salary paid for a job obtained by means of bribery can be considered a "valuable thing" or "something of value." You are the judges of the facts and, consistent with my legal instructions, you must decide the facts based on the evidence at trial.[59]

Each Count is to be considered separately and you have the specific instructions for each Count, including the required elements and definitions, in your packet. Please follow all of my instructions on the law, as you continue to deliberate your verdicts.

[323-1].

Madigan argues that the Court's response created a "new instruction" which in turn provided an improper "circular analysis as to whether bona fide compensation qualifies as a thing of value." [401] at 57. This characterization remains inaccurate. *See* [328]. Just as the Court stated in its Order denying the Joint Request for Additional Instruction, the "Court's response correctly clarified the statutory exception articulated in both § 666(c) and in the Court's instructions," and then specifically "addressed the jury's questions regarding" the terms "valuable thing" and "something of value," and reminded them to follow all of the Court's instructions on the law. *Id*. at 2–3. Here, the Court got it right.[60]

The Court's answer accurately described the important, if at times subtle, distinction mandated by § 666(c). Courts have held that a salary or other compensation "is not 'bona fide' simply because it is paid for legitimate work." *United States v. Bryant,* 556 F. Supp. 2d 378, 429 (D.N.J. 2008). If a payment (compensation

---

[59] Page 88 of the instructions referred to the definition of "unlawful activity" for purposes of the § 1952 charges in this case, specifically 720 ILCS § 5/33-8 (legislative misconduct). *See* [313] at 87–88. Page 96 referred to the definitions of "bribery" for the wire fraud charges. *See id*. at 96.

[60] The Honorable Edmond Chang, sitting as emergency judge, presided over the proceedings held on February 7, 2025, without objection from any of the parties. Tr. 11072:6–20. Even though Judge Chang presided over the response to the jury's question in Juror Note 29, he also conferred remotely with this Court (Judge Blakey) regarding the response, and both this Court and Judge Chang agreed on the proper answer given.

or not) constituted "the *quid* or bribe in a scheme to influence" a public official "in his official capacity," then "a reasonable jury could find" that the payment "was not in the 'usual course of business' or 'bona fide.'" *Cui*, 2024 WL 3848513 at *5. *See also McClain*, 2024 WL 50868 at *7 (collecting cases); *Williams*, 507 F.3d at 908 (collecting cases where employees' wages were not exempt under § 666(c)); *Bryant*, 556 F. Supp. 3d at 429 ("If a public official sells his office for wages, even if some legitimate work is performed in exchange for those wages, it is sufficiently clear that such wages are not 'bona fide.'"); *United States v. Urlacher*, 979 F.2d 935, 938 (2d Cir. 1992) (holding that "section 666(a)(1)(A) prohibits embezzling, stealing, obtaining by fraud, converting, or intentionally misapplying funds," and thus "a broad interpretation of § 666(c) as exempting from coverage the intentional misapplication of funds used for otherwise legitimate purposes . . . would be inconsistent with § 666(a)(1)(A)'s prohibitions").

The jury's assessment of whether a payment, in fact, constitutes "bona fide compensation" thus necessarily involves assessing the nature and purpose of the payment in question. Therefore, the jury must decide both questions of fact when determining whether a "thing of value" was in fact exchanged, and whether the purported "thing of value" might constitute "bona fide compensation." Madigan's assertion that "the jury must *first* determine if the salary, wages, fees or other compensation was paid in the usual course of business to determine if they were 'thing[s] of value' for purposes of the bribery analysis" finds no support in the case law (and Madigan cites no legal authority at all to support his theory). [401] at 57 (emphasis added). Accordingly, the Court did not err by referring the jury back to its correct "bona fide compensation" instruction, nor did it err by stating the inverse principle that instruction conveyed: that while compensation obtained in the usual course of business is not a thing of value, "compensation obtained by means of bribery is not a payment 'in the usual course of business.'" [323-1].[61] This answer did not invade the jury's province to make the factual determinations of whether a bribery agreement existed or whether the payments constituted bona fide compensation. Rather, Court answered "the question specifically" by restating the legal principle the jury first asked about—the bona fide compensation exception. *Hewlett*, 453 F.3d at 880.

Madigan also argues that the Court improperly "imputed the concept of bona fide compensation into the Section 1343 charges," which he claims confused the jury and failed "to inform the jury of the government's burden to prove Madigan knew that the salary, wages, fees or other compensation at issue was not bona fide also infected Counts 8, 9, and 10." [401] at 57. Again, not so.

First, the Court has already addressed, and rejected, Madigan's arguments regarding whether the Government had to prove beyond a reasonable doubt that he

---

[61] Again, the Court notes that the majority in *Snyder* intimated that bribery schemes, by their nature, are "inherently corrupt" (and thus, by implication, not in the usual course of business). 603 U.S. at 5.

knew the payments at issue were not bona fide.  But even if the Court's answer was erroneous with respect to the § 1343 charges,[62] which it was not, any such error could not have prejudiced Madigan, because the "safe harbor" provision of § 666(c) exempts certain payments (those made in the "usual course of business") from the jury's consideration.  If that concept was misapplied to the § 1343 charges, then the jury would have excluded certain relevant payments from its consideration if the jury found those payments were bona fide.  This would only advantage, rather than prejudice, the defense, because the jury could have mistakenly exempted certain payments that, in fact, should have been considered under § 1343.

Nevertheless, the Court did not err in addressing the jury's question concerning the § 1343 charges.  The jury asked a specific question inquiring whether any overlap existed in the definition of "thing of value," a term for which they received a specific definition, and the terms "valuable thing" and "something of value," terms that they did not receive explicit definitions for in the instructions.  As the Court stated on the record, the jury's question necessitated "more than just referring them back" to the instructions and required an answer that clarified the legal principles they asked about.  Tr. 11073:13–14.  The Court observed that a bona fide salary paid in the usual course of business is "also not a valuable thing or something of [value] under" either § 1952 or § 1343.  Tr. 11069:6–9.  As the Court discussed above, where a defendant obtains "money through fraudulent means," that "compensation" is "neither 'bona fide' nor received 'in the usual course of business.'"  *United States v. Williams*, 507 F.3d 905, 909 (5th Cir. 2007).  In the context of wire fraud under § 1343, "money obtained by fraudulent means," such as through a *quid pro quo* bribery agreement, falls into the same category of the jury's consideration: the object to be exchanged in a bribery scheme.

Certainly, without any applicable statutory carve-out or any countervailing legal authority (and Madigan cites none), a jury may validly consider payments made for improper purposes, i.e., pursuant to a bribe, in evaluating liability under § 1343.  The Court's answer thus informed the jury of that correct legal principle—addressing "the question specifically" of whether a "bona fide salary" may be considered "something of value."  *See Hewlett*, 453 F.3d at 880.  That answer, uncontroversially, remains yes, since a real salary obtained via improper purposes (such as bribery) is not, by definition, a bona fide salary.  *Bryant*, 556 F. Supp. 3d at 429.[63]  Further, the Court's answer to Juror Note 29 also referred the jury back to the instructions as a whole, which repeatedly reminded the jury of the Government's burden in the case

---

[62] Although the Court's answer concerned both the § 1343 and § 1952 charges, Madigan claims no error regarding the § 1952 Counts. Therefore, Madigan waives any arguments on that issue.  *Crespo v. Colvin* 824 F.3d 667, 674 (7th Cir. 2016) (". . . perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.").

[63] The Court notes again that Madigan does not appear to take issue with the Court's answer as applied to the § 1952 charges, and thus, he waives any such arguments.

and that each count should be considered separately. Accordingly, the Court did not err in its response to Juror Note 29.

In sum, Madigan fails to show any error that "both misled the jury and prejudiced the defendant." *United States v. Siepman*, 107 F.4th 762, 765 (7th Cir. 2024) (citations omitted). The Court gave the jury correct instructions regarding 18 U.S.C. § 666(c) and further provided an answer to Juror Note 29 with correct statements of the law pertaining to the specific legal principles the jury inquired about. Because Madigan cannot show any error in these instructions, or otherwise show any resulting prejudice, the Court denies his motion for a new trial on this issue.[64]

### iv. State Law Bribery Instructions

Madigan also takes issue with the Court's instructions regarding state law bribery, specifically those instructions delineating the elements of 720 ILCS § 5/33-1(d) and (e), § 5/33-3(a)(4), and 720 ILCS § 5/33-8. *See* [401] at 61; [313] at 45, 87–88. Madigan claims the instructions for these statutes should have stated that a defendant only "commits bribery or official/legislative misconduct when he knew" that he would "improperly influence or attempt to influence an official act 'in exchange for' property or personal advantage." [401] at 61.

Madigan cites no legal authority to support his claim that "the statutes clearly require the government to prove an exchange."[65] *Id.* Instead, he cites (and misconstrues) this Court's Pretrial Order.[66] But there, the Court only addressed the defendant's Fifth Amendment vagueness challenges and found the statutes "so clearly" proscribed the conduct alleged in the indictment that the defense could not bring facial or as-applied challenges for vagueness. [213] at 15–16. Specifically, this Court did not construe any of the Illinois statutes to require proof of a defendant's intent to engage in a "this-for-that" exchange; instead, this Court merely held that "the Illinois statutes both impose an express scienter requirement, requiring that the individual know about the unlawful purpose of accepting the property, personal

---

[64] Once again, even if an instructional error occurred, it would be a harmless one, where the evidence discussed above established that Madigan knew the subcontractor payments and other hires were not bona fide. *See supra* Part III.a. The Government presented more than sufficient evidence to show that the subcontractor payments were for "no-show" jobs made pursuant to an ongoing bribery agreement. Fidel Marquez also testified extensively regarding how the Madigan hiring requests departed from ComEd's usual business practices. *See e.g.,* Tr. 2517:9–12; 2546:17–20; 2555:15–20. In light of this evidence, any instructional error was harmless. *See United States v. Lupton*, 620 F.3d 790, 802 (7th Cir. 2010).

[65] This was the case in Madigan's objection to the Government's proposed jury instruction for these statutes. *See* [261] at 55–56.

[66] Madigan also points to the Government's Response to his Motion to Dismiss, [141]. This filing obviously does not qualify as "pertinent authority" for argument purposes. *Crespo,* 824 F.3d at 674.

advantage, fee, or reward." *Id.* at 16. Clearly distinct from Madigan's linguistic reformulation, the actual scienter requirement listed in the statute (and noted by this Court in its order) "satisfies any concerns that an ordinary person would be unable to understand what conduct the statute prohibits or that the statute would encourage arbitrary or prejudicial enforcement." *Id.* (citing *Bell v. Keating*, 697 F.3d 445, 461 (7th Cir. 2012); *United States v. Burke*, Case No. 19-cr-322, 2022 WL 1970189, at *44 (N.D. Ill. June 6, 2022) (noting "the Illinois state bribery statute imposes a *mens rea* requirement, which further reduces any potential for vagueness") (quotation omitted)).

Despite Madigan's complaint, this Court's conclusion remains correct—the Illinois bribery and official misconduct statutes do not require evidence of an "exchange" to prove a violation.[67] The text of the respective statutes reinforces this position. The state bribery and official misconduct statutes do not contain the term "exchange" as part of their scienter requirement (*see* 720 ILCS § 5/33-1(d); 720 ILCS § 5/33-1(e), § 5/33-3(a)(4)), and Madigan cites no Illinois or Seventh Circuit cases holding that any of those statues require proof of an "exchange."[68]

Likewise, the Illinois Pattern Instructions (IPI) do not impose an "exchange" requirement for any of these state statutes. Of course, a federal district court maintains "substantial discretion in formulating its instructions," (*Siepman*, 107 F.4th at 765 (quotation omitted)) and "pattern instructions are not necessarily authoritative." *United States v. Edwards*, 869 F.3d 490, 496 (7th Cir. 2017). But "pattern instructions reflect the collective experience of the judges and lawyers who crafted them and can serve as a helpful starting point to ensure that essential elements of crimes and defenses are not overlooked." *Id.* at 497. Certainly, this is the view of Illinois courts, as under state law, trial courts are directed to, after "giving due consideration to the facts of the case and the applicable law" and determining that "the jury should be instructed on the subject," provide any applicable Illinois Pattern Instructions "unless the court determinates it does not accurately state the law." *People v. Dorn*, 883 N.E.2d 584, 588 (Ill. App. Ct. 2008) (citing *People v. Smith*, 605 N.E.2d 105, 110 (Ill. App. Ct. 1992)). *See also Smith*, 605 N.E.2d at 110 ("Whenever Illinois Pattern Jury Instructions contain an instruction applicable in a criminal case, giving due consideration to the facts and the governing law, and the court determines that the jury should be instructed on the subject, the IPI instruction should be used, unless the court determines that it does not accurately state the law.").

---

[67] The Court, however, did conclude that the Illinois legislative misconduct statute (§ 5/33-8) does require proof of such an exchange. The instructions accordingly reflected that requirement. *See* [313] at 46–48; 87–88. This ruling renders Madigan's arguments with respect to that statute moot, and the Court accordingly does not include it in its analysis here.

[68] And in fact, as the Court explains below, *United States v. Garner*—a Seventh Circuit case binding on this Court—holds the opposite. *See* 837 F.2d 1404, 1420–21 (7th Cir. 1987).

Here, the Government proposed, and the Court provided, instructions modeled after the applicable IPIs in this case.[69] *Compare* [213] at 45–46; 87–88 *with* ILLINOIS PATTERN CRIMINAL JURY INSTRUCTIONS 21.11–21.16 (2019 ed.). The Court, after conducting an independent analysis, found IPI 21.11 comported with the requirements of Illinois law—a conclusion significantly bolstered by the Seventh Circuit's approval of jury instructions for §§ 5/33-1(d) and (e) broadly restating the very same elements. *See United States v. Garner*, 837 F.2d 1404, 1420–21 (7th Cir. 1987) (analyzing 720 ILCS 5/33-1(d) and (e) and concluding that the statutes do "not require that a defendant provide a quid pro quo" and further "clearly" envision "that a defendant can be guilty of bribery without agreeing to be influenced").[70] *See also People v. Brandstetter*, 430 N.E.2d 731, 739 (Ill. App. Ct. 1982) (concluding that the Illinois "legislature intended the word 'tender' to be used in a sense much broader than its usage in contractual law," and noting that the Illinois Supreme Court previously "described the offense of bribery as occurring when the accused 'promises or tenders to a public official' in the manner prohibited by the statute," and that "'the mere offer or promise with the requisite intent is sufficient to constitute the completed offense of bribery.'") (quoting *People v. Wallace*, 312 N.E.2d 263, 266 (Ill. 1974)).[71]

Because these statutes remain constitutional as written, the Court declined to intentionally insert a legal requirement not facially present within the statutes' plain language, especially in the absence of any good faith basis for doing so under binding authority.[72] Instead, the Court followed a plain reading of the statutes and

---

[69] The Court did, however, depart from IPI 21.11 by including the statutory language "authorized by law" in its instructions regarding § 5/33-1(d) and § 5/33-3(a)(4), although both Pattern Instructions for these statutes do not include that phrase. The Court explains the reasons for this change below. *See infra* Part IV.a.v.

[70] The Seventh Circuit, when addressing the various issues presented in *Garner*, separately noted that "the Illinois official misconduct statute," now codified at 720 ILCS § 5/33-3(a)(4), does not have the "requirement of corrupt intent or a quid pro quo" in the offense. *Garner*, 837 F.2d at 1417–18. Again, the Court points out that Madigan cites no authority overturning or otherwise contradicting *Garner*'s conclusion, which remains binding on this Court.

[71] It bears mentioning that the Illinois Appellate Court has reaffirmed this stance more recently with respect to § 5/33-1(a). *See People v. Johnson*, 780 N.E.2d 803, 806 (Ill. App. Ct. 2002) (holding that "the words of the current statute (720 ILCS 5/33–1(a) (West 2000)), particularizes the offense and does not require a 'corrupt' intent."). § 5/33-1(a) proscribes promising or tendering property or personal advantage to a public officer or employee with the intent to influence the performance of any act related to that person's role. § 5/33-1(d), on the other hand, proscribes receiving or retaining property or personal advantage that the person is not authorized to accept, knowing that it was tendered to influence the performance of any act of any public official or employee. *Compare* § 5/33-1(a) *with* § 5/33-1(d). Both sections of § 5/33-1 utilize the same *mens rea* terms and differ only in that (a) prohibits promising or tendering while (d) prohibits receiving or retaining.

[72] The Court notes that other courts in this District have reached the same conclusion regarding these statues. *See United States v. La Schiazza*, No. 22 CR 520, 2024 WL 5089118, at *16 (N.D. Ill. Dec. 12, 2024) ("The intent required under the Illinois bribery statute is less demanding than the intent

uncontroverted Seventh Circuit and state court precedent when drafting the instructions. Since these instructions contained correct statements of law, Madigan's challenge must fail.

Further, even if instructional error occurred, any error would be harmless. For the reasons the Court explained above with respect to Madigan's Rule 29 motion, the evidence presented at trial overwhelmingly established a *quid pro quo* in both the § 666 convictions and § 1343 convictions. *See supra* Part III. Because "harmless-error review looks" at "the basis on which 'the jury *actually* rested its verdict,'" and the evidence presented to the jury established multiple exchanges, a new trial remains unwarranted. *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993) (quoting *Yates v. Evatt*, 500 U.S. 391, 404 (1991)) (emphasis in original).

### v. Illinois Ethics Act Instruction

Next, Madigan claims error regarding the Court's inclusion of an instruction related to the Illinois State Officials and Employees Ethics Act and Illinois Governmental Ethics Act (collectively, the "Ethics Acts"). *See* [401] at 62. Court's Instruction 42 (*see* [313] at 47)[73] instructed the jury to consider two separate "state laws only for the limited purpose of" determining "whether certain conduct was 'authorized by law' for purposes of the Illinois bribery statute § 5/33-1(d), and the Illinois official misconduct statute § 5/33-3(a)(4)." *Id.* The phrase "authorized by law" appears in the text of both statutes. *See* 720 ILL. COMP. STAT. 5/33-1(d) ("(d) He or she receives, retains or agrees to accept any property or personal advantage which he or she is not authorized by law to accept . . . ."); 720 ILL. COMP. STAT. 5/33-3(a)(4) ("(4) Solicits or knowingly accepts for the performance of any act a fee or reward which he knows is not authorized by law.").[74]

Madigan argues that Court's Instruction 42 was "not triggered by the facts of this case" and "provided to the jury" what amounted to "essentially a legislative code of conduct" with no "criminal penalty." [401] at 63. But this argument fails for two separate reasons.

---

required under 18 U.S.C. § 666, since the Illinois bribery statute requires only the 'property or personal advantage' to be 'promised or tendered with intent to cause him or her to influence the performance'" of an official act, which "contrasts with § 666's requirement of 'a specific intent to give or receive something of value in exchange for an official act.'") (quoting 720 ILL. COMP. STAT. 5/33-1(d)).

[73] This instruction applied to the RICO charge contained in Count One. The jury did not reach a verdict with respect to Count One. Madigan only brings challenges to Counts Five, Twelve, Thirteen, and Fourteen with respect to this issue. Those counts all charged use in interstate facilities in aid of racketeering violations under 18 U.S.C. § 1952 and incorporated § 5/33-1(d) and § 5/33-8, among other statutes, as alleged "unlawful activity" in those charges.

[74] Though importantly, "knowledge by the defendant that the conduct is not authorized by law is not an element of the offense and need not be alleged." *Brandstetter*, 430 N.E.2d at 738.

First, the instruction was correct as a matter of state law. Illinois courts clearly articulate that "the Illinois statutory scheme defines with specificity 'property or personal advantage' which a legislator is 'authorized by law' to accept" in the context of state bribery statutes. *Brandstetter*, 430 N.E.2d at 735–36 (holding that "the meaning of the phrase 'which he is not authorized by law' contained in section 33-1(a)" was defined by "the Illinois statutory scheme" including "the Illinois Governmental Ethics Act"). While those statutes do not carry criminal penalties themselves, under uncontroverted Illinois precedent, they liquidate the meaning of the state bribery statutes. *See id.* Thus, no error resulted from the jury receiving correct legal definitions of a relevant statutory term in a charged offense, even though Illinois law defines that term outside the criminal code—here, the Ethics Acts.[75]

Next, contrary to Madigan's argument, the record triggered a need for the Court's legal instruction. As Madigan himself stated, "the 'authorized by law language'" in these statutes "essentially provide[s] a safe harbor for a defendant," since it permits a defendant to "argue that their conduct did not violate the statute if it was otherwise authorized by law." [401] at 62. Whether the defendants' conduct was in fact "authorized" by law became a critical issue at trial, as both Defendants Madigan and McClain consistently argued to the jury that they only engaged in permissible lobbying activities and job recommendations, not bribery schemes.

In the jury instruction conferences, the Defendants jointly requested defense theory instructions to that end, specifically requesting instructions on the definition of "lobbying" and the definition of "influencing" in the lobbying context under Illinois law. *See* [317] at 3–4. This Court granted those requests in relevant part, providing modified versions of the proposed defense instructions,[76] containing correct statements of the applicable law triggered by the evidence. *See United States v.*

---

[75] Even if including this legally correct definition was error, which it was not, Madigan fails to show how the error prejudiced him in any way. Madigan asserts, without explaining, that this instruction confused the jury and therefore "it is possible that the jury convicted based on a violation of a state ethics law that carries no criminal penalty." [401] at 63. But reading the entire set of jury instructions easily disproves Madigan's speculation. The Court's instructions for Counts Five, Twelve, Thirteen, and Fourteen told the jury to find a defendant guilty *only* if the Government proved all the elements of § 1952 beyond a reasonable doubt. [313] at 85. Here, as with Madigan's claimed error with respect to bona fide compensation and § 1343, any improper inclusion of a "safe harbor" (which Madigan admits the "not authorized by law" provision creates, *see* [401] at 62) would only advantage the defense. The term "not authorized by law" limited the jury's consideration; its presence only *narrowed* the jury's scope of consideration, constraining the jury's evaluation (i.e., if certain payments *were* authorized by law, then the jury could not attribute those to a bribery agreement). Likewise, the jury also was warned, per the instructions, to separately determine whether a defendant maintained the required intent in receiving the property—an entirely separate but critical element in finding a violation of § 5/33-1(d). Accordingly, no plausible reading of the jury instructions would permit a conviction based merely on a finding that a defendant's receipt of property or personal advantage, without more, violated the Ethics Acts. Therefore, Madigan cannot show that Court's Instruction 42 prejudiced him in any way, even if the Court erred.

[76] *Compare* [317] at 3–4 *with* [313] at 30–31.

---

*Fadden*, 874 F.3d 979, 982 (7th Cir. 2017). But the defense theory instructions created tension with the state bribery statute instructions, due to both instructions' use of the term "influence."

Illinois law defines "lobbying" as "means to communicate" "with an official" "for the ultimate purpose of influencing any executive, legislative, or administrative action at" any "government level." 25 ILL. COMP. STAT. 170/2(e). "Influencing" is further defined in the same chapter as "any communication action, reportable expenditure, or other means used to promote, support, affect, modify, oppose, or delay any executive, legislative, or administrative action or to promote goodwill with public officials." 25 ILL. COMP. STAT. 170/2(f). But as the Court already explained, the Illinois bribery, official misconduct, and legislative misconduct statutes only require the Government to prove that a defendant accepts property or personal advantage knowing it was given with the "intent to influence" the performance of an official action. *See* [313] at 45. Thus, without further clarification, the instructions would inform the jury that lobbying is "influencing" an "action" at any "governmental level" and maintaining an "intent to influence" an official action violates the Illinois bribery statutes, implying that lobbying itself violates the state bribery statutes. Obviously, this conflicting use of the term "influence" required clarification to avoid jury confusion.

As was discussed at numerous points throughout the trial process, "there is no question that lobbying, generally, is" not illegal and instead remains "protected by the First Amendment." *United States v. Nat'l Training & Info. Ctr., Inc.*, 532 F. Supp. 2d 946, 953 (N.D. Ill. 2007) (citing C*alifornia Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510–11 (1972); *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964); *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 137–38 (1961)). In fact, exactly what distinguishes the legal influences of protected lobbying activity from the illegal, criminal influences of bribery agreements became a central issue in both the evidence and arguments at trial. But the IPIs applicable to the state bribery statutes (which do not include "not authorized by law," *see supra* note 69) provided no distinction between the scienter requirement of intention to unlawfully influence the performance of any official act (*see* ILLINOIS PATTERN CRIMINAL JURY INSTRUCTIONS 21.11–21.16 (2019 ed.)) and the permissible lobbying activity of lawfully "influencing" any "action" at any "government" level. *See* [313] at 31 (Court's Instruction 29).

This Court remedied the issue with a legally correct set of instructions. *See Brandstetter*, 430 N.E.2d at 736 ("statutory scheme" sets out the specific circumstances in which legislators may or may not accept property, including compensation); *see* [313] at 48–49. While the parties did not argue any alleged violations of the Ethics Acts, the parties *did* dispute whether the evidence at trial demonstrated permissible lobbying activity or an ongoing, illegal bribery scheme. *See, e.g.,* GX 1511; GX 1512; GX 1514. Because of these disputes, the record obligated

the Court to provide the jury with a tailored set of legal instructions detailing Illinois' statutory scheme regulating when influence on public employees and officials remains lawful and permissible versus unlawful and criminal. Further, since the Court granted the joint defense request for a lobbying defense theory instruction, it became especially necessary to ensure the instructions reflected the same nuance. The Court therefore included instructions which defined the statutory term "authorized by law," differentiating between lawful and unlawful influence, to resolve that internal tension and foreclose the possibility the jury would convict a defendant based on lawful conduct.

To summarize, "not authorized by law" presented an important and necessary concept in this case to ensure the jury did not find any defendant guilty based on permissible lobbying and commercial activities. Because Illinois courts have held that the broader Illinois statutory scheme defines that term in the bribery context, the Court accordingly provided those definitions to the jury. Whether any party made explicit arguments about violation of the Ethics Acts did not precipitate the Court's decision. Instead, the Court included the instruction to provide the jury with correct statements of law defining the phrase as used in the state bribery statutes. This decision was not erroneous, nor did it prejudice any defendant, and therefore the Court denies Madigan's motion with respect to this claim.

### vi. Defense Instructions

Madigan claims the Court also erred by declining to give his proposed "Good Faith" instructions for the § 666 and § 1343 counts. But Seventh Circuit precedent forecloses Madigan's claims here (and, for that matter, the arguments raised in the Defendants' proposed jury instructions, *see* [261]). As the Seventh Circuit has already explained, "this circuit's pattern jury instructions call for a good-faith instruction only when the statute contains a term such as 'willful' that (as understood for that particular statute) makes knowledge of the law essential." *United States v. Blagojevich*, 794 F.3d 729, 738 (7th Cir. 2015).[77]

As explain above, the term "corruptly" as used in 18 U.S.C. § 666 does not equate to "willfully." *See supra* Part IV.a.i.3. Therefore, the Court did not err in declining to provide a good faith instruction for the § 666 charges in this case, since

---

[77] Significantly, the Seventh Circuit in *Blagojevich* held that, to the extent the defendant's arguments relied on *Cheek v. United States*, 498 U.S. 192 (1991), the case did not apply because "the Justices read the word 'willfully' in a particular tax law to require proof that the accused knew the law, which the Justices saw as technical and beyond the ken of many taxpayers." 794 F.3d at 738. Because "the word 'willfully' does not appear in any of the statutes" charged in the case, the court held that *Cheek* provided no guidance. *Id.* at 738–39. In the proposed jury instructions in this case, the defense also cited *Cheek* as support for their proposed "Good Faith" instructions, and this Court, applying *Blagojevich*, properly rejected that argument.

the Government did not need to prove Madigan acted "willfully" for those counts.[78] Further, the fact that "a given defendant wants to apply the phrase 'good faith' to the lack of essential knowledge or intent does not imply the need for a separate instruction; a jury's task is hard enough as it is without using multiple phrases to cover the same subject." *Blagojevich*, 794 F.3d at 738. Because the Court's "instructions defined the statutes' *mens rea* elements correctly," and Madigan does not argue otherwise with respect to § 1343, "no more was required." *Id. See also United States v. Walton,* 874 F.3d 990, 1002 (7th Cir. 2017) (finding that where the defendants "were convicted of crimes that required the jury to find bad faith, and specifically the intent to commit fraud, they were not entitled to an additional instruction for good faith"). Accordingly, no error exists regarding the absence of good faith instructions for the § 666 and § 1343 charges. Thus, the Court denies Madigan's motion with respect to this issue.

### vii. *Pinkerton* Instruction

Madigan's final claim of instructional error contends that the Court erred by providing a *Pinkerton* instruction in this case. *See* [313] at 83 (Court's Instruction 66).[79] Madigan argues that because the "case charged multiple conspiracy objects

---

[78] The Court's instructions, however, did provide a good faith instruction modeled after Pattern Instruction 6.10 for the Count Two conspiracy, because two of the four objects of that charged conspiracy did, in fact, utilize the term "willful." *See* [313] at 70 (Court's Instruction 57). Madigan does not raise any arguments regarding this instruction in his motion.

[79] The instruction provided as follows:

For the purposes of Counts Three, Four, Five, Six, and Seven, if the government proves Madigan guilty beyond a reasonable doubt of the conspiracy charged in Count Two as defined in these instructions, then Madigan is also responsible for the offenses committed by other members of the conspiracy charged in Count Two if the government proves each of the following elements beyond a reasonable doubt:

1.    Madigan is guilty of the charge of conspiracy as charged in Count Two;
2.    Other members of the same conspiracy committed the crime charged in the Count you are considering during the time that Madigan was also a member of the conspiracy;
3.    The other co-conspirator or co-conspirators committed the crime as charged in the Count you are considering to advance the goals of the conspiracy charged in Count Two; and
4.    It was reasonably foreseeable to Madigan that other co-conspirators would commit the crime charged in the Count you are considering to advance the goals of the conspiracy. The government is not required to prove that the defendant actually knew about the crime charged in the Count you are considering or that Madigan actually realized that this type of crime would be committed as part of the conspiracy.

SA78

and substantive offenses . . . a *Pinkerton* instruction risked injecting confusion and complexity into the jury deliberations." [404] at 56. He further contends that the instruction was "gratuitous" since a defendant who could have been convicted on a *Pinkerton* theory could have also been convicted on an aiding and abetting theory.

While the Seventh Circuit has "noted the need for caution in using *Pinkerton* instructions in RICO conspiracy charges," (*United States v. Benabe*, 654 F.3d 753, 777 (7th Cir. 2011) (citing *United States v. Neapolitan*, 791 F.2d 489, 505 n.7 (7th Cir. 1986), *modified on other grounds by Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961 (7th Cir. 2000))), it has also stated providing a *Pinkerton* charge in a RICO conspiracy case is not "wrong or improper," *United States v. Campione*, 942 F.2d 429, 437 (7th Cir. 1991) (quoting *United States v. Neapolitan*, 791 F.2d 489, 505 n.7 (7th Cir. 1986)). *See also United States v. Caliendo*, 910 F.2d 429, 439 (7th Cir. 1990) (finding that use of a proper *Pinkerton* instruction did not result in an unwarranted extension of criminal liability on the substantive Travel Act counts under which the defendant was charged in a RICO conspiracy case).

Madigan only cites two Seventh Circuit cases[80] to support his arguments, *United States v. Manzella*, 791 F.2d 1263 (7th Cir. 1986) and *United States v. McClain*, 934 F.2d 822 (7th Cir. 1991). Madigan wrongly asserts these cases stand for the proposition that *Pinkerton* instructions are "generally discouraged" in the Seventh Circuit. [401] at 63. Not so. Instead, both opinions expressed concern over compressed *Pinkerton* instructions that failed to adequately present the doctrine to the jury. *See Manzella*, 791 F.2d at 1268–69; *McClain*, 934 F.2d at 818–19. Neither case casts doubt on the *Pinkerton* doctrine itself but instead rejected the respective district courts' poor formulation of its application. *See Manzella*, 791 F.2d at 1267 ("Whether it really adds anything besides complication, given the possibility of basing liability on aiding and abetting—are not questions open to us to reexamine. The only question for us is the adequacy of the charge."); *McClain*, 934 F.2d at 829 ("It is

---

If you find from your consideration of all the evidence that the government has proved each of these elements beyond a reasonable doubt as to the charge you are considering, then you should find the defendant guilty of that charge.

If, on the other hand, you find from your consideration of all the evidence that the government has failed to prove any one of these elements beyond a reasonable doubt as to the charge you are considering, then you should find the defendant not guilty as to that charge.

[313] at 82 (Court's Instruction 66).

[80] Madigan also cites an additional Second Circuit case, *United States v. Salameh*, 152 F.3d 88, 149 (2d Cir. 1998), to support his theory. This out-of-circuit authority does not in any way undermine this Court's use of a proper formulated *Pinkerton* instruction, nor does it affect the binding Seventh Circuit precedent the Court discusses here.

evident that the requirements for a *Pinkerton* instruction vary depending on its application.").

Notably, Madigan raises no arguments contending that the *Pinkerton* instruction here was legally deficient or otherwise misstated the law on conspiratorial liability. Instead, he only argues that it was unnecessary given the context of the charges and the possibility of other theories of liability. But courts often provide instructions on multiple theories of liability, even when they may overlap. *See e.g., United States v. Delatorre*, 581 F. Supp. 2d 968, 991–92 (N.D. Ill. 2008) (In challenging their RICO conspiracy convictions, "defendants next argue that the Court erred in giving the *Pinkerton* instruction . . . . Under the facts of this case, the defendants could be held responsible for first-degree murder under three possible theories: (1) as a direct participant; (2) as an aider, abettor, counselor, or commander; or (3) under *Pinkerton*. The instruction given was an accurate statement of the law."); *McClain*, 2024 WL 50868, at *4 ("A defendant in a case charging a conspiracy may be liable for each of the substantive counts charged in an indictment under any of three separate theories: (1) Actual commission of the crime; (2) Participation in the crime as an aider or abettor; and (3) Liability under a *Pinkerton* theory.") (citing *United States v. Ailsworth*, 867 F. Supp. 980, 987 (D. Kan. 1994)).

Here, Count Two of the superseding indictment charged Madigan with conspiracy under 18 U.S.C. § 371, thus rendering a *Pinkerton* instruction appropriate based on the record. *See United States v. Wantuch*, 525 F.3d 505, 519–520 (7th Cir. 2008) (upholding the district court's decision to give a *Pinkerton* instruction in 18 U.S.C. § 371 case). The Court gave the jury a *Pinkerton* instruction modeled from Pattern Instruction 5.11. *See* [313] at 83 (Court's Instruction 66); *supra* note 79. This instruction correctly informed the jury that conspiratorial liability only applied to some and not all of the charged Counts (specifically, Counts Three through Seven) and appropriately instructed the jury that the Government bears the burden of proving all of the conspiratorial liability elements beyond a reasonable doubt. *See* [313] at 83. *See also United States v. Stott*, 245 F.3d 890, 908 (7th Cir. 2001), *United States v. Sandoval-Curiel*, 50 F.3d 1389, 1394–95 (7th Cir. 1995)).

The instructions at issue in *Manzella* and *McClain* present a stark contrast to the detailed and particularized version the Court provided to the jury in this case. *See supra* note 79 (Court's Instruction 66). Further, neither of those cases apply here since their central holdings concerned legal challenges to the language of the *Pinkerton* instructions given, and, again, Madigan raises no challenge to the Court's proper formulation of the *Pinkerton* instruction. Madigan's only objection pertains to the need for instruction, but he presents no legal authority requiring district courts to forego a proper *Pinkerton* instruction simply because other theories of liability may also exist.

Therefore, Madigan shows no basis for concluding that the Court erred in providing a *Pinkerton* instruction here. The Court's formulation properly reflected the necessary elements of conspiratorial liability, and Madigan cites no legal authority demonstrating that the use of the instruction was improper in the conspiracy charges in this case. Certainly, the use of legally correct and contextually appropriate instructions cannot prejudice a defendant, and therefore the Court denies the motion for a new trial on this issue.

### b. Evidentiary Rulings

A trial court's "evidentiary rulings are afforded special deference and will be reversed 'only where no reasonable person could take the view adopted by the trial court.'" *United States v. Garcia–Avila*, 737 F.3d 484, 490 (7th Cir. 2013) (quoting *United States v. Reese*, 666 F.3d 1007, 1015 (7th Cir. 2012)). But even if "an abuse of discretion occurs, however, reversal only follows if admission of the evidence affected the defendant's substantial rights." *United States v. Richards*, 719 F.3d 746, 758 (7th Cir. 2013); *United States v. Miller*, 673 F.3d 688, 700 (7th Cir. 2012).

### i. Government Exhibit 156

Madigan first claims that the Court erred in admitting Government Exhibit 156. The exhibit consists of an August 4, 2018 recorded call between Madigan and McClain where they discuss the execution of certain labor agreements between ComEd and two local unions. During the conversation, McClain informed Madigan that a ComEd labor consultant, Dennis Gannon, would obtain signatures on the agreements for the parties. Madigan then asked McClain how Gannon was involved with the issue:

Madigan:    Mhm. How did Gannon get involved?

McClain:    (Coughs.) Um, wells we want all, we want all three to be signed and so Dennis hasn't done anything for a while so I just, just as a F-Fidel, when we have Dennis go around and give it to everybody to sign so it's just a, it, it, he's just, um, he's just take it around, he never got really involved. We're just asking him to do the, uh, the traveling.

Madigan:    B-but Mike, he's involved with ComEd?

McClain:    Yeah, remember we got him that contract, um, maybe five years ago now, whenever it was? For a buck fifty a year.

Madigan:    Mhm (laughs).

McClain:      Well if, if you remember uh-

Madigan:      Some of those guys have made out like bandits Mike.

McClain:      Oh my god, (coughs) for very little work too.

Madigan:      Yeah.

McClain:      Very little work.

*See* GX 156.

Before trial, Madigan filed a motion in *limine* seeking to exclude this exhibit, arguing that it constituted impermissible propensity evidence under Rule 404(b)(2). *See* [174]. In pre-trial briefing and at the Final Pretrial Conference, the parties disputed the underlying nature of Madigan's involvement with the Gannon contract. During questioning from the Court, the Government represented that the call demonstrated that Madigan and McClain believed "they were responsible for hiring" Gannon, and that therefore the exhibit confirmed their understanding "that there are folks that are associated with them that are hired by ComEd that don't do any work or very little work." Tr. 183:9–18. Counsel for Madigan argued that Madigan was not involved in Gannon's contract and the call only showed the Defendants "making jokes" about people "they are not involved in" hiring, and thus the exhibit had little to no probative value. Madigan further claimed that admitting the exhibit would cause prejudicial juror confusion under Rule 403, because the recording did not involve any charged conduct in the case and would necessitate a "mini-trial" over the exact circumstances of Gannon's employment with ComEd. *See* [174].

The Court agreed, in part, and held that "based on the pretrial proffer" the balance under Rule 403 favored excluding the exhibit. Tr. 188:2–3. But the Court added on the record that this analysis remained subject to change, in the course of the "fluidity of trial," since the exhibit could become relevant in or after the cross examination of a witness or "the defendants if they testify." Tr. 188:5–8.

Despite the clear provisional nature of this Court's ruling, Madigan weighed the advantages and disadvantages of taking the witness stand (Tr. 8576:11–8577:20), and after consultation with his attorneys, Madigan did, in fact, choose to testify at trial. Not surprisingly, the substance of his testimony changed the Rule 403 balance of GX 156's admissibility, just as the Court indicated could happen. During his direct examination, Madigan repeatedly testified that he valued hard work and maintained a strong work ethic throughout his life. *See e.g.*, Tr. 8587:20–23 ("Q. Were there any traits that you learned early in your career as a student that you carried through the rest of your life? A. Hardworking and discipline."). Madigan testified that he was "very angry" upon learning that no-show subcontractor Frank Olivo did "little to no

work" while working on contract with Jay Doherty "on behalf of ComEd." Tr. 8676:9–13. Madigan added that he was angry for the following reasons:

> A.    Because I knew Frank for years. And Frank knew that I worked all the time. And I expected people associated with me to work all of the time, and he knew that. And given that knowledge, he should have worked. He should have done his job.

Tr. 8676:16–20.

When asked similar questions about Ray Nice, another no-show subcontractor, Madigan again testified that his "reaction again is anger" after hearing that Nice did little to no work. Tr. 8678:20. Madigan repeated that Nice "knew my work ethic and what I expected from people associated with me," and therefore Nice "should have worked just like everybody else is supposed to work." Tr. 8678:21–23.

Madigan further claimed that a conversation where no-show subcontractor Ed Moody claimed he told Madigan he was not doing any work for ComEd did not actually occur. Tr. 8681:19–25.[81]

During questioning by McClain's counsel, Madigan also testified that from 2011–2019, he never had anyone approach him and ask for a "no-show" job. Tr. 8881:22–8882:1. He added that, in the same time period, McClain never told him that he was attempting to get anyone Madigan recommended a "no-show job," and that McClain never told Madigan that he suspected any of Madigan's recommendations were not working. Tr. 8882:2–9.

Before beginning cross-examination of Madigan, the Government renewed its arguments in favor of admitting GX 156 outside the presence of the jury, in compliance with the Court's prior order denying the Government's pretrial motion in limine. *See* Tr. 188:1–12. Specifically, the Government sought to admit the recording to rebut Madigan's purported surprise and the "notion" that he was "offended by the idea that folks that he believes he's recommended or gotten jobs for would not work hard," and to show, among other things, that a recorded conversation proves Madigan was not surprised or offended by such notions and instead he laughed when "advised by Mr. McClain of a situation where" people "they had recommended for jobs were not really doing any work." Tr. 8895:11–25.

Whether "a party opens the door to evidence" that might be "otherwise inadmissible" depends "on the specific situation in which it is used and thus calls for an exercise of judicial discretion." *United States v. Villegas*, 655 F.3d 662, 672 (7th Cir. 2011) (citation omitted). Here, Madigan's testimony significantly increased the probative value of GX 156. The Government was "entitled to put forth evidence to

---

[81] Moody testified about this conversation on November 20, 2024. *See* Tr. 4424:12–4426:17.

rebut the defense," (*United States v. Gulley*, 722 F.3d 901, 907 (7th Cir. 2013)) and offered "a legitimate, non-propensity use for this evidence" in its renewed arguments to admit the exhibit. *United States v. Mireles*, 116 F.4th 713, 724 (7th Cir. 2024). This non-propensity purpose appropriately rebutted Madigan's testimony, as Madigan's laughter and comments about some individuals "making out like bandits" on the recording directly contradicted his statements asserting he felt outraged at the notion of individuals failing to work. *See United States v. Hall*, 165 F.3d 1095, 1117 (7th Cir. 1999) ("It is well established that the admission of rebuttal evidence lies within the sound discretion of the trial court and appellate courts will not interfere with the trial court's ruling unless there is a clear abuse of discretion.") (citation omitted); *United States v. Williams*, 945 F.2d 192, 915 (7th Cir. 1991) (Appellate courts "give particular deference to the district court that had the opportunity to hear the testimony and observe the demeanor of the witnesses.") (quotation omitted).

Madigan repeatedly argues that the discussion concerning Gannon in GX 156 "had nothing to do with Madigan" and the recording "did not relate to the charges," thus its admission was erroneous. [401] at 69. But as the Court stated on the record at trial, "the admissibility of the exhibit" shifted because of Madigan's testimony and its admissibility "did not hinge upon whether or not the Gannon recommendation" was "technically a Madigan recommendation" or not. Tr. 9038:2–4.[82] The evidence was not offered to assert that Gannon was a Madigan recommendation nor any other propensity inference.

Rather, the Government offered this evidence to rebut the portrait Madigan tried to present on the witness stand that the very "notion" of a no-show job would trigger his surprise, outrage, and anger, due to his core beliefs about a strong work ethic and his disdain for people would fail to work hard. In the exhibit, however, McClain is recorded saying "we got" a ComEd contractor "that contract" about "five years ago now" for "a buck fifty a year" and then, Madigan, who is not surprised or angered, laughs on tape telling McClain "some of those guys have made out like bandits Mike." *See* GX 156. Based on the entire record, including Madigan's clear attempts on the witness stand to sanitize the recordings (and thus distance himself from his co-conspirators and the corrupt sentiments littered therein), the law entitled the Government to present a proper rebuttal. Thus, this Court properly admitted GX 156 and its admission resulted in no unfair prejudice to the defense.[83] The law is

---

[82] Madigan admits that the "Court stated its ruling 'did not hinge upon whether or not the Gannon recommendation [was] technically a Madigan recommendation.'" [401] at 67 (quoting Tr. 9038:2–4).

[83] As the Government points out in its Response, the prosecutors did not argue the exhibit for any improper purpose, and they did not even ask Madigan about Gannon on cross-examination. *See* Tr. 9037:23–9038:14. Likewise, the defense took full advantage of it redirect examination to explain its own characterization of the exhibit and put it in context. *See* Tr. 9039:4–6 (The Court: ". . . I expect there to be clarifications that Gannon was not among those that the defendant himself recommended."); Tr. 9308:12–24, 9313:9–22 (Madigan's counsel asked him questions about Gannon and the exhibit on redirect and Madigan provided testimony explaining his understanding of the call

clear—where the jury hears "contrary interpretations suggested by the parties," it is "for the jury to decide what weight to give the evidence." *United States v. Hubbard*, 61 F.3d 1261, 1274 (7th Cir. 1995). The fact that evidence may be "subject to different interpretations" does not affect its admissibility if the evidence is "sufficiently probative . . . to be admissible under Rules 401, 402, and 403." *Id.* Here, Madigan's self-serving testimony substantially increased the probative value of the exhibit, outweighing any risk of unfair prejudice. The jury heard the parties' opposing arguments concerning GX 156 and then gave whatever weight it felt appropriate to the evidence.

Because the Court properly admitted GX 156, no error exists.[84]

### ii. 2009 University of Illinois Interview

Madigan also claims error with respect to the Court's trial ruling reconsidering the motion in *limine* concerning GX 1. The exhibit consists of a 2009 University of Illinois interview Madigan gave as part of an oral history of Mayor Richard J. Daley. Madigan filed a motion in *limine* to exclude this exhibit, arguing that the interview had little to no probative value given that Madigan described his political work decades prior to the 2011–2019 time period. *See* [174] at 15–16. The Court agreed in part, and granted Madigan's motion, finding that it was "unclear what the probative value is given the difference in time frame" between the events Madigan described in the interview and the charged conduct in this case. Tr. 213:2–3. Notably, in a

---

in detail). Madigan's counsel also read stipulations stating that both Tom O'Neill and Fidel Marquez did not recall Gannon being a Madigan recommendation. *See* Stip. 108; Stip. 109. *See also* Tr. 9309:17–9313:2.

[84] Madigan also argues that the timing of Court's reconsideration of its prior motion in *limine* ruling prejudiced him because he elected to take the stand after the Court excluded the evidence but before the Court granted the motion for reconsideration. Madigan claims the Court's reversal after his direct testimony "denied" him "the opportunity to front the evidence" like the Government did with its witnesses. [401] at 67. But this argument grossly misstates the record. First, the Court explicitly stated in its original oral pretrial ruling that witness testimony, or the testimony of a defendant, may change the Rule 403 balance. Tr. 188:5–8. So, Madigan, like every testifying defendant before him, assumed the risks of doing so. Second, after the Court rescinded its prior order regarding Madigan Motion in Limine 1, the Court also asked counsel for Madigan whether they wanted the Court to permit the Government to use the exhibit on cross examinations so they could "ask questions on redirect," or whether they preferred for the exhibit to be admitted as evidence in the Government's rebuttal case. Tr. 8900:6–16. *See also* Tr. 8900:8–11 ("I'm not going to force the defendants to have government start introducing evidence in their case, but they might reconsider that in light of the Court's 403 ruling on reconsidering Motion in Limine Number 1."). Counsel for Madigan then indicated they would confer with the Government on the issue. *See* Tr. 8902:3–8. Ultimately the Government introduced the exhibit on cross-examination, but this Court's reconsidered ruling on Motion in Limine 1 never denied Madigan the opportunity to "front" the exhibit. Madigan could have deferred admission of the exhibit until the Government's rebuttal case and "fronted" the exhibit during redirect, and the Court explicitly gave them the opportunity to make that choice. Madigan's decision not to do so remained entirely within his own discretion and free from any purported interference by the Court—accordingly, no error resulted from Madigan's own strategic choices.

separate Pretrial Order, the Court also excluded numerous areas of the Government's proffered expert testimony relating to patronage  *See* [200] at 10 ("The Court finds that any testimony Professor Simpson may offer regarding his generalized opinions on the subjective, internal motivations of precinct captains at large to engage in their work must be excluded under Rules 702 and 403.").

But the Court added on the record that this evidence was not excluded "indefinitely," noting that "something in the case" could, "either in whole or in part" change the Court's Rule 403 analysis.  Tr. 213:7–10.  Once again, that "something" came in the form of Madigan's direct testimony.

Under questioning by his counsel, Madigan began his testimony as follows:

Q.    Mike, I want to start with some important questions.  Throughout your career in politics, did people ask you for help?

A.    Yes.

Q.    What types of people asked you for help?

A.    All types of people.

Q.    Did those requests for help include help in finding a job?

A.    Yes.

Q.    What was your response when people sought that kind of help?

A.    When people ask me for help, if possible, I try to help them.

Tr. 8584:14–25.

Madigan continued to testify that he always tried to provide help when asked throughout his career.  Madigan's counsel asked him whether "from 1996 through when you retired, did the members of your caucus often come to you and ask for help?"  Tr. 8630:15–16.  Madigan answered, "Yes they would," and proceeded to provide a list of examples of the types of help he would provide, including jobs for the public officials themselves, jobs for a relative, or assistance with interacting with a state agency or passing a bill.  Tr. 8629:20–8630:10.  Madigan added that "my general approach would be if I could be helpful, I wanted to be helpful."  Tr. 8630:13–14.

Madigan also testified that, during his career, it was a common occurrence for public officials and other individuals to come to him asking for assistance with jobs.

SA86

Tr. 8688:19–8689:6.  Madigan's counsel then expanded the scope of this line of inquiry to the last 50-years:

> Q.    Over your 50-year career, about how often would someone come to you and ask you for assistance in locating a job?
>
> A.    I would say once a week.

Tr. 8689:7–9.

After Madigan answered, the Government objected on Rule 404(b) grounds. During arguments heard at sidebar, the Court noted that counsel's broad line of questioning "asked a series of questions" about seeking "assistance with jobs," and Madigan's "common practice with respect to officials and jobs over the last 50 years" to put into "context" what Madigan "did or did not do," and that this questioning, of course, could "open doors to" other previously excluded evidence.  Tr. 8690:16–8691:2.[85]

Before beginning its cross-examination, the Government asked the Court to reconsider its prior ruling granting Madigan's motion in *limine* in light of that line of questioning.  The Government argued it should be permitted to introduce certain portions of GX 1 to show that "there have been other interests Mr. Madigan has pursued in making these job recommendations, including rewarding his political workers," besides the altruistic motive, of just wanting to help others, that he offered up on direct.  Tr. 8978:2–4.  Specifically, the Government sought to introduce five brief clips from the interview, each containing excerpts where Madigan described the operations of a ward organization and the respective roles of precinct captains and ward committeemen.  Clip 2 in particular showed Madigan explaining the role of the patronage hiring system in the ward's political operations, and his own efforts to get people jobs, not based on altruism, but rather based on personal political gain.  *See* GX 1, Clip 2 ("That's how I would structure it for my precinct captains.  So, I'm sitting here and I'm trying to take somebody who never thought that they'd be a Democratic precinct captain and make them into a salesman.  These, these are people that never did sales work in their lives, but they wandered into the office of the ward committeeman, who wanted a job in the patronage system.  I would tell them, 'Yeah, we can put you in a job, but you're going to work for the Democratic party.'").

After re-reviewing the excerpts, the Court found the clips admissible in light of the trial record.  Each brief clip provided important context regarding Madigan's role in the ward organization over the span of his decades-long career, and the role of the ward organization in political activities and its relationship to the patronage hiring system.  The portions of the interview included in the exhibit only concerned

---

[85] After hearing additional argument from the parties at sidebar, the Court overruled the Government's Rule 404(b) objection.  Tr. 8694:6–11.

Madigan's role as a ward committeeman and the purpose and function of the ward organization and precinct captains in doing campaign work, with Madigan's own words explaining why "everybody wanted to be ward committeeman." GX 1, Clip 5. Because the clips were narrowly selected to rebut Madigan's own words on direct examination, the Court found the evidence did not pose any risk of unfair prejudice.

In his brief, Madigan argues that the interview "had no relevance to the charges in the case," but this argument ignores the fact that it was his own testimony that opened the door to Madigan's past hiring motives and thus increased the interview's probative value. On the witness stand, Madigan testified extensively about his general employment assistance practices over his entire 50-year career in politics. The Government then had the right to rebut that testimony and demonstrate that Madigan helped others find jobs for reasons other than the purely charitable motives he tried to convince the jury of during his direct testimony. Hearing a redacted clip from GX 1 about Madigan's own hiring practice during the patronage system, in Madigan's own words, did not increase any risk of unfair prejudice.[86]

Thus, the Court properly reconsidered its prior ruling regarding Madigan's motion in *limine* based on the events unfolding at trial, and did not err in permitting the Government to present a shortened and narrowly tailored version of GX 1. Madigan's motion for new trial is therefore denied.

### iii. Evidence Relating to Helping Representative Jaime Andrade's Wife Find a Job

Madigan next argues the Court erroneously permitted the Government to present evidence related to Madigan's efforts helping find Illinois Representative Jaime Andrade's wife a job. In a motion in *limine* brought before trial, the Government sought to admit a recorded call between the Defendants, later admitted as GX 135, and a call between Rep. Andrade and McClain, later admitted as GX 172.[87] *See* [104] at 13. The Government argued that GX 135 showed the Defendants engaging in activities supporting the existence of the charged association-in-fact enterprise set forth in Count One of the indictment. In the call, Madigan told McClain that Rep. Andrade "came to me and same story, he needs money. And he had the thought that maybe I could help his wife on something." GX 135. Madigan continues that "one thought I had was with um Jay Doherty . . . . And, um, not necessarily with ComEd, but I had the thought that I could actually put Jay Doherty on a retainer."

---

[86] This is especially true where the trial record contained evidence elsewhere regarding the role of the patronage system and Madigan's ward operations from witnesses called by both sides, such as the testimony of Government witnesses Ed Moody and Joe Lullo, and defense witness Steven Hensley (all of whom did volunteer political work for the 13th Ward). Certainly, such testimony renders any purported error (though there is none) harmless as to GX 1, since the jury heard similar evidence regarding Madigan's prior practices through other witnesses at trial.

[87] The Government referred to Rep. Andrade as "Public Official E" in its motion. *See* [104] at 13.

SA88

*Id.* Madigan adds that "we'd" instruct Andrade "to prepare some monthly reports on what she's doing," to which McClain responds "Right, right." *Id.* Madigan then said, "So he's got it on file." *Id.* Madigan instructed McClain to "give it some thought" and McClain asked for permission to call Andrade. *Id.* GX 172 contains a call between Andrade and McClain, where Andrade thanks McClain for helping his wife obtain a job at the Secretary of State's Office.

In its motion and at the Final Pretrial Conference, the Government argued that this evidence demonstrated the Defendants working together to devise a means of coordinating and concealing payments [via the coconspirator Jay Doherty] to the spouse of one of Madigan's political allies—a stated purpose of the enterprise charged in Count One. Tr. 70:6–19; [104] at 14–17. Seventh Circuit precedent allows the Government to "use uncharged criminal acts in a RICO prosecution to prove the nature of an enterprise and the defendant's participation in it." *United States v. Salerno*, 108 F.3d 730, 739 (7th Cir. 1997) (citation omitted). Here, the evidence related to Rep. Andrade's wife showed the Defendants working together in a manner fully consistent with their respective charged roles within the enterprise, in furtherance of the enterprise's stated purposes and its manner and means. *See* [37] ¶¶ 3, 7, 13. Madigan's suggestion to pay Rep. Andrade's wife through Jay Doherty's firm further enhanced the probative value of this evidence, as this was the same covert method employed to funnel payments to the ComEd subcontractors. Because this evidence was highly probative of the existence of the enterprise charged in Count One and did not invite any risk of unfair prejudice, the Court properly granted the Government's motion. Tr. 82:6–15.

Madigan contends that this evidence "constituted improper propensity evidence" under Rule 404(b). [401] at 70. Not so. For Count One, "the government was required to prove, beyond a reasonable doubt, the existence of an enterprise." *Salerno,* 108 F.3d at 738. Thus, "because enterprise was an essential element of the crimes charged, the proffered evidence cannot properly be characterized as 'other crimes' evidence, and thus, Federal Rule of Evidence 404(b) does not apply." *Id.* Even if Rule 404(b) applied, the evidence would remain admissible because it demonstrated the Defendants' intent, motive, and plan to conceal payments through intermediaries such as Doherty. The Seventh Circuit instructs that district courts "should not just ask *whether* the proposed other-act evidence is relevant to a non-propensity purpose but *how* exactly the evidence is relevant to that purpose—or more specifically, how the evidence is relevant without relying on a propensity inference." *United States v. Gomez*, 763 F.3d 845, 856 (7th Cir. 2014) (emphases in original). Here, this evidence was relevant and admissible for a variety of non-propensity purposes, including showing the intent and practice of both Defendants regarding the use Doherty's firm as a conduit to conceal payments to Madigan's political associates, satisfying Rule 404(b).

Likewise, no improper propensity arguments or inferences were permitted at trial. Where a defendant fails to show any prejudice, let alone prejudice that "affected the defendant's substantial rights," a new trial remains inappropriate. *United States v. Richards*, 719 F.3d 746, 758 (7th Cir. 2013).

Madigan's failure to meet this burden must result in the denial of his motion with respect to this issue.

### iv.  Evidence Relating to Misconduct and Sexual Harassment

Madigan also argues that the Court erred in permitting evidence related to allegations of sexual harassment against certain Madigan associates. This evidence concerned the following individuals: (1) Kevin Quinn, whom McClain assisted in obtaining work after he lost his job at the 13th Ward Office; (2) Tim Mapes, Madigan's former chief of staff at the state legislature; and (3) Lou Lang, a former state representative.

The Court first addresses the evidence concerning Kevin Quinn. Before trial, the Court granted in part, and denied in part, the Government's motion to admit evidence related to McClain's efforts to assist Kevin Quinn after his termination for sexual misconduct. While the Court found the evidence probative of important issues at trial (i.e., the existence and nature of the enterprise charged in Count One), the risk of unfair prejudice under Rule 403 required exclusion of certain details, including exclusion of the *type* of alleged misconduct. Tr. 90:6–15. In his brief, Madigan claims that even though the Court excluded the sexual nature of the misconduct, because the jury heard evidence related to sexual harassment allegations against Tim Mapes and Rep. Lou Lang, the jury may have concluded that the unspecified "misconduct" allegations against Kevin Quinn also concerned sexual harassment. But Madigan cites no support for this conjecture, and indeed nothing in the record supports his speculation.[88] Accordingly, Madigan's unsupported "spillover" claim must fail.

Madigan also argues that this evidence did not involve him and therefore did not have any probative value with respect to the charges in the case. But as the Court recounted above, the Government may "use uncharged criminal acts in a RICO prosecution to prove the nature of an enterprise and the defendant's participation in it." *Salerno*, 108 F.3d at 739 (citation omitted). Here, the evidence related to Kevin Quinn's workplace misconduct, and the subsequent efforts by the Defendants to find him a job and money, supported the Government's RICO allegations, including Madigan's role within the charged enterprise and its objectives—to coordinate and

---

[88] Frankly, common sense indicates the exact opposite. From the jury's perspective, they heard the sexual nature of the misconduct allegations against two individuals, and then heard separate, generic misconduct allegations against Kevin Quinn. There was no logical reason for the jury to assume that the sexual nature of any misconduct allegations was withheld when they were permitted to hear that type of evidence at other points in the trial.

conceal payments made to reward certain Madigan political associates. *See e.g.*, GX 167; GX 168; GX 169. Further, the record shows that McClain called Madigan on August 29, 2018, and reported that he "put 4 or 5 people together that are willing to contribute to uh, help with monthly things for the next 6 months like I mentioned" for Kevin Quinn. GX 170. McClain then asked if Madigan wants to mention the arrangement to the 13th Ward alderperson (Kevin Quinn's brother) or if he'd prefer to "stay out of it," to which Madigan responds that he thinks "I oughta stay out of it." *Id.* While the defense remained free to characterize this evidence differently (and did so at trial), the Government properly offered this exhibit to show both Defendants acting in a manner consistent with their alleged roles in the enterprise. As such, the admission of the exhibit, subject to the limitations set by this Court, was properly admitted in furtherance of the Government's allegations.

Because the Court properly permitted this evidence and sufficiently accounted for the Rule 403 factors by redacting the sexual nature of the alleged misconduct, no error occurred, and no unfair prejudice existed.

Turning next to the evidence concerning Mapes, the Government introduced evidence and testimony related to Mapes' resignation as Madigan's chief of staff after "allegations" against him. Tr. 1849:4–10. This factual episode was highly probative of important issues in the case, including but not limited to, the Defendants' roles in the enterprise charged in Count One, particularly McClain's, as Madigan relied upon McClain and others for sensitive political advice. The relationship between conspirators was also clearly exhibited in their actions in the aftermath of the various sexual harassment allegations against Democratic officials and employees, including Mapes. As the Government points out in its Response, Madigan's own counsel chose to introduce the sexual harassment nature of the allegations against Tim Mapes, not the Government. *See* [408] at 118 (comparing the Government's direct examination of Will Cousineau referring to the "allegations" against Mapes with the cross examination conducted by Madigan's counsel, asking if Cousineau's reference to "the topic of sexual harassment" was Mapes) (citing Tr. 1849:4–10; Tr. 1932:15–17). A defendant cannot claim error from an evidentiary ruling where the defendant himself "actually introduced" the evidence, "even if a proper contemporaneous objection was made." *United States v. Saunders*, 359 F.3d 874, 877 (7th Cir. 2004) (citing *Ohler v. United States*, 529 U.S. 753 (2000)). Therefore, no error exists where the evidence was introduced by way of Madigan's own strategic trial decision.

Furthermore, again as the Government articulates, no prejudice arose where the jury heard numerous clarifications that neither Madigan nor McClain were accused of any harassment or sexual misconduct themselves. *See* [408] at 118 ("Tr. 1843 (Q. And just to be clear, those were not allegations against Speaker Madigan? A. They were not, no. Q. And nor were they allegations against Mr. McClain? A. No); Tr. 1933 (Q. Okay. And just to make crystal clear, these sexual harassment allegations were not involving Mike Madigan, correct? A. Correct.") (internal

quotation marks omitted).  Such clarifications undermine Madigan's motion, because a defendant's association with an individual or entity later found to be involved in misconduct is not, by itself, inherently prejudicial.  *See United States v. Hill*, 552 F.3d 541, 550 (7th Cir. 2008) (holding that a district court's decision to admit evidence showing a defendant patronized a business that was later indicted "was, at worst, harmless error" because "a person's patronage of a business that is later indicted is not inherently prejudicial").

Here, there was no risk of unfair prejudice where the jury was clearly informed, on multiple occasions, that neither of the Defendants were accused of sexual harassment and where Madigan's own counsel chose to reveal that Mapes was accused of sexual harassment.  *See* Tr. 1932:22–1933:2 ("Q. You mentioned that there was an employee and a representative involved in issues, correct?  A. Yes, sir.  Q. Okay.  Just so we're clear on this stuff, the employee you were talking about was Tim Mapes, right?  A. Yes, sir.").  Therefore, no error or prejudice occurred in admitting this evidence.

Finally, the Court addresses the evidence related to former Rep. Lou Lang.  Madigan contends that evidence of Rep. Lang's misconduct unfairly tainted him and separately argues that the admission of his comment regarding Lou Lang's replacement unfairly prejudiced him.  *See* [401] at 71.  First, only one of the exhibits admitted regarding the allegations against Rep. Lang contained Madigan's statements—GX 213.  In that call, Madigan makes the statement about wanting a male replacement for Rep. Lang's seat but adds that he does not want that statement connected back to him.  *See* GX 213.  This evidence, along with the other recordings concerning Rep. Lang's resignation, supported the Government's allegations in Count One, including demonstrating the Defendants acting in accordance with their roles in the alleged enterprise.  Madigan directed McClain's activities, and McClain conveyed Madigan's instructions and messages to public officials and further provides Madigan with strategic advice on sensitive political matters—here, Lang's resignation.  *See* [37] ¶¶ 7–8.  Again, as with the allegations against Mapes, the jury also heard clarifications that neither Defendant was accused of harassment themselves.  *See* Tr. 1849:4–10.  Based upon the record, no risk existed that Lang's alleged conduct would be wrongfully imputed to Madigan, and the evidence was otherwise highly probative of the charges in Count One.  Consequently, no error occurred in admitting this evidence.  *See Hill*, 552 F.3d at 550.

### v. Government's Motion in Limine 4

Madigan claims this Court erred in granting the Government's motion in *limine* concerning GX 247.  This exhibit contains a call between McClain and government witness Fidel Marquez, a former ComEd executive, where Marquez asks if ComEd can cease payments to subcontractors Eddie Acevedo and Ed Moody.  *See* GX 247.  During the conversation, McClain remarks that he had a similar

conversation with an individual at Rush Hospital, saying the hospital "could let Bill Harte go," adding that "you can't just ask a company to be donating $60,000 a year" when the person "can't even . . . really, uh, uh, talk very well, anymore." *Id.*

As noted above, the Government was required to prove, among other things, "the existence of an enterprise." *Salerno,* 108 F.3d at 738. Here, GX 247 demonstrated McClain acting as Madigan's agent with respect to coordinating payments to certain Madigan associates through intermediary companies and determining when the companies could cease those payments, all consistent with the RICO allegations in Count One. Further, in the call McClain directly links the Bill Harte payment to the ComEd subcontractor payments that were the subject of the conspiracy charged in Count Two. Thus, the Court properly permitted the evidence because it was directly relevant to both conspiracies charged in Counts One and Two and not unfairly prejudicial.

Separately, the Court notes that because this evidence was relevant to Count One and proof of the existence of an "enterprise was an essential element of the crimes charged, the proffered evidence cannot properly be characterized as 'other crimes' evidence, and thus, Federal Rule of Evidence 404(b) does not apply." *Id.* But even if Rule 404(b) applied, the evidence would remain admissible because it would meet the requirements of the rule, and it properly demonstrated the Defendants' intent, motive, and plan to conceal payments through intermediaries such as Rush Hospital.

Finally, even if permitting the exhibit constituted error, any error would remain harmless. Indeed, Madigan makes no arguments demonstrating *how* the admission of this evidence prejudiced him, beyond his conclusory and incorrect assertion that it was impermissible propensity evidence which "failed to demonstrate any connection to the alleged enterprise or racketeering activity." [401] at 74.[89] For the reasons the Court explained above, this evidence was highly probative of the allegations in Counts One and Two.

On this point, Madigan's motion again fails.

### vi.  Government Exhibit 88

Madigan argues that this Court should have excluded GX 88, a May 23, 2018 recorded phone call between McClain and Madigan's son, Andrew Madigan. Madigan advanced a motion in *limine* seeking to exclude this exhibit before trial (*see* [174] at

---

[89] Even the admissions of propensity evidence (which did not occur here) remains harmless where the "brief testimony almost certainly had little, if any, impact on the jury's deliberations." *United States v. Seals*, 813 F.3d 1038, 1044 (7th Cir. 2016) (citation omitted). As the Court recounted above, the jury was faced with substantial evidence supporting Madigan's guilt in this case. *See supra* Part III. As such, McClain's fleeting reference to Bill Harte in the recorded call, and Fidel Marquez' testimony that he understood "that Rush was paying Bill Hart $60,000 for basically no work" (Tr. 2561:9–10), are not sufficiently prejudicial to warrant a new trial in this case.

16–18).  The Court initially denied the motion without prejudice ([235] at 3) based upon the pretrial record, and then the exhibit was later admitted at trial, based on a full record.

In GX 88, McClain and Andrew Madigan discuss efforts to have a utility company (Peoples Gas) hire a friend of Andrew Madigan's, Tom Volini.  McClain expresses irritation at the utility company's resistance to receiving the hire request, commenting: "I just love these people that, they, they are in a regulatory body, right?  And they're offended if people ask for favors.  Hello?  Dumb shits."  GX 88.

Madigan claims that this call should have been excluded because it was "irrelevant to Michael Madigan as it was not related to the allegations concerning ComEd or AT&T."  [401] at 73.  But this ignores the context of the call itself.  At trial, GX 87, admitted into evidence right before GX 88 (*see* Tr. 2693:4–7), contains a May 23, 2018 recorded call in which Fidel Marquez informed McClain that he received a call from an employee at Peoples Gas who asked if he knew Tom Volini.  On the call, Marquez communicated to McClain that he told the employee to consider the hire because "sometimes maybe one day you'll have an ask and this will be remembered."  GX 87.  McClain responded "Right.  Exactly," and later added "it all comes . . . around, right?"  *Id.*  During his direct testimony concerning GX 87, Marquez further testified that he knew Volini was a friend of Andrew Madigan, which was why he related the information to McClain.  Tr. 2694:10–11.  Marquez also testified that he would treat requests from Andrew Madigan "the same as if they were coming from Michael Madigan."  Tr. 2694:17–18.  McClain also called Andrew Madigan after speaking with Marquez.  *See* GX 88.  McClain relayed his conversation with Marquez, adding his comments regarding expecting favors from individuals in "a regulatory body."  *Id.*  The Government published GX 88 at trial after Marquez testified about the conversation in GX 87.

Consistent with the pretrial proffer, GX 88 contained highly probative evidence of ongoing efforts to reward Madigan's associates, a key motive alleged in several charges, including an alleged goal of the enterprise charged in Count One.  *See* [37] ¶ 4.  The call also showed McClain's knowledge of those efforts, as McClain expresses his views that regulated companies should expect to provide favors in exchange for favorable treatment in Springfield.  *See* GX 87; GX 88.  Furthermore, as the Government points out in its Response, additional evidence introduced at trial showed McClain and Marquez also discussing attempts to get Volini work from ComEd.  *See* GX 152.  In those discussions, Marquez tells McClain that he will speak to a certain ComEd executive about the request because that person understood "the uh, political sensitivity to it versus others not."  GX 152.  Marquez testified that the inquiry was "politically sensitive" because "Tom Volini is a friend of Andrew Madigan's, and that's where the request was coming from."  Tr. 2929:9–10.  Taken together, the sequence of calls concerning efforts to hire Tom Volini, including GX 88, constituted relevant and highly probative evidence of the manner and means of the

racketeering conspiracy charged in Count One.  The evidence was also plainly relevant to the conspiracy charged in Count Two, as it demonstrates the co-conspirators' motives and their understanding of the connection between hiring requests and official actions.  Accordingly, no error occurred in the admission of this evidence.  *See United States v. Causey*, 748 F.3d 310, 316 (7th Cir. 2014) ("To be relevant, evidence need not conclusively decide the ultimate issue in the case, nor make the proposition appear more probable, but it must in some degree advance the inquiry.").

### vii.  Evidence Relating to Insurance Payments

Madigan claims error with respect to the admission of GX 1601-B. At trial, the Government presented evidence showing that Madigan requested Solis to ask Raul Raymundo of the Resurrection Project to speak with his son, Andrew Madigan, so the latter could pitch his insurance brokerage services to the organization.  *See* GX 151.  The Resurrection Project later hired Andrew Madigan's firm, Alliant Insurance Services, for its insurance coverage.  GX 1601-B presents a summary chart reflecting the total insurance premiums the Resurrection Project paid, inclusive of commissions, between 2019 and December 2021.  This figure amounted to $1,150,016.02.  *See* GX 1601-B.

Madigan objected to the admission of the exhibit on Rule 401 and Rule 403 grounds, claiming that the exhibit's figure caused unfair prejudice and jury confusion regarding the amount of money Andrew Madigan received.  The Court overruled Madigan's objection, and further noted that GX 1601-A, already admitted without objection just before the offer of GX 1601-B, contained the very same information.  That exhibit, along with the accompanying testimony of Alliant Vice President Jennifer Gavelek, listed the billing transactions issued by Alliant regarding the Resurrection Project.  *See* GX 1601-A.  The table also included a column showing the commission Alliant was owed on each transaction and another column delineating the portion of that commission owed to Andrew Madigan.  *Id.*  Gavelek testified that from 2019 to December 2021, the sum total of commission payable to Alliant from the Resurrection Project was $216,625 and that Andrew Madigan was entitled to 20% of that amount, or around $43,000.  Tr. 5970:8–5971:4.  Based on the information contained in GX 1601-A, the jury could simply "do the math" and calculate the total amount of payments the Resurrection Project made for insurance products brokered for the company by Alliant.  GX 1601-B also showed that the payments were actually made by the Resurrection Project, and thus that Alliant (and subsequently, Andrew Madigan) only received the commission owed.  But, as the Court noted when overruling Madigan's objection, GX 1601-B presented no risk of undue prejudice because the "math" had "already been done" with respect to the total amount paid by the Resurrection Project in insurance premiums when GX 1601-A was entered into evidence without objection.  Tr. 5974:6–7.

Even now, the Court's analysis remains unchanged—the "math" is still correct, and Madigan is not alleging otherwise. The record simply does not support Madigan's argument that GX 1601-B "served only as an attempt to confuse the jury that Madigan and his family 'lined their pockets' with millions of dollars." [401] at 78. Gavelek repeatedly testified that Andrew Madigan was only entitled to 20% of Alliant's commission. *See* Tr. 5971:2–4; 5984:2–4; 5986:4–7. Further, GX 1601-A clearly delineated the disbursement structure between the Resurrection Project's premium payments, Alliant's commission, and Andrew Madigan's portion of that commission. *See* GX 1601-A. Likewise, GX 1601-B did not add any new information to these figures but only displayed the calculated total while adding the relevant evidence that the Resurrection Project actually made the payments owed. No risk of confusion existed because the evidence and testimony clearly and repeatedly explained the commission payment structure, and correctly informed the jury that Andrew Madigan was entitled to receive only a percentage of the total $1.1 million figure the Resurrection Project paid. Accordingly, the admission of GX 1601-B was not erroneous.

### viii. Evidence Relating to Jeffery Rush

Next, Madigan contends the Court erred by permitting evidence related to Jeffrey Rush, specifically Government Exhibits 174, 292,[90] and 297. These exhibits contain recorded calls evincing efforts to obtain employment for Jeffrey Rush, the son of U.S. Representative Bobby Rush. GX 174 consists of a call between Madigan and McClain where Madigan told McClain that Jeffrey Rush "is a guy that I'm gonna want to help somewhere along the road," and stated that Rush "got himself jammed up because he was working for the Illinois Department of Corrections" and "got involved sexually with one of the inmates." GX 174. Madigan then asks McClain if he thought Rush's background in criminal justice might make him eligible for a consulting role with IDOC and asked McClain to "give some thought" to assisting Rush in finding employment. *Id.*

During Fidel Marquez's testimony, the Government introduced GX 174, GX 297, and GX 308 in succession. Tr. 2947:20–2948:21. GX 297 contained a recorded call between McClain and Jeffrey Rush, and GX 308 was a recorded meeting between McClain and Marquez.[91] In GX 308, after explaining Jeffrey Rush's history and that he was "Bobby Rush's son," McClain asks Marquez if there "was any way we could put this guy on for a couple, three months." GX 308. Marquez testified he understood McClain to be asking if "ComEd could hire him on a temporary basis." Tr. 2950:1–2.

---

[90] While Madigan objected to GX 292 before trial and the Court overruled the objection (*see* [235] at 9), the Government never actually published this exhibit at trial.

[91] Marquez was cooperating with the FBI at the time of this recording. Tr. 2949:6–8.

These exhibits constituted highly probative evidence of Madigan and McClain's agency relationship, relevant to multiple charges in the indictment, and it also constituted evidence of McClain acting in furtherance of the charges when he requested prior co-conspirator Marquez to arrange for ComEd to financially reward another associate politically advantageous to Madigan. Thus, the Court properly denied Madigan's pretrial motion to exclude this evidence (*see* [235] at 9–10) and permitted the Government to introduce the exhibits at trial.

Madigan claims that the Government "doubled down on using this prejudicial evidence" after Madigan elected to testify by seeking the Court's permission to ask Madigan about Rush's background, including his three prior felony convictions. [401] at 75–76. But, as Madigan admits, the Court did not permit the Government to ask Madigan questions about those prior convictions, nor did the Court permit the Government to inquire into details concerning Rush's sexual misconduct at IDOC. *See* [401] at 76; Tr. 9007:4–13. The Government was entitled, however, to ask Madigan about a conversation Madigan participated in, and which was already properly admitted into evidence. The Government's questions on cross-examination centered on Madigan's knowledge about Rush's background before seeking to recommend him for a job—an entirely proper line of questioning rebutting Madigan's own testimony that he only provided job recommendations for qualified candidates. Tr. 9113:20–9117:9. Further, Madigan had, and took advantage of, the opportunity to provide additional explanation and context for his involvement with Jeffrey Rush on redirect. Tr. 9316:15–9319:17. Accordingly, Madigan fails to show any error with respect to the evidence or questioning relating to Jeffrey Rush.

Finally, Madigan makes a related claim that the Government also improperly sought to use these same exhibits, and ask questions about Jeffrey Rush, to impeach Madigan's statements from a deposition in a prior, unrelated civil case. *See* [401] at 76. But Madigan waived any claimed error regarding the Government's questions related to the civil deposition. Madigan explicitly did not object to the line of questioning concerning the civil deposition when the Government previewed it before cross-examination, nor did Madigan make a contemporaneous objection during cross-examination. *See* Tr. 9021:11–19; Tr. 9022:21–24; Tr. 9092:1–9095:24.[92] Because

---

[92] The Court notes that, while Madigan did initially object to the line of questioning related to the deposition via email correspondence with the Court and the Government, the above cited portion of the trial transcript occurred after the Government clarified that it did not seek to admit the exhibit itself into evidence. On the record and after this clarification, counsel for Madigan then explicitly indicated they had no objection on several occasions. *See* Tr. 9021:11–19 ("MR. BHACHU: I'm going to ask: 'Did you testify under oath—did you make the statement and you lied when you said that, didn't you, sir?' THE COURT: And he's going to say, 'No, I didn't.' MR. BHACHU: Right. THE COURT: And then you're just— MR. BHACHU: Stuck with that. THE COURT: Is there an objection to that? MR. PUGH: There isn't."); Tr. 9022:21–24 ("MR. PUGH . . . I don't think we—fundamentally, if that's how he wants to try his case, go ahead. THE COURT: Okay. It doesn't sound like there's an objection to that one."). Further, Madigan did not timely object at trial when the Government asked the previewed questions related to the deposition. *See* Tr. 9092:1–9095:24 (no objection). The exhibit was later used for refresh purposes only in the Government's cross examination of Madigan.

Madigan waived this issue, the Court need not address it.  *See Walker v. Groot*, 867 F.3d 799, 805 (7th Cir. 2017) (Where "a party fails to timely and properly object at trial to the admission of evidence, the party is deemed to have waived the issue on appeal.").  *See also* Tr. 9022:23–9023:1 ("THE COURT: Okay.  It doesn't sound like there's an objection to that one.  MR. BHACHU: Okay.  THE COURT: Nothing for me to rule on.").

### ix.  Government Exhibit 2

Finally, Madigan argues that the Court erred in admitting Clip 2 of GX 2.  The exhibit consists of a recording of an August 18, 2014 meeting between Madigan, Bud Getzendanner, Danny Solis, See Wong, and Kin Chong that occurred at the Madigan & Getzendanner law offices.  The meeting resulted from an earlier phone call where Madigan asked Solis to bring Chong to his law firm for a meeting, so the firm could solicit tax work from Chong.  At the time, Chong was seeking to develop a Best Western hotel in Chicago's Chinatown neighborhood, but the development required a zoning change in the city council.  At this point, See Wong was a cooperating witness, and he recorded the meeting as well as a subsequent conversation with Solis after leaving the law firm's offices.[93]  Clip 2 of GX 2 shows that later conversation between Wong and Solis.

Federal Rule of Evidence 801(d)(2)(E) provides that statements made by a co-conspirator during and in furtherance of a conspiracy are not hearsay.  What constitutes a "conspiracy" for purposes of the "evidentiary rule differs from conspiracy as a crime," because the "evidentiary rule of conspiracy is founded on concepts of agency law."  *United States v. Coe*, 718 F.2d 830, 835 (7th Cir. 1983).  Because of this distinction, "some courts refer to the coconspirator exception as the 'joint venture' or 'concert of action' exception."  *Id.* (citing *United States v. Gil*, 604 F.2d 546, 549 (7th Cir. 1979)).  To admit statements under the Rule, "the government must prove by a preponderance of independent evidence" that "the statements it seeks to admit were in the course and in furtherance of the particular joint venture it has established."  *Id.* at 835–36.  *See also United States v. Ladd*, 218 F.3d 701, 704 (7th Cir. 2000).

Before trial, the Court overruled Defendants' objection to Clip 2, finding that this portion of the exhibit was admissible under Rule 801(d)(2)(E).  *See* [235] at 5.  Madigan argues this ruling was erroneous because "there was no evidence Solis and Madigan had agreed to participate in a joint venture at the time of Solis' conversation with Wong."  [401] at 79.  Further, Madigan contends that the Government failed to offer any evidence "that (1) a joint venture existed, (2) Madigan knew of the joint venture, and (3) that any purported joint venture was used for an illegal purpose or used illegal means."  *Id.* (citing *United States v. Shah*, 2023 WL 22140, *1 (N.D. Ill. Jan. 3, 2023)).  But these claims evince an erroneous view of both the record and the law applicable to the joint venture exception.

---

[93] Solis was not yet cooperating with the Government at the time of the meeting.  *See* [213] at 22–24.

First, the Government presented more than sufficient evidence of a joint venture between Madigan and Solis to obtain legal business for Madigan's private law firm. For example, the Government produced evidence at trial that Solis was the alderperson of the 25th Ward, where Chong's proposed development was located. The jury also heard evidence that Chong needed Solis' approvals in his capacity as the Chairman of the Chicago City Council's Committee on Zoning, Landmarks, and Building Standards. Solis testified that Madigan called him and asked him to bring Chong to his law firm so that Madigan and his law partner could "make a presentation." Tr. 4810:6–20. Solis agreed, arranging the meeting and attending the meeting himself. Solis also participated in the meeting, stating to the group that "[t]here is no better firm than this firm in terms of doing real estate taxes in the state." GX 2 at 17.

The statements in Solis' post-meeting conversation with Wong also furthered the joint venture between Solis and Madigan. Solis told Wong that if "he [Chong] works with the Speaker, he will get anything he needs for that hotel." GX 2 at 21. Solis also stated that "he's going to benefit from being with the Speaker" (*id.*), which he testified meant that Chong was "going to benefit from getting a good firm, but he's also going to be on my agenda and get the zoning that he needs." Tr. 4826:18–19.

Taken together, this evidence demonstrated that Madigan and Solis established a joint venture to obtain business for Madigan's law firm. Indeed, the fact that Madigan initiated the meeting request provides independent corroboration of his awareness of the joint venture. The statements in Clip 2 itself furthered that joint venture, as Solis clearly explained to Wong that if Chong gave business to Madigan, Solis would provide the zoning changes Chong needed for the development. Further, to the extent Madigan argues that Solis had ulterior, self-interested motives for his statements, any such motives do not change the relevant analysis under the law. A "statement may be susceptible to alternative interpretations and still be 'in furtherance' of the conspiracy; the statement need not have been exclusively, or even primarily, made to further the conspiracy in order to be admissible under the coconspirator exception." *United States v. Messino*, 855 F. Supp. 973, 977 (N.D. Ill. 1994) (citation omitted). For the reasons the Court explained above and at trial, the Government met its burden to establish a joint venture by a preponderance of the evidence.

Next, Madigan's contention that the Government had to establish "that any purported joint venture was used for an illegal purpose or used illegal means" misunderstands Seventh Circuit precedent interpreting Rule 801(d)(2)(E). Madigan ostensibly draws this mistaken conclusion from *United States v. Shah*—a district court opinion quoting the Seventh Circuit case *United States v. Gil* for this element of Rule 801(d)(2)(E)'s applicability. But *United States v. Coe* clarified the relevant statement in *Gil* and held that there is "language in some cases to the effect that the

government must establish that the conspiracy or joint venture was illegal before the coconspirator hearsay exception may be invoked . . . . We read this, however, as simply requiring that the statements relate to the crime charged in a criminal case." *Coe*, 717 F.2d at 835 (citing *Gil*, 604 F.2d at 549). *See also United States v. Warner*, 396 F. Supp. 2d 924, 943 (N.D. Ill. 2005) ("A hearsay statement made by a co-conspirator may be admitted into evidence against a defendant if the government proves that: (1) a conspiracy existed; (2) both the declarant and the defendant were members of the conspiracy; and (3) the statements were made in the course and in furtherance of the conspiracy.") (citation omitted); *Ladd*, 218 F.3d at 704 ("For coconspirator statements to be admitted pursuant to Rule 801(d)(2)(E), the Government must prove by a preponderance of the evidence that a conspiracy existed, that both the declarant and the defendant were members of the conspiracy, and that the statements were made in the course and in furtherance of the conspiracy.") (citations omitted). The joint venture itself (contained in Clip 2) need not be an illegal venture, but rather it must be (and was) related to the criminal conduct alleged in the indictment. In short, this Court properly admitted the exhibit under Rule 801(d)(2)(E).

Finally, as the Government articulates in its Response, any error in admitting GX 2 remained harmless given the substantial evidence the jury heard concerning Madigan's prior dealings with Solis to obtain business for his private law firm. *See supra* Part III.b. Where a "disputed exhibit was one small piece of the substantial physical, electronic, and testimonial evidence supporting a conviction," any error remains harmless. *United States v. Medrano*, 83 F.4th 1073, 1078 (7th Cir. 2023). Here, the jury heard extensive evidence regarding Madigan and Solis' relationship and their joint efforts to utilize Solis' official position to obtain business for Madigan. In light of this substantial evidence, any error concerning Clip 2 (and there was none) was harmless.

### c. Other Purported Errors

Madigan finally claims cumulative error, which might entitle a defendant to a new trial, provided he can show "that (1) at least two errors were committed during the trial, and (2) these errors denied [him] a fundamentally fair trial." *United States v. Adams*, 628 F.3d 407, 419 (7th Cir. 2010). The "Constitution entitles the criminal defendant to a fair trial, not a perfect one." *United States v. Neeley*, 189 F.3d 670, 679 (7th Cir.1999) (quoting *Rose v. Clark*, 478 U.S. 570, 579 (1986)). Thus, the cumulative error inquiry requires the courts to examine "the entire record, looking at factors such as the nature and number of errors committed, the interrelationship and combined effect of the errors, how the trial court handled the errors, and the strength of the prosecution's case." *Adams*, 628 F.3d at 419 (citation omitted). A defendant will only receive relief if "the effect of the errors, considered together, could not have been harmless." *Id.* (citation omitted).

Here, Madigan falls far short of meeting his burden.  As explained above, he fails to show even one error committed during trial, much less cumulative errors.  Moreover, even if more than one error did occur, Madigan still fails to show that any of those purported errors "could not have been harmless."  *Id.* (citation omitted).  The jury in this case heard overwhelming evidence of guilt on the counts of conviction, including testimony from over 50 witnesses and 200 recordings, spanning the course of four months.  At each turn, Madigan had an ample opportunity to cross-examine each of the Government's witnesses and present extensive evidence in his own defense case.  In short, Madigan received a fair trial.

## V.     Conclusion

For the reasons explained above, this Court has properly denied Madigan's motion for judgment of acquittal under Rule 29 and his motion for a new trial under Rule 33, [396].

Date: July 3, 2025

ENTERED:

John Robert Blakey
United States District Judge

ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case

Judgment – Page 1 of 8

DEFENDANT: MICHAEL J. MADIGAN
CASE NUMBER: 1:22-CR-00115(1)

# UNITED STATES DISTRICT COURT
## Northern District of Illinois

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
| v. | ) | |
| | ) | |
| MICHAEL J. MADIGAN | ) | Case Number: 1:22-CR-00115(1) |
| | ) | |
| | ) | USM Number: 90368-509 |
| | ) | |
| | ) | |
| | ) | Daniel John Collins |
| | ) | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s)

☐ pleaded nolo contendere to count(s)        which was accepted by the court.

☒ was found guilty on Count(s) 2s, 4s, 5s, 6s, 8s, 9s, 10s, 12s, 13s, and 14s after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| **Title & Section / Nature of Offense** | **Offense Ended** | **Count** |
|---|---|---|
| 18:371.F Conspiracy To Defraud The United States | 03/11/2019 | 2s |
| 18:666A.F Converts To Own Use Property Of Another | 03/11/2019 | 4s |
| 18:1952-7420.F Racketeering - Bribery | 03/11/2019 | 5s |
| 18:666A.F Converts To Own Use Property Of Another | 03/11/2019 | 6s |
| 18:1343.F Fraud By Wire, Radio, Or Television | 03/11/2019 | 8s |
| 18:1343.F Fraud By Wire, Radio, Or Television | 03/11/2019 | 9s |
| 18:1343.F Fraud By Wire, Radio, Or Television | 03/11/2019 | 10s |
| 18:1952-7420.F Racketeering - Bribery | 03/11/2019 | 12s |
| 18:1952-7420.F Racketeering - Bribery | 03/11/2019 | 13s |
| 18:1952-7420.F Racketeering - Bribery | 03/11/2019 | 14s |

The defendant is sentenced as provided in pages 2 through 8 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☒ The defendant has been found not guilty on Count(s) 3s, 7s, 11s, 15s, 16s, 17s, and 18s of the superseding indictment.

☒ The original indictment, and Counts 1s, 19s, 20s, 21s, 22s, and 23s dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States Attorney for this District within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and the United States Attorney of material changes in economic circumstances.

June 13, 2025
Date of Imposition of Judgment

Signature of Judge

John Robert Blakey, United States District Judge
Name and Title of Judge

7/15/25
Date

ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 2 – Imprisonment                                                                                   Judgment – Page 2 of 8

DEFENDANT: MICHAEL J. MADIGAN
CASE NUMBER: 1:22-CR-00115(1)

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of 90 months. This total term consists of: 60 months as to Count 2s; 90 months as to Count 4s; 60 months as to Count 5s; 90 months as to Count 6s; 90 months as to Count 8s; 90 months as to Count 9s; 90 months as to Count 10s; 60 months as to Count 12s; 60 months as to Count 13s; 60 months as to Count 14s; with all terms to run concurrently with each other.

☒     The court makes the following recommendations to the Bureau of Prisons: Consistent with the needs of the Bureau of Prisons and the Defendant, the Defendant is to be evaluated for placement at FCI Terre Haute Satellite Camp.

☐     The defendant is remanded to the custody of the United States Marshal.

☐     The defendant shall surrender to the United States Marshal for this district:

        ☐     at        on

    ☐     as notified by the United States Marshal.

☒     The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☒     before 2:00 pm on 10/13/2025.

    ☐     as notified by the United States Marshal.

    ☐     as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows: _____

_____

_____

Defendant delivered on _____ to _____ at _____, with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 3 – Supervised Release                                                                                                  Judgment – Page 3 of 8

DEFENDANT: MICHAEL J. MADIGAN
CASE NUMBER: 1:22-CR-00115(1)

## MANDATORY CONDITIONS OF SUPERVISED RELEASE PURSUANT TO 18 U.S.C § 3583(d)

Upon release from imprisonment, you shall be on supervised release for a total term of three (3) years supervised release. This total term consists of: 3-year terms on Counts 2s, 4s, 5s, 6s, 8s, 9s, 10s, 12s, 13s, and 14s; with all terms to run concurrently with each other. As to all terms, the Court imposes those conditions identified by checkmarks below:

**During the period of supervised release:**

☒ (1) you shall not commit another Federal, State, or local crime.

☒ (2) you shall not unlawfully possess a controlled substance.

☐ (3) you shall attend a public, private, or private nonprofit offender rehabilitation program that has been approved by the court, if an approved program is readily available within a 50-mile radius of your legal residence. [Use for a first conviction of a domestic violence crime, as defined in **§ 3561(b)**.]

☐ (4) you shall register and comply with all requirements of the Sex Offender Registration and Notification Act (**42 U.S.C. § 16913**).

☒ (5) you shall cooperate in the collection of a DNA sample if the collection of such a sample is required by law.

☐ (6) you shall refrain from any unlawful use of a controlled substance AND submit to one drug test within 15 days of release on supervised release and at least two periodic tests thereafter, up to 104 periodic tests for use of a controlled substance during each year of supervised release. [This mandatory condition may be ameliorated or suspended by the court for any defendant if reliable sentencing information indicates a low risk of future substance abuse by the defendant.]

## DISCRETIONARY CONDITIONS OF SUPERVISED RELEASE PURSUANT TO 18 U.S.C § 3563(b) AND 18 U.S.C § 3583(d)

**Discretionary Conditions** — The court orders that you abide by the following conditions during the term of supervised release because such conditions are reasonably related to the factors set forth in **§ 3553(a)(1)** and **(a)(2)(B), (C), and (D);** such conditions involve only such deprivations of liberty or property as are reasonably necessary for the purposes indicated in **§ 3553 (a)(2) (B), (C), and (D);** and such conditions are consistent with any pertinent policy statement issued by the Sentencing Commission pursuant to **28 U.S.C. 994a.**
The court imposes those conditions identified by checkmarks below:

**During the period of supervised release:**

☐ (1) you shall provide financial support to any dependents if you are financially able to do so.

☐ (2) you shall make restitution to a victim of the offense under **§ 3556** (but not subject to the limitation of **§ 3663(a)** or **§ 3663A(c)(1)(A)**).

☐ (3) you shall give to the victims of the offense notice pursuant to the provisions of **§ 3555**, as follows: ▨

☐ (4) you shall seek, or work conscientiously at, lawful employment or, if you are not gainfully employed, you shall pursue conscientiously a course of study or vocational training that will equip you for employment.

☐ (5) you shall refrain from engaging in the following occupation, business, or profession bearing a reasonably direct relationship to the conduct constituting the offense, or engage in the following specified occupation, business, or profession only to a stated degree or under stated circumstances; (if checked yes, please indicate restriction(s))

☒ (6) you shall not knowingly meet or communicate with any person whom you know to be engaged, or planning to be engaged, in criminal activity and shall not:
    ☐ visit the following type of places: ▨.
    ☒ knowingly meet or communicate with the following persons: Michael McClain, Daniel Solis, and Edward Moody.

☐ (7) you shall refrain from ☐ any or ☐ excessive use of alcohol (defined as ☐ having a blood alcohol concentration greater than 0.08%; or ☐    ), and from any use of a narcotic drug or other controlled substance, as defined in **§ 102** of the Controlled Substances Act (**21 U.S.C. § 802**), without a prescription by a licensed medical practitioner.

☒ (8) you shall not possess a firearm, destructive device, or other dangerous weapon.

☐ (9)    ☐ you shall participate, at the direction of a probation officer, in a substance abuse treatment program, which may include urine testing up to a maximum of 104 tests per year.
    ☐ you shall participate, at the direction of a probation officer, in a mental health treatment program, and shall take any medications prescribed by the mental health treatment provider.
    ☐ you shall participate, at the direction of a probation officer, in medical care; (if checked yes, please specify: ▨.)

ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 3 – Supervised Release                                                                                           Judgment – Page 4 of 8

DEFENDANT: MICHAEL J. MADIGAN
CASE NUMBER: 1:22-CR-00115(1)

☐ (10) (intermittent confinement): you shall remain in the custody of the Bureau of Prisons during nights, weekends, or other intervals of time, totaling ▨▨▨▨ [no more than the lesser of one year or the term of imprisonment authorized for the offense], during the first year of the term of supervised release (provided, however, that a condition set forth in **§3563(b)(10)** shall be imposed only for a violation of a condition of supervised release in accordance with **§ 3583(e)(2)** and only when facilities are available) for the following period ▨▨▨▨.

☐ (11) (community confinement): you shall reside at, or participate in the program of a community corrections facility (including a facility maintained or under contract to the Bureau of Prisons) for all or part of the term of supervised release, for a period of ▨▨▨▨ months.

☐ (12) you shall work in community service for ▨▨▨▨ hours as directed by a probation officer.

☐ (13) you shall reside in the following place or area: ▨▨▨▨, or refrain from residing in a specified place or area: ▨▨▨▨.

☒ (14) you shall not knowingly leave the federal judicial district where you are being supervised, or the State of Wisconsin, unless granted prior permission to leave by the Court or a probation officer. The geographic area of the Northern District of Illinois currently consists of the Illinois counties of Cook, DuPage, Grundy, Kane, Kendall, Lake, LaSalle, Will, Boone, Carroll, DeKalb, Jo Daviess, Lee, McHenry, Ogle, Stephenson, Whiteside, and Winnebago.

☒ (15) you shall report to the probation office in the federal judicial district to which you are released within 72 hours of your release from imprisonment. You shall thereafter report to a probation officer at reasonable times as directed by the court or a probation officer.

☒ (16) ☒ you shall permit a probation officer to visit you ☒ at any reasonable time or ☐ as specified:                  ,
         ☒ at home    ☐ at work    ☐ at school    ☐ at a community service location
         ☒ other reasonable location specified by a probation officer
         ☒ you shall permit confiscation of any contraband observed in plain view of the probation officer.

☒ (17) you shall notify a probation officer within 72 hours, after becoming aware of any change in residence, employer, or workplace and, absent constitutional or other legal privilege, answer inquiries by a probation officer. You shall answer truthfully any inquiries by a probation officer, subject to any constitutional or other legal privilege.

☒ (18) you shall notify a probation officer within 72 hours if arrested, charged with a crime, or questioned by a law enforcement officer.

☐ (19) (home confinement)
         ☐ (a)(i) (home incarceration) for a period of __ months, you are restricted to your residence at all times except for medical necessities and court appearances or other activities specifically approved by the court.
         ☐ (a)(ii) (home detention) for a period of __ months, you are restricted to your residence at all times except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities pre-approved by the probation officer.
         ☐ (a)(iii) (curfew) for a period of __ months, you are restricted to your residence every day.
         ☐ from the times directed by the probation officer; or ☐ from __ to __.
         ☐ (b) your compliance with this condition, as well as other court-imposed conditions of supervision, shall be monitored by a form of location monitoring technology selected at the discretion of the probation officer, and you shall abide by all technology requirements.
         ☐ (c) you shall pay all or part of the cost of the location monitoring, at the daily contractual rate, if you are financially able to do so.

☐ (20) you shall comply with the terms of any court order or order of an administrative process pursuant to the law of a State, the District of Columbia, or any other possession or territory of the United States, requiring payments by you for the support and maintenance of a child or of a child and the parent with whom the child is living.

☐ (21) (deportation): you shall be surrendered to a duly authorized official of the Homeland Security Department for a determination on the issue of deportability by the appropriate authority in accordance with the laws under the Immigration and Nationality Act and the established implementing regulations. If ordered deported, you shall not remain in or enter the United States without obtaining, in advance, the express written consent of the United States Attorney General or the United States Secretary of the Department of Homeland Security.

☒ (22) you shall satisfy such other special conditions as ordered below.

☐ (23) You shall submit your person, property, house, residence, vehicle, papers [computers (as defined in 18 U.S.C. 1030(e)(1)), other electronic communications or data storage devices or media,] or office, to a search conducted by a United States Probation Officer(s). Failure to submit to a search may be grounds for revocation of release. You shall warn any other occupants that the premises may be subject to searches pursuant to this condition. An officer(s) may conduct a search pursuant to this condition only when reasonable suspicion exists that you have violated a condition of your supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner.

☐ (24) Other:

DEFENDANT:  MICHAEL J. MADIGAN
CASE NUMBER:  1:22-CR-00115(1)

**SPECIAL CONDITIONS OF SUPERVISED RELEASE PURSUANT TO 18 U.S.C. 3563(b)(22) and 3583(d)**

The court imposes those conditions identified by checkmarks below:

**During the term of supervised release:**

☐ (1)    if you have not obtained a high school diploma or equivalent, you shall participate in a General Educational Development (GED) preparation course and seek to obtain a GED within the first year of supervision.

☐ (2)    you shall participate in an approved job skill-training program at the direction of a probation officer within the first 60 days of placement on supervision.

☐ (3)    you shall, if unemployed after the first 60 days of supervision, or if unemployed for 60 days after termination or lay-off from employment, perform at least _____ hours of community service per week at the direction of the probation office until gainfully employed. The total amount of community service required over your term of service shall not exceed _____ hours.

☐ (4)    you shall not maintain employment where you have access to other individual's personal information, including, but not limited to, Social Security numbers and credit card numbers (or money) unless approved by a probation officer.

☒ (5)    you shall not incur new credit charges or open additional lines of credit without the approval of a probation officer unless you are in compliance with the financial obligations imposed by this judgment.

☒ (6)    you shall provide a probation officer with access to any requested financial information requested by the probation officer to monitor compliance with conditions of supervised release.

☒ (7)    within 72 hours of any significant change in your economic circumstances that might affect your ability to pay restitution, fines, or special assessments, you must notify the probation officer of the change.

☒ (8)    you shall file accurate income tax returns and pay all taxes, interest, and penalties as required by law.

☐ (9)    you shall participate in a sex offender treatment program. The specific program and provider will be determined by a probation officer. You shall comply with all recommended treatment which may include psychological and physiological testing. You shall maintain use of all prescribed medications.

  ☐    You shall comply with the requirements of the Computer and Internet Monitoring Program as administered by the United States Probation Office. You shall consent to the installation of computer monitoring software on all identified computers to which you have access and to which the probation officer has legitimate access by right or consent.  The software may restrict and/or record any and all activity on the computer, including the capture of keystrokes, application information, Internet use history, email correspondence, and chat conversations.  A notice will be placed on the computer at the time of installation to warn others of the existence of the monitoring software. You shall not remove, tamper with, reverse engineer, or in any way circumvent the software.

  ☐    The cost of the monitoring shall be paid by you at the monthly contractual rate, if you are financially able, subject to satisfaction of other financial obligations imposed by this judgment.

  ☐    You shall not possess or use at any location (including your place of employment), any computer, external storage device, or any device with access to the Internet or any online computer service without the prior approval of a probation officer. This includes any Internet service provider, bulletin board system, or any other public or private network or email system

  ☐    You shall not possess any device that could be used for covert photography without the prior approval of a probation officer.

  ☐    You shall not view or possess child pornography. If the treatment provider determines that exposure to other sexually stimulating material may be detrimental to the treatment process, or that additional conditions are likely to assist the treatment process, such proposed conditions shall be promptly presented to the court, for a determination, pursuant to **18 U.S.C. § 3583(e)(2)**, regarding whether to enlarge or otherwise modify the conditions of supervision to include conditions consistent with the recommendations of the treatment provider.

  ☐    You shall not, without the approval of a probation officer and treatment provider, engage in activities that will put you in unsupervised private contact with any person under the age of 18, and you shall not knowingly visit locations where persons under the age of 18 regularly congregate, including parks, schools, school bus stops, playgrounds, and childcare facilities. This condition does not apply to contact in the course of normal commercial business or unintentional incidental contact

  ☐    This condition does not apply to your family members: _____ [Names]

  ☐    Your employment shall be restricted to the judicial district and division where you reside or are supervised, unless approval is granted by a probation officer.  Prior to accepting any form of employment, you shall seek the approval of a probation officer, in order to allow the probation officer the opportunity to assess the level of risk to the community you will pose if employed in a particular capacity.  You shall not participate in any volunteer activity that may cause you to come into direct contact with children except under circumstances approved in advance by a probation officer and treatment provider.

ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 3 – Supervised Release

Judgment – Page 6 of 8

DEFENDANT: MICHAEL J. MADIGAN
CASE NUMBER: 1:22-CR-00115(1)

☐ You shall provide the probation officer with copies of your telephone bills, all credit card statements/receipts, and any other financial information requested.

☐ You shall comply with all state and local laws pertaining to convicted sex offenders, including such laws that impose restrictions beyond those set forth in this order.

☒ (10) you shall pay to the Clerk of the Court any financial obligation ordered herein that remains unpaid at the commencement of the term of supervised release, at a rate of not less than 10% of the total of your gross earnings minus federal and state income tax withholdings.

☒ (11) you shall not enter into any agreement to act as an informer or special agent of a law enforcement agency without the prior permission of the court.

☐ (12) you shall pay to the Clerk of the Court $▓▓▓ as repayment to the United States of government funds you received during the investigation of this offense. (The Clerk of the Court shall remit the funds to ▓▓▓ (list both Agency and Address.)

☐ (13) if the probation officer determines that you pose a risk to another person (including an organization or members of the community), the probation officer may require you to tell the person about the risk, and you must comply with that instruction. Such notification could include advising the person about your record of arrests and convictions and substance use. The probation officer may contact the person and confirm that you have told the person about the risk.

☐ (14) You shall observe one Reentry Court session, as instructed by your probation officer.

☐ (15) Other: ▓▓▓

SA107

ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 5 – Criminal Monetary Penalties                                                                 Judgment – Page 7 of 8

DEFENDANT: MICHAEL J. MADIGAN
CASE NUMBER: 1:22-CR-00115(1)

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| TOTALS | $1,000.00 | $.00 | $2,500,000.00 | $.00 | $.00 |

☐    The determination of restitution is deferred until         . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐    The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to **18 U.S.C. § 3664(i)**, all nonfederal victims must be paid before the United States is paid.

☐    Restitution amount ordered pursuant to plea agreement $

☐    The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant **to 18 U.S.C. § 3612(f)**.  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to **18 U.S.C. § 3612(g)**.

☐    The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐         the interest requirement is waived for the         .

☐         the interest requirement for the         is modified as follows:

☐    The defendant's non-exempt assets, if any, are subject to immediate execution to satisfy any outstanding restitution or fine obligations.

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 6 – Schedule of Payments                                                                    Judgment – Page 8 of 8

DEFENDANT: MICHAEL J. MADIGAN
CASE NUMBER: 1:22-CR-00115(1)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A    ☒    Lump sum payment of $2,501,000.00 due immediately.

        ☒    balance due not later than 30 calendar days after the date of the entry of the judgment of conviction, or

        ☐    balance due in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

B    ☐    Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

C    ☐    Payment in equal    *(e.g. weekly, monthly, quarterly)* installments of $    over a period of    *(e.g., months or years)*, to commence    *(e.g., 30 or 60 days)* after the date of this judgment; or

D    ☐    Payment in equal    *(e.g. weekly, monthly, quarterly)* installments of $    over a period of    *(e.g., months or years)*, to commence    *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

E    ☐    Payment during the term of supervised release will commence within    *(e.g., 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F    ☐    Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐    Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>(including defendant number) | Total Amount | Joint and Several<br>Amount | Corresponding Payee, if<br>Appropriate |
|---|---|---|---|

**See above for Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.**

☐    The defendant shall pay the cost of prosecution.

☐    The defendant shall pay the following court cost(s):

☐    The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

## CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30

I hereby certify that the Appendix herein includes all of the materials required by Circuit Rule 30(a) and (b).

/s/ *Amy Mason Saharia*
AMY MASON SAHARIA