In the

# UNITED STATES COURT OF APPEALS
### for the Seventh Circuit

## No. 25-2249

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**v.**

**MICHAEL J. MADIGAN,**

**Defendant-Appellant.**

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 22 CR 115 — John Robert Blakey, *Judge.*

## BRIEF OF THE UNITED STATES

ANDREW S. BOUTROS
United States Attorney
  for the Northern District of Illinois
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-5300

DEBRA RIGGS BONAMICI
Assistant United States Attorney
Criminal Division Counsel

JULIA K. SCHWARTZ
Assistant United States Attorney

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................ 1

JURISDICTIONAL STATEMENT ................................................... 2

ISSUES PRESENTED FOR REVIEW ............................................ 2

STATEMENT OF THE CASE ......................................................... 3

SUMMARY OF ARGUMENT ........................................................ 18

ARGUMENT ................................................................................ 19

   I.    Standard of Review ......................................................... 19

   II.   The Court Should Affirm Madigan's ComEd Related
      Convictions (Counts 2, 4, 5, and 6). ................................ 21

     A.    Ample Evidence Supported the Jury's Guilty Verdicts. .............. 21

        1.    Sufficient Evidence Supported the Jury's Finding that
           Madigan Committed *Quid Pro Quo* Bribery ............................ 21

          a.   Madigan Knew the Subcontractors Did Not Work. ............... 22

          b.   Madigan Received Benefits Knowing that ComEd
             Expected Specific Official Action in Return. .......................... 23

        2.    Sufficient Evidence Supported the Jury's Finding that
           Madigan Participated in the Charged Conspiracy to
           Falsify Documents and Circumvent Internal Controls. .......... 30

          a.   Madigan Acted Willfully. ......................................................... 30

          b.   *Thompson* Does Not Apply, and Even If It Does, the Jury
             Was Properly Instructed and There Were False
             Statements. ............................................................................. 32

     B.    Plain Error Review Applies to Madigan's Challenges to the
        Stream-of-Benefits, Official Act, and Corruptly Instructions.
        .............................................................................................. 34

C.    The District Court Correctly Instructed the Jury as to § 666 Bribery. ....................................................................... 36

1.    Stream-of Benefits and Official Action ..................................... 36

2.    "Corruptly" ............................................................................... 41

D.    The District Court Correctly Instructed the Jury as to the Travel Act. ....................................................................... 45

III.    The Court Should Affirm Madigan's State Board Related Convictions (Counts 8, 9, 10, 12, 13, and 14). .................................. 49

A.    A Reasonable Jury Could Find Madigan Committed Wire Fraud. ....................................................................... 49

1.    A Reasonable Jury Could Find a *Quid Pro Quo.* ...................... 49

2.    A Reasonable Jury Could Find a Scheme to Defraud. .............. 54

3.    A Reasonable Jury Could Find Official Action. ........................ 57

B.    The District Court Correctly Instructed the Jury as to the Travel Act. ....................................................................... 59

CONCLUSION ................................................................................ 60

# TABLE OF AUTHORITIES

## CASES

*Ingram v. State*, 103 S.E.2d 666 (Ga. App. 1958) ............................................ 47

*McDonnell v. United States*, 579 U.S. 550 (2016) ....................................*passim*

*Nell v. State*, 277 So. 2d 1 (Fla. 1973)............................................ 47, 49, 51, 54

*Perrin v. United States*, 444 U.S. 37 (1979)................................................. 45, 46

*Skilling v. United States*, 561 U.S. 358 (2010) .................................................. 30

*Snyder v. United States*, 603 U.S. 1 (2024) ..............................................*passim*

*State v. Begyn*, 167 A.2d 161 (N.J. 1961)........................................................ 47

*State v. Kearns*, 129 N.E.2d 543 (Ohio Com. Pl. 1955) ................................. 47

*State v. Smith*, 212 So. 2d 410 (La. 1968)....................................................... 47

*Street v. New York*, 394 U.S. 576 (1969) ......................................................... 48

*Thompson v. United States*, 604 U.S. 408 (2025)................................. 31, 32, 33

*United States v. Baker*, 227 F.3d 955 (7th Cir. 2000) .................................... 47

*United States v. Berkowitz*, 927 F.2d 1376 (7th Cir. 1991) ...................... 27, 30

*United States v. Black*, 104 F.4th 996 (7th Cir. 2024) ................................... 20

*United States v. Blagojevich*, 794 F.3d 729 (7th Cir. 2015)................ 21, 41, 42

*United States v. Bloom*, 149 F.3d 649 (7th Cir. 1998) ................................... 55

*United States v. Brewer*, 143 F.4th 903 (7th Cir. 2025)................................. 19

*United States v. Bruno*, 661 F.3d 733 (2d Cir. 2011) .................................... 21

*United States v. Burnette*, 65 F.4th 591 (11th Cir. 2023) ......................... 24, 26

*United States v. Campione*, 942 F.2d 429 (7th Cir. 1991) .............................. 47

*United States v. Courtright*, 155 F.4th 941 (7th Cir. 2025)............................ 19

*United States v. Crowder*, --- F.4th ----, No. 24-2143, 2026 WL 172616 (7th Cir. Jan. 22, 2026)............................................................ 22, 28, 44, 50

*United States v. Cui*, --- F.4th ----, No. 24-2495, 2026 WL 73014 (7th Cir. Jan. 9, 2026)..................................................................*passim*

*United States v. Falcón-Nieves*, 79 F.4th 116 (1st Cir. 2023)......................... 39

*United States v. Fattah*, 914 F.3d 112 (3d Cir. 2019) ..................................... 58

*United States v. Ford*, 435 F.3d 204 (2d Cir. 2006) .................................. 43, 44

*United States v. Foy*, 50 F.4th 616 (7th Cir. 2022) ................................... 20, 21

*United States v. Hausman*, 345 F.3d 952 (7th Cir. 2003).......................... 55, 56

*United States v. Householder*, 137 F.4th 454 (6th Cir. 2025)......................... 40

*United States v. Lawson*, 810 F.3d 1032 (7th Cir. 2016) ............................... 20

*United States v. Maez*, 960 F.3d 949 (7th Cir. 2020) ..................................... 24

*United States v. Marchan*, 935 F.3d 540 (7th Cir. 2019)................................ 57

*United States v. McCabe*, 103 F.4th 259 (4th Cir. 2024) ............................... 38

*United States v. Morgan*, 635 F. App'x 423 (10th Cir. 2015)......................... 42

*United States v. Mullins*, 800 F.3d 866 (7th Cir. 2015) ................................. 41

*United States v. Nardello*, 393 U.S. 286 (1969)............................................. 46

*United States v. Nayak*, 769 F.3d 978 (7th Cir. 2014) ................................... 55

*United States v. Ng*, No. 18-CR-538, 2022 WL 1062704 (E.D.N.Y. Apr. 8, 2022) ............................................................................................ 33

*United States v. Paneras*, 222 F.3d 406 (7th Cir. 2000) ................................ 22

*United States v. Peleti*, 576 F.3d 377 (7th Cir. 2009)..................................... 43

*United States v. Romero*, 57 F.3d 565 (7th Cir. 1995) .............................. 50, 57

*United States v. Ryan*, 156 F.4th 583 (5th Cir. 2025)..................................... 32

*United States v. Sabaini*, 161 F.4th 1036 (7th Cir. 2025) ............................... 32

*United States v. Shen Zhen New World I, LLC*, 115 F.4th 1167 (9th Cir. 2024) ....................................................................................................... 46, 47

*United States v. Sheneman*, 682 F.3d 623 (7th Cir. 2012) ............................ 54

*United States v. Silver*, 948 F.3d 538 (2d Cir. 2020)..................... 38, 39, 40, 43

*United States v. Sittenfeld*, 128 F.4th 752 (6th Cir. 2025) ....................... 43, 52

*United States v. Solomon*, 892 F.3d 273 (7th Cir. 2018)................................ 37

*United States v. Sorich*, 523 F.3d 702 (7th Cir. 2008) .................................... 55

*United States v. Thomas*, 933 F.3d 685 (7th Cir. 2019)................................. 20

*United States v. Watkins*, 107 F.4th 607 (7th Cir. 2024)................................ 19

*United States v. Weiss*, 153 F.4th 574 (7th Cir. 2025) ................................... 35

*United States v. White*, 443 F.3d 582 (7th Cir. 2006) .................................... 20

*Woodward v. United States*, 905 F.3d 40 (1st Cir. 2018)................................ 24

*Yates v. United States*, 354 U.S. 298 (1957) .................................................. 30

*Zant v. Stephens*, 462 U.S. 862 (1983) ..................................................... 48, 59

## STATUTES

15 U.S.C. § 78m(b) ..................................................................................... 29, 32

18 U.S.C. § 371............................................................................................... 15

18 U.S.C. § 666...................................................................................*passim*

18 U.S.C. § 1014...................................................................................... 31, 32

18 U.S.C. § 1343.............................................................................. 2, 15, 58

18 U.S.C. § 1952.............................................................................. 2, 15, 27, 44

18 U.S.C. § 1962 .............................................................................................. 2

18 U.S.C. § 3231 ................................................................................ 2

28 U.S.C. § 1291 ................................................................................ 2

720 ILCS 5/33-1(d) ........................................................................... 45

720 ILCS 5/33-8 ................................................................. 45, 48, 58

## INTRODUCTION

For more than eight years, defendant Michael Madigan repeatedly exploited his powerful position as Speaker of the Illinois House of Representatives to illegally enrich himself, his son, and his associates.

Madigan arranged for Commonwealth Edison to unlawfully pay, through several different intermediaries, over $1.3 million dollars to five Madigan associates for little or no work, in exchange for Madigan's assistance in passing legislation affecting ComEd's electricity rates, which increased the company's revenues by hundreds of millions of dollars.

Madigan also exploited his own position and the official position of Chicago Alderman Daniel Solis, by agreeing to get Solis a State board appointment in return for Solis's efforts to direct lucrative business to Madigan's law firm and Madigan's son.

Based on the abundant evidence presented at trial, a jury convicted Madigan of bribery, fraud, and Travel Act offenses. Madigan seeks to overturn the jury's verdicts, incorrectly characterizing his actions as "rough-and-tumble politics," "unbecoming," or "prosaic." Br. 4-5. Because, as the district court correctly held, Madigan has failed to make the legal showing necessary to justify such relief, the district court's judgment should be affirmed.

## JURISDICTIONAL STATEMENT

Defendant-Appellant's jurisdictional statement is not complete and correct.

Madigan was charged in a superseding indictment with violations of 18 U.S.C. §§ 1962, 666, 1343, and 1952. R. 37. Madigan was convicted of ten counts after a trial (R. 331), and was sentenced on July 15, 2025. R. 453. Final judgment was entered on the docket on the same day. *Id.* Defendant timely filed a notice of appeal on July 23, 2025. R. 456.

The district court had jurisdiction pursuant to 18 U.S.C. § 3231. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1.    Whether the evidence, viewed in the light most favorable to the verdict, was sufficient to support the jury's verdicts on the ComEd-related counts charging bribery, conspiracy to commit bribery and to falsify books and records and circumvent internal controls, and Travel Act offenses.

2.    Whether the district court plainly erred in instructing the jury regarding stream-of-benefits, official acts, and corrupt intent for the ComEd-related bribery counts.

3.    Whether the district court correctly instructed the jury with respect to the stream-of-benefits and official act instructions for the ComEd-

related bribery counts, and whether any error was harmless beyond a reasonable doubt.

4.     Whether the district court correctly instructed the jury regarding the meaning of "corruptly" in the context of 18 U.S.C. § 666, and whether any error was harmless beyond a reasonable doubt.

5.     Whether the district court's instructions with respect to the Travel Act accurately stated the law, and whether any error was harmless beyond a reasonable doubt.

6.     Whether the evidence, viewed in the light most favorable to the verdict, was sufficient to support the jury's verdicts on the State board-related counts charging wire fraud and Travel Act violations.

## STATEMENT OF THE CASE

### A.     Offense Conduct

#### *ComEd "Subcontractors" Scheme*

Madigan served as Speaker of the Illinois House of Representatives for 36 years and Chairman of the Democratic Party of Illinois for 21 years.

Tr. 1658, 2303.[1] As Speaker, Madigan controlled which measures were called for a vote and exercised enormous influence over fellow lawmakers. *E.g.,* Tr. 182, 202, 309, 335, 605, 719, 756-57, 776, 1085-86, 1097, 2368-69. Leveraging the tremendous power he wielded over legislation, Madigan orchestrated an eight-year bribery conspiracy, in which energy company Commonwealth Edison ("ComEd) made payments to Madigan's associates in exchange for favorable official action on legislation affecting ComEd's rates.

The conspiracy began in 2011, when Madigan approved the first so-called "subcontract" with ComEd for one of his close political associates, former 13th Ward Alderman Frank Olivo. Tr. 3799, 2304, 2259.[2] In total, ComEd paid approximately $1.3 million to five Madigan "subcontractors" between 2011 and 2019, even though these men did virtually no work for ComEd. GX 1520 at 21; Tr. 2444-56, 2497, 2515, 2535, 3617-18, 3630, 3687, 3746, 4426. To conceal the payments, ComEd paid Madigan's allies indirectly through Madigan-affiliated intermediaries and falsified records. GX 1520 at 1; GX 263 at 3; GX 267 at 2; Tr. 2500, 2510-11.

---

[1] Citations to the Original Electronic Record and Supplemental Record on appeal are designated as "R." followed by the district court document number. Citations to the defendant's brief are designated as "Br." Defendant's appendix and supplemental appendix are cited as "A." and "S.A.", respectively. The trial transcript is cited as "Tr." Government and defense trial exhibits are cited as "GX" and "DX" respectively, followed by the exhibit number. Government Exhibits can be found at R. 471, R. 472, R. 473, R. 474, and R. 489. Defense exhibits can be found at R. 474-3 and R. 474-4. Citations are followed by page numbers.

[2] Madigan's district included Chicago's 13th and 23rd Wards. Tr. 1658.

| Subcontractor | Timeframe | Total Payments |
|---|---|---|
| Frank Olivo | August 2011 - April 2019 | $ 368,000 |
| Edward Moody | April 2012 - December 2018 | $ 354,750 |
| Ray Nice | June 2012 - May 2019 | $ 415,000 |
| Edward Acevedo | March 2017 - December 2018 | $ 120,000 |
| Michael Zalweski | August 2018 - April 2019 | $ 45,000 |
| **Total** | | **$ 1,302,750** |

GX 1520 at 21.

Madigan agreed to this "creative," "crazy" means of paying his allies for no work and thought it was "great," as coconspirators Michael McClain (Madigan's confidante and ComEd lobbyist) and John Hooker (ComEd's former head of legislative affairs turned lobbyist) reminisced in recorded conversations. GX 48 at 2; GX 63 at 1; GX 267 at 3. The "subcontractors" were paid based on their continued loyalty and work for Madigan, not on their legitimate value to ComEd. *E.g.,* GX 75 at 1-2.

Madigan controlled when the subcontractor payments started and stopped and when the subcontractors moved to different intermediaries. *E.g.,* GX 73 at 8; GX 74 at 2-3; GX 75 at 1-3; GX 77 at 1; GX 247 at 2; GX 248 at 1. Madigan's coconspirators recognized that the "subcontractor" payments were linked to Madigan's power over ComEd's legislation. *E.g.*, GX 274 at 2-3; GX 270 at 8. In one call, McClain observed, referring to Madigan hires, "if you want

to pass this bill, this is what it requires," and that the new ComEd CEO "might" view the subcontractor arrangement as a "*quid pro quo*." GX 279 at 3-4.

The jury heard evidence from Madigan's coconspirators in testimony and recorded conversations describing the nature of the "subcontractor" arrangement and its connection with ComEd's ongoing efforts to enact favorable legislation, such as the Energy Infrastructure and Modernization Act ("EIMA"), and the Future Energy Jobs Act ("FEJA"). For example, one of the "subcontractors," longtime political worker Edward Moody, testified that he received monthly payments from ComEd from 2012 through 2018, while performing political work for Madigan, but no work for ComEd after 2014. Tr. 4378-79, 4391-92, 4406-07, 4428. Madigan told Moody that he would "lose the contract" with ComEd if he stopped his political work for Madigan. Tr. 4325-26. When Moody expressed concern to Madigan in 2018 that he was doing no work for ComEd, Madigan told him he had "nothing to worry about," and that what he was "doing right now" was what Madigan and ComEd wanted. Tr. 4424-26.[3]

### ComEd Contract with Reyes Kurson

In 2011, Madigan arranged for ComEd to enter into a unique contract with Reyes Kurson, the law firm of Victor Reyes, a valuable Madigan

---

[3] Madigan also expressed interest in using the "subcontractor" arrangement, with payment sources other than ComEd, to conceal payments. GX 135.

fundraiser. McClain and Hooker, on Madigan's behalf, pressured ComEd's general counsel, Thomas O'Neill, to retain the firm, and an agreement was finalized on October 25, 2011—just one day before Madigan voted in favor of the veto override to enact ComEd's beneficial formula rate legislation that impacted the rates ComEd charged customers. Tr. 1181-85; GX 1071, GX 1204. The contract guaranteed hundreds of hours of work each year. Tr. 1188.

Madigan made specific requests regarding the valuable billable hours provision of the Reyes Kurson's contracts. In 2016, when ComEd sought to reduce the guaranteed hours, Madigan (through McClain)[4] pressured ComEd against it. Tr. 1192-93, 1256-57, 1198-1243. McClain emailed ComEd CEO Anne Pramaggiore that if Reyes did not get "850 hours" per year "then he will go to our Friend. Our Friend will call me and then I will call you. Is this a drill we must go through?" GX 522 at 1. McClain added that he did "not understand why we have to spend valuable minutes on items like this when we know it will provoke a reaction from our Friend," the designation McClain used to refer to Madigan. *Id*. *See also* GX 533. Aware of Madigan's power over pending legislation directly affecting its revenues, ComEd renewed the contract in July 2016, and again in December 2016. Tr. 1065, 1234, 1244-56.

---

[4] Madigan met with McClain before McClain conveyed many of these demands. *E.g.,* GX 1118 at 12, 18; GX 535; GX 539.

7

ComEd paid Reyes Kurson $1.8 million from 2012 to 2019. GX 1520 at 22.

### *Other Hiring Demands from Madigan*

Madigan's demands on ComEd included the hiring of other individuals, including applicants who "bombed" interviews and failed basic pre-employment tests (*e.g.,* GX 424; GX 470; GX 480; GX 495; GX 552; Tr. 2840-48) and a set number of summer intern positions reserved for Madigan's ward each year. *E.g.,* GX 648 (McClain referring to the intern slots as part of "our friend's pathway").

Through McClain, Madigan communicated to ComEd his expectation of quick and favorable responses to his hiring demands. For example, in 2014, McClain—referencing Madigan's hiring requests—told ComEd's head of legislative affairs, Fidel Marquez, in an email that Madigan complained that there were "two Fidels," explaining that Marquez was at times "totally responsive and engaging," and at other times "not with us." GX 466 at 3. McClain emphasized to Marquez that Madigan "believe[d] in his mind there should be a hard and quick favorable response" to his demands. *Id.* Similarly, in a recorded call between Madigan and McClain, Madigan quipped that Marquez did not move quickly enough when completing tasks. GX 108 at 2; *see also* GX 62 at 3.

### *Madigan's Official Acts*

Between 2011 and 2019, while ComEd made monthly payments to Madigan's allies and acceded to Madigan's hiring demands, Madigan repeatedly took official action on legislation that benefited ComEd to the tune of hundreds of millions of dollars. Tr. 597, 614, 625-35. Those acts included:

- The Energy Infrastructure and Modernization Act ("EIMA") passed in a 2011 veto override vote that was scheduled by Madigan and that included Madigan's favorable vote. GX 1204; Tr. 765, 1065. Among other things, EIMA implemented the formula rate, which lent certainty and predictability to the way ComEd charged its customers and which ComEd valued at approximately $400 million for five years. Tr. 614, 1058-59. EIMA was passed after the Olivo payments began and just one day after Reyes Kurson got its first contract.

- Senate Bill 9 passed in 2013, after Madigan's "subcontractors" and Reyes Kurson had been paid for two years, with Madigan's favorable votes during the regular session and in a veto override vote. The bill clarified the formula rate provisions to benefit ComEd. GX 1205; GX 1206; Tr. 612-13.

- Another extension of the formula rate passed in 2014, while the "subcontractor," Reyes Kurson, and other payments continued. Tr. 617; GX 1304.

- The Future Energy Jobs Act (FEJA) passed in 2016, while the "subcontractor," Reyes Kurson, and other payments had been rolling in for five years. FEJA again extended the valuable formula rate and benefited ComEd's parent company by allowing two Illinois nuclear plants to remain open, among other things. Madigan authorized his staff to work on FEJA, ensured FEJA got out of committee, called FEJA for a vote in the veto session, and even directed his Issues Director to ensure there were enough votes for FEJA to pass on December 1, 2016. Tr. 624-25, 631-34, 1150-53, 1157-66, 1637-40, 2048; GX 70 at 2; GX 577; DX 5055.

- House Bill 5626, advanced by Madigan's daughter in her capacity as Illinois Attorney General in 2018 (Tr. 2394-98, 3349-50), was opposed by ComEd. McClain told the conspirators that Madigan intended to kill the bill, and the bill did not pass. GX 794; GX 82 at 1; GX 1228.

9

- The "Skinny Bill" was advanced by ComEd in 2019, which would have extended the formula rate. Tr. 719-20, 2381-82. By 2019, the "subcontractor," Reyes Kurson, and other payments had continued for eight years. The conspirators believed Madigan would consider the bill during that session. Tr. 2971. In May 2019, the last month of the regular legislative session, the government's investigation became overt, and the Skinny Bill did not pass. Tr. 2971, 719-20.

### *Exchange of State Board Seat for Continued Assistance in Recruiting Law Firm Clients*

In addition to serving as Speaker, Madigan worked for decades as a named partner at his law firm, Madigan & Getzendanner, which specialized in real estate tax appeals. Tr. 4793. In 2018, Madigan agreed to exploit his political power to obtain a State board position for Chicago Alderman Daniel Solis, in exchange for Solis's efforts to recruit new clients for Madigan's law firm, as well as, on one occasion, an insurance client for Madigan's son.

As an Alderman and Chairman of Chicago's Zoning Committee, Solis had substantial control over real estate developments in Chicago. Tr. 4616, 4622-28, 4766. Between 2014 and late 2018, before and after Solis began to cooperate with the government in 2016, Madigan used Solis to bring in developers to Madigan's law firm. *E.g.,* GX 2; GX 151; Tr. 4740.

In 2017, before discussions regarding the State board seat began, Madigan sought Solis's help in obtaining legal work from a developer called Union West, which was located in Solis's ward. GX 6; Tr. 4923.[5] In

---

[5] The jury acquitted Madigan of the charges related to Union West. R. 331.

conversations leading to a pitch with Union West, Solis (as part of a ruse) explained to Madigan that Union West's principals understood the "*quid pro quo*," meaning the link between the developer's meeting with Madigan and getting zoning approvals from Solis. GX 7 at 2; GX 9. Weeks later, on the day of the "pitch," Madigan took Solis into his private office and instructed him not to use the phrase "*quid pro quo*," falsely explaining, "You're just recommending our law firm . . . because if [ ] they don't get a good result on the real estate taxes, the whole project would be in trouble . . . . Which is not good for your ward." GX 11 at 1-2.

In speaking with Madigan after the pitch, Solis twice referred to the link between Solis's zoning approvals and Union West's giving Madigan tax appeal business, and Madigan confirmed Solis should "process that," or go forward with the approvals after he confirmed Union West would be engaging his firm. GX 12 at 1; GX 16 at 3.

Solis also linked official action with business for Madigan's firm when discussing a proposed hotel development in Chicago's Chinatown neighborhood.[6] Starting in July 2017, Solis sought Madigan's assistance with the legislative transfer of the Chinatown property from State to private ownership so that the development could proceed. GX 11 at 2. On March 26,

---

[6] The jury was unable to reach a verdict on the counts related to the Chinatown property. R. 331; R. 332.

2018, Solis told Madigan he could be "discreet," and that the Chinatown developer would "get you the . . . property taxes." GX 31 at 21. The next day, Solis repeated this linkage, telling Madigan, "If you can take care of that matter [the land transfer] in May, I'm confident they'll [the Chinatown developer] appreciate it and . . . sign you up [ ] after May." GX 32. Madigan continued to work to secure the Chinatown parcel transfer and seek Solis's assistance in recruiting clients. *E.g.,* GX 73 at 7, GX 103.

On June 20, 2018, immediately after a pitch with another developer that Solis had arranged at Madigan's request (GX 28), Solis raised the issue of a State board appointment with Madigan. GX 125 at 23. Solis told Madigan that he was interested in a State board position. *Id*. Madigan immediately responded, "I'll take a note down. I have a file." *Id*. at 24. Solis then told Madigan that he would continue to get him legal business, and Madigan immediately asked Solis to help arrange a pitch meeting with Harry Skydell, the developer of the Old Post Office in Solis's ward. *Id.*; Tr. 5116.

On August 2, 2018 (after Solis told Madigan he had arranged a pitch with Skydell, GX 146 at 1), Solis and Madigan met to discuss the State board positions. GX 151 at 3-8. The men reviewed a list of State boards Madigan had sent to Solis. Tr. 5145, 5153; GX 309; GX 1401. Solis told Madigan that he would continue to help Madigan get law firm business and proposed potential clients. GX 151 at 7. Madigan responded, "don't worry about it," and then

confirmed the two boards Solis was interested in, stating: "Just leave it in my hands." *Id.* at 8. Solis then asked if there was anything else Madigan was interested in, and Madigan immediately responded, "There's one thing you can do." *Id.* Madigan then asked Solis to reach out to the president of a certain non-profit to help secure insurance business for Madigan's son. *Id.* Madigan gave Solis his son's business card (Tr. 5147, GX 1401), and then immediately shifted the conversation back to the State board, again stating: "just leave this in my hands." GX 151 at 9. Later in the same conversation, Madigan repeated that he would help with the State board appointment ("I got it"), and then reminded Solis to contact the non-profit's president. *Id.* at 14.[7]

Madigan continued to press Solis for Skydell's business (GX 166 at 1), noting on September 26, 2018, that a new Skydell development "may be an opportunity for me." GX 185 at 1.

On October 26, 2018, Solis told Madigan (as a ruse) that Skydell would give Madigan legal work. GX 197 at 1. In that same conversation, Madigan told Solis he would discuss the State board position with soon-to-be-elected Governor JB Pritzker and that Madigan would tell him, "Here it is, this is what we want to do." *Id.* at 2.

---

[7] The non-profit subsequently engaged Madigan's son's insurance firm. Madigan's son earned approximately $43,000 in commissions between 2019 and 2021. Tr. 5969-70.

On November 23, 2018, Solis referenced a development in his ward and told Madigan, "I figure I can still help you a lot." GX 236 at 4. Solis promised Madigan he was "committed" to introducing Madigan to developers, to which Madigan responded, "thank you" and immediately asked, "Do you want to go forward now on one of those state appointments?" *Id.* at 4-5. Madigan then asked for Solis's resume and added that the referral to Pritzker "doesn't have to be in writing." *Id.* at 5-6.

A week later, Madigan called Solis to confirm the boards in which Solis was interested. GX 244. Madigan took handwritten notes of these State boards Solis listed. GX 1570; GX 1592.

The State board recommendation never materialized, because in January 2019, Solis's cooperation became public. GX 863. Madigan never again contacted Solis. Tr. 5242-43.

## B.  Procedural History

### *Indictment and Trial*

Madigan was charged in a 23-count superseding indictment with racketeering, bribery, honest services fraud, and Travel Act violations. R. 37. The case went to trial beginning on October 9, 2024, and the government's evidence was presented over a period of approximately eight-and-a-half weeks. R. 224; Tr. 154, 7408.

Madigan testified in his own defense at trial. Among other things, Madigan admitted on cross-examination that Solis had on six occasions before June 20, 2018, proposed exchanging official action for business for Madigan's law firm and that he knew this was illegal. Tr. 9168-89.

On February 12, 2025, a jury convicted Madigan on ten counts related to ComEd and the State Board position, as summarized below. R. 331.

| Count | Statute | Description |
|-------|---------|-------------|
| 2 | 18 U.S.C. §§ 371, 2 | Conspiracy: ComEd |
| 4 | 18 U.S.C. §§ 666(a)(1)(B), 2 | Bribery, Zalewski 2018: ComEd |
| 5 | 18 U.S.C. §§ 1952(a)(3), 2 | Use of a Facility to Promote Bribery, Zalewski 2018: ComEd |
| 6 | 18 U.S.C. §§ 666(a)(1)(B), 2 | Bribery, Olivo, Nice, Zalewski 2019: ComEd |
| 8-10 | 18 U.S.C. §§ 1343, 1346 | Wire fraud: State Board |
| 12-14 | 18 U.S.C. §§ 1952(a)(3), 2 | Use of a Facility to Promote Bribery: State Board |

The jury did not reach a verdict as to McClain. R. 332.

### Post Trial Motions

Madigan moved for acquittal or, alternatively, a new trial. R. 396. On June 9, 2025, the district court denied Madigan's motions, first orally, and then in a 101-page written Memorandum Opinion and Order. R. 435, 450.

In denying Madigan's Rule 29 motion, the court concluded that "the Government presented overwhelming evidence of an ongoing agreement

between Madigan and ComEd to exchange private benefits for official actions." S. A. 25; *id.* at 7-19, 25. The district court also found that the jury's findings that Madigan conspired to falsify ComEd and Exelon's records and to circumvent the companies' internal controls was supported by the evidence. *Id.* at 20-25.

Regarding the State board conduct, the court found "overwhelming" the evidence proving that Madigan intended to exchange a thing of value for official action and that Madigan's scheme to defraud involved false or fraudulent representations. *Id.* at 27-36.

The district court also denied Madigan's Rule 33 motion, rejecting Madigan's challenges to the jury instructions. S. A. 40-81. The district court upheld the validity of the stream-of-benefits bribery theory, and rejected Madigan's argument that the stream-of-benefits instruction given by the court was inadequate. S. A. 58-61. The court further concluded that, even accepting Madigan's legal argument, no error occurred because the instructions, considered as whole, "explicitly and repeatedly emphasized the required specificity and concrete nature of the official actions" and required an agreed exchange before the official action. *Id.* at 61-63 (cleaned up). The court also found that any instructional error was harmless. *Id.* at 58, 71, 74.

Analyzing the statute's text, history, and structure, the court determined that the jury was properly instructed regarding the meaning of the term

16

"corruptly" in § 666. The court concluded that "§ 666 does not require that the defendant have knowledge of what the law prohibits," but instead "center[s] on the defendant's factual awareness of the exchange." S. A. 43-57.

Finally, the court concluded that the Travel Act instructions accurately stated the law and that any error was harmless. S. A. 71-74.

### *Sentencing*

On June 13, 2025, the district court sentenced Madigan. The court found that Madigan committed perjury at trial. R. 445 at 59-66 (calling Madigan's trial testimony "a nauseating display . . . of perjury and evasion"). The court applied an enhancement for obstruction of justice. R. 445 at 59-66, 73-75, 114. The court found Madigan's lies included, among others:

- His denial that he talked to Moody about Moody's failure to perform work for ComEd. R. 445 at 61-62.

- His denial that he expected a "quick and favorable response from ComEd as to his demands." *Id.* at 62-64.

- His testimony "that he only recommended people for jobs in good faith because he merely wanted to help people who needed help." *Id.* at 65.

- His testimony that he did not intend to recommend Solis for a State board position. *Id.* at 73-74.

- His testimony that he agreed to recommend Solis for a State board because he had never heard anything negative about Solis. *Id.* at 74-75.

The court calculated Madigan's Guidelines range at 105 years' imprisonment and sentenced Madigan to a total below-Guidelines term of 90 months. R. 445 at 78, 119.

## SUMMARY OF ARGUMENT

### *ComEd Counts*

The jury's verdicts were supported by abundant evidence establishing that Madigan committed *quid pro quo* bribery involving specific official action, and conspired to do so, and that he willfully conspired to falsify ComEd documents and circumvent internal controls. The evidence showed that Madigan exchanged official action for money and that many of the payments were concealed in ComEd's records.

Madigan's arguments concerning the stream of benefits, official act, and corruptly § 666 instructions are reviewed for plain error, because he did not raise his current challenges during trial.

No matter the standard of review, the § 666 instructions correctly stated the law, by requiring an exchange for a specific official action before that official action took place. Further, any error was harmless in light of the overwhelming trial evidence of Madigan's guilt.

The district court accurately instructed the jury, consistent with this Court's precedent, that a defendant acts corruptly under § 666 if he understands a thing of value is to be exchanged for an official act. Moreover, any error was harmless in light of the overwhelming trial evidence of Madigan's guilt.

The Travel Act instructions accurately summarized Illinois bribery offenses, which constitute "bribery" as contemplated by the Act, and any error was harmless.

### State Board Counts

The jury's verdicts were supported by abundant evidence showing that Madigan committed wire fraud, which established that Madigan intended an exchange for official action and engaged in a scheme to defraud.

There is no basis to disturb the Travel Act convictions, because the instructions accurately stated the law and any error was harmless.

## ARGUMENT

### I.     Standard of Review

This Court reviews *de novo* a district court's denial of a motion for judgment of acquittal, applying the standard applicable to sufficiency challenges on direct review. *United States v. Courtright*, 155 F.4th 941, 947 (7th Cir. 2025); *United States v. Watkins*, 107 F.4th 607, 626 (7th Cir. 2024). When evaluating a defendant's sufficiency challenge, the Court "starts with a reminder that great deference is owed to the jury's verdict." *United States v. Brewer*, 143 F.4th 903, 907 (7th Cir. 2025) (cleaned up). Consistent with this principle, the Court limits its inquiry to "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*

(cleaned up). The Court does not "reweigh the evidence and may up-hold [sic] verdicts entirely based on circumstantial evidence." *Id.* at 907-908 (cleaned up).

The Court reviews the denial of a motion for a new trial under Rule 33 for abuse of discretion. *United States v. Foy*, 50 F.4th 616, 622 (7th Cir. 2022).

Where instructional challenges are preserved, this Court reviews the legal accuracy of jury instructions *de novo*, while deferring to the district court's discretion in the specific phrasing of instructions. *United States v. Thomas*, 933 F.3d 685, 690 (7th Cir. 2019). The Court decides "whether, taken as a whole," the instructions "correctly and completely informed the jury of the applicable law.'" *United States v. Black*, 104 F.4th 996, 1001 (7th Cir. 2024) (cleaned up). "[T]o receive a new trial based on erroneous instructions, a defendant must show both that the instructions did not adequately state the law and that the error was prejudicial to him because the jury was likely to be confused or misled." *United States v. White*, 443 F.3d 582, 587 (7th Cir. 2006) (cleaned up).

Instructional challenges that are not preserved in the district court are reviewed for plain error, considering whether a defective instruction "improperly influenced the jury's verdict . . . against the backdrop of the entire trial." *United States v. Lawson*, 810 F.3d 1032, 1040 (7th Cir. 2016) (cleaned up). Under this test a reversal is "rare," and the verdict stands "if it appears

beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* at 1041-42 (cleaned up).

Questions of statutory interpretation are reviewed *de novo. Foy*, 50 F.4th at 622.

## II. The Court Should Affirm Madigan's ComEd Related Convictions (Counts 2, 4, 5, and 6).

### A. Ample Evidence Supported the Jury's Guilty Verdicts.

#### 1. Sufficient Evidence Supported the Jury's Finding that Madigan Committed *Quid Pro Quo* Bribery.

The evidence supported a finding that Madigan's arrangement with ComEd involving the "subcontractors," Reyes Kurson, and the other hires constituted *quid pro quo* bribery.

Madigan's control over the ComEd hires from 2011 to 2019, the other conspirators' clear understanding of the link between Madigan's power over legislation and the "subcontractors," the duration and amount of the payments, the conspirators' efforts at concealment, the fact that the subcontractors were essentially ghost workers, and the timing of the payments relative to critical legislation, demonstrated that the subcontractor payments and the other hires were part of a "this-for-that" exchange. *E.g., United States v. Bruno*, 661 F.3d 733, 744 (2d Cir. 2011). An express agreement to exchange a specific this-for-that is not necessary. *See McDonnell v. United States*, 579 U.S. 550, 572 (2016); *United States v. Blagojevich*, 794 F.3d 729, 738 (7th Cir. 2015).

a. <u>Madigan Knew the Subcontractors Did Not Work.</u>

Madigan concedes "that the subcontractors did little to no work for ComEd," but contends that his knowledge of that was disputed. Br. 11. Considering the evidence in the light most favorable to the jury's verdict, this Court should credit the evidence of Madigan's knowledge, including Moody's testimony that he told Madigan that he was not working for ComEd and that Madigan assured him he was doing what was expected. Tr. 4425-26. *See United States v. Crowder*, ---F.4th ----, No. 24-2143, 2026 WL 172616, at *5 (7th Cir. Jan. 22, 2026) (jury was entitled to disbelieve defendant's theory and find other evidence more probative); *United States v. Paneras*, 222 F.3d 406, 410 (7th Cir. 2000) ("[c]ompeting characterization[s] of the evidence" provide no basis for setting aside the jury's verdict). McClain also specifically referenced the bribery arrangement ("that ComEd agreement") in a conversation with Madigan, in which they discussed stopping payments to Moody. GX 248 at 1. Madigan's recognition of the no-show "ComEd agreement" was powerful evidence of Madigan's participation in the conspiracy.[8]

Madigan recognized the illicit nature of the subcontractor payments from the beginning in 2011. Madigan initially thought the arrangement was

---

[8] The jury also heard a conversation with McClain, in which Madigan joked that "some of these guys have made out like bandits," referring to individuals paid by ComEd. McClain agreed, "for very little work." GX 156 at 2. This exhibit was admitted during Madigan's cross examination. Tr. 9049-50. Madigan does not challenge the exhibit's admission on appeal.

"crazy" but then thought it was "great," which demonstrates his knowledge that his cronies would be paid as ghost workers. GX 48 at 2; GX 267 at 3.

Madigan's admission that he knew consultant Jay Doherty was being used as an intermediary to conceal payments and that fake "monthly reports" would be generated to keep "on file" further demonstrates Madigan's knowledge. GX 135 at 2.[9]

b.  Madigan Received Benefits Knowing that ComEd Expected Specific Official Action in Return.

The jury was presented with substantial evidence concerning the highly regulated nature of ComEd's business, the company's interest in legislation governing its business, in particular its rates and revenue, and its continuing efforts to pass (or in one case prevent the passage of) such legislation. Tr. 553-77, 606-26. This evidence included testimony and documents concerning specific legislation that ComEd actively supported, and that Madigan assisted in passing, including EIMA in 2011 and FEJA in 2016. *Id.* The charged bribes clearly involved a specific and focused question or matter—regulations directed at companies providing electric service to Illinois residents and affecting the manner in which such companies charge customers.

---

[9] Madigan admitted when he testified that he was suggesting using Doherty as an intermediary to conceal payments. Tr. 8721, 9307.

Moreover, the evidence overwhelmingly proved that Madigan was well versed in ComEd's legislative agenda before entering the bribery agreement in 2011, and thus from the outset knew what ComEd wanted and needed out of each piece of proposed legislation. *E.g.,* Tr. 647-48, 1053, 1088, 1621. Although Madigan did not need to follow through on the exchange under § 666, *Snyder v. United States*, 603 U.S. 1, 19 (2024); *United States v. Cui*, --- F.4th ----, No. 24-2495, 2026 WL 73014, at *7 (7th Cir. Jan. 9, 2026); *United States v. Burnette*, 65 F.4th 591, 605 (11th Cir. 2023), he did. Year after year, Madigan took official action to benefit ComEd, while his closest allies received monthly payments from ComEd for no work. Accordingly, Madigan's claim that the government's evidence proved only that the agreement was for legislation "writ large" (Br. 31), holds no water—in addition to being legally incorrect. *See Woodward v. United States*, 905 F.3d 40, 45 (1st Cir. 2018) ("Requiring a tie to the 'enactment of legislation' also seems to substantially satisfy *McDonnell*'s definition of 'official act.'"). The focus throughout trial and in closing was on

24

specific pieces of legislation that impacted the way ComEd charged its customers.[10]

2011. Considering Madigan's immense power to stall or block legislation, Madigan's argument that he could not have been bribed because he supported EIMA in the spring session falls flat. Br. 32. In the summer of 2011, when ComEd started paying Olivo and Madigan pushed for the first Reyes Kurson contract, EIMA remained hotly contested. *E.g.,* Tr. 1104-05.[11] Madigan controlled what matters were called for a vote during the fall veto session. Tr. 197, 606. ComEd's general counsel was pressured to enter into the first Reyes Kurson contract, just one day before Madigan joined the vote to override the Governor's veto of EIMA. GX 1071; GX 1204; Tr. 1177, 1180-94. Given the correspondence in time between these benefits and EIMA and Madigan's knowledge of the agreements to pay Olivo and Reyes Kurson, Madigan knew those payments were tied to ComEd's pending legislation worth hundreds of

---

[10] Madigan claims that statements made by the government in closing were "unlawful[]," though he failed to contemporaneously object. Br. 30 (quoting A. 400, A. 408, A. 410, A. 411); *see United States v. Maez*, 960 F.3d 949, 956 (7th Cir. 2020) (plain error review applies where defendants fail to object to summations). In any event, Madigan's contention that the government in closing only referred generally to "legislation" is contradicted by the government's detailed discussion of the specific legislation that ComEd was trying to obtain for its bribes. Tr. 9981, 10067, 10007, 10060-62, 10063-66.

[11] The General Assembly's regular session concludes in late May, and the veto session commences in fall. Tr. 1248, 1757.

millions of dollars. Tr. 614. This was a concrete, identifiable "matter" under *McDonnell*.

2013. In 2013, after Madigan's associates had received monthly payments for two years, Madigan moved for and voted to pass Senate Bill 9 in the regular session and in the veto override. Tr. 1134. That bill clarified the formula rate provisions and lent additional certainty to ComEd's rates. Tr. 612; GX 1302.

2014. In 2014, as the monthly payments to Madigan's allies continued to roll in, the formula rate was extended to 2019, and again ComEd thanked Madigan. Tr. 617-18, GX 1304. This same year, McClain reminded Marquez that Madigan expected "a hard and quick favorable response" to his hiring demands. GX 466 at 3.

2016. On December 1, 2016, the formula rate was extended to 2022, as part of FEJA, among other changes beneficial to ComEd and Exelon. Tr. 624-25. When FEJA passed, ComEd had been paying Madigan's allies for virtually no work for five-plus years and had acceded to numerous other Madigan hiring demands. GX 1520 at 21. Among other official action to move FEJA (Tr. 624-25, 631-34, 1150-53, 1157-66; GX 70 at 2; GX 577; DX 5055), Madigan pushed to secure the final votes to pass FEJA, as Madigan's Issues Director testified

26

and as other evidence corroborated. Tr. 1637-40, 2048; GX 70 at 2; GX 577.[12] Madigan's efforts unquestionably constituted specific official acts. *See Burnette*, 65 F.4th at 605 (official's confirming vote count constitutes official action).

Madigan incorrectly claims that the renewal of Reyes Kurson's contract in 2016 was not tied to FEJA (Br. 32-33), but the emails show otherwise. In January 2016, one day after Madigan met with Victor Reyes (GX 1513 at 112), and before FEJA was called for a vote, McClain nudged O'Neill about the firm's hours. GX 522. Just two days later, McClain threatened Pramaggiore that failure to renew Reyes Kurson "will provoke a reaction from our Friend" (*id.*), a threat related to Madigan's action on ComEd's major legislation that year. The connection between the contract renewal and Madigan's support of FEJA was further demonstrated by the fact that McClain involved ComEd's project manager for FEJA—who had no role in hiring lawyers (Tr. 2671)—to finalize the Reyes Kurson contract. GX 539. Madigan, using McClain, strategically pushed for this contract renewal in July and December 2016 (Tr. 1065, 1234, 1244-56), knowing that Madigan controlled FEJA's fate. Madigan thus knew there was a link between the payments and Madigan's action on FEJA.

---

[12] Although Madigan did not vote on FEJA, the evidence established that Madigan pushed to ensure its passage, which is an official act.

2018. Madigan argues that he is entitled to acquittal on Count 4, which charged him with § 666 bribery, and Count 5, which charged him under § 1952, in connection with the 2018 Zalewski payments. Br. 34; R. 37 at 65-66.[13] In 2018, Madigan knew his associates had been paid for 6-plus years for virtually no work. Tr. 4426. That same year, Madigan told McClain that he would kill a bill advanced by his daughter, which Madigan knew would have negatively impacted ComEd's revenues and rates. GX 794; GX 82 at 1; GX 1228. ComEd opposed the bill, and it did not pass in 2018. Tr. 2394-98, 3349-50. The failure of the bill was a win for ComEd, even if a similar version of the bill, "with some changes," passed after the government's investigation went overt. Tr. 8546. Madigan claimed at trial, as he does now, that he did not take any official action (Br. 34), but the jury was not required to credit his version of events. *Crowder*, 2026 WL 172616, at *5.

2019. Madigan also argues that he is entitled to acquittal on Count 6, which charged him with § 666 bribery in connection with the 2019 subcontractor payments. Br. 34; R. 37 at 67. By 2019, the sham subcontractors had been paid more than $1 million. GX 1520 at 20. While the monthly payments rolled in, and before May 2019, when the government's investigation went overt, ComEd advanced the "Skinny Bill," which would have extended

---

[13] Madigan's perfunctory, undeveloped arguments concerning Counts 4, 5, and 6 (Br. 34) are waived. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991).

the valuable formula rate. Tr. 719-20. The coconspirators believed Madigan was on board with the "Skinny Bill." Tr. 2971, 719-20.

Around the same time, Madigan's coconspirators expressly connected Madigan hires to Madigan's official action. For example, Marquez asked Hooker how Madigan would react if ComEd refused to renew the Doherty contract, from which many of the subcontractors were paid. GX 286 at 2. Hooker responded that Madigan would say: "You're not going to do something for me, I don't have to do anything for you." *Id*. at 3. This stark response made clear the adverse action Madigan would take if the payments ceased. *See also* Tr. 2619-20; GX 279 at 3-4 (McClain, referring to Madigan hires, noting "if you want to pass this bill, this is what it requires" and observing that this might be viewed as a "*quid pro quo*"); GX 274 at 2; GX 270 at 11. The jury had ample evidence to find Madigan knew the 2019 subcontractor payments were intended to impact his action on ComEd's formula rate legislation, as in years past.

The district court correctly determined that the evidence overwhelmingly proved that, from 2011 to 2019, Madigan conspired to obtain a stream of benefits in the form of contracts and jobs at ComEd for his associates. The evidence, considered in the light most favorable to the jury's verdict, clearly demonstrated that Madigan knew ComEd intended an exchange of jobs for specific official action on specific pending legislation

ComEd sought to pass during the conspiracy, and that Madigan "acted with the understanding that a 'thing of value' was to be exchanged for an 'official act . . . .'" S.A. at 25; *id.* at 7-19, 25. Madigan's years-long scheme to make ComEd pay for its legislation is quintessential bribery.

### 2. Sufficient Evidence Supported the Jury's Finding that Madigan Participated in the Charged Conspiracy to Falsify Documents and Circumvent Internal Controls.

Even if the Court were to accept Madigan's § 666 arguments, any error is harmless as to Count 2 because there was abundant evidence to find Madigan joined a conspiracy to falsify books and records of ComEd and Exelon and circumvent internal controls. 15 U.S.C. §§ 78m(b)(5), 78ff(a). Instructional error as to one object of a conspiracy does not require reversal of a conviction, where the error was harmless. *Skilling v. United States*, 561 U.S. 358, 414 (2010); *Yates v. United States*, 354 U.S. 298, 312 (1957).[14]

#### a. Madigan Acted Willfully.

The evidence abundantly established that Madigan willfully joined a conspiracy to falsify records and circumvent internal controls. The instructions defined "willfully" to require Madigan acted with the "intent to do something he or she knows is against the law." A. 506.

---

[14] Madigan's perfunctory, undeveloped arguments about these objects are waived. Br. 35-36. *See Berkowitz*, 927 F.2d at 1384.

Madigan's primary argument is that he did not know about ComEd's internal forms or processes. Br. 35-36. But the evidence, considered in the light most favorable to the prosecution, established that Madigan knew the subcontractors were paid through intermediaries and did no work and that this arrangement was concealed through false internal records. *See supra* at 22-23. As a lawyer, Madigan knew that ComEd's records could not reflect that the subcontractors did no work, or else the payments would be stopped. Madigan's knowledge that Doherty was used to falsely conceal payments was established in a phone call in which Madigan suggested using Doherty again to generate phony "reports" to keep "on file." GX 135 at 2. Moreover, Madigan approved this "creative" and "crazy" means of paying his allies and thought it was "great," precisely because the payments were concealed in ComEd's records. GX 48 at 2; GX 63 at 1; GX 267 at 3. Indeed, Madigan acknowledged during cross-examination that he had represented multiple corporations as a lawyer and knew that corporate employees cannot falsify records. Tr. 9278.

As a sophisticated lawyer, businessperson, and lawmaker, Madigan also necessarily understood that it was illegal to set up a system like the one his

coconspirators designed to get around the internal controls within the company to ensure that payments to the sham subcontractors went through.[15]

     b.     <u>*Thompson* Does Not Apply, and Even If It Does, the Jury Was Properly Instructed and There Were False Statements.</u>

Madigan also claims, in one paragraph (Br. 36), that the government presented no evidence that ComEd's records were false, citing *Thompson v. United States*, 604 U.S. 408 (2025).[16]

In *Thompson*, the Supreme Court held that 18 U.S.C. § 1014, which prohibits making false statements to a financial institution, does not criminalize statements that are solely misleading. 604 U.S. at 413-16. The Court noted, however, that "[c]ontext obviously matters in determining whether a statement is false" *Id.* at 418 (quoting Thompson's brief). When considered in context, an omission may be false. *Id.* at 417; *accord United States v. Ryan*, 156 F.4th 583, 595-96 (5th Cir. 2025).

The Supreme Court's analysis in *Thompson* was rooted in the text of 18 U.S.C. § 1014. 604 U.S. at 413. Whereas § 1014 criminalizes "knowingly mak[ing] any *false* statement or report," the statute here provides that no

---

[15] The government presented evidence at trial of the internal accounting controls that were circumvented. *E.g.*, Tr. 4036-37, 9393, 4041-43, 4091, 4103, 3552. For example, executive approval was required to process any consultant invoice to ensure that payments were for work performed (Tr. 3552, 9394), and employees were prohibited from misrepresenting the nature of any financial transaction. Tr. 4041-43.

[16] Pramaggiore and McClain appealed their convictions related to the FCPA objects of the ComEd conspiracy. Case No. 25-2349 & 25-2350 (7th Cir.). No argument has been set.

person may "knowingly *falsify* any book, record, or account described in paragraph (2)." 15 U.S.C. § 78m(b)(5) (emphasis added). Paragraph (2), in turn, requires issuers to maintain records "which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer." 15 U.S.C. § 78m(b)(2)(A). The phrase "fairly reflect" indicates that § 78m(b)(5) encompasses a broader scope of conduct than merely making a false record. *Thompson* is irrelevant to § 78m(b), given its different wording. *See also United States v. Sabaini,* 161 F.4th 1036, 1047 n.3 (7th Cir. 2025) (declining to apply *Thompson* outside of § 1014).

Even if *Thompson* applies, the jury was properly instructed that the relevant statements must be false and that Madigan could not be convicted if "he honestly believed the truthfulness" of the records. A. 504; A. 508. And contrary to Madigan's argument (Br. 36), the government argued in closing that these were false statements and "lies," consistent with the instructions. *E.g.,* Tr. 9996-10000, 10858.

The evidence, viewed in the light most favorable to the government, established that the relevant contracts, invoices, and accounting entries in ComEd's books and records were false.[17] For example, Doherty's 2017 contract

---

[17] *Thompson* has no bearing on the circumvention FCPA object. *See United States v. Ng*, No. 18-CR-538, 2022 WL 1062704, at *7 (E.D.N.Y. Apr. 8, 2022) ("'circumvention' . . . does not depend on the falsification of a book or record—which the statute specifically addresses in a separate provision").

specified that the payments were "consideration for the monthly services of" Doherty, namely, advising "ComEd on legislative issues affecting ComEd and its subsidiaries." GX 1108 at 6-7. That was a lie; a substantial portion of the payments were destined to the "subcontractors" who did no work and were paid to bribe Madigan. GX 270 at 6-8; Tr. 2510.

The 2018 amendment to Doherty's contract to add Zalewski was similarly false, as it described Doherty's purported "expanded role" with Cook County officials to justify the additional payments. GX 809 at 4. This was a lie because Doherty did not have an expanded role; rather, Doherty received more money so that he could pay Zalewski. Tr. 2551-52. Likewise, Doherty's invoices were false. *See, e.g.,* GX 1095 at 192 (stating that additional $5,000 was "due to additional scope of services," even though it was paid to Zalewski). These documents were not merely misleading. They were false.[18]

## B. Plain Error Review Applies to Madigan's Challenges to the Stream-of-Benefits, Official Act, and Corruptly Instructions.

Madigan challenges the stream-of-benefits and official action instructions, arguing that they failed to convey that, "when an official accepts a 'bribe,' he [must] understand[] the 'particular question or matter to be influenced.'" Br. 22-23. Although Madigan objected to the district court's

---

[18] Madigan incorrectly states that the government's falsification theory was based on "ComEd's 'single source justification' forms." Br. 35. These forms were one of many false records.

stream-of-benefits instruction at trial, he did so on the basis that the stream-of-benefits theory was invalidated by *Snyder v. United States*, 603 U.S. 1 (2024) (R. 314 at 4 (arguing that "the stream of benefits concept . . . will confuse the jury and lessens the government's burden" and that "the stream of benefits theory is not valid post-*Snyder*"); R. 317 at 10 (same))—a contention he now disclaims. Br. 27. Madigan did not propose the language he now contends was necessary, or make the argument he makes here, before the jury retired to deliberate. Therefore, his challenge is reviewed for plain error.

The same is true of Madigan's challenge to the Pattern "official action" instruction (Br. 39), which he did not make during trial. *See* R. 261 at 80; R. 314.

Plain error review similarly applies to Madigan's argument that the instructions' definition of "corruptly" omitted "consciousness of unlawfulness or wrongfulness" (Br. 44), because Madigan proposed two different "corruptly" instructions at trial, neither of which tracks his current proposal. R. 261 at 101 (requesting instruction that "[a] person acts corruptly when that person acts with the knowledge that his conduct is unlawful"); Tr. 9027-28; R. 317 at 9 (requesting instruction that a "defendant acts corruptly when he specifically intends to receive a private financial benefit in violation of his legal duty to faithfully represent his constituents and the citizens of Illinois"). Indeed, Madigan argued against defining "corruptly" to require knowledge of

35

wrongfulness. Tr. 8090-95, 9027-28.[19] *See United States v. Weiss*, 153 F.4th 574, 584-85 (7th Cir. 2025) (plain error review applies where defendant "raises objections that are substantively different from those he raised before the district court").[20]

### C. The District Court Correctly Instructed the Jury as to § 666 Bribery.

The district court did not err, let alone plainly err, because the instructions accurately stated the law.

### 1. Stream-of Benefits and Official Action

The district court instructed the jury that a "'thing of value' may involve a stream of benefits in a 'this for that' exchange for one or more official actions." A. 506; A. 516.

As the district court discussed at length in denying Madigan's post-trial motions, the instructions guarded against any concern that the jury may have been permitted to convict based on vague promises regarding unspecified future action. S. A. 58-63. To begin, the instructions stated that "[v]ague expectations of some future benefit are not sufficient, by themselves, to make a payment a bribe." A. 506; A. 516.

---

[19] The government initially proposed a definition that required knowledge of wrongfulness, which was conservative because "[c]ircuit law . . . doesn't require that we show some additional state of mind for corruptly." Tr. 8085. The government ultimately did not object to the instruction given. R. 317 at 30.

[20] Madigan acknowledged that mistake of law is no defense. Tr. 3000, 6593, 8103, 8119.

In addition, the instructions required that: (i) Madigan knew the solicitation involved "a 'this for that' exchange of a 'thing of value' for an 'official action,'" and (ii) that an agreement "existed to take an official action in exchange for a thing of value *before* the official action is to take place." A. 505; A. 515-16 (emphasis added). Further, consistent with *McDonnell* and the Seventh Circuit's Pattern instructions, the instructions defined "official action," to require a "*specific* decision or action" on a "*specific* question or matter," that "involve[s] a formal exercise of governmental power and must be something *specific and focused*, rather than a broad policy objective." A. 493 (emphasis added). As further emphasis, the district court added "rather than a broad policy objective" to the Seventh Circuit Pattern, at defendant's request. R. 261 at 80.

In sum, the jury had to find that Madigan entered a this-for-that agreement from the beginning of the bribery conspiracy in 2011, *before* any official action, and that the agreement was for Madigan's specific action on a specific question or matter that concerned a specific and focused exercise of formal governmental power.

Contrary to Madigan's suggestion, the Supreme Court's decision in *McDonnell v. United States*, 579 U.S. 550 (2016), in no way undermines the instructions or the government's theory. In *McDonnell*, the Court held that (1) an official act is limited to a "'question, matter, cause, suit, proceeding or

controversy' involving the formal exercise of governmental power," (2) which "must be something specific and focused that is 'pending' or 'may by law be brought before any public official,'" and (3) "merely arranging a meeting or hosting an event to discuss a matter does not count as a decision or action on that matter." *Id.* at 578-79. As the district court correctly found, there was more than enough evidence to allow the jury to find that each of these requirements were satisfied. S. A. 58-63. *See supra* at 23-29.

The fact that the agreement between Madigan and ComEd continued over time and involved multiple payments and multiple pieces of legislation does not change the equation. As defendant now concedes, the "stream-of-benefits" theory of bribery was not invalidated by the Supreme Court's decisions in *Snyder v. United States*, 603 U.S. 1 (2024) or *McDonnell*. Br. 27. Neither decision suggested that proof of a *quid pro quo* requires a "link [between] each specific benefit [and] a single official act," or a "this for that" link of "each quid, or item of value [. . .] to a specific quo, or official act." *United States v. Solomon*, 892 F.3d 273, 277 (7th Cir. 2018) (cleaned up). To the contrary, the stream-of-benefits theory punishes those particularly invidious "corrupt bribery schemes that involve multiple exchanges over a period of time, as opposed to the so-called 'one-and-done handshake deal.'" *United States v. McCabe*, 103 F.4th 259, 284-85 (4th Cir. 2024).

Nor is there a requirement that, at the time the agreement is entered into, the payments to be made and the official acts to be taken be precisely defined. Madigan relies heavily on the Second Circuit's decision in *United States v. Silver*, 948 F.3d 538 (2d Cir. 2020), and subsequent cases addressing the "stream-of-benefits" theory after *McDonnell*, but those cases generally undermine, rather than support, his position. In *Silver*, the former Speaker of New York State Assembly was convicted of extortion and honest services fraud based on a stream-of-benefits bribery scheme involving the exchange of official acts for referrals of business to the defendant's law firm. The court held that "the 'as the opportunities arise' theory of bribery requires more than . . . an open-ended promise to perform official actions 'for the benefit of the payor.'" *Silver*, 948 F.3d at 559.

Notably, the *Silver* court observed that its holding did "not signal a change in the law" and would not "affect the prosecution of bribery in most cases because neither the facts of *McDonnell*, nor the Court's opinion, suggest that either the payor or the official must precisely define the relevant matter or question upon which the official is expected to exercise his official power." *Id.* at 557. Instead, "[t]he crux of our inquiry is whether the offered quo has enough definition and focus to be properly understood as promising, in return for some quid, the formal exercise of governmental power." *Id.* at 557-58; *see also United States v. Falcón-Nieves*, 79 F.4th 116, 129-30 (1st Cir. 2023)

39

("*Silver* . . . concerned only a challenge to jury instructions that did not require a finding of there having been any promise to take official actions with respect to any specific matter at all.").

As the district court correctly observed (S. A. 60), the *Silver* court was concerned with an instruction that required that the defendant understood "he was expected to exercise official influence or take official action for the benefit of the payor and, at the time the bribe was accepted, intended to do so as specific opportunities arose." 948 F.3d at 559. None of the cases cited by Madigan hold, or even suggest, that in a case such as this one, a *quid pro quo* may only be shown by an agreement from the inception regarding every bill or draft of legislation that may be pending or may be brought before Madigan during the conspiracy.

*Silver*'s concern about vagueness is not present on the facts of this case. Madigan's agreement was neither vague nor open-ended. The agreement was for Madigan to exercise his powers as Speaker to pass (or in one case, to prevent the passage of) legislation directed at the small number of companies supplying electric power to Illinois customers—including, specifically, legislation affecting the manner in which such companies charge their customers for service. Considered "in light of its factual context," the instructions did not "suggest that an official may be held criminally liable for accepting a payment with the understanding that she will take some action on any conceivable

topic." *Silver*, 948 F.3d at 566; s*ee also United States v. Householder*, 137 F.4th 454, 473 (6th Cir. 2025) (instructions did not allow conviction based on official's agreement to take any unspecified action at any time, where they required the "official 'intended to exchange a thing of value from the payor *for a specific official action . . .* or . . . knew the payor intended to exchange the thing of value *for a specific official act*").

Nor did the instructions risk turning legal lobbying efforts into corruption. Br. 40. To the contrary, any such risk was foreclosed by two additional instructions provided to the jury, stating that "[j]ob recommendations tendered by a public official, without more, are not unlawful," and that "[l]obbying, without more, is not unlawful." A. 468; A. 469.[21]

For all of these reasons, and given the overwhelming evidence if an intended exchange, any instructional error was harmless. *See supra* at 23-29.

### 2.     "Corruptly"

The district court correctly instructed the jury that "[a] defendant acts 'corruptly' if he acted with the understanding that a 'thing of value' is to be exchanged for an 'official act' with the intent to influence or reward a State

---

[21] By the time of deliberations, the distinction between legal lobbying and bribery had been unpacked for nearly four months. *E.g.*, Tr. 122, 152, 840-41, 2024, 3008, 9986, 10487, 10647. There was no risk that the jury confused legal lobbying with bribery.

agent in connection with his official duties . . ." A. 505; A. 515. Madigan first challenges this instruction by arguing that the district court failed to instruct the jury that "corruptly" requires knowledge of an unlawful or wrongful exchange. This Court recently held in *United States v. Cui*, --- F.4th ----, No. 24-2495, 2026 WL 73014 (7th Cir. Jan. 9, 2026), that the Seventh Circuit pattern instruction, which likewise omits language requiring that defendant have knowledge unlawfulness or wrongfulness, correctly stated the law.[22] Relying on *Snyder*, this Court reasoned, "Because bribery is 'inherently corrupt,' a person acts 'corruptly' when he understands the payment is a bribe." *Id.* at *11 (quoting *Snyder*, 603 U.S. at 5). Accordingly, the Court held that additional knowledge of unlawfulness was not required and there was no error in the Circuit's pattern instruction. *Id.* at *11, *14; *see also Blagojevich*, 794 F.3d at 736-38; *United States v. Mullins*, 800 F.3d 866, 870 (7th Cir. 2015).

Madigan argues that "not all exchanges are inherently corrupt" (Br. 44-45), citing *Blagojevich*, 794 F.3d at 736, which stands for the unremarkable proposition that a political trade of favors is not bribery. But *Snyder* instructs that exchanging a thing of value for official action is corrupt. *Snyder*, 603 U.S. at 5; *see also Cui*, 2026 WL 73014, at *11. And notably, *Blagojevich* makes clear

---

[22] Indeed, the pattern instruction at issue in *Cui* did not require an "exchange," as the jury was instructed here.

42

that payments to "ghost worker[s]" can be bribes and that mistake of law is no defense under § 666. *Blagojevich*, 794 F.3d at 736.

Madigan also argues that the intent instruction provided to the jury improperly focused on the offeror's intent. Br. 45. But the instructions required a finding that Madigan "acted with the intent to be influenced or rewarded in connection with" government business. A. 503; A. 515. Moreover, the instructions correctly required the jury to find that, as part of the conspiracy, Madigan understood that a thing of value would be given as part of an intended this-for-that exchange. A. 505; A. 515. In other words, the instruction focused on Madigan's intent. *See, e.g., United States v. Morgan*, 635 F. App'x 423, 434-35 (10th Cir. 2015).

The instructions also correctly stated that § 666 does not require that the official "in fact intended to perform the specific official act;" and instead stated, "[i]t is sufficient if the public official knew that the thing of value was offered with the intent to exchange the thing of value for the performance of the official act." A. 509. *Snyder* recognized that § 666 criminalizes instances where an official "took a bribe before the official act but asserts as a defense that he would have taken the same act anyway and therefore was not 'influenced' by the payment." *Snyder*, 603 U.S. at 19; *see also Cui*, 2026 WL 73014, at *7. *Snyder* thus confirms that § 666 requires that the public official solicit or accept payment knowing that it is offered to influence him, not that the official

43

intend to take any specific action. *Id.*; *see also United States v. Sittenfeld*, 128 F.4th 752, 770 (6th Cir. 2025) ("[I]t is bribery to knowingly accept a bribe even if the official does not intend to be influenced by the bribe"); *United States v. Peleti*, 576 F.3d 377, 383 (7th Cir. 2009) (holding, in the context of bribery involving federal officials under § 201, that whether the defendant "actually intended to be influenced is irrelevant, so long as [defendant] conveyed to [the bribe payor] that the money would influence him"). *See also Silver*, 948 F.3d at 552 (the phrase "being influenced" in § 201(b)(2)(A) "does not describe the [official's] true intent, it describes the intention he *conveys* to the briber in exchange for the bribe." (cleaned up)).

Madigan claims that cases involving § 201(b) are irrelevant. Br. 49. But *Snyder* found that "Congress modeled the text of § 666(a)(1)(B) . . . on § 201(b)," and that the statutes share "defining characteristics." 603 U.S. at 10-12.

Madigan cites *United States v. Ford*, 435 F.3d 204 (2d Cir. 2006), to argue that the instructions improperly focused on the bribegiver's intent. Br. 41. But this Court has said otherwise. *Peleti*, 576 F.3d at 383. And significantly, the instructions given in *Ford* did not include an express *quid pro quo* exchange requirement as was included here. *Id.* at 211. None of the other cases cited by Madigan (Br. 46, n. 10), support the proposition that it is necessary (as opposed to sufficient) that a public official accept a thing of value with the intent to change his official act.

44

Finally, any error was harmless, because Madigan plainly knew a this-for-that exchange was unlawful, as a licensed attorney and long-time member of the Illinois General Assembly. Indeed, Madigan admitted that he knew exchanging things of value for official action was "a big red flag" and would cause a "great deal of concern." Tr. 9165, 9170. Moreover, as discussed above, the evidence showed that Madigan intended to be influenced, and was influenced, based on ComEd's payments to the low- and no-work "subcontractors" and other hires. *See supra* at 9-10, 23-29.

## D.    The District Court Correctly Instructed the Jury as to the Travel Act.

The jury was properly instructed as to Count 5, which charged Madigan with use of a facility in interstate commerce with intent to promote "any unlawful activity," in violation of 18 U.S.C. § 1952(a)(3) (the "Travel Act"). *See Crowder*, --- F.4th ----, No. 24-2143, 2026 WL 172616, at *3. "Unlawful activity" includes "bribery . . . in violation of the laws of the State in which committed." 18 U.S.C. § 1952(b). Count 5 alleged that Madigan promoted bribery and legislative misconduct in violation of Illinois law, specifically 720 ILCS 5/33-1(d) and 720 ILCS 5/33-8. R. 37 at 66.

The district court defined those crimes consistently with Illinois' pattern jury instructions. Ill. Pattern Crim. Jury Inst. § 21.12C (rev. Jan. 25, 2019). Bribery in violation of § 5/33-l(d) was defined to occur when a person

45

> receives, retains, or agrees to accept any property or personal advantage from another party that the person is not authorized by law to receive, retain, or agree to accept; and . . . knew that the property or personal advantage was tendered or promised with intent to cause him to influence the performance of any act related to [their] employment or function . . .

A. 525. Legislative misconduct was defined to require an "exchange," when a member of the Illinois General Assembly

> knowingly accepts or receives, directly or indirectly, any money or valuable thing from a corporation, company, or person; and . . . accepts such money or valuable thing in exchange for any vote or influence the person might give or withhold on any bill, resolution, or appropriation, or for any other official act.

A. 525-26.

As the district court ruled (R. 470 at 27-29), Madigan's argument that the Travel Act criminalizes only state bribery statutes that require proof of an explicit *quid pro quo* is foreclosed by *Perrin v. United States*, 444 U.S. 37, 49 (1979). Br. 53. In *Perrin*, the Court held "that Congress intended 'bribery'" as "used in the Travel Act to encompass" a "violation of state commercial bribery statutes," explicitly rejecting a "narrow common-law definition" of the crime. 444 U.S. at 49. In adopting that expansive view, the Court stated that "by the time the Travel Act was enacted in 1961, federal and state statutes had extended the term bribery well beyond its common-law meaning." *Id*. at 43.[23]

---

[23] The holding of *Perrin* also forecloses Madigan's claim that "bribery" under the Travel Act requires an "official act" (Br. 54), because commercial bribery involves private citizens and necessarily does not involve official action. 444 U.S. at 48-49.

Madigan similarly misreads *United States v. Nardello*, 393 U.S. 286 (1969), which did not hold that Congress intended the Travel Act to proscribe a narrow uniform type of conduct. Br. 53. *Nardello* discussed the legislative history of the Travel Act and declined to give "extortion" an "unnaturally narrow reading." 393 U.S. at 296. In holding that the state label for a statute does not dictate whether the statute is a Travel Act predicate, the Court emphasized that the Travel Act was enacted "to aid local law enforcement officials" and reflected "a congressional judgment that certain activities of organized crime which were violative of state law had become a national problem." *Id.* at 292-94. Madigan's position would thwart congressional intent, by imposing a narrower definition of "bribery" than intended by either Congress or the state legislature.

The Ninth Circuit's recent decision holding that courts must identify the "generic" definition of bribery is based on a similar misreading of *Nardello* and *Perrin*. *See United States v. Shen Zhen New World I, LLC*, 115 F.4th 1167, 1183-84 (9th Cir. 2024), *cert. denied,* 145 S. Ct. 2814 (2025) (stating that "bribery" under the Travel Act requires "a contemplated (1) *quid pro quo* and (2) an official act"). The Ninth Circuit affirmed the conviction on other grounds, finding that the jury instructions conformed to a "generic" definition (*id.* at 1185), and thus its "incomplete" discussion of the historical definitions of "bribery" were dicta. R. 470 at 28. The government has identified no authority

47

in the Seventh Circuit or elsewhere adopting the Ninth Circuit's position. And in any event, because there was a contemplated *quid pro quo* for official action, as discussed above (*see supra* at 23-29), *Shen Zhen* does not help Madigan.

Even if the Court performs the common law analysis Madigan proposes, the Illinois statutes at issue here constitute "bribery." Around the time the Travel Act was enacted in 1961, many state bribery statutes were comparable to Illinois' bribery statutes. *See, e.g., Nell v. State*, 277 So. 2d 1, 5 (Fla. 1973); *State v. Smith*, 212 So. 2d 410, 413 (La. 1968); *State v. Begyn*, 167 A.2d 161, 167-68 (N.J. 1961); *Ingram v. State*, 103 S.E.2d 666, 670 (Ga. App. 1958); *State v. Kearns*, 129 N.E.2d 543, 544 (Ohio Com. Pl. 1955).

Finally, any error is harmless beyond a reasonable doubt, because the Travel Act does not require that the underlying bribery predicate occurred, only that the facility was used to further the predicate. *See United States v. Campione*, 942 F.2d 429, 434 (7th Cir. 1991); *United States v. Baker*, 227 F.3d 955, 961 (7th Cir. 2000). Moreover, the evidence overwhelmingly demonstrated an exchange. Indeed, the jury's § 666 convictions premised on the same evidence demonstrate that the jury found a *quid pro quo,* as discussed above. *See supra* at 23-29. Accordingly, "there is no uncertainty about the multiple

grounds on which a general verdict rests." *Zant v. Stephens*, 462 U.S. 862, 883 (1983); *see also Street v. New York*, 394 U.S. 576, 588 (1969).[24]

## III. The Court Should Affirm Madigan's State Board Related Convictions (Counts 8, 9, 10, 12, 13, and 14).

### A. A Reasonable Jury Could Find Madigan Committed Wire Fraud.

Madigan's sole challenges to Counts 8 through 10 concern the sufficiency of the evidence, yet he ignores Rule 29's deferential standard. As the district court found, "overwhelming" evidence (S. A. 27) established that Madigan agreed to use his position as Speaker to get Solis appointed to a paid State board in exchange for Solis steering business to Madigan's law firm and Madigan's son. Based on his conduct, Madigan committed both property fraud and honest services fraud. A. 528-34.

#### 1. A Reasonable Jury Could Find a *Quid Pro Quo.*

With respect to the government's honest services fraud theory, Madigan argues that the jury could not have found a *quid pro quo* exchange. Br. 58-62. This argument is contradicted by the record.

In multiple recordings, Madigan and Solis discussed the State board appointment together in the same conversation as Solis's efforts to secure legal

---

[24] The instructions incorporated an exchange requirement with regard to the legislative misconduct statute (720 ILCS § 5/33-8), as Madigan concedes. Br. 56; A. 526.

work for Madigan's firm. *E.g.,* GX 125 at 23-27; GX 146 at 1-2; GX 236 at 4-6. Indeed, the recording Madigan claims exonerates him (Br. 60) proves an intended exchange. During this August 2, 2018, private meeting, immediately after discussing board positions with Madigan, Solis committed to continuing to help Madigan get law firm business. GX 151 at 6-8. Madigan responded, "Don't worry about it," and then immediately confirmed the State board Solis was interested in and agreed to take action to further the appointment, saying, "Just leave it in my hands." *Id.* at 8.

Solis then asked if Madigan was interested in anything else. *Id.* Madigan immediately proposed an exchange ("There's one thing you can do") and asked Solis to reach out to the non-profit president to help Madigan's son secure insurance business. *Id.* Madigan immediately shifted the conversation back to the State board, again stating: "just leave this in my hands." *Id.* at 9. Later in the conversation, Madigan again said he would help with the State board appointment ("I got it"), then immediately reminded Solis to contact the non-profit. *Id.* at 14. Thus, Madigan demonstrated his intent to engage in an exchange, by repeatedly linking the board appointment to business for Madigan and his son.

As he argued to the jury (Tr. 10582-83, 10592), Madigan claims that what he meant by "don't worry about it" was "don't worry about bringing me law firm business," rather than "don't worry, I'll see about getting you the

50

board position you want." Br. 60-61. The jury was not required to credit Madigan's implausible explanation. *Crowder*, 2026 WL 172616, at *5. Madigan's argument about what he meant during his conversation with Solis does not come close to meeting the standard for reversal or a new trial. *See United States v. Romero*, 57 F.3d 565, 570 (7th Cir. 1995) ("Alternative explanations alone, even if plausible, do not ordinarily overcome the defendant's burden in challenging the sufficiency of the evidence." (citation omitted)).

After August 2, Madigan understood that Solis would continue to bring him business, by twice asking Solis to contact Skydell, a prolific developer, to allow Madigan to pitch his law business and by continuing to press Solis for assistance. GX 166; GX 185; GX 186; GX 197. Immediately after the Skydell pitch on September 4, 2018, Solis privately told Madigan, "he'll give you business," to which Madigan responded "Mhmm" and "Sure." GX 179 at 6. After this, Madigan promised to "sit down with Pritzker" about the board position and tell him, "this is what we want to do." GX 197 at 2.

On November 23, 2018, Solis promised Madigan he was "committed" to introducing Madigan to more developers, to which Madigan responded, "thank you," then immediately turned the conversation to the State board. GX 236 at 4-5. Madigan thus clearly connected the law firm referrals to the State board appointment. Madigan's statement that the recommendation to Pritzker

"doesn't have to be in writing" further shows Madigan's intent to engage in an unlawful exchange. *Id.* at 6.

Madigan ignores the recordings before June 20, 2018, the day Solis first raised a State board appointment, and incorrectly contends that June 20 was "the first recorded meeting." Br. 59. A jury could reasonably find—and Madigan admitted during his testimony (Tr. 9168-70, 9189)—that Solis had, on six occasions before June 20, proposed an unlawful exchange of official action for business for Madigan's law firm. *See* GX 7 at 2 (Solis telling Madigan that Union West understood the "*quid pro quo*," to which Madigan responded "yeah, okay");[25] GX 9 at 1 (Solis telling Madigan that Union West understood Solis would approve zoning and the developer would engage Madigan, to which Madigan responded, "Very good"); GX 12 at 1 (Solis asking Madigan whether Union West had hired him before Solis decided on zoning); GX 16 at 3 (Solis asking Madigan whether Union West had "contacted your [ ] firm," followed by Madigan's instruction to "go ahead and process that");[26] GX 31 at 21 (Solis

---

[25] Weeks later, Madigan told Solis not to "talk[] like that." GX 11 at 1-2. A reasonable jury could find that Madigan was instructing Solis to be more careful in his language, as Madigan gave Solis a false explanation to give developers and continued to agree to unlawful exchanges after this meeting.

[26] Madigan argues that this could not have been a *quid pro quo*, because the conversations concerned Solis's official action and not state legislative action. Br. 61. But the instructions stated, consistent with *McDonnell*, 579 U.S. at 572-73 and without objection, that official action can include an official's use of his position "to exert pressure on another official to perform an official act, or to advise another official, knowing or intending that the advice will form the basis for an official act by another official." A. 493.

telling Madigan that the Chinatown developer would "get you . . . the property taxes"); GX 32 (Solis telling Madigan that if Madigan helped with Chinatown land-transfer legislation, the developer would engage his firm).

Even though the jury did not convict Madigan of the Union West and Chinatown charges, Madigan's course of conduct with Solis on and before June 20, 2018, was highly probative evidence of his intent to exchange official action for law firm business. *See, e.g., Sittenfeld*, 128 F.4th at 773 (defendant's earlier conversation with developer-turned-informant "laid important groundwork and offered significant context for [defendant's] later interactions" and supported bribery conviction); *see also* S. A. 31 n.24. Indeed, many of the conversations in which Solis and Madigan discussed the State board position *also* included discussion of the Chinatown property, highlighting the relevance of the prior conduct. *See, e.g.,* GX 125 at 27, 30-33; GX 179 at 6-7 (discussing Chinatown land transfer after pitch meeting with Skydell); GX 197 at 2-5; GX 236 at 1-2, 5.

Considering the evidence in the light most favorable to the government, the jury reasonably found this was more than mere "juxtaposition" (Br. 50), and was instead an intended exchange of official action for private gain for Madigan and his son.

## 2.     A Reasonable Jury Could Find a Scheme to Defraud.

Contrary to Madigan's contention, Madigan's scheme involved false statements. Br. 62-63. Madigan schemed to falsely represent to Governor Pritzker that he was recommending Solis based on Solis's credentials, when, in fact, his recommendation was part of a bribe and Madigan knew Solis had proposed unlawful *quid pro quos* on prior occasions. Madigan asked Solis to send Madigan his resume in connection with the State board position, and Solis complied. GX 236 at 5; GX 852. Had Pritzker known the truth, Pritzker "would never" have appointed Solis, as his transition team director testified. Tr. 6313.

The fact that the scheme was exposed before the recommendation to Pritzker does not impact Madigan's conviction. Wire fraud criminalizes the scheme, or "a plan or course of action" to obtain money or commit bribery; the scheme need not be completed or successful. A. 530; A. 532 ("The government need not prove that the scheme to defraud actually succeeded.").

Here, the scheme was false to its core. Madigan sought to obtain business through a *quid pro quo* arrangement, which involved Solis being recommended for and receiving a board position not based on his merit but based on a bribe.[27]

---

[27] In addition, Madigan's suggestion that *he* must make a false statement is incorrect; the scheme must involve an intended misrepresentation, which could be made by a co-schemer. *United States v. Sheneman*, 682 F.3d 623, 628-29 (7th Cir. 2012).

Madigan claims the government relied on "speculation" to prove an intended false statement or misrepresentation. Br. 63. But the evidence, considered in the light most favorable to the government, showed that Madigan planned to recommend Solis to a State board position in exchange for business for himself and his son and took substantial steps to make that happen. Madigan told Solis he "would go to Pritzker" and that "you'd come in as Pritzker's recommendation." GX 151 at 7. Madigan twice told Solis, "Just leave it in my hands." *Id.* at 8-9. Madigan also made clear that he believed he would convince Pritzker to appoint Solis. *See* GX 197 at 2 (Madigan told Solis, "When I sit down with Pritzker [ ] I'll tell him . . . this is what we want to do."). Madigan even boasted about past successful appointments, showing that he believed he could get Solis a board seat. GX 151 at 4-5. Madigan also sent Solis board materials, asked for and received Solis's and his daughter's resumes, and took notes on the boards Solis was interested in. GX 236 at 5; GX 244; GX 309; GX 1570; GX 1592. A reasonable jury could find this was more than "mere preparation." Br. 64.[28]

---

[28] On direct examination, Madigan testified that he agreed to recommend Solis for the State board in 2018 because, "I never heard anything negative about Alderman Solis." Tr. 9181. But before Solis's request for a State board appointment, Solis told Madigan that he was engaged in an unlawful exchange on six occasions. The district court found at sentencing that Madigan committed perjury when he gave this justification for why he agreed to recommend Solis. R. 445 at 74-75.

Moreover, for the honest services fraud theory, the government need not show false statements or misrepresentations but rather an undisclosed breach of fiduciary duty and a bribe or kickback. *E.g., United States v. Bloom*, 149 F.3d 649, 655 (7th Cir. 1998) ("Misuse of office . . . for private gain is the line that separates run of the mill violations of state-law fiduciary duty."); *accord United States v. Sorich*, 523 F.3d 702, 707 (7th Cir. 2008); *United States v. Nayak*, 769 F.3d 978, 981 (7th Cir. 2014) (noting that *Bloom* remains good law provided there are bribes or kickbacks). In *United States v. Hausman,* 345 F.3d 952 (7th Cir. 2003), for example, an attorney was convicted of conspiring to commit fraud through a scheme to refer law clients to his co-defendant, a chiropractor, in return for the chiropractor paying kickbacks to third parties at the attorney's direction. *Id.* at 954. The Seventh Circuit affirmed both defendants' convictions, noting that the attorney "deprived his clients of their right to know the truth about his compensation" and thus "misrepresented" the "compensation" he received, even if the "clients received the same net benefit as they would have absent the kickback scheme." *Id.* at 957. Thus, "the scheme itself converted" the defendant's "representations to his clients into misrepresentations," because he "illegally profited at the expense of his clients, who were entitled to his honest services." *Id. Hausman* thus stands for the proposition that an honest services fraud theory does not require a false or intended false representation but instead applies when a "defendant

misuses his fiduciary relationship (or information acquired therefrom) for personal gain" or does not disclose profits from business transacted on the employer's behalf. *Id.* at 956 (citation omitted).

Madigan, like the defendant in *Hausmann*, arranged to recommend Solis to a lucrative public board position, which was premised on false representations to the Governor and the Illinois public about Solis's credentials and Madigan's real reasons for the recommendation. As the district court concluded, like in *Hausmann*, Madigan stood to illegally profit "'at the expense' of the Governor-elect and the people of Illinois, who were 'entitled to his honest services.'" S. A. 34 (quoting *Hausmann*, 345 F.3d at 957). A reasonable jury could find Madigan engaged in a scheme to defraud.

### 3.     A Reasonable Jury Could Find Official Action.

Madigan claims the government did not prove an official action for Counts 8, 9, and 10. Br. 66. The government presented evidence from which a reasonable jury could find that Madigan planned to advise Governor Pritzker to appoint Solis and believed Pritzker would take his advice. Madigan told Solis he would "come in as Pritzker's recommendation" and twice told Solis, "Just leave it in my hands." GX 151 at 7-9. Madigan told Solis he would tell the Governor, "here it is, this is what we want to do." GX 197 at 2. And Madigan referred to his success in securing a board seat for a different individual. GX 151 at 4-5. The executive director of Governor Pritzker's transition team

testified that Madigan's board recommendations were given "serious consideration." Tr. 6302-03. Indeed, Madigan's recommendations were successful about half of the time. A. 98. This evidence, considered in the light most favorable to the government, was sufficient to establish that Madigan intended to use his official position to exert pressure on or advise Governor Pritzker to perform an official act. *McDonnell*, 579 U.S. at 572-73.

Madigan's self-serving argument that he "could not know how Pritzker or his aides would receive his recommendations" (Br. 67) is contradicted by this evidence, and the jury was certainly not required to credit such an argument. *Romero*, 57 F.3d at 570.

Contrary to Madigan's argument (Br. 66),[29] a reasonable jury could easily find Madigan intended that Governor Pritzker would perform an official action at his advice. The likelihood of success of that plan does not require reversal. *See, e.g., Cui*, 2026 WL 73014, at *7 (finding sufficient evidence of official action where defendant intended for alderman to take official action by exerting pressure on another official to reverse the denial of a permit, even

---

[29] Madigan claims the rebuttal misstated the law, though Madigan did not object (Br. 67 (citing A.429)), and juries are presumed to follow instructions. *United States v. Marchan*, 935 F.3d 540, 547-48 (7th Cir. 2019).

though no action was taken). The jury had ample evidence to find Madigan intended to pressure or advise Pritzker, rather than offer mere support.[30]

The jury had abundant evidence to find Madigan guilty of Counts 8, 9, and 10.

## B.  The District Court Correctly Instructed the Jury as to the Travel Act.

As discussed above, the Travel Act instructions were correct. *See supra* at 44-47.

Any instructional error was harmless (a point Madigan does not challenge), based on the overwhelming evidence that Madigan intended a *quid pro quo* exchange. *See supra* at 49-53.

Moreover, the instructions incorporated an exchange requirement with regard to legislative misconduct (720 ILCS § 5/33-8). A. 526. Because the jury's § 1343 convictions required an exchange and were premised on the same evidence, any error was harmless. *See Zant*, 462 U.S. at 883.

---

[30] *United States v. Fattah*, 914 F.3d 112 (3d Cir. 2019) is inapposite, because the jury was not instructed that it had to find an "impermissible attempt 'to pressure or advise another official on a pending matter.'" *Id.* at 156 (quoting *McDonnell*, 579 U.S. at 572-73). Here, unlike *Fattah*, the jury was instructed that an official act includes an official's use of his position to pressure another but does not include merely calling another official. A. 493.

## CONCLUSION

The Court should affirm the defendant's convictions.

Respectfully submitted.

ANDREW S. BOUTROS
United States Attorney

DEBRA RIGGS BONAMICI
Assistant United States Attorney
Criminal Division Counsel

/s/ *JULIA K. SCHWARTZ*
JULIA K. SCHWARTZ
Assistant United States Attorney

## RULE 32 CERTIFICATION

I hereby certify that:

1.  This brief complies with the type volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B) because it contains 13,960 words.

2.  This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5), 32(a)(6), and Circuit Rule 32(b), because it has been prepared using the Microsoft Office Word proportionally spaced typeface of Century Schoolbook with 13-point font in the text and 12-point font in the footnotes.

Respectfully submitted.

ANDREW S. BOUTROS
United States Attorney

By:      /s/ *JULIA K. SCHWARTZ*
JULIA K. SCHWARTZ
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-5326

## CERTIFICATE OF SERVICE

I hereby certify that on January 30, 2026, I electronically filed the foregoing Brief of the United States with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Respectfully submitted.

By:     /s/ *JULIA K. SCHWARTZ*
        JULIA K. SCHWARTZ
        Assistant United States Attorney
        219 South Dearborn Street, 5th Floor
        Chicago, Illinois 60604
        (312) 353-5326