# In the United States Court of Appeals for the Seventh Circuit

No. 25-2249

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*

*v.*

MICHAEL J. MADIGAN,
*Defendant-Appellant*

*On Appeal from the United States District Court for the Northern District of Illinois*
*No. 1:22-cr-00115 (Hon. Robert J. Blakey)*

## REPLY BRIEF OF DEFENDANT-APPELLANT MICHAEL J. MADIGAN

DANIEL J. COLLINS
KATTEN MUCHIN ROSENMAN LLP
  525 West Monroe Street
  Chicago, Illinois 60661
  (312) 902-5434
  Daniel.Collins@Katten.com

LISA S. BLATT
DAVID M. ZINN
AMY MASON SAHARIA
  *Counsel of Record*
PATRICK J. LOOBY
ALLISON S. EISEN
KAITLIN D. WETZ
WILLIAMS & CONNOLLY LLP
  680 Maine Avenue, S.W.
  Washington, DC 20024
  (202) 434-5000
  asaharia@wc.com

**TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................................1
ARGUMENT .........................................................................................3
I.  MADIGAN IS ENTITLED TO ACQUITTAL OR A NEW
    TRIAL ON THE COMED COUNTS (COUNTS 2, 4-6). ......................3
    A.  The Government Did Not Prove the ComEd Counts
        Beyond a Reasonable Doubt. ..............................................3
        1.  The government did not prove a legally valid quid
            pro quo. ...............................................................3
        2.  No evidence proved Madigan's agreement to
            falsification of documents or circumvention of
            internal controls. ...............................................11
    B.  At a Minimum, Madigan Is Entitled to a New Trial Due to
        Instructional Errors. ......................................................13
        1.  De novo review applies to the erroneous instructions .......13
        2.  The stream-of-benefits instruction was erroneous. ...........15
        3.  The "corruptly" instruction was erroneous. .................18
        4.  The Travel Act instructions were erroneous. ................23
II. MADIGAN IS ENTITLED TO ACQUITTAL OR A NEW
    TRIAL ON THE STATE BOARD COUNTS (COUNTS 8-10,
    12-14). .....................................................................25
    A.  The Government Did Not Prove the State Board Counts
        Beyond a Reasonable Doubt. ............................................25
        1.  The government failed to prove a quid pro quo. .............26
        2.  The government failed to prove a scheme to defraud. .......29
        3.  The government failed to prove an official act. .............33
    B.  Madigan Is Entitled to a New Trial on Counts 12-14
        Because the Travel Act Instructions Were Erroneous. ...........34
CONCLUSION ....................................................................................34

**TABLE OF AUTHORITIES**

Page

**CASES**

*Gerhartz v. Richert*, 779 F.3d 682 (7th Cir. 2015) ................................13

*Kousisis v. United States*, 145 S. Ct. 1382 (2025) ...............................29

*McConville v. SEC*, 465 F.3d 780 (7th Cir. 2006) ................................11

*McDonnell v. United States*, 579 U.S. 550 (2016) .......................*passim*

*Perrin v. United States*, 444 U.S. 37 (1979) .....................................24, 25

*Snyder v. United States*, 603 U.S. 1 (2024) ................................*passim*

*Thompson v. United States*, 604 U.S. 408 (2025) ..........................12, 13

*United States v. Abbey*, 560 F.3d 513 (6th Cir. 2009) ....................21, 22

*United States v. Blagojevich*, 794 F.3d 729 (7th Cir. 2015) ..........19, 30, 31

*United States v. Bloom*, 149 F.3d 649 (7th Cir. 1998) .........................32

*United States v. Cui*, 163 F.4th 1072 (7th Cir. 2026) .....................18, 19

*United States v. Falcón-Nieves*, 79 F.4th 116 (1st Cir. 2023) .........17

*United States v. Ford*, 435 F.3d 204 (2d Cir. 2006) ......................20, 21

*United States v. Hausmann*, 345 F.3d 952 (7th Cir. 2003) ...............32

*United States v. Householder*, 137 F.4th 454 (6th Cir. 2025) ..........17

*United States v. Keane*, 522 F.2d 534 (7th Cir. 1975) .......................29

*United States v. Morgan*, 635 F. App'x 423 (10th Cir. 2015) ...........21

*United States v. Gladish*, 536 F.3d 646 (7th Cir. 2008) ....................29

*United States v. Nardello*, 393 U.S. 286 (1969) ...............................24

*United States v. Ng Lap Seng*, 934 F.3d 110 (2d Cir. 2019) ............15

*United States v. Otradovec*, 72 F.4th 794 (7th Cir. 2023) ...........13, 14

*United States v. Peleti*, 576 F.3d 377 (7th Cir. 2009) .......................20

*United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003) ................31, 32

*United States v. Sawyer*, 85 F.3d 713 (1st Cir. 1996) .......................32

*United States v. Shen Zhen New World I, LLC*,
115 F.4th 1167 (9th Cir. 2024) ....................................................24

*United States v. Silver*, 948 F.3d 538 (2d Cir. 2020) ...........5, 8, 16, 21

*United States v. Sittenfeld*, 128 F.4th 752 (6th Cir. 2025) ..........21, 22, 28, 29

*United States v. Solakyan*, 119 F.4th 575 (9th Cir. 2024) .................32

*United States v. Turner*, 551 F.3d 657 (7th Cir. 2008) .....................31

*United States v. Valle*, 538 F.3d 341 (5th Cir. 2008) ........................21

*United States v. Williams*, 504 U.S. 36 (1992) .................................13

*Waldemer v. United States*, 106 F.3d 729 (7th Cir. 1996) ................17

*Woodward v. United States*, 905 F.3d 40 (1st Cir. 2018) ................4, 5

ii

Page

**STATUTES AND RULE**

18 U.S.C.

§ 201................................................................................................20, 22

§ 666.................................................................................................*passim*

§ 1014...................................................................................................12

§ 1343...............................................................................................31, 32

§ 1346...............................................................................................31, 32

Fed. R. Crim. P. 29 ...............................................................................6

**OTHER AUTHORITY**

Seventh Circuit Pattern Criminal Jury Instructions (2023 ed.) .................18, 19

**INTRODUCTION**

The government's opposition confirms that this prosecution pushed federal bribery law over the boundaries set by the Supreme Court. On the ComEd counts, the government does not defend the validity of the "question or matter" it told the jury was the quo in the alleged federal-program bribery scheme—"legislation" of interest to ComEd. Instead, the government (at 23) offers, for the first time in this Court, a new formulation with more words but no more specificity: "regulations directed at companies providing electric service to Illinois residents and affecting the manner in which such companies charge customers."

This re-formulation does nothing to assuage the concerns that *McDonnell* articulated about such generically defined questions or matters: they put any politician who accepts something of value from a constituent at risk that prosecutors may deem any action he later takes benefitting the constituent as evidence of an multi-year bribery agreement that prosecutors define after the fact (including, as here, on appeal).

This case proves that concern. The government urges this Court to affirm Madigan's convictions on the ComEd counts by asking the Court to infer

1

links between alleged quids and quos occurring many years apart. In a striking passage (at 26-27), the government points to the Illinois Legislature's consideration of legislation of interest to ComEd over several years (2013-2016) while payments on contracts signed *years* before (in 2011 and 2012) "continued" as proving a quid pro quo. The government does not contend that the legislation was against the public interest or that Madigan took any anomalous action on it. And it urges this Court to ignore evidence of Madigan's working *against* ComEd's interests during the same period. According to the government, once ComEd hired the first subcontractor in 2011, Madigan's ability to serve the public was frozen in one direction. Any actions benefitting ComEd were illegitimate (and a federal crime), and any actions unfavorable to ComEd were irrelevant.

The government's arguments regarding the alleged state board scheme are no less troubling. The government implausibly argues that Madigan's recorded rejection of a quid pro quo proves that he accepted one. It also asks the Court to excuse its failure to prove the misrepresentation and official act elements because bribery schemes need not succeed to violate the wire-fraud statute. But that maxim is irrelevant where, as here, the alleged scheme was never even attempted. The government's arguments that a jury could infer

2

that Madigan might, at some future point, say *something* false or cross the line separating permissible recommendations from unlawful pressure or advice are pure speculation. If this sufficed to prove wire fraud, then any expression of support by a politician—which *McDonnell* identified as quintessentially protected political activity—could be bribery.

The government's attempted defense of the jury instructions is of a piece with its blind pursuit of Madigan. The government casually invites the Court to create circuit splits on the definition of "corruptly" in the federal-program bribery statute and the scope of the Travel Act. Its opposition gives the Court no sound reason to do so. The Court should reverse on all counts.

## ARGUMENT

### I. MADIGAN IS ENTITLED TO ACQUITTAL OR A NEW TRIAL ON THE COMED COUNTS (COUNTS 2, 4-6).

#### A. The Government Did Not Prove the ComEd Counts Beyond a Reasonable Doubt.

##### 1. *The government did not prove a legally valid quid pro quo.*

a. The government did not prove beyond a reasonable doubt that Madigan agreed with ComEd to take official action on an identified, specific question or matter. For the first time in its opposition—nearly four years after the indictment and after a four-month trial and extensive briefing on

Madigan's post-trial motions—the government (at 23) claims that, at some uncertain time in 2011, Madigan agreed to act favorably towards ComEd on "regulations directed at companies providing electric service to Illinois residents and affecting the manner in which such companies charge customers." This post-hoc articulation is no different than the vague "legislation" of interest to ComEd formulation that it pursued before the jury. Br. 31. Defined at that high level of generality, the question or matter fails *McDonnell*'s requirement that it be "the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete." *McDonnell v. United States*, 579 U.S. 550, 570 (2016).

The government cites no case endorsing such a nebulous question or matter as part of a legally valid bribery agreement. It relies exclusively on *Woodward v. United States*, but there the First Circuit declined to grant the "extraordinary remedy" of coram nobis relief from a two-decade-old conviction based on an argument that the jury instructions, although tied to "enactment of legislation," covered legislation-related actions that did not require "the formal exercise of governmental power" as defined by *McDonnell*. 905 F.3d 40, 45 (1st Cir. 2018) (citation omitted). That argument did not concern the specificity of the *question or matter* or the parties' understanding of

4

it. *See id.* at 45-49. And the First Circuit recognized the "existence of arguments" that the instruction did not "precisely comport with *McDonnell*." *Id.* at 45.

The government's vague articulation exemplifies the risks highlighted by *McDonnell* and its progeny. Unless a bribery agreement relates to a specific question or matter, "any official who accepts a thing of value and then later acts to the benefit of the donor, in any manner, could be vulnerable to criminal prosecution." *United States v. Silver*, 948 F.3d 538, 558 (2d Cir. 2020). Even where, as here, the official takes no money from a constituent, the constituent's mere act of hiring a political ally—something companies do all the time to attempt to generate goodwill—could result in liability so long as the government can point to some favorable action the official took years later. Permitting conviction on such an ill-defined question or matter also undercuts *Snyder* by making it impossible to determine whether the things of value (here, contracts to third parties) were intended as legal gratuities for past support or as unlawful bribes for future acts.

b. In any event, the evidence did not prove Madigan's agreement to this vague, invalidly defined arrangement. Even viewed in the light most favorable to the government, the record reflects no overarching agreement, only a series

5

of unconnected alleged quids and quos. The government's arguments on appeal mirror its approach at trial—throw a near-decade of alleged misconduct at the wall and see what sticks. It peppers its recounting of this eight-year period with cherry-picked phrases from call transcripts, most of which did not involve Madigan and occurred several years into the alleged conspiracy.[1] But none of this evidence sheds any light on the specifics of the agreement supposedly struck in 2011: to take official action on "regulations directed at companies providing electric service to Illinois residents and affecting the manner in which such companies charge customers."

**2011.** The undisputed timeline refutes the government's no-show-jobs-for-legislation theory from the start. The only legislation at issue in 2011 was EIMA. The government (at 25) blithely claims, *without citing evidence*, that Madigan knew in late 2011 that Olivo's and Reyes Kurson's contracts were "tied" to EIMA. The government has the timeline wrong. Madigan *already* supported EIMA in December 2010, R.471-3 p.817, and the bill passed both houses in May 2011, A.39-40. Madigan's support predated the Reyes Kurson

---

[1] The government's sufficiency arguments for all counts improperly rely on evidence admitted during the defense case, including a dozen cites to Madigan's testimony and other exhibits (*e.g.*, GX.156). *See* Fed. R. Crim. P. 29(a)-(b); Br. 26-27.

contract, finalized in October 2011, and the Olivo contract, finalized in August 2011, by many months.

Conspicuously, although the government (at 22) asserts that "Madigan recognized the illicit nature of the subcontractor payments from the beginning in 2011," the only evidence it cites dates to 2018 and 2019—one of many instances where the government's citations do not match its assertions. The government repeatedly misstates the thin 2011-era evidence. For example, the government wrongly claims that Madigan "approved" Olivo's contract in August 2011 while EIMA was pending. U.S. Br. 4 (citing Tr. 3799, 2304, 2259). There is no evidence of Madigan's "approval," nor any evidence that Madigan changed his behavior between voting for EIMA in May 2011 and voting for the veto override months later. The government also vaguely invokes (at 8) ComEd's hiring of other employees and interns recommended by Madigan's office but does not even claim the hiring started or accelerated in or after 2011, when the supposed agreement was struck.

***2012-2015.*** The next subcontractor, Moody, was hired in 2012, and the government (at 6) appears to concede that he performed work for ComEd at least in 2012-2014. *See* R.360 pp.4359-61. No relevant legislation was pending in 2012 when ComEd hired Moody. These facts are irreconcilable with the

theory that Madigan, in 2011, exchanged no-show jobs for future official acts on legislation. Instead, the government (at 6, 22) jumps ahead *seven years* to Moody's alleged 2018 comment to Madigan that he wasn't working for ComEd at that time. That Moody, after working for ComEd for years, ceased doing so at some point between 2014 and 2018 says nothing about Madigan's supposed agreement in 2011 (or even 2012, when Moody was hired) to exchange no-show jobs for legislation.

The remainder of the government's 2012-2015 timeline similarly does not prove the alleged 2011 agreement. Discussing Madigan's vote on SB9 in 2013, the government (at 26) merely observes that ComEd *continued* paying subcontractors on contracts from two years earlier, but it cites no evidence connecting the 2011-2012 contracts to SB9's enactment years later. This passage in the government's brief epitomizes *Silver*'s warning about subjecting officials to liability based on "later" actions benefitting a donor. 948 F.3d at 558.

***2016.*** Jumping ahead to 2016, the government (at 26-27) attempts to tie Madigan's vote on FEJA in December 2016 to "five-plus years" of subcontractor jobs and the Reyes Kurson renewal contract. But the government does

8

not identify evidence tying the continued payments under the 2011-2012 contracts to FEJA. Br. 32-33; A.413. It does not dispute that ComEd first renewed its contract with Reyes Kurson in July 2016 following months of negotiations, and it cites no evidence linking the contract's second renewal in December 2016 to pending legislation. Br. 12. The second renewal occurred *after* FEJA passed. A.413.

The government (at 27) attempts to cast doubt on the legitimacy of the renewal by claiming that McClain copied ComEd's project manager for FEJA on emails related to the negotiations. But it cites no evidence that his involvement in legal contracts was improper; the cited testimony (Tr. 2671) states only that he was not in the law department. Nor does the record show that McClain "threatened Pramaggiore" that failure to renew the Reyes Kurson contract would affect FEJA: the lone email the government cites (GX.522) was sent nearly a year before FEJA passed.

c. The government similarly failed to prove beyond a reasonable doubt the substantive ComEd § 666 counts (Counts 4 and 6) or Travel Act count (Count 5). The government (at 28 n.13) is incorrect that Madigan waived this challenge by making a supposedly "perfunctory" argument. Madigan pointed to the lack of evidence linking the alleged quid in Counts 4 and 5 (Zalewski's

9

2018 hiring) and Count 6 (payments for three subcontractors in March 2019) with any act on specific legislation in 2018-2019. Br. 34. The lack of evidence does not require many words to describe. The government's opposition confirms the point; it identifies *no* evidence linking Zalewski's—nor any other subcontractor's—hiring to HB 5626, debated in 2018, or the "skinny" version of HB 5626 reintroduced and passed in 2019. For each count, the government needed to prove quid pro quo bribery, Br. 34, and it failed to satisfy its burden.

The exhibits it cites are inapposite. GX.286, a recorded conversation between McClain and others in February 2019 about Doherty's contract, has nothing to do with specific legislation. GX.279, also a recorded conversation between McClain and others in February 2019, likewise does not reference HB 5626; although McClain vaguely refers to a bill ComEd "wants," ComEd opposed HB 5626. Nor does the call concern ComEd's hiring of subcontractors or Reyes Kurson. The remaining exhibits are unrelated to legislation. *See* GX.274; 270.

Additionally, no evidence showed that Madigan "killed" HB 5626. No witness testified that he did, and the cited exhibits (GX.794; 82; 1228) show at most that, by May 2018, any effort to "kill" the bill had failed. The government's argument (at 28) that the jury could infer that Madigan "kill[ed]" the

10

bill simply because it did not become law is pure speculation. Moreover, the government's arguments ignore evidence that Madigan supported the bill, even removing a procedural hurdle in 2019 to help it pass in "skinny" form. R.357 pp.3419.

### 2. *No evidence proved Madigan's agreement to falsification of documents or circumvention of internal controls.*

Nor did the government prove that Madigan willfully joined a conspiracy to falsify ComEd's books and records or to circumvent ComEd's internal controls. The government (at 31) continues to rely on Madigan's legal training to supply knowledge of the facts underlying these objects. That Madigan went to law school does not prove he was aware of ComEd's internal processes. For example, no evidence proved that Madigan knew of ComEd's Code of Business Conduct, much less that he conspired to knowingly violate it.[2]

The government's observation (at 31) that the subcontractors were paid through "intermediaries" (*i.e.*, Doherty's contract) does not move the needle, as Doherty was ComEd's longtime lobbyist. A.73. And the government's suggestion that Madigan knew Doherty was generating "phony" reports (the

---

[2] The government also failed to establish that ComEd's Code of Business Conduct is an "internal control" under the FCPA. *See McConville v. SEC*, 465 F.3d 780, 790 (7th Cir. 2006).

government's word, not Madigan's) is not supported by the lone cited exhibit (GX.135): a transcript in which Madigan suggests Doherty prepare *legitimate* reports on what monthly services a potential employee could render.

The falsification object fails for the separate reason that the documents were not false. The government's attempt (at 33) to distinguish between "false" in 18 U.S.C. § 1014 and "falsify" in the FCPA fails. The words plainly mean the same thing, and the government provides no support for its tortured interpretation. The government's opposition (at 34) dispels any doubt that it is pursuing an invalid misleading (rather than false) documents theory, arguing that ComEd's forms *should have disclosed* certain information about payments to Doherty. The government does not dispute that the forms contained true statements regarding Doherty's services; Doherty did advise "ComEd on legislative issues affecting ComEd and its subsidiaries," U.S. Br. 34 (quoting GX.1108 at 6-7), even if a "substantial portion" of the payments to Doherty were passed through to subcontractors. Failure to name and describe the subcontractors would at most make the documents "misleading but

true." *Thompson v. United States*, 604 U.S. 408, 414 (2025).[3] The same is true for the 2018 contractual amendment referencing Doherty's "expanded role."

**B.      At a Minimum, Madigan Is Entitled to a New Trial Due to Instructional Errors.**

### 1. *De novo review applies to the erroneous instructions.*

Madigan raised each instructional argument in his post-verdict motion for new trial. R.401 pp.39-52. The government tellingly did not argue waiver in response. Nor did the district court find that Madigan waived these arguments when it passed on them post-trial. SA.58-62. Because the district court decided these issues on the merits, they are properly before this Court. *See United States v. Williams*, 504 U.S. 36, 41-42 (1992) ("It suffices for our purposes that the court below passed on the issue presented." (quotation omitted)); *Gerhartz v. Richert*, 779 F.3d 682, 686 (7th Cir. 2015) (issues addressed in post-verdict motions were properly preserved).

In any event, as the government recognizes (at 36), plain error applies only to arguments that are "substantively different from those … raised before the district court." "[N]othing prevents [an appellant] from amplifying

---

[3] Former ComEd CEO Pramaggiore's pending appeal in this Court presents the same issue. *See United States v. Pramaggiore*, No. 25-2349 (7th Cir. 2025), Dkt. No. 233 at 39-58.

and elaborating on appeal a properly preserved argument." *United States v. Otradovec*, 72 F.4th 794, 796 (7th Cir. 2023). Madigan sufficiently preserved his challenges to the ComEd § 666 instructions.[4]

*Stream-of-benefits*. Without a request from either party—and in its proposed-final draft instructions circulated after the charge conference—the district court added a sentence of its own creation: "The term 'thing of value' may involve a stream of benefits in a 'this for that' exchange for one or more official actions." A.505-06. Madigan objected, arguing that inserting the "stream of benefits concept into the instruction … will confuse the jury and lessens the government's burden." R.314 p.4.[5] This objection became reality at closing when the government urged conviction by mixing and matching alleged quids and quos untethered to any specific question or matter identified in 2011. *See supra* p. 4.

*Corruptly*. The definition of "corruptly" was extensively litigated below. Madigan maintained that the term requires knowledge that one's actions are

---

[4] The government (at 34-36) concedes that Madigan preserved his objections to the Travel Act instructions.

[5] Madigan reiterated as an "additional[]" objection his pre-trial argument that *Snyder* invalidated the stream-of-benefits theory. R.314 p.4. Madigan's decision not to pursue this argument on appeal does not undermine his separate objection to the instruction's language. *Contra* U.S. Br. 35.

unlawful. *See* R.176 pp.71, 137; R.183 pp.75-79; R.261 pp.95-98; R.314 pp.3-4. The government initially agreed the instruction should require consciousness of wrongdoing but insisted on the word "wrongful" instead of "unlawful." Madigan maintains that unlawful was correct. *See United States v. Ng Lap Seng*, 934 F.3d 110, 142 (2d Cir. 2019). Instead of settling the parties' dispute, the court rejected the concept of consciousness of wrongdoing altogether. Thereafter, Madigan reiterated his prior objection and additionally objected that the court's proposed instruction incorrectly focused on the bribe-giver's intent. R.314 pp.3-4. Madigan's positions on appeal are unchanged. *See infra* pp. 18-23.

### 2. *The stream-of-benefits instruction was erroneous.*

The instruction that a "thing of value" "may involve a stream of benefits in a 'this for that' exchange for one or more official actions," A.505-06, is irreconcilable with *McDonnell*'s requirement that the government must "identify a 'question [or] matter'" that is "specific and focused" that is the subject of the bribery agreement. 579 U.S. at 567, 574.

1. The government does not dispute that the stream-of-benefits sentence added by the district court did not convey *McDonnell*'s specificity requirement. Instead, it (at 37) argues that two other sentences covered the

concept.  It first invokes the instruction that an "official action" is a "specific decision or action" on a "specific question or matter."  A.493.  That instruction, however, did not explain that the "question" or "matter" must be identified at the time of the agreement.  The government next cites the instruction requiring it to "prove that an agreement existed … *before* the official action is to take place."  A.516.  But the instruction did not tell the jury that the agreement needed to relate to a specific question or matter.  The jury was never instructed on this requirement.

2.  The government does not challenge *Silver*'s holding that the government must show that, when an official accepts a "bribe," he must understand the "particular question or matter to be influenced."  948 F.3d at 553.  The government, instead, disputes the degree of specificity required, claiming that *Silver*'s concern about "vagueness" does not mean that "at the time the agreement is entered into, the payments to be made and official acts to be taken be *precisely* defined."  U.S. Br. 39 (emphasis added).  This misses the point:  the instructions did not require the jury to find the question or matter was identified ahead of time at all, let alone with any degree of "precision."  That failure permitted the government to frame the question or matter as "legislation."  The government cites no case affirming a conviction on such a vague question

16

or matter; the cases it cites involved specific questions or matters. *See, e.g.*, *United States v. Falcón-Nieves*, 79 F.4th 116, 129 (1st Cir. 2023) (a single "3CG purchasing-website contract proposal"); *United States v. Householder*, 137 F.4th 454, 473 (6th Cir. 2025) (per curiam) (passage of "bailout" bill), *pet. for cert. filed* (Dec. 29, 2025) (No. 25-756).

3. The court's error on the stream of benefits instruction was not harmless beyond a reasonable doubt. The government barely contends otherwise. It (at 41) references its sufficiency arguments, but that confuses harmlessness with evidentiary sufficiency. The harmlessness analysis "asks not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to error." *Waldemer v. United States*, 106 F.3d 729, 731 (7th Cir. 1996).

The government cannot meet that weighty burden. As previously discussed, *see* Br. 40, the breadth of the "question or matter" on which the government built its entire case ("legislation") allowed the jury to convict based on *any* official acts Madigan took that may have favored ComEd over nearly a decade. The split verdict illustrates the closeness of the case, making it far more likely that any instructional error affected the outcome.

### 3. The "corruptly" instruction was erroneous.

The errors in defining "corruptly" (a) without requiring consciousness of wrongdoing and (b) with respect to the bribe-giver's (not recipient's) intent independently require vacating the ComEd § 666 counts.

a. The government is wrong (at 42) that *United States v. Cui*, 163 F.4th 1072 (7th Cir. 2026), forecloses Madigan's challenge. *Cui* was a § 666(a)(2) case against the bribe-giver in which "corruptly" "refer[red] to the 'state of mind' of the individual offering the thing of value." *Id.* at 1087. In such cases, this Court's Pattern Instructions define corruptly with respect to the bribe-giver's "intent … to reward or influence" an official. *Id.* In *Cui*, this Court reasoned that the defendant's proposed instruction that he knew his offer was "forbidden" was unnecessary because, for a bribe-giver, intending to obtain influence over an official is inherently "forbidden." *See id.* ("[I]f the individual acts expecting to achieve a forbidden influence, the individual acts corruptly." (cleaned up)).

In contrast, neither the Pattern Instruction for § 666(a)(1)(B), nor the instructions in this case, define corruptly with respect to the bribe-recipient's intent to be influenced or rewarded. Instead, they focus on the bribe-recipient's understanding of *the bribe-giver's intent* to influence or reward him. *See*

18

Seventh Circuit Pattern Criminal Jury Instructions 298 (2023 ed.); A.505; A.515. This focus on the bribe-giver's intent was independently erroneous for the reasons discussed below. *See infra* pp. 20-23. It also militates against applying *Cui* to § 666(a)(1)(B) cases against alleged bribe recipients.

A politician's job often includes soliciting and/or accepting valuable things—donations, volunteer services, endorsements, internships for college students, etc.—from constituents with vocal desires regarding how the official should act. Officials routinely make promises to the public about what they will do in office to warrant support. This is politics. It is not obvious that accepting valuable things from constituents *without intending to be influenced or rewarded* (but understanding the constituents desire such influence) is inherently wrongful, unlawful, or, in *Cui*'s parlance, "forbidden."

That is especially so because federal law permits state officials to accept gratuities, good-will gifts, and political favors. *Snyder v. United States*, 603 U.S. 1 (2024); *McDonnell*, 579 U.S. 550; *United States v. Blagojevich*, 794 F.3d 729 (7th Cir. 2015). In this context, "corruptly," as traditionally defined to include consciousness of wrongdoing, is necessary to limit criminal liability to true bribes. *See* Br. 51.

b. For similar reasons, the "corruptly" instruction's focus on the briber-giver's intent fatally undermined the separate intending-to-be-influenced-or-rewarded element. The government notes (at 43) that the court instructed on that separate intent element, but ignores that the instruction merely repeated the same error by stating it was sufficient "if the public official knew that the thing of value *was offered with the intent to exchange* the thing of value for the performance of the official act." A.509 (emphasis added). As with the "corruptly" definition, the italicized language concerns only the bribe-giver's intent. Yet the instructions applied this definition of intent to be influenced or rewarded to Count Two's § 666(a)(1)(B) object and the substantive § 666(a)(1)(B) counts where only *Madigan's intent* mattered. A.520.

Like the district court, the government does not dispute that these instructions conflict with the Second Circuit's decision in *United States v. Ford*, 435 F.3d 204 (2d Cir. 2006). The government (at 44) claims that this Court has already resolved this question, but the lone case it cites, *United States v. Peleti*, 576 F.3d 377 (7th Cir. 2009), involved § 201(b), not § 666. As *Ford* recognized, "the language of the two provisions differs in significant respects," including, as relevant here, that "Section 201 lacks an explicit intent requirement as to recipients of alleged bribes while Section 666 contains one." *Id.*

20

at 210 & n.2.  Multiple circuits have recognized this textual distinction.  *See United States v. Valle*, 538 F.3d 341, 346 (5th Cir. 2008) (discussing *Ford* and the "important textual difference between the two statutes"); *Silver*, 948 F.3d at 552 & n.6 (similar).

The government does not engage with *Ford* and gives this Court no compelling reason to create a circuit split.  No circuit has disapproved of *Ford*'s analysis.  The Fifth Circuit in *Valle* cited it approvingly, *see* 538 F.3d at 346, as did the Tenth Circuit in *United States v. Morgan*, 635 F. App'x 423 (10th Cir. 2015).  The government (at 43) puzzlingly cites *Morgan* even though that case described an instruction echoing this Court's Pattern Instruction on "corruptly" as "ill-advised" in a § 666(a)(1)(B) case.  *Id.* at 434.

None of the government's other cases provides reason to reject *Ford*. In *United States v. Sittenfeld*, 128 F.4th 752 (6th Cir. 2025), the court seemingly endorsed in dicta the idea that an official need not "intend to be influenced by the bribe."  *Id.* at 770.  The line appears in background discussion of both Hobbs Act bribery and § 666, but cites a portion of an earlier Sixth Circuit decision concerning *only* Hobbs Act bribery.  *See id.* (citing *United*

*States v. Abbey*, 560 F.3d 513, 517-19 (6th Cir. 2009)).[6]  Both the concurring

and dissenting judges read the statute as requiring subjective intent to be in-

fluenced or rewarded.  *See id.* at 794 (Murphy, J., concurring); *id.* at 805 (Bush,

J., dissenting).

Nor does *Snyder* support the government.  *Snyder*'s observation that

§ 666(a)(1)(B) was "modeled" on § 201(b) merely emphasized that

§ 666(a)(1)(B) more closely resembles § 201(b) (governing bribery) than

§ 201(c) (governing gratuities).  603 U.S. at 10.  The Court did not analyze the

textual differences in the intent elements.  And *Snyder*'s statement that "in-

fluenced or rewarded" covers a situation where the official "took a bribe before

the official act but asserts … that he would have taken the same act anyway

and therefore was not 'influenced' by the payment," 603 U.S. at 19, is irrele-

vant.  In the very next paragraph, the Court explained that "even if 'influenced'

alone might have covered the waterfront of bribes, adding 'rewarded' made

---

[6] In a separate portion of *Abbey* addressing § 666, the court stated that the jury must find that the official "accepted property with the corrupt intent to use his official influence in [the bribe-giver's] favor."  560 F.3d at 521.

good sense to avoid potential ambiguities, gaps, or loopholes." *Id.* That passage does not suggest that officials need not intend to be influenced or rewarded at all.

c. The government's only response on harmlessness (at 45) is that Madigan as an attorney knew bribery was unlawful and testified to that understanding. This Court cannot consider Madigan's defense case testimony. *See supra* n.1. In any event, this conclusory argument continues to put the cart before the horse and does not establish harmlessness beyond a reasonable doubt. Bribes of course are wrong and illegal. But the question before the jury was whether the jobs or law firm business were, in fact, bribes. Under a proper reading of § 666(a)(1)(B), that distinction should have turned on Madigan's intent to act "corruptly" by transgressing known boundaries and to be influenced or rewarded. The court's instructions deprived Madigan of the right to have the jury evaluate that question in this close case.

### 4. The Travel Act instructions were erroneous.

The court also erred in instructing the jury that Illinois state offenses lacking a quid pro quo element could serve as Travel Act predicates. Br. 52-56.

The government's contrary argument fundamentally misreads *Perrin v. United States*, 444 U.S. 37 (1979). That case held that commercial bribery could be prosecuted under the Travel Act because Congress intended "bribery" to have its "generic" meaning rather than be limited to its common-law definition. *Id.* at 49. As the Court explained, a "generic" definition is one that encompasses most state statutes in existence when Congress enacted the Travel Act in 1961. *Id.* at 43-45. *Perrin*'s holding that Travel Act bribery may sweep more broadly than common-law bribery does not mean that the Travel Act incorporates *any* state statute labeled "bribery" regardless of its elements. Rather, the Court emphasized that the term is limited to offenses consistent with bribery's "contemporary meaning" at the time of the Act's enactment. *Id.* at 48; *accord United States v. Nardello*, 393 U.S. 286, 296 (1969) ("generic" definition of extortion).

As set forth in Madigan's opening brief (at 53-55) and by the Ninth Circuit in *United States v. Shen Zhen New World I, LLC*, 115 F.4th 1167, 1183 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 2814 (2025), the "contemporary, common meaning" of bribery in 1961 *required* a quid pro quo. The government offers no meaningful response to *Shen Zhen*. Instead, it asserts (at 47-48) that the Ninth Circuit was wrong and invites this Court to create a circuit split. Its

24

only support is a string citation of five state statutes (at 48).  But courts rigorously identify a "generic" definition by looking to the prevailing rule reflected in the substantial majority of jurisdictions.  *E.g.*, *Perrin*, 444 U.S. at 42 (survey of 42 states and federal legislation).  Five atypical statutes cannot displace the widely recognized consensus.  *See* Br. 53-54.

Finally, the government's harmless error arguments (at 48-49) are incorrect.  The government's first contention—that the Travel Act requires only proof that interstate facilities were used to "promote" unlawful activity, not that the underlying offense actually occurred—is beside the point.  Even if true, the jury still must be properly instructed on what constitutes "bribery."  The government's second argument—that the § 666 convictions independently establish the required quid pro quo—ignores that Madigan also challenges the § 666 convictions.  The error was not harmless beyond a reasonable doubt.

## II. MADIGAN IS ENTITLED TO ACQUITTAL OR A NEW TRIAL ON THE STATE BOARD COUNTS (COUNTS 8-10, 12-14).

### A. The Government Did Not Prove the State Board Counts Beyond a Reasonable Doubt.

The government did not prove beyond a reasonable doubt that Madigan and Solis agreed to a quid pro quo, that Madigan participated in a scheme to defraud, or that Madigan would have advised or pressured Governor Pritzker

to perform an official act.  Br. 57-67.  The opposition wrongly treats these arguments as a run-of-the-mill sufficiency challenge.  But the government's decision to charge as wire fraud an inchoate "scheme" that allegedly existed (if at all) within a single conversation manufactured by the government through its cooperator produced glaring failures of proof.  Acquittal is required.

### 1.  The government failed to prove a quid pro quo.

The government (at 49, 59) repeatedly characterizes the evidence on the state board counts as "overwhelming."  Far from it.  The only evidence purportedly establishing a quid pro quo is a handful of recorded conversations between Madigan and Solis.  The government cherry-picks two- and three-word fragments from the recordings, stripped of context.  Examined in full, even viewed in the light most favorable to the government, the evidence did not prove a quid pro quo.

**August 2 (R.471-3 p.450):**  This call speaks for itself:  Madigan *rejected* a quid pro quo.  Solis told Madigan:  "I've helped you in the past.  I'm gonna continue to help you. . . . [Y]ou've been very good to me.  And, and I'm gonna help you."  R.471-3 pp.456-57.  Madigan's immediate response was unequivocal:  "Don't.  Don't worry about it."  *Id.* at 457.  That is not the language of a

26

person accepting a bribe—it is the language of a person declining one. Although the government disputes this interpretation, it does not, and cannot, argue that "Don't" meant that Madigan was accepting a bribe.

When Madigan and Solis later discussed Solis's desired state board appointment, Madigan did not reference any exchange for law firm business. *See* R.471-3 pp.457-58. Madigan mentioned his son, Andrew, and asked whether Solis could put in a good word for Andrew with the head of a non-profit. R.471-3 pp.457-58. But the government's ruse was not designed around Andrew, and the recordings reflect that neither Madigan nor Solis ever mentioned Andrew again. Moreover, no evidence connected the remark to any official act.

**September 4 (R.471-3 p.535):** The transcript of the Skydell meeting similarly does not prove a quid pro quo; the meeting was nothing more than a standard business introduction. Solis privately told Madigan that Skydell "[wi]ll give you business," R.471-3 p.540, but they never discussed the state board appointment.

**October 26 (R.471-3 pp.640):** Solis falsely claimed that Skydell was going to give Madigan business, to which Madigan responded: "Great, great." The two then discussed meeting logistics. R.471-3 p.640. The government intimates (at 13) that *Madigan* then pivoted the conversation to the state board

27

seat.  The record cited by the government shows otherwise.  R.471-3 p.643.  Solis injected the state board seat into the conversation.  *Id.*

**November 23 (R.471-3 p.640):**  The government (at 51-52) distorts the context of this final state board-related discussion.  Madigan asked whether Solis still "want[ed] to go forward now on one of those state appointments."  The government (at 51-52) emphasizes Madigan's comment that the recommendation "does not need to be in writing," but that comment does nothing to prove Madigan's agreement to a quid pro quo.

**Transcripts unrelated to state board counts**:  Finally, as a last-ditch effort, the government (at 52-53) contends that Solis's prior use of the phrase "quid pro quo" in Madigan's presence in conversations about other topics is "highly probative" of Madigan's alleged intent to exchange official action for law firm referrals.  Those calls, however, had nothing to do with the subject matter of the alleged state board count.  For this reason, *Sittenfeld* does not assist the government.  There, the Sixth Circuit reasoned that two calls in which a government cooperator proposed connecting the defendant with someone interested in a quid pro quo provided "context" relevant to the defendant's understanding of that same quid pro quo when it was later offered.

28

*See* 128 F.4th at 773.  Here, the unrelated calls in which Solis supposedly proposed some other quid pro quo (a proposition the jury did not accept, as it acquitted or hung on the related counts) provide no comparable context.

### 2.  *The government failed to prove a scheme to defraud.*

The government (at 54) acknowledges that the recommendation to Pritzker never materialized, and therefore neither Madigan nor anyone else made a misrepresentation.  The government instead conflates the (correct) idea that a scheme to defraud need not succeed with the (incorrect) idea that a scheme does not need to be *attempted*.  That is not the law.  *See Kousisis v. United States*, 145 S. Ct. 1382, 1390 (2025) (defendant participates in scheme to defraud only if "he … engage[s] in deception"); *United States v. Keane*, 522 F.2d 534, 544-45 (7th Cir. 1975) (scheme to defraud must involve conduct designed to deceive).  Although the government identifies (at 55) what it calls "substantial steps"—Madigan told Solis he would "go to Pritzker," sent board materials to Solis, requested Solis's resume, and took notes—those are, at most, mere preparatory acts.  *See United States v. Gladish*, 536 F.3d 646, 650 (7th Cir. 2008).

What is more, the jury could not evaluate whether the plan would have amounted to a scheme to defraud even if it had been attempted because the

alleged "scheme" was so nebulous. The government (at 57) speculates that Madigan was *going to*, at *some* future time, make *some* representation to Pritzker about (1) "Solis's credentials" and (2) "Madigan's real reasons for the recommendation." That speculation lacks supporting evidence.

As to a representation about Solis's credentials, the government did not prove that Solis was unqualified for a state board position. Madigan asked for Solis's resume, indicating that any recommendation would have been based on Solis's *actual* credentials. R.471-3 p.654.

As to a representation about the reasons for the recommendation, the government's assertion (at 57) that Madigan would lie about his "real reasons" for the recommendation is pure conjecture. Because Madigan never made the recommendation, the government has no basis to predict what Madigan would have said. Any number of lawful possibilities exist. For instance, Madigan could have told Pritzker that Solis was qualified given his decades of public service, while also disclosing that Solis was a friend who introduced business to his firm. And he could have asked Pritzker for the appointment specifically as a favor to Madigan so that Madigan could keep his friend Solis happy.

This Court has held that this type of logrolling among politicians is common and legal. *See Blagojevich*, 794 F.3d at 735-36. And this Court rejected

the theory, implicit in the government's arguments here, that failing to disclose the true motivations for an appointment is fraud or that an appointment is an implicit warranty that the individual is "the best person for the job." *Id.* at 735.

Finally, the government is wrong (at 56-57) that honest-services fraud requires only an undisclosed breach of fiduciary duty and a bribe or kickback, without misrepresentations. The government tellingly did not make this argument in response to Madigan's post-trial motion, *see* R.408 pp.68-70, and the argument contradicts the jury instructions, which required a finding that the "scheme to defraud involved a materially false or fraudulent pretense, representation, or promise," A.528. This instruction applied equally to the honest-services theory and the traditional wire-fraud theory. *See id.*

Regardless, the government's argument is incorrect on the merits. Section 1346 is not a standalone offense but a definitional provision that defines "scheme or artifice to defraud" for purposes of the wire-fraud statute, § 1343. A § 1343 conviction requires proof of all traditional fraud elements. *See United States v. Turner*, 551 F.3d 657, 664 (7th Cir. 2008). That is why multiple circuits have held that the government must prove a material misrepresentation to sustain an honest-services fraud conviction. *See United States v. Rybicki*,

354 F.3d 124, 146 (2d Cir. 2003) (en banc); *id.* at 152 (Katzmann, J. concurring) ("[W]hen § 1346 is read together with … § 1343, [an] additional element[] define[s] and limit[s] the conduct proscribed:  a defendant … must misrepresent or conceal a material fact."); *United States v. Solakyan*, 119 F.4th 575, 588 (9th Cir. 2024), *cert. denied*, 146 S. Ct. 91 (2025) (similar); *cf. United States v. Sawyer*, 85 F.3d 713, 733 (1st Cir. 1996) (proof of bribe alone, without deception, is insufficient to sustain honest-services fraud conviction).

The government cites no contrary authority.  *United States v. Bloom*, 149 F.3d 649 (7th Cir. 1998), and its progeny, do not discuss the issue at all. *United States v. Hausmann*, 345 F.3d 952 (7th Cir. 2003), likewise does not help the government.  Hausmann made "written representations" to his clients regarding "their settlements" while concealing that the funds were being used to pay kickbacks.  345 F.3d at 956-57.  The Court held that Hausmann committed honest-services fraud "[i]nsofar as Hausmann *misrepresented* this compensation."  *Id.* at 957.  *Hausmann* confirms that honest-services fraud requires an affirmative representation that is rendered false by the scheme. Madigan took no comparable affirmative step and made no representation— false or otherwise—to Pritzker or anyone else.

### 3. *The government failed to prove an official act.*

Finally, the government did not prove that Madigan planned to cross the line that *McDonnell* drew between lawfully "expressing support" and unlawfully pressuring or advising knowing or intending the advice would form the basis for another's official act. 579 U.S. at 573. *McDonnell* warned that failure to recognize this boundary would raise serious due process and federalism concerns, chill lawful advocacy by public officials, and risk turning ordinary governance into fodder for federal prosecution. *See id.* Because the recommendation never occurred, the jury lacked evidence to determine whether Madigan's recommendation would have constituted unlawful pressure or advice.

None of the evidence the government cites (at 57) changes that outcome: "Just leave it in my hands" proves nothing about what Madigan would have said to Pritzker. Moreover, as the government acknowledges (at 13), because Pritzker was newly elected, Madigan had no track record with him, making it irrelevant that Madigan had once helped secure a board seat for one individual.

**B.** **Madigan Is Entitled to a New Trial on Counts 12-14 Because the Travel Act Instructions Were Erroneous.**

As discussed above, the Travel Act instructions were erroneous.  The error was not harmless, *contra* U.S. Br. 59, because the evidence did not establish a quid pro quo exchange, *supra* pp. 26-29.

## CONCLUSION

For the foregoing reasons, the Court should reverse the conviction with instructions to grant judgment of acquittal or, alternatively, vacate the conviction and remand for a new trial.

Respectfully submitted,

MARCH 6, 2026

LISA S. BLATT
DAVID M. ZINN
AMY MASON SAHARIA
   *Counsel of Record*
PATRICK J. LOOBY
ALLISON S. EISEN
KAITLIN D. WETZ
WILLIAMS & CONNOLLY LLP
   *680 Maine Avenue, S.W.*
   *Washington, DC 20024*
   *(202) 434-5000*
   *asaharia@wc.com*

DANIEL J. COLLINS
KATTEN MUCHIN ROSENMAN LLP
   *525 West Monroe Street*
   *Chicago, Illinois 60661*
   *(312) 902-5434*
   *Daniel.Collins@Katten.com*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT AND TYPEFACE AND TYPE-STYLE REQUIREMENTS

I, Amy Mason Saharia, counsel for Defendant-Appellant and a member of the Bar of this Court, certify that:

1. This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B) and 7th Cir. R. 32(c), because it contains 6,905 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f); and

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) and 7th Cir. R. 32(b) because it was prepared in a proportionally spaced typeface using Microsoft Word in Century Expanded BT, size 14.

3. I further certify, pursuant to Circuit Rule 28(A)(h)(2), that this document and the attached appendices have been scanned for viruses and are virus-free.

*Amy Mason Saharia*
*Attorney for Defendant-Appellant*

MARCH 6, 2026

# CERTIFICATE OF SERVICE

I, Amy Mason Saharia, counsel for Defendant-Appellant and a member of the Bar of this Court, certify that on March 6, 2026, a true and correct copy of the foregoing Reply Brief for Defendant-Appellant Michael J. Madigan was filed with the Clerk through the Court's electronic filing system. I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*Amy Mason Saharia*
*Attorney for Defendant-Appellant*

MARCH 6, 2026