In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 25-2249

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

MICHAEL J. MADIGAN,

*Defendant-Appellant*.

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:22-cr-00115-1 — **John Robert Blakey**, *Judge.*

———————————

ARGUED APRIL 9, 2026 — DECIDED APRIL 27, 2026

———————————

Before EASTERBROOK, SCUDDER, and MALDONADO, *Circuit Judges*.

SCUDDER, *Circuit Judge*. Michael J. Madigan served as the Speaker of the Illinois House of Representatives for over three decades. The government prosecuted him in federal court for expansive corruption rooted in bribery. A four-month trial ended with a jury convicting him on several counts. Madigan now appeals. But sufficient evidence supports each

conviction, and we see no prejudicial error in the district court's jury instructions. We therefore affirm.

## I.     Background

In 2022, a grand jury indicted Madigan on twenty-three counts. Almost half of the charges in the operative (superseding) indictment concerned two broad schemes relevant on appeal. The government aimed to prove the following at trial.

The first scheme involved Madigan's dealings with the Chicago-based utility company named Commonwealth Edison. The company faced financial trouble from 1998 until 2011. During those years, ComEd confronted a statutory rate freeze and regulatory unpredictability, which limited its revenue and put pressure on profitability. By 2011, the state agency in charge of energy rates had been disallowing or undercounting ComEd's costs to the tune of $100 million per year. ComEd enlisted Madigan's help to resolve the downward financial spiral.

From 2011 to 2019, ComEd lined the pockets of Madigan's close political allies. The company did so in part by using intermediaries to funnel over $1.3 million to five of Madigan's friends for little or no work. ComEd would increase the dollar amount of contracts with certain businesses with the understanding that those businesses would then pay Madigan's political associates as so-called "subcontractors." In much the same vein, ComEd awarded contracts worth over $1.8 million to a law firm founded by a Madigan fundraiser.

These payments were in exchange for Madigan's support advancing ComEd's legislative agenda. In 2011, he voted to override the governor's veto on a law to stabilize energy rates. This was a boon to ComEd, and Madigan supported similar

legislation in the years that followed. These actions restored rate predictability and relieved ComEd's financial distress.

Madigan took steps to avoid being caught red handed. He orchestrated the scheme indirectly through his longtime friend, Michael F. McClain, a former Illinois legislator who had been a contract lobbyist for ComEd since the 1980s. What Madigan did not know was that the government had wire tapped McClain's phone. And the government featured the recorded calls at trial.

The second scheme concerned Madigan's interactions with Chicago City Council Alderman Daniel Solis. The government had investigated Solis for years, and when confronted, he agreed to cooperate and to record his conversations with Madigan. The government directed Solis to tell Madigan that he was thinking of retiring as an alderman and wanted Illinois's incoming governor to appoint him to a state board. Madigan agreed to recommend Solis to Governor-elect JB Pritzker in exchange for business referrals.

The government tried Madigan and McClain together. The trial lasted four months, with the government introducing over 1,000 exhibits into evidence and calling more than 50 witnesses to testify, including some of Madigan's alleged co-conspirators in the ComEd scheme and Solis himself. The trial transcript spans more than 11,000 pages.

The jury returned a partial and mixed verdict. The counts related to ComEd and the state board seat charged Madigan alone (Counts 2–7 and 8–14, respectively). The jury convicted him on most of them (Counts 2, 4–6, 8–10, 12–14) but acquitted him on two alleging that he tried to get a political ally appointed to ComEd's board of directors (Counts 3 and 7) and

one framing his state board dealings as federal-program bribery (Count 11). Other counts charged both Madigan and McClain, including one alleging a vast conspiracy in violation of the Racketeer Influenced and Corrupt Organizations Act. The jury could not reach a verdict on this second set of counts.

At the close of trial, Madigan renewed an earlier motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29 and also moved for a new trial under Federal Rule of Criminal Procedure 33. The district court denied both motions in a thorough opinion canvassing broad swaths of the record. It later sentenced Madigan to 90 months' imprisonment and fined him $2.5 million.

Madigan now appeals.

## II.    ComEd Counts

We begin with the jury's verdict. It first convicted Madigan on several counts related to the ComEd scheme. Count 2 alleged a violation of 18 U.S.C. § 371, claiming that Madigan conspired both to receive a stream of benefits in exchange for taking official acts beneficial to ComEd, in violation of 18 U.S.C. § 666(a)(1)(B), and to falsify records to hide a bribe, in violation of 15 U.S.C. §§ 78m(b)(5) and 78ff(a). Counts 4 and 6 charged Madigan with violating 18 U.S.C. § 666(a)(1)(B) by accepting individual bribes.

### A.  Jury Instructions

Madigan contends that the jury received erroneous instructions on § 666(a)(1)(B). "The district court enjoys substantial discretion in formulating its instructions." *United States v. Siepman*, 107 F.4th 762, 765 (7th Cir. 2024) (cleaned up). "To secure a new trial based on improper jury instructions, an appellant must show both that the instructions did

not adequately state the law and that the error was prejudicial to [him] because the jury was likely to be confused or misled." *United States v. Clark*, 140 F.4th 395, 413 (7th Cir. 2025) (cleaned up).

Section 666 is known as the federal-program bribery statute. It provides that "[w]hoever, … being an agent of … a State … government, … corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such … government … involving any thing of value of $5,000 or more" shall be punished. 18 U.S.C. § 666(a)(1)(B).

The district court correctly identified the elements of the offense, instructing the jury that the government had to prove that Madigan "solicited, demanded, accepted, or agreed to accept a thing of value from another person"; that Madigan "did so corruptly"; and that he "acted with the intent to be influenced or rewarded." This tracked our Pattern Jury Instructions. See *The William J. Bauer Pattern Criminal Jury Instructions of the Seventh Circuit* 300 (2023 ed.).

### 1. Official Action

Madigan first asks us to vacate the Count 2 conspiracy conviction because Instruction 56 informed the jury that § 666's "term 'thing of value' may involve a stream of benefits in a 'this for that' exchange for one or more official actions." He contends that the district court should have instructed the jury to convict on this so-called "stream of benefits" theory only if it found that Madigan agreed—upon joining the conspiracy—to take official action on a specific question or

matter. In his view, the Supreme Court said as much in *McDonnell v. United States*, 579 U.S. 550 (2016).

Madigan's reading of *McDonnell* is plenty reasonable. *McDonnell* involved an honest-services wire fraud conviction where the parties agreed to define the crime according to 18 U.S.C. § 201, the general federal bribery statute. See *id.* at 562. The government had to show that the defendant "committed or agreed to commit an 'official act' in exchange for" certain "loans and gifts." *Id.* at 563. Congress defined "official act" to mean "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." *Id.* at 562 (quoting § 201(a)(3)). And the Supreme Court vacated the convictions in part because the district court's instructions allowed a jury to believe that "merely arranging a meeting or hosting an event to discuss" "something as nebulous as 'Virginia business and economic development'" counted as an "official act." *Id.* at 578–79.

*McDonnell* identified "two requirements" for what constitutes an "official act" under § 201(a)(3). *Id.* at 567. First, the government must identify a "question" or "matter" that is sufficiently formal and "focused and concrete." *Id.* at 567–68, 570. Second, the government must prove that the defendant either took an action or agreed to take an action on "*that* question [or] matter." *Id.* at 567 (emphasis added).

The government stipulated at Madigan's trial that § 666(a)(1)(B) requires proving that he agreed to take an "official act" as Congress defined that term in § 201(a)(3). *McDonnell* therefore suggests that convicting Madigan on this object of the Count 2 conspiracy charge required finding that he

promised "at the time the bribe was accepted" "to take official action on a specific and focused question or matter." *United States v. Silver*, 948 F.3d 538, 569 (2d Cir. 2020) (emphasis omitted). But see *United States v. Burnette*, 65 F.4th 591, 614 (11th Cir. 2023) (Jordan, Rosenbaum, & Newsom, JJ., concurring) (reading *McDonnell* to allow conviction where the defendant promises to help every time an opportunity arises).

This understanding aligns with what the district court told the jury. Instruction 56 required the government to prove that "*[w]hen the defendant conspired* to solicit, demand, accept, or agree to accept, a 'thing of value' … in connection with his official duties," he "understood the conspiracy involved a 'this for that' exchange of a 'thing of value' for an 'official action'" (emphasis added). Instruction 47, in turn, defined "official action" as "a specific decision or action on, or an agreement to make a decision or take action on, *a specific question or matter*," even clarifying that the "'question' or 'matter' must … be something specific and focused, rather than a broad policy objective" (emphasis added). Just to be safe, Instruction 56 clarified that "[v]ague expectations of some future benefit are not sufficient, by themselves, to make a payment a bribe." All told, the district court instructed the jury to convict only if it found that Madigan agreed—at the moment he joined the scheme—to take an official act on a specific question or matter. We see no error.

### 2. Corruptly

Madigan next urges us to vacate the convictions on Counts 2, 4, and 6 because the district court erroneously defined § 666(a)(1)(B)'s "corruptly" element. Instructions 56 and 63 stated that a "defendant acts 'corruptly' if he acted with the understanding that a 'thing of value' is to be exchanged for an

'official act' with the intent to influence or reward a State agent in connection with his official duties." Both instructions clarified that "[t]he government need not prove … that the defendant knew that the law prohibited his conduct." Madigan contends that these instructions focused too much on the bribe-giver's intent and not enough on the bribe-receiver's intent. In his view, a defendant acts "corruptly" only when he knows his actions are unlawful or wrong.

Our precedent forecloses Madigan's challenge. We held in *United States v. Hawkins* that someone acts "corruptly" under § 666(a)(1)(B) when he understands that the bribe-giver intends to influence or reward him in connection with his official duties. See 777 F.3d 880, 882 (7th Cir. 2015); see also *United States v. Mullins*, 800 F.3d 866, 870 (7th Cir. 2015) ("An agent acts corruptly when he understands that the payment given is a bribe, reward, or gratuity." (citing *Hawkins*, 777 F.3d at 882)); *United States v. Blagojevich*, 794 F.3d 729, 736 (7th Cir. 2015) ("'Corruptly' refers to the recipient's state of mind and indicates that he understands the payment as a bribe or gratuity." (citing *Hawkins*, 777 F.3d at 882)). That is what the district court told the jury.

Madigan insists that the Supreme Court's 2024 decision in *Snyder v. United States*, 603 U.S. 1, abrogated *Hawkins*. But that is true only with respect to the portion of *Hawkins* concluding that § 666 applies to gratuities. Compare *Snyder*, 603 U.S. at 5, with *Hawkins*, 777 F.3d at 881. *Hawkins* never relied on that proposition to define "corruptly." See 777 F.3d at 882. Were there any doubt, we recently relied on *Hawkins* in part to reaffirm the proposition that "a person acts 'corruptly' when he understands the payment is a bribe." *United States v. Cui*, 163 F.4th 1072, 1087 (7th Cir. 2026). While *Cui* technically

interpreted and addressed § 666(a)(2), our reasoning covered § 666(a)(1)(B) as well. See, *e.g.*, *id.* at 1087–88 ("To be guilty of soliciting or accepting a bribe in violation of section 666(a)(1)(B) requires knowing that the money or other thing of value received was indeed a bribe, which is to say an inducement to do a corrupt act." (quoting *United States v. Curescu*, 674 F.3d 735, 742 (7th Cir. 2012))).

### 3. Intent to Be Influenced or Rewarded

Madigan finally asks us to vacate the convictions on Counts 2, 4, and 6 because he claims the district court effectively told the jury that the government did not need to show that he "intend[ed] to be influenced or rewarded," 18 U.S.C. § 666(a)(1)(B), thereby relieving the government of its burden to prove this element of the crime. He points to Instruction 58, which informed the jury that it was not "necessary that the public official in fact intended to perform the specific official act" and that it was "sufficient if the public official knew that the thing of value was offered with the intent to exchange the thing of value for the performance of the official act." According to Madigan, this instruction contradicted § 666(a)(1)(B), which requires proving that the defendant received a thing of value "intending to be influenced or rewarded."

But we cannot read Instruction 58 in isolation. The district court twice listed the elements of § 666(a)(1)(B), stating in Instructions 55 and 63 that the government had to prove that Madigan acted "with the intent to be influenced or rewarded." Instruction 58 never erased that element or even defined it. It instead clarified the meaning of "Intent to Influence," which mattered for two different reasons. First, Count 2 alleged that Madigan conspired to violate not only § 666(a)(1)(B), but also § 666(a)(2). And § 666(a)(2) requires

showing that the bribe-giver acted with "intent to influence or reward." Instruction 58 therefore helped the jury decide whether Madigan conspired to violate § 666(a)(2). Second, returning to § 666(a)(1)(B), Instructions 55, 56, and 63 explained that the government must separately prove that he acted "corruptly"—"with the understanding that a 'thing of value' is to be exchanged for an 'official act' with the intent to influence or reward a State agent in connection with his official duties." Instruction 58 therefore clarified § 666(a)(1)(B)'s "corruptly" element, not its distinct requirement that a bribe-receiver "intend[ed] to be influenced or rewarded." We see no error.

## B. Sufficiency of the Evidence

Madigan also challenges the sufficiency of the evidence for his ComEd convictions. Our role as a court of review is limited. We must view "the evidence in the light most favorable to the" jury's verdict and ask whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We have described this burden as "nearly insurmountable." *United States v. Garcia*, 580 F.3d 528, 535 (7th Cir. 2009) (cleaned up).

### 1. Conspiracy to Commit Federal-Program Bribery

Count 2 first charged Madigan with conspiring to violate 18 U.S.C. § 666(a)(1)(B) by accepting a stream of benefits in exchange for advancing ComEd's legislative agenda. The jury could have rationally convicted him on this ground. Understanding why requires digging into the expansive trial record. Stay with us. The particulars of the evidence reveal that ComEd faced regulatory uncertainty surrounding its rates, that it sought a legislative solution to its financial turmoil

while funneling large sums of money to Madigan's close political allies, and that Madigan, in exchange, delivered in Springfield. Indeed, the evidence was overwhelming.

We begin with ComEd itself. The jury learned that the company was in serious financial distress for many years leading up to 2011. One of its financial executives, Scott Vogt, testified that from 1998 to 2006, ComEd could not change its energy rates due to a statutory rate freeze. This held ComEd's revenue constant, forcing the company "to be very, very cost effective and diligent on the decisions [it] could make about how much [it] could invest in the business." Vogt testified that ComEd worried that the General Assembly would extend the rate freeze, which would have caused the company to be unable to pay its already agreed-upon supply contracts. Vogt helped prepare bankruptcy affidavits just in case.

ComEd's financial difficulties shifted in 2007. The statutory rate freeze ended, leaving the Illinois Commerce Commission in charge of rates. At the time, Illinois used a traditional rate system. Vogt explained that this meant that a public utility company would identify a test year and provide the ICC with that year's costs and expenses, with the Commission then evaluating the information and determining the rates the company could charge.

ComEd sought relief before the ICC. According to Vogt, the company asked the Commission to increase its rates enough to generate an additional $318 million in annual revenue. The ICC rejected ComEd's request, ultimately allowing only $74 million per year. Vogt testified that the ICC reached its decision by second-guessing ComEd's claimed costs. He stated that this decision had a "dramatic impact," decreasing ComEd's income by around $450 million in 2007 alone.

ComEd continued to file with the ICC. But Vogt testified that "every time we would get a rate case order, the rules or the reasons for an allowance or disallowance would change." As a result, Vogt and others at ComEd "didn't feel like [they] had a fair shot at really getting a reasonable outcome, which made it very difficult then to predict what the revenue and the financial condition of the company was going to be." Vogt recalled that the ICC disallowed about $100 million in annual costs in the years leading to 2011.

This is where Madigan enters the picture. By 2011, ComEd needed a financial game changer to survive, so it turned to the Illinois General Assembly. Vogt testified that ComEd's then-Chief Operating Officer, Anne Pramaggiore, led the company's efforts to enact the Energy Infrastructure Modernization Act, or EIMA. This measure promised to replace traditional ratemaking with a formula rate, which would control the inputs used by the ICC to set energy rates. Vogt explained that ComEd wanted this change because it would stop the ICC from allowing certain costs one year and disallowing them the next, increasing financial predictability and certainty. EIMA also provided for a $2.6 billion investment in energy infrastructure benefiting ComEd. The General Assembly passed the legislation, but then the governor vetoed it. ComEd's only hope for getting EIMA across the finish line was a veto override.

ComEd began providing financial benefits to Madigan's political allies. Sometime around August 2011, the company started funneling monthly payments to a man named Frank Olivo. He was the former alderman for Chicago's 13th Ward, the same ward where Madigan held leadership roles for over 40 years. Fidel Marquez, a former ComEd vice president,

testified for the government at trial that Olivo was known to be Madigan's "political ally." And one of ComEd's contract lobbyists, Jay Doherty, took good care of him. Doherty owned a lobbying firm, Jay D. Doherty & Associates, and one of his administrative assistants testified that the firm increased its contract amount with ComEd so that it could send monthly payments to Olivo as a "subcontractor." An FBI agent clarified that JDDA paid Olivo $4,000 each month. But this was not your average, above-board subcontract. There was no written arrangement, and according to Marquez, Olivo did no work in return for the money.

ComEd did not stop there. On October 25, 2011, just one day before the EIMA veto-override vote and after receiving pressure from McClain, the company awarded a contract to the Reyes Kurson law firm. Victor Reyes was a named partner at the firm and a fundraiser for Madigan. And the contract guaranteed his firm at least 850 hours of annual billable work for three years. ComEd's former general counsel Tom O'Neill testified that John Hooker, the company's then-head of government affairs, told him that time was of the essence with the Reyes Kurson contract—"we needed to get it done and we needed to get it done now."

It appears ComEd's efforts paid off. The very next day, on October 26, 2011, Madigan and a supermajority of the General Assembly voted to override the governor's veto, allowing EIMA to become law. Vogt testified that ComEd credited Pramaggiore for the legislative victory, making her CEO shortly thereafter.

But ComEd was not completely off the hook. Vogt explained that EIMA included a sunset provision that required the company to return to the state house before 2017. He

stated that Madigan's office proposed this provision and that ComEd agreed to it only after learning that the bill would not move forward without it. ComEd also learned that EIMA needed to be clarified. According to Vogt, the ICC in 2012 started disputing the meaning of the statutory language, decreasing ComEd's expected annual revenue by around $40–$50 million.

ComEd provided more benefits to those in Madigan's orbit. In April 2012, the company started funneling payments to Edward Moody. He was a former 13th Ward precinct captain who had performed election work for Madigan for about 20 years. He testified for the government at trial, explaining that he asked Madigan for a consulting position that would pay him $45,000 per year as he neared retirement. Madigan eventually told him he would "be working for McClain" and that this was how he "reward[ed] [his] good soldiers." ComEd executive Marquez testified that Moody's payments came indirectly from ComEd and that he was not aware of any work performed by Moody. According to Moody, McClain called it "one hell of a plum" job.

ComEd did something similar a couple months later. In June 2012, it began channeling monthly payments to Raymond Nice. He, too, was one of Madigan's close political allies. Marquez testified that he was "one of the top three precinct captains for the 13th Ward." And once again, Jay Doherty's administrative assistant testified that his firm increased its contract amount with ComEd so that it could send monthly payments to Nice. An FBI agent explained that Jay D. Doherty & Associates paid Nice $5,000 per month. Marquez stated this was for no work.

ComEd's continued loyalty to Madigan reaped dividends. In 2013, the company pushed for Senate Bill 9, which clarified the EIMA provisions disputed by the ICC. Madigan voted for the bill, the governor vetoed it, and Madigan voted for the veto override. A supermajority of state legislators followed suit, and Senate Bill 9 became law. Vogt testified that its enactment finally led to certainty before the ICC. And according to his projections at the time, extending the formula rate from 2018 through 2022 promised to increase shareholder value by around $400 million. The first step of that extension occurred in 2014, when ComEd successfully pushed the sunset to 2019. Madigan was absent for the floor vote, but then-CEO Pramaggiore wrote him a thank you note afterward acknowledging his "ongoing support."

The next wave of activity came in 2015. ComEd's Scott Vogt testified that the company pushed for the Future Energy Jobs Act, or FEJA, which proposed extending the formula rate to 2022 and providing price support to two underperforming nuclear power plants owned by ComEd's parent company. Tom O'Neill, ComEd's former general counsel, testified that around this same time, the company seriously considered decreasing its guaranteed hours for the Reyes Kurson law firm, with one in-house lawyer even contemplating not renewing the contract at all. O'Neill explained that there was just not enough work to give to the firm.

Madigan's longtime friend, Michael McClain, caught wind of ComEd's reservations. In January 2016, he emailed Pramaggiore this note:

> Last night I got a call from Victor [Reyes] who informed me that the company cut his law firm down to administrative hearing hours only. No

> other hours …. I know the drill and so do you. If you do not get involve[d] and resolve this issue of 850 hours for his law firm per year then he will go to our Friend. Our Friend will call me and then I will call you …. Is this a drill we must go through? … I just do not understand why we have to spend valuable minutes on items like this when we know it will provoke a reaction from our Friend.

Pramaggiore apologized and said, "I am on this." At trial, a former Illinois legislator testified that McClain used the nicknames "our friend" or "my friend" to refer to Madigan. O'Neill testified that ComEd renewed its Reyes Kurson contract in July 2016.

In December 2016, Madigan helped FEJA become law. This was not a foregone conclusion. One of Madigan's former staffers, William Cousineau, testified that in the days leading up to the vote, his roll call indicated that the bill would fail. He also testified that Madigan told him to "go out and work the bill and try to get that bill passed." After the vote, McClain stated on a recorded phone call that Madigan convinced 47 representatives to vote for the bill. This allowed FEJA to pass despite Madigan's abstention (also known as a "no-vote"). O'Neill testified that this was a big win for ComEd and that he saw Pramaggiore and McClain meet with Madigan in the Speaker's suite afterward.

A few months later, ComEd started funneling payments to a new "subcontractor," Edward Acevedo. He served as an assistant majority leader in the General Assembly until January 2017. Marquez testified that this made Acevedo part of Madigan's leadership team. And according to an FBI agent, in

March 2017, ComEd increased its monthly payments to Shaw Decremer Consulting LLC by $5,000, which in turn started paying Acevedo $5,000 per month. The principal of the consulting firm, Shaw Decremer, used to work for Madigan. And the FBI agent testified that she searched Decremer's residence, including his emails, and found no evidence of work performed by Acevedo.

Another wave of mutual benefits occurred in 2018. Early that year, the General Assembly began considering a bill that, according to ComEd's Marquez, "proposed that utilities set up a special rate, a lower rate, for low-income customers." Marquez testified that the company opposed the bill because the only way to offset costs would be to increase rates for higher-income customers.

The jury heard that Madigan helped stop this unfavorable legislation. When Marquez described the bill, he did so in the context of a May 2018 email from McClain to Pramaggiore. In that email, McClain wrote that "a friend of ours alerted me and thereby us to this initiative," which "we all know … was code for we can go ahead and kill it." Marquez testified that he understood the "friend" to be Madigan. It appears from the record that the bill never passed that session. So the jury could have inferred that Madigan succeeded in blocking the legislation.

In no way was Madigan's assistance lost on ComEd. To the contrary, in August 2018, ComEd started paying another Madigan ally, Michael Zalewski, through an intermediary. He was a former alderman for the 23rd Ward, which fell in Madigan's district. ComEd once again used Jay D. Doherty Associates to deliver the money. Doherty's administrative assistant testified that the firm increased its contract amount

with ComEd to cover its monthly payments to Zalewski. And an FBI agent clarified that JDDA paid Zalewski $5,000 per month. Marquez testified that Zalewski performed no work.

The final flurry of activity took place in 2019. That spring, ComEd pushed for legislation known as the "Skinny Bill." Marquez testified that this bill would have extended the favorable formula rate permanently. He also testified that ComEd aimed for the General Assembly to pass it by May 2019. The company was on the clock.

ComEd almost risked upsetting Madigan. The prior year, Anne Pramaggiore accepted a promotion to ComEd's parent company, and ComEd replaced her with a new CEO named Joe Dominguez, a former Assistant U.S. Attorney. This caused members of the scheme to panic. In February 2019, several of them worried that the new CEO would not approve the pending contract with Jay Doherty's lobbying firm due to concerns about the subcontractor arrangement.

Fidel Marquez met with Doherty that month and asked for advice on how to explain the lobbying contract to Dominguez. In the recorded conversation, Doherty suggested reminding him that "ComEd money" "comes from Springfield" and telling him, "if it ain't broke, don't fix it." Pramaggiore recommended something similar in a separate recorded phone call. She told Marquez to say it was a little too early to end the subcontractor arrangement. She advised telling Dominquez to wait "until after the session's over" to avoid getting "caught up in a … disruptive battle where … somebody gets their nose out of joint" as "we're in the middle of needing to get something done in Springfield." The jury could have inferred she was speaking about the Skinny Bill.

A few days later, McClain spoke on the phone with Pramaggiore and John Hooker, now a contract lobbyist for ComEd. In the recording, McClain stated that he did not trust Dominguez and predicted that he would "think that … this is a *quid pro quo* and that he's wired." Put another way, McClain worried that his requests on behalf of Madigan so resembled bribery that the former prosecutor would think McClain was setting him up. McClain then spoke to Marquez and Hooker. In the recorded conversation, Marquez asked how their "friend" would react to Dominguez ending the subcontractor arrangement. Hooker responded with a prediction of Madigan's reaction that the jury was free to credit: "You're not gonna do it? You're not going to do something for me, I don't have to do anything for you," adding that "[h]e won't say it."

ComEd ultimately kept Madigan happy and vice versa. In March 2019, the company renewed its contract with Jay Doherty's lobbying firm, who was paying Olivo, Nice, and Zalewski. And in April 2019, McClain communicated to Marquez that "Madigan was onboard" with the Skinny Bill. Marquez's cooperation in the Madigan investigation became public before the bill could pass.

The jury could reasonably infer from this mountain of evidence that Madigan conspired to receive bribes in violation of 18 U.S.C. § 666(a)(1)(B). This was not politics as usual or ordinary lobbying. The trial evidence exposed a sustained and concealed arrangement to exchange enormous political influence within the Illinois General Assembly for over $3 million of benefits for political allies. There was no agreement signed at a sit-down meeting. But there did not have to be. See *Blagojevich*, 794 F.3d at 738 ("Few politicians say, on or off the record, 'I will exchange official act X for payment Y.'"). The

jury received overwhelming circumstantial evidence that Madigan agreed to help ComEd at a price in 2011 and then stayed the course through early 2019.

Further, loads of evidence showed that Madigan both had "knowledge" that ComEd "expect[ed] to achieve a forbidden influence," *Hawkins*, 777 F.3d at 882 (defining § 666(a)(1)(B)'s "corruptly" element), and that he "intend[ed] to be influenced or rewarded," § 666(a)(1)(B), by the sizeable and concealed payments over many years to his close political associates and allies. Two examples underscore this point. When ComEd dragged its feet renewing the Reyes Kurson contract, McClain warned that failure to deliver would "provoke a reaction from our Friend." And when Marquez asked how Madigan would respond to ComEd ending the subcontractor arrangement, Hooker predicted that Madigan would feel that he would no longer "have to do anything" for ComEd. These were not the views of strangers. And the jury was allowed to rely on them (and other like evidence) to draw conclusions about Madigan's knowledge and intent. See *United States v. Loscalzo*, 18 F.3d 374, 383 (7th Cir. 1994) ("[E]vidence of [a] defendant's acts or statements may be provided by the statements of co-conspirators.").

Madigan insists that the government had to prove something more. He points to *McDonnell* and asks us to adopt the Second Circuit's requirement that "a public official must do more than promise to take some or any official action beneficial to the payor as the opportunity to do so arises; she must promise to take official action *on a particular question or matter* as the opportunity to influence that same question or matter arises." *Silver*, 948 F.3d at 552–53.

But the government presented plenty of evidence for the jury to find that Madigan promised to take official action to help ComEd with a specific question or matter, namely, its struggle to control its energy rates, which drove its financial distress. The evidence showed that ComEd turned to the General Assembly in 2011 to escape the ICC's unpredictable rate treatment. That same year, Madigan helped the EIMA legislation cross the finish line, introducing a formula rate meant to stop the ICC from undervaluing ComEd's costs. He delivered again in 2013 and 2014 by supporting legislation clarifying EIMA and extending the formula rate. In 2016, he whipped votes for FEJA, which extended the formula rate further. And in 2018, when a bill posed a threat to ComEd's preferred rates, Madigan gave the code to kill it. The final touch came in 2019, when McClain suggested that Madigan supported the Skinny Bill, which would have permanently extended the formula rate. The jury could have connected these dots and concluded that Madigan agreed to help ComEd gain control over its rates. See *McDonnell*, 579 U.S. at 572–73 ("It is up to the jury, under the facts of the case, to determine whether the public official agreed to perform an 'official act' at the time of the alleged *quid pro quo*. The jury may consider a broad range of pertinent evidence … to answer that question.").

## 2. Conspiracy to Falsify Records

We affirm the Count 2 conspiracy conviction (under 18 U.S.C. § 371) for an independent reason. The government alleged that Madigan conspired to violate not only 18 U.S.C. § 666(a)(1)(B), but also the recordkeeping provisions of the Foreign Corrupt Practices Act. Sufficient evidence supported this second ground. And that is all that is required for us to

affirm on Count 2. See *United States v. Beverly*, 913 F.2d 337, 363 (7th Cir. 1990) (explaining that a § 371 conspiracy conviction "will be sustained so long as the evidence is sufficient to show that the defendants agreed to accomplish at least one of the alleged objects" (cleaned up)).

The FCPA provides that "[n]o person shall … knowingly falsify any book, record, or account," 15 U.S.C. § 78m(b)(5), which would otherwise "accurately and fairly reflect the transactions and dispositions of the assets of" a securities issuer, § 78m(b)(2)(A), and that knowing and willful violators shall be punished, § 78ff(a).

The government presented evidence that ComEd's financial records contained a falsehood. Recall that in 2018 ComEd began funneling $5,000 per month to Madigan's political ally Michael Zalewski through an intermediary, Jay D. Doherty & Associates. ComEd's Fidel Marquez testified that Zalewski did no work in return for these payments.

Zalewski's money did not start flowing automatically. Jay Doherty first submitted an amended contract to ComEd, requesting an additional $5,000 per month. He represented that the increase was for his "expanded role with [the] Cook County Board President's office and [the] Cook County Commissioners and Department Heads." At trial, the government asked Marquez if this explanation was "truthful," and he responded, "No." He elaborated that "it [didn't] reflect the actual situation of adding Mike Zalewski."

Doherty then submitted an invoice to ComEd similarly representing that the increased bill was "due to additional scope of services." A ComEd employee testified that ComEd recorded that invoice as an expense, with the transaction then

feeding into the company's general ledger—a foundational corporate financial record. That meant ComEd's general ledger contained a falsehood: that ComEd paid Doherty's firm an extra $5,000 for increased lobbying services. As Marquez testified, the money instead went to Zalewski for no work at all.

The jury could have found that Madigan agreed to this object of the conspiracy. In February 2019, McClain said on a phone call with the ComEd contract lobbyist John Hooker that he and a small group had come up with the Zalewski plan and that their "friend" had "thought it was great." It would have been reasonable for the jury to infer that any discussion of the plan would have recognized that Doherty would submit a false invoice leading to falsified ComEd financial records. We see no reason to disturb the conviction.

### 3.  Federal-Program Bribery

That brings us to Counts 4 and 6, which charged Madigan with accepting bribes, in violation of § 666(a)(1)(B). Much of the evidence from Count 2 applies here as well. So we only need to highlight a few points.

Count 4 alleged that in 2018 Madigan arranged for ComEd to funnel payments to his longtime political ally Michael Zalewski in exchange for legislative action benefiting the company. We have already canvassed evidence that ComEd started making roundabout payments to Zalewski that year. That came shortly after McClain emailed Pramaggiore that their "friend" had given the code to "kill" a bill unfavorable to ComEd. The jury heard plenty to find that Madigan had an intent to be influenced or rewarded.

Count 6 alleged that in 2019 Madigan accepted a renewed contract between ComEd and Jay D. Doherty & Associates to continue paying Olivo, Nice, and Zalewski in exchange for his legislative help. The jury heard a recording of a February 2019 meeting where John Hooker predicted that Madigan would halt his legislative support if ComEd terminated the subcontracts. The next month, in March 2019, the company signed a new contract with the lobbying firm. And finally, in April 2019, McClain communicated to Marquez that "Madigan was onboard" with the Skinny Bill. The jury was welcome to agree with Hooker's understanding of Madigan's intent to make legislative aid contingent on no-work subcontracts for friends.

### III.     State Board Counts

The jury also convicted Madigan of three counts related to the state board seat. Counts 8–10 charged him with honest-services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346. The indictment alleged that Madigan agreed to recommend Alderman Daniel Solis to then-Governor-elect JB Pritzker for a state board seat in exchange for financial benefits. It claimed that Madigan, who practiced law while serving as Speaker, wanted Solis to facilitate introductions to potential law firm clients. Madigan also allegedly asked Solis to steer insurance business to his son's employer.

### A.  Honest-Services Fraud

A defendant commits honest-services wire fraud when he devises a "scheme or artifice to deprive another of the intangible right of honest services," 18 U.S.C. § 1346, and he "transmits or causes to be transmitted by means of wire … in interstate or foreign commerce, any writings … for the purpose of

executing such scheme or artifice," § 1343. The government must prove that the defendant engaged in a kickback or bribe. See *Skilling v. United States*, 561 U.S. 358, 408–09 (2010). This "requires proof of a *quid pro quo*." *United States v. Johnson*, 874 F.3d 990, 999 (7th Cir. 2017).

### B. Sufficiency of the Evidence

Sufficient evidence supported finding that Madigan agreed to a quid pro quo. The two men first met in the late 1980s, when Solis traveled to Springfield to advocate for legislation. And in more recent years, Madigan would occasionally call Solis to ask for an introduction to a potential law firm client. Solis always obliged. Then in 2016, after being investigated for years, Solis agreed to cooperate with the government and to record his conversations with Madigan.

In June 2018, Solis approached Madigan and mentioned he was interested in sitting on a state board. Madigan said he would "take a note down" and that he had a "file." Solis assured Madigan that he would "continue to get [him] legal business." Madigan then shared that he had been trying to connect with a local developer named Harry Skydell. Solis promised to make the introduction. After the meeting, according to Solis's trial testimony, Madigan delivered documents to Solis's office describing the different board seats and their compensation amounts.

In August 2018, Solis asked what would happen if Madigan recommended him for a state board seat. Madigan clarified, "See, I would go to Pritzker. That's what I would do …. So, you'd come in as Pritzker's recommendation." Solis once again assured Madigan that he would continue to send him

legal business. Madigan initially seemed wary of this trade, responding, "Don't. Don't worry about it."

But Madigan changed his tune later in that same conversation. After confirming which two seats Solis wanted, he told Solis, "Just leave it in my hands." Solis then said he would introduce Madigan to Skydell in a couple weeks and told Madigan to let him know if "anything else" "interested" him. Madigan responded, "There's one thing you can do," and asked Solis to help his son Andrew secure the insurance business of a local nonprofit.

Madigan told Solis to tell the nonprofit's CEO to "[g]ive Andrew something." The hope was for Andrew to "get his foot in the door." Solis agreed, and Madigan reminded him to "[j]ust leave this in my hands." From 2019 to 2021, Andrew Madigan received about $43,000 in commissions from the nonprofit. The jury could have found that Madigan agreed to help Solis to benefit his son.

Madigan tells us the government failed to identify a material misrepresentation. Cf. *United States v. Rybicki*, 354 F.3d 124, 146 (2d Cir. 2003) (en banc) (requiring a material misrepresentation for an honest-services fraud conviction under 18 U.S.C. § 1346). But a rational jury could have found that Madigan planned to "conceal[] a material fact" by recommending Solis without mentioning the bribery. *United States v. Weimert*, 819 F.3d 351, 355 (7th Cir. 2016). It also could have viewed the missing information as material because a former adviser on the Pritzker campaign testified that the administration "would never" appoint someone who bribed Madigan.

Madigan insists that he never actually attempted to recommend Solis. But it is the "*plan* to take [a thing of value] in

exchange for an official act" that "constitutes a scheme to de-fraud." *Hawkins*, 777 F.3d at 883–84 (emphasis in original). And the jury heard evidence that Madigan did indeed plan to make the recommendation. He asked for Solis's resume to prepare for an upcoming meeting with Governor-elect Pritz-ker, affirmatively sent Solis materials outlining the different board positions and their compensation, and took notes on Solis's preferred seats. The jury could have rationally con-cluded that Madigan intended to recommend Solis.

Finally, Madigan contends that his recommendation would not have counted as an official act. But "if a public of-ficial uses his official position to provide advice to another of-ficial, knowing or intending that such advice will form the ba-sis for an 'official act' by another official, that too can qualify as [an official act.]" *McDonnell*, 579 U.S. at 572. One of Madi-gan's former employees testified that Governor Pritzker ac-cepted nearly half of his recommendations. And the govern-ment presented evidence that Madigan understood the weight of his recommendation. He confidently told Solis to "[j]ust leave it in my hands" and said that Solis would "come in as Pritzker's recommendation." We will not disturb these convictions.

## IV.    Travel Act Counts

One final issue requires our attention. The jury convicted Madigan on several counts under the Travel Act, which pro-vides that "whoever … uses … any facility in interstate or for-eign commerce, with intent to … promote, manage, establish, carry on, or facilitate the promotion, management, establish-ment, or carrying on, of an unlawful activity" and "thereafter performs or attempts to perform" that unlawful activity shall be punished. 18 U.S.C. § 1952(a)(3). "[U]nlawful activity"

means "extortion, bribery, or arson in violation of the laws of the State in which [they are] committed or of the United States." § 1952(b).

Madigan asks us to vacate his Travel Act convictions due to instructional error. The district court identified various "unlawful activities" for the jury, including bribery (720 ILCS § 5/33-1) and legislative misconduct (720 ILCS § 5/33-8). Madigan tells us the Illinois bribery statute includes no quid pro quo element. And he claims that makes it overbroad relative to the Travel Act. See *United States v. Shen Zhen New World I, LLC*, 115 F.4th 1167, 1182–84 (9th Cir. 2024) (applying the categorical approach to the Travel Act and concluding that the generic definition of "bribery" included a quid pro quo element).

But the "omission of an element from the jury instructions" is "subject to harmless-error analysis." *United States v. Wade*, 962 F.3d 1004, 1008 (7th Cir. 2020). That means we should affirm the convictions if it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Neder v. United States*, 527 U.S. 1, 18 (1999). We are confident that any error was harmless.

Count 5 alleged that in 2018 Madigan caused the use of an email account to facilitate the Zalewski bribe charged in Count 4. We have already decided that sufficient evidence supported the jury's conviction on Count 4. The same evidence leaves us with no reasonable doubt that a rational jury would have found that Madigan engaged in a quid pro quo to get Zalewski hired. We ground our conclusion in the totality of the evidence, including the timing of the hiring, the surreptitious nature of the payments, Zalewski's lack of actual work, and John Hooker's prediction that Madigan would

have felt off the hook if ComEd ended its subcontract with Zalewski. We will not disturb this conviction.

Counts 12–14 alleged that in 2018 Madigan caused the use of a cell phone to facilitate the honest-services wire fraud scheme charged in Counts 8–10. Once again, we have already determined that sufficient evidence supported the jury's convictions on Counts 8–10. The same evidence gives us no reasonable doubt that a rational jury would have found that Madigan engaged in a quid pro quo when he offered to recommend Solis for the state board seat. Madigan took affirmative steps to help Solis choose his preferred seat and said he would recommend him to Governor-elect Pritzker. And when Solis responded by asking if Madigan was interested in anything other than an introduction to Harry Skydell, Madigan said, "There's one thing you can do," and asked Solis to steer insurance business to his son's employer. We see no additional arguments from Madigan on this point, so we are confident that any error was harmless.

***

Michael Madigan spent nearly a decade leveraging his power as one of the highest-ranking public officials in Illinois in exchange for over $3 million of financial benefits for his close political allies. The linkage was clear and far from fleeting. He repeatedly facilitated changes to state law impacting countless energy consumers in northern Illinois, all because ComEd funneled money to the right people. Madigan insists that this was run-of-the-mill politics. But a jury of twelve Illinois residents saw the evidence differently. So do we.

AFFIRMED